STATE OF SOUTH CAROLINA

IN THE SUPREME COURT

_____

Appeal from Georgetown County

J. Cordell Maddox, Jr., Circuit Court Judge

_____

QUINTIN J. HOLT,

PETITIONER,

V.

STATE OF SOUTH CAROLINA,

RESPONDENT

APPELLATE CASE NO. 2014-000402

_____

A P P E N D I X

_____

LARA M. CAUDY
Appellate Defender

South Carolina Commission on Indigent
Defense
Division of Appellate Defense
PO Box 11589
Columbia, SC 29211-1589

ATTORNEY FOR PETITIONER

ALAN WILSON
Attorney General

JOSHUA L. THOMAS
Assistant Attorney General
P. O. Box 11549
Columbia, SC 29211

ATTORNEYS FOR RESPONDENT

**i**

## INDEX

INDEX ...................................................................................................................................................i

TRIAL TRANSCRIPT (SEPTEMBER 20 – 22, 2014) .....................................................................1

INITIAL BRIEF OF APPELLANT ..............................................................................................285

INITIAL BRIEF OF RESPONDENT............................................................................................297

COURT OF APPEALS' OPINION NO. 2012-UP-253 (FILED APRIL 25, 2012).........................308

APPLICATION FOR POST-CONVICTION RELIEF...................................................................310

APPLICANT'S MEMORANDUM OF LAW IN SUPPORT OF ALL ISSUE(S).........................318

RETURN ......................................................................................................................................323

RULE 2 PRELIMINARY HEARING...........................................................................................327

APPLICANT'S FIRST AMENDMENT TO POST-CONVICTION RELIEF APPLICATION....331

APPLICANT'S SECOND AMENDMENT TO POST-CONVICTION RELIEF
    APPLICATION ......................................................................................................................351

AMENDED RETURN..................................................................................................................356

POST-CONVICTION RELIEF HEARING TRANSCRIPT (AUGUST 29, 2013) .......................362

ORDER OF DISMISSAL.............................................................................................................397

INDICTMENTS ...........................................................................................................................405

1

STATE OF SOUTH CAROLINA

COUNTY OF GEORGETOWN          IN THE COURT OF GENERAL SESSIONS
                                     10-GS-22-00179
                                     10-GS-22-00181
THE STATE OF SOUTH CAROLINA,)
                            )
          PLAINTIFF,        )
vs.                         )     TRANSCRIPT OF RECORD
                            )
QUENTIN J. HOLT,            )
                            )
          DEFENDANT.        )
_____)


                                   SEPTEMBER 20-22,2010
                                   GEORGETOWN, SOUTH CAROLINA


BEFORE:

     THE HONORABLE, BENJAMIN H. CULBERTSON; AND JURY


APPEARANCES:

     BY: ERIN E. BAILEY, ESQ.
         ATTORNEY FOR STATE

     BY: CEZAR E. MCKNIGHT, ESQ.
         ATTORNEY FOR QUENTIN J. HOLT


                    BRENDA R. BABB
                    Circuit Court Reporter

2

## INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEPUTY REGINAL GRANT | | | | |
| MS. BAILEY | 58 | | 89 | |
| MR. MCKNIGHT | | 76 | | |
| JOE NATHAN LEWIS | | | | |
| MS. BAILEY | 98 | | | |
| MR. MCKNIGHT | | 118 | | |
| INVESTIGATOR MICHAEL THACKER | | | | |
| MS. BAILEY | 133 | | | |
| MR. MCKNIGHT | | 137 | | |
| SELINA KINARD | | | | |
| MS. BAILEY | 142 | | | |
| MR. MCKNIGHT (NO CROSS EXAMINATION) | | | | |
| MARIBETH BURROUGHS | | | | |
| MS. BAILEY | 149 | | 181 | |
| MR. MCKNIGHT | | 174 | | |
| QUENTIN J. HOLT | | | | |
| MR. MCKNIGHT | 195 | | | |
| MS. BAILEY | | 214 | | |

VOIR DIRE                                                  5

JURY SELECTION                                            26

MOTION TO AMEND INDICTMENT BY STATE                       35

MOTION TO SEQUESTER WITNESSES BY DEFENSE                  40

MOTION TO REVEAL STATE'S DEAL BY DEFENSE                  42

OPENING STATEMENT BY STATE                                52

3

## INDEX (CONTINUING)

OPENING STATEMENT BY DEFENSE                              54

DEFENSE MOTION FOR DIRECTED VERDICT                  185/226

CLOSING ARGUMENT BY DEFENSE                             230

CLOSING ARGUMENT BY STATE                               125

JURY CHARGE                                             253

VERDICT                                                 272

POLLING OF JURORS                                       274

DEFENSE MOTION TO SET ASIDE VERDICT                     227

SENTENCING                                              284

CERTIFICATE OF REPORTER                                 285

### EXHIBITS

| NO. | DESCRIPTION | ID. | EV. |
|-----|-------------|-----|-----|
| S-1 | BEST BAG DATED 6/17/09, L09-07986#1 DR-2F44 | 68 | 173 |
| S-2 | BEST BAG DATED 6/20/09, L09-08007#1 DR-2F58 | 71 | 173 |
| S-3 | CD - 06091821 | 95 | 111 |
| S-4 | CD - 06091821 | 95 | 112 |
| D-1 | MOBILE HOME BILL OF SALE, PERMIT FOUR PAGES | 190 | 203 |
| D-2 | COASTAL WIRE CO. TIME PUNCH CARD | 190 | 210 |
| D-3 | PHOTOGRAPH - KITCHEN | 190 | 200 |
| D-4 | PHOTOGRAPH - KITCHEN | 190 | 200 |
| C-1 | NOTE FROM JURY - FOREPERSON JUROR #206 | 45 | |
| C-2 | NOTE FROM JURY: "WHAT WAS THE DATE OF THE ACTUAL ARREST? WE WOULD LIKE TO HEAR THE AUDIO AGAIN." | 268 | |

4

4

## EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | ID. | EV. |
|-----|-------------|-----|-----|
| C-3 | QUESTION FROM JURY WITH COURT'S WRITTEN RESPONSE | 269 | |
| C-4 | NOTE FROM JURY: "WE WOULD LIKE TO HEAR DEP. GRANT'S TESTIMONY CONCERNING THE TIMES OF THE BUYS ON THE 17TH AND THE 20TH." | 272 | |
| C-5 | TWO PAGE CERTIFIED COPY OF 07-GS-22-164 | 282 | |
| C-6 | TWO PAGE CERTIFIED COPY OF 00-GS-22-561 | 282 | |

5

1    THE COURT:    SOLICITOR, DO YOU WANT TO CALL THE

2    FIRST CASE?

3    MS. BAILEY:    YES, YOUR HONOR, THE STATE CALLS

4    2010-GS-22-00181 AND 2020-GS-22-00179.    THOSE ARE BOTH TRUE

5    BILLED INDICTMENTS FOR DISTRIBUTION OF CRACK COCAINE, STATE

6    V. QUENTIN J. HOLT.

7    THE COURT:    ALL RIGHT, THIS IS THE CASE OF THE

8    STATE V. QUENTIN J. HOLT.    MR. HOLT IS CHARGED WITH TWO

9    COUNTS OF DISTRIBUTION OF COCAINE BASE.    THESE ALLEGED

10   DISTRIBUTIONS OCCURRED IN GEORGETOWN COUNTY DURING THE

11   MONTH OF JUNE OF 2009.

12   NOW I'VE GOT A SERIES OF QUESTIONS THAT I'LL NEED

13   TO GO OVER WITH THOSE OF YOU IN THE JURY PANEL.    THESE ARE

14   COMMONLY REFERRED TO AS VOIR DIRE QUESTIONING AND THE

15   PURPOSE OF THESE QUESTIONS, YOU'VE ALL BEEN QUALIFIED TO

16   SERVE AS JURORS THIS WEEK, BUT THE PURPOSE OF THIS VOIR

17   DIRE QUESTIONING IS TO DETERMINE WHETHER OR NOT YOU ARE

18   ELIGIBLE AND QUALIFIED TO SERVE AS JURORS ON THIS

19   PARTICULAR CASE.    IT ALSO GIVES THE ATTORNEYS SOME

20   INFORMATION TO HELP THEM IN THEIR JURY SELECTION PROCESS,

21   AND AS I TOLD YOU YESTERDAY TO SERVE JURY DUTY YOU'RE

22   CONSTANTLY TAKING OATHS, AND SO IF I COULD, PLEASE, GET

23   EVERYONE TO STAND AND RAISE YOUR RIGHT HAND I NEED TO

24   ADMINISTER THE OATH FOR YOU RESPOND TO THE VOIR DIRE

25   QUESTIONING IN THIS CASE.

6

6

1          (WHEREUPON, THE JURY PANEL WAS SWORN.)

2          MADAM CLERK:   THANK YOU, YOU MAY BE SEATED.

3          THE COURT:   FIRST OF ALL IS THERE ANY MEMBER OF

4  THE JURY PANEL WHO DID NOT RESPOND TO THE OATH BY SAYING I

5  DO, PLEASE STAND?

6          THANK YOU VERY MUCH, ALL RIGHT, AS I STATED THIS

7  IS THE CASE OF THE STATE V. QUENTIN J. HOLT.  IS THERE ANY

8  MEMBER OF THE JURY PANEL RELATED BY BLOOD OR MARRIAGE TO

9  THE DEFENDANT QUENTIN J. HOLT, IF SO PLEASE STAND?

10         DOES ANY MEMBER OF THE JURY PANEL HAVE A CLOSE

11 PERSONAL RELATIONSHIP, A SOCIAL RELATIONSHIP, A BUSINESS

12 RELATIONSHIP, OR ANY OTHER TYPE OF RELATIONSHIP WITH THIS

13 DEFENDANT, IF SO PLEASE STAND?

14         ALL RIGHT, IF I CAN GET YOU TO LISTEN UP

15 CAREFULLY BECAUSE THIS IS A LIST OF THE POTENTIAL WITNESSES

16 IN THIS CASE.  IN ADDITION TO MR. HOLT WE HAVE,

17         REGINALD GRANT WITH THE GEORGETOWN COUNTY

18 SHERIFF'S DEPARTMENT

19         JASON WARD WITH THE GEORGETOWN CITY POLICE

20 DEPARTMENT

21         JOE NATHAN LEWIS

22         MICHAEL THACKER OF THE GEORGETOWN COUNTY

23 SHERIFF'S DEPARTMENT

24         CLINT SAWYER FORMALLY OF THE GEORGETOWN COUNTY

25 SHERIFF'S DEPARTMENT

7

1          SELINA KINARD OF THE STATE LAW ENFORCEMENT
2   DIVISION, AND
3          MARIBETH BURROUGHS OF THE STATE LAW ENFORCEMENT
4   DIVISION.
5          IS THERE ANY MEMBER OF THE JURY PANEL RELATED BY
6   BLOOD OR MARRIAGE, HAVE A BUSINESS RELATIONSHIP, SOCIAL
7   RELATIONSHIP, PERSONAL RELATIONSHIP, OR ANY OTHER TYPE OF
8   RELATIONSHIP WITH ANY OF THESE POTENTIAL WITNESSES, IF SO
9   PLEASE STAND?
10          ALL RIGHT, THE ATTORNEY FOR THE STATE IN THIS
11   CASE IS MS. ERIN BAILEY OF THE FIFTEENTH CIRCUIT
12   SOLICITOR'S OFFICE;
13          THE ATTORNEY FOR THE DEFENDANT IN THIS CASE IS
14   MR. CEZAR MCKNIGHT.
15          IS THERE ANY MEMBER OF THE JURY PANEL RELATED BY
16   BLOOD OR MARRIAGE, HAVE A CLOSE PERSONAL RELATIONSHIP,
17   SOCIAL RELATIONSHIP, BUSINESS RELATIONSHIP, OR ANY OTHER
18   TYPE OF RELATIONSHIP WITH EITHER OF THESE ATTORNEYS, IF SO
19   PLEASE STAND?
20          IS THERE ANY MEMBER OF THE JURY PANEL EITHER
21   PERSONALLY OR HAVE A CLOSE FRIEND OR A FAMILY MEMBER
22   EMPLOYED WITH THE FIFTEENTH CIRCUIT SOLICITOR'S OFFICE OR
23   WITH THE LAW OFFICE OF MR. CEZAR MCKNIGHT, IF SO PLEASE
24   STAND?
25          YES, MA'AM, YOUR NAME AND NUMBER, PLEASE?

8

8

1    JURY PANEL MEMBER:    JUROR 285, ████████ ████████-

2    ████████.

3         THE COURT:  LET ME GET MY LIST HERE.  ALL RIGHT,

4    MS. ████████, ARE YOU EMPLOYED OR A FAMILY MEMBER OR A

5    FRIEND EMPLOYED?

6         JURY PANEL MEMBER:  FAMILY.

7         THE COURT:    IS A FAMILY MEMBER EMPLOYED WITH

8    WHICH OFFICE?

9         JURY PANEL MEMBER:   I ---

10        THE COURT:  I'M SORRY, HOLD FOR A SECOND?

11        JURY PANEL MEMBER:   OKAY, I'M TRYING TO THINK,

12   UNLESS I MISUNDERSTOOD WHAT YOU SAID I AM RELATED TO

13   SOMEBODY IN THE SHERIFF OFFICE.

14        THE COURT:   NO, NO, THIS IS WHETHER OR NOT

15   YOU'RE RELATED TO ANYBODY EMPLOYED WITH THE SOLICITOR'S

16   OFFICE OR WITH MR. MCKNIGHT'S OFFICE?

17        JURY PANEL MEMBER:   NO, SIR.

18        THE COURT:   ALL RIGHT, I WILL HAVE A QUESTION

19   THAT WILL BE APPLICABLE TO YOU IN JUST A MINUTE BUT RIGHT

20   NOW WE'RE JUST DEALING WITH ANYBODY EMPLOYED WITH THE

21   SOLICITOR'S OFFICE OR MR. MCKNIGHT'S OFFICE, IF SO PLEASE

22   STAND?  (NO RESPONSE.)

23        IS THERE ANY MEMBER OF THE JURY PANEL WHO HAS

24   EVER BEEN REPRESENTED BY MS. ERIN BAILEY AN ATTORNEY IN THE

25   FIFTEENTH CIRCUIT SOLICITOR'S OFFICE, MR. MCKNIGHT OR ANY

9

1  ATTORNEY IN HIS OFFICE, IF SO PLEASE STAND?  (NO RESPONSE.)

2          IS THERE ANY MEMBER OF THE JURY PANEL EVER BEEN

3  INVOLVED IN ANY LEGAL ACTION IN WHICH EITHER OF THESE

4  ATTORNEYS HAS BEEN INVOLVED, IF SO PLEASE STAND?  (NO

5  RESPONSE.)

6          IS THERE ANY MEMBER OF THE JURY PANEL WHO ATTENDS

7  CHURCH, SYNAGOGUE, MOSQUE, PRAYER GROUPS, BIBLE STUDIES, OR

8  ANY OTHER TYPE OF ORGANIZATION OR FUNCTION EITHER WITH MS.

9  BAILEY, MR. MCKNIGHT OR THE DEFENDANT OR ANY ATTORNEYS IN

10  THE SOLICITOR'S OFFICE OR MR. MCKNIGHT'S OFFICE, IF SO

11  PLEASE STAND?  (NO RESPONSE.)

12          IS THERE ANY MEMBER OF THE JURY PANEL WHO EITHER

13  PERSONALLY HAS A FAMILY MEMBER OR A CLOSE PERSONAL FRIEND

14  EMPLOYED IN LAW ENFORCEMENT, IF SO PLEASE STAND?

15          ALL RIGHT, MA'AM, IF YOU'D PLEASE GIVE ME YOUR

16  NAME AND JURY NUMBER AGAIN?

17          JURY PANEL MEMBER:    JUROR 285, ███████ █████-

18  ██████.

19          THE COURT:  ALL RIGHT, MS. ████████ IS THIS A

20  FAMILY MEMBER, A FRIEND, OR YOU PERSONALLY?

21          JURY PANEL MEMBER:   FAMILY MEMBER.

22          THE COURT:  ALL RIGHT, AND WHERE IS THAT FAMILY

23  MEMBER EMPLOYED?

24          JURY PANEL MEMBER:   IN THE SHERIFF'S DEPARTMENT

25  IN GEORGETOWN.

10

1  ATTORNEY IN HIS OFFICE, IF SO PLEASE STAND?  (NO RESPONSE.)

2          IS THERE ANY MEMBER OF THE JURY PANEL EVER BEEN

3  INVOLVED IN ANY LEGAL ACTION IN WHICH EITHER OF THESE

4  ATTORNEYS HAS BEEN INVOLVED, IF SO PLEASE STAND?  (NO

5  RESPONSE.)

6          IS THERE ANY MEMBER OF THE JURY PANEL WHO ATTENDS

7  CHURCH, SYNAGOGUE, MOSQUE, PRAYER GROUPS, BIBLE STUDIES, OR

8  ANY OTHER TYPE OF ORGANIZATION OR FUNCTION EITHER WITH MS.

9  BAILEY, MR. MCKNIGHT OR THE DEFENDANT OR ANY ATTORNEYS IN

10 THE SOLICITOR'S OFFICE OR MR. MCKNIGHT'S OFFICE, IF SO

11 PLEASE STAND?  (NO RESPONSE.)

12          IS THERE ANY MEMBER OF THE JURY PANEL WHO EITHER

13 PERSONALLY HAS A FAMILY MEMBER OR A CLOSE PERSONAL FRIEND

14 EMPLOYED IN LAW ENFORCEMENT, IF SO PLEASE STAND?

15          ALL RIGHT, MA'AM, IF YOU'D PLEASE GIVE ME YOUR

16 NAME AND JURY NUMBER AGAIN?

17          JURY PANEL MEMBER:   JUROR 285, ████████ █████-

18 ████████

19          THE COURT:  ALL RIGHT, MS. ████████ IS THIS A

20 FAMILY MEMBER, A FRIEND, OR YOU PERSONALLY?

21          JURY PANEL MEMBER:   FAMILY MEMBER.

22          THE COURT:   ALL RIGHT, AND WHERE IS THAT FAMILY

23 MEMBER EMPLOYED?

24          JURY PANEL MEMBER:  GEORGETOWN SHERIFF.

25          THE COURT:   GEORGETOWN COUNTY?

10

1          JURY PANEL MEMBER:   YES, SIR.

2          THE COURT:   ALL RIGHT, AND WHAT IS THE

3   RELATIONSHIP, WHAT KIND OF FAMILY MEMBER?

4          JURY PANEL MEMBER:   HE'S A FOURTH COUSIN.

5          THE COURT:   AND HOW OFTEN DO YOU MAINTAIN

6   CONTACT WITH THAT --

7          JURY PANEL MEMBER:   NOT REALLY OFTEN, IF I SEE

8   HIM I SEE HIM, IF I DON'T, I DON'T.  I DON'T GO VISIT HIM

9   AND HE DON'T COME VISIT ME.

10          THE COURT:   HE'S NOT LISTED ON THE WITNESS LIST

11   THAT I READ OUT?

12          JURY PANEL MEMBER:   THAT'S WHY I WAS WONDERING

13   ABOUT THE NAMES THAT YOU HAD CALLED.  I PROBABLY MISSED IT.

14          THE COURT:   OKAY, LET ME, LET ME GO OVER THE

15   LIST WITH YOU AGAIN,

16          ALL RIGHT, GEORGETOWN COUNTY SHERIFF'S DEPARTMENT

17   WE HAVE REGINALD GRANT, MICHAEL THACKER ---

18          JURY PANEL MEMBER:   GRANT.

19          THE COURT:   ALL RIGHT, REGINALD GRANT IS RELATED

20   TO YOU?

21          JURY PANEL MEMBER:   YES.

22          THE COURT:   OKAY, ALL RIGHT, MS. ███████  I

23   WILL EXCUSE YOU FROM THIS PARTICULAR CASE, THANK YOU VERY

24   MUCH.

25          JURY PANEL MEMBER:   THANK YOU, YOUR HONOR.

12

1    THE COURT:   IF YOU WOULD STAY WITH US I'LL

2  EXCUSE YOU IN JUST A MINUTE BUT I'M JUST GOING TO EXCUSE

3  YOU FROM THIS CASE SO PLEASE JUST STAY WITH US RIGHT NOW.

4    JURY PANEL MEMBER:   ALL RIGHT.

5    THE COURT:   ALL RIGHT, THE GENTLEMAN DIRECTLY

6  BEHIND HER, YOUR NAME AND NUMBER, PLEASE, SIR?

7    JURY PANEL MEMBER:   JUROR NUMBER 64, ███████

8  ██████████.

9    THE COURT:   ALL RIGHT, MR. ███████ IS THIS YOU

10 PERSONALLY OR A FAMILY MEMBER?

11   JURY PANEL MEMBER:   PERSONALLY.

12   THE COURT:   ALL RIGHT, AND WHERE ARE YOU

13 EMPLOYED?

14   JURY PANEL MEMBER:   I'M EMPLOYED IN ANDREWS.

15   THE COURT:   OKAY, I MEAN IS THIS --

16   JURY PANEL MEMBER:   A FRIEND.

17   THE COURT:   A FRIEND THAT IS EMPLOYED IN LAW

18 ENFORCEMENT, ALL RIGHT, AND WHAT LAW ENFORCEMENT AGENCY?

19   JURY PANEL MEMBER:   GEORGETOWN, I'M NOT SURE IF

20 IT'S SHERIFF OR, I'M NOT SURE, SHELLEY BRANTLY.

21   THE COURT:   ALL RIGHT, AND HE'S NOT ON THE

22 WITNESS LIST, IT'S JUST A FRIEND?

23   JURY PANEL MEMBER:   CLOSE FRIEND.

24   THE COURT:   OKAY, ALL RIGHT, HE'S WITH THE CITY

25 POLICE DEPARTMENT, HOW OFTEN DO YOU SEE MR. BRANTLEY?

12

1          JURY PANEL MEMBER:   I SEE HIM ONCE A WHILE WHEN

2     HE COMES TO CHURCH AND TRY TO CALL HIM TO COME OUT

3     SOMETIMES TO THE SHOOTING RANGE AND SO FORTH.

4          THE COURT:   ALL RIGHT, NOW WOULD YOUR

5     RELATIONSHIP WITH MR. BRANTLY AFFECT YOUR ABILITY TO BE

6     FAIR AND IMPARTIAL TO BOTH THE STATE AND THE DEFENDANT IN

7     THIS CASE?

8          JURY PANEL MEMBER:   NO, SIR.

9          THE COURT:   WOULD YOU BE ABLE TO SET THAT

10    RELATIONSHIP ASIDE IN ITS ENTIRETY AND IF YOU WERE SELECTED

11    AS A JUROR IN THIS CASE, BASE YOUR DECISION EXCLUSIVE ON

12    THE TESTIMONY AND EVIDENCE PRESENTED IN THIS CASE?

13         JURY PANEL MEMBER:   YES, SIR.

14         THE COURT:   OKAY, THANK YOU FOR BRINGING THAT TO

15    OUR ATTENTION.  ALL RIGHT, THE GENTLEMAN RIGHT NEXT TO HIM,

16    SIR, YOUR NAME AND NUMBER?

17         JURY PANEL MEMBER:   JUROR NUMBER 75, ████████

18    ██████████

19         THE COURT:   ALL RIGHT, MR. ████████ IS THIS A

20    FAMILY MEMBER OR --

21         JURY PANEL MEMBER:   FRIEND.

22         THE COURT:   A FRIEND, EMPLOYED WITH WHO?

23         JURY PANEL MEMBER:   GEORGETOWN SHERIFF.

24         THE COURT:   OKAY, WAS THE FRIEND LISTED ON THE

25    WITNESS LIST?

14

13

1    JURY PANEL MEMBER:   YES, SIR.

2    THE COURT:   OKAY, AND WHO IS THE FRIEND?

3    JURY PANEL MEMBER:   REGINALD GRANT.

4    THE COURT:   OKAY, AND HOW OFTEN DO YOU SEE MR.

5 GRANT?

6    JURY PANEL MEMBER:   NOT SO OFTEN BUT WE PRETTY

7 MUCH STAY IN CONTACT WITH ONE ANOTHER.

8    THE COURT:   OKAY, ALL RIGHT, MR. ▮▮▮▮▮▮▮▮  I'M

9 GOING TO EXCUSE YOU FROM PRESIDING IN THIS CASE, OKAY,

10 THANK YOU FOR BRINGING THAT TO OUR ATTENTION.

11    ALL RIGHT, THE LADY TO HIS RIGHT?

12    JURY PANEL MEMBER:   I'M JUROR NUMBER 246,

13 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

14    THE COURT:   ALL RIGHT, MS. ▮▮▮▮▮▮▮▮ WHO IS IT

15 THAT YOU KNOW?

16    JURY PANEL MEMBER:   JUST A FRIEND, CLAY KNORR,

17 HE'S THE SERGEANT ON THE PAWLEYS ISLAND POLICE DEPARTMENT.

18    THE COURT:   ALL RIGHT, WOULD THAT RELATIONSHIP

19 AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL TO BOTH THE

20 DEFENDANT AND THE STATE IN THIS CASE?

21    JURY PANEL MEMBER:   NO, SIR.

22    THE COURT:   ALL RIGHT, WOULD YOU BE ABLE TO

23 DISREGARD THAT RELATIONSHIP IN ITS ENTIRETY AND IF YOU WERE

24 SELECTED AS A JUROR BASE YOUR DECISION EXCLUSIVELY ON THE

25 TESTIMONY AND EVIDENCE IN THIS CASE?

14

1    JURY PANEL MEMBER:   YES, SIR.

2    THE COURT:   ALL RIGHT, THANK YOU FOR BRINGING

3  THAT TO OUR ATTENTION.

4    ALL RIGHT, THE LADY IN THE ORANGE SHIRT?

5    JURY PANEL MEMBER:   116, ████████ ████████

6    THE COURT:   ALL RIGHT, MS. ████████ WHO IS IT

7  THAT YOU KNOW?

8    JURY PANEL MEMBER:   BRANDON MCCONNELL.

9    THE COURT:   AND WHERE IS HE EMPLOYED?

10    JURY PANEL MEMBER:   HE'S MY NEPHEW, THE

11  SHERIFF'S OFFICE.

12    THE COURT:   ALL RIGHT, AND THAT'S YOUR NEPHEW?

13    JURY PANEL MEMBER:   YES, SIR.

14    THE COURT:   AND HOW OFTEN DO YOU MAINTAIN

15  CONTACT WITH HIM?

16    JURY PANEL MEMBER:   I SEE HIM BASICALLY SIX DAYS

17  A WEEK.

18    THE COURT:   OKAY, WOULD THAT RELATIONSHIP AFFECT

19  YOUR ABILITY TO BE FAIR AND IMPARTIAL TO BOTH THE DEFENDANT

20  AND THE PLAINTIFF IN THIS CASE?

21    JURY PANEL MEMBER:   I THINK SO.

22    THE COURT:   OKAY, THANK YOU, MS. ████████ FOR

23  BRINGING TO OUR ATTENTION, I'LL EXCUSE YOU FROM THIS CASE,

24  ALL RIGHT.

25    ALL RIGHT, THE LADY RIGHT BEHIND HER, YOUR NAME

17

1  BRINGING THAT TO OUR ATTENTION, I'LL EXCUSE YOU IN THIS

2  CASE.

3          ALL RIGHT, THE GENTLEMAN IN THE BACK, YOUR NAME

4  AND NUMBER?

5          JURY PANEL MEMBER:   52, ██████ ███████

6          THE COURT:   ALL RIGHT, MR. ██████ WHO IS IT THAT

7  YOU KNOW?

8          JURY PANEL MEMBER:  MY WIFE'S UNCLE, MY NEXT

9  DOOR NEIGHBOR, AND A CLOSE FRIEND.  MY WIFE'S UNCLE'S NAME

10 IS MICHAEL LEWIS, NEIGHBOR NAME IS GARY TODD, AND THE CLOSE

11 FRIEND OF MINE IS WILLIAM BAXLEY.

12         THE COURT:   ALL RIGHT, WOULD THOSE RELATIONSHIPS

13 AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL TO BOTH THE

14 STATE AND THE DEFENDANT IN THIS CASE?

15         JURY PANEL MEMBER:   NO, SIR.

16         THE COURT:   WOULD YOU BE ABLE TO SET THOSE

17 RELATIONSHIPS ASIDE AND BASE YOUR DECISION IF YOU WERE

18 SELECTED AS A JUROR IN THIS CASE EXCLUSIVELY ON THE

19 TESTIMONY AND EVIDENCE PRESENTED IN THIS CASE?

20         JURY PANEL MEMBER:   YES, SIR.

21         THE COURT:   ALL RIGHT, THANK YOU FOR BRINGING

22 THAT TO OUR ATTENTION, MR. ███████

23         ANYBODY ELSE RELATED BY BLOOD OR MARRIAGE OR HAVE

24 A CLOSE PERSONAL FRIEND EMPLOYED IN LAW ENFORCEMENT, IF SO

25 PLEASE STAND?  (NO RESPONSE.)

18

1    HAS ANY MEMBER OF THE JURY PANEL FORMED OR

2    EXPRESSED AN OPINION ABOUT ANY ISSUE OR MATTER INVOLVED IN

3    THIS CASE, IF SO PLEASE STAND?

4    SIR, YOUR NAME AND NUMBER?

5    JURY PANEL MEMBER:  197, ████████ ████████.

6    THE COURT:  I'M SORRY, YOUR NUMBER AGAIN?

7    JURY PANEL MEMBER:  197.

8    THE COURT:  I APOLOGIZE, YOU'RE GOING TO NEED TO

9    PRONOUNCE YOUR NAME?

10    JURY PANEL MEMBER:  ████████

11    THE COURT:  ALL RIGHT, MR. ████████ YOU HAVE

12    YOU'VE SPOKEN WITH SOMEONE, EXPRESSED AN OPINION OR --

13    JURY PANEL MEMBER:  DUE TO THE NATURE OF THE

14    CRIME, SIR, I HAVE JUST AN OPINION AND WOULD BE UNABLE TO

15    BE FAIR AND IMPARTIAL.

16    THE COURT:  ALL RIGHT, WELL, MR. ████████ IF

17    YOU'D JUST STAY WITH US AND I'LL ADDRESS YOU IN JUST ONE

18    SECOND, OKAY.

19    ANYBODY ELSE EXPRESSED AN OPINION OR SPOKEN WITH

20    ANYONE ABOUT THIS CASE?  (NO RESPONSE.)

21    ASIDE FROM MR. ████████ IS ANY MEMBER OF THE JURY

22    PANEL AWARE OF ANY BIAS OR PREJUDICE TOWARDS EITHER THE

23    STATE OR THE DEFENDANT IN THIS CASE, IF SO PLEASE STAND?

24    SIR, YOUR NAME AND NUMBER?

25    JURY PANEL MEMBER:  ████████ ████████ JUROR

18

1  NUMBER 264.

2         THE COURT:   ALL RIGHT, MR. ████████  IF YOU'D

3  JUST HAVE A SEAT AND I'LL CALL YOU UP IN JUST A SECOND,

4  OKAY.

5         ANYONE ELSE AWARE OF ANY BIAS OR PREJUDICE

6  TOWARDS EITHER THE STATE OR THE DEFENDANT, IF SO PLEASE

7  STAND?  (NO RESPONSE.)

8         IS THERE ANY MEMBER OF THE JURY PANEL THAT WAS A

9  MEMBER OF THE GRAND JURY THAT ISSUED THE INDICTMENT IN THIS

10 CASE, IF SO PLEASE STAND?  (NO RESPONSE.)

11        IS THERE ANY MEMBER OF THE JURY PANEL WHO IS A

12 MEMBER OF OR A CONTRIBUTOR TO ANY GROUP WHICH HAS AS ITS

13 PRIMARY CONCERN THE PROMOTION OF LAW ENFORCEMENT OR VICTIMS

14 RIGHTS?  SOME OF THESE ORGANIZATIONS ARE BUT THEY'RE NOT

15 LIMITED TO, MOTHERS AGAINST DRUNK DRIVING OR WHAT'S

16 COMMONLY REFERRED TO AS MADD, STUDENTS AGAINST DRUNK

17 DRIVING OR WHAT'S COMMONLY REFERRED TO AS SADD, CAVE WHICH

18 IS CITIZENS AGAINST VIOLENT CRIME, OR CASA CITIZENS AGAINST

19 SPOUSAL ABUSE OR ANY OTHER SUCH ORGANIZATION, ANYBODY IN

20 THE JURY PANEL A MEMBER OF OR A CONTRIBUTOR TO ANY SUCH

21 ORGANIZATION, IF SO PLEASE STAND?  (NO RESPONSE.)

22        ALL RIGHT, SIR, AND I APOLOGIZE, BUT YOU'LL NEED

23 TO GIVE YOUR NAME AND NUMBER AGAIN?

24        JURY PANEL MEMBER:   JUROR 264, ████████ ████████

25        THE COURT:   ALL RIGHT, MR. ████████ ARE YOU A

20

1    MEMBER OF OR A CONTRIBUTOR TO ONE OF THOSE ORGANIZATIONS?

2          JURY PANEL MEMBER:   A CONTRIBUTOR TO MADD.

3          THE COURT:   ALL RIGHT, WOULD THE FACT THAT YOU

4    HAVE MADE DONATIONS TO THAT ORGANIZATION AFFECT YOUR

5    ABILITY TO BE FAIR AND IMPARTIAL TO BOTH THE STATE AND THE

6    DEFENDANT IN THIS CASE?

7          JURY PANEL MEMBER:   YES.

8          THE COURT:   IT WOULD, OKAY, THANK YOU, MR.

9    ██████████ FOR BRINGING THAT TO OUR ATTENTION I'LL EXCUSE

10   YOU FROM THIS CASE.

11         ANYBODY ELSE A MEMBER OF OR A CONTRIBUTOR TO ANY

12   SUCH ORGANIZATION?

13         IS THERE ANY MEMBER OF THE JURY PANEL WHO IS

14   CURRENTLY SERVING OR HAS SERVED IN ANY BRANCH OF THE UNITED

15   STATES ARMED SERVICES, IF SO PLEASE STAND?

16         ALL RIGHT, STARTING WITH THE LADY UP FRONT, YOUR

17   NAME AND NUMBER?

18         JURY PANEL MEMBER:   JUROR NUMBER 266, ████████

19   ██ ████████.

20         THE COURT:   ALL RIGHT, MS. ████████ AND WHAT

21   BRANCH WERE YOU IN?

22         JURY PANEL MEMBER:   ARMY.

23         THE COURT:   ALL RIGHT, LET'S GO AHEAD AND DO IT

24   THIS WAY, THE NEXT GENTLEMAN RIGHT BEHIND HER AND TO MY

25   RIGHT, YOUR NAME AND NUMBER?

20

21

```
 1              JURY PANEL MEMBER:   JUROR NUMBER 214, ████
 2  ████████
 3              THE COURT:   ALL RIGHT, MR. ████████ WHAT BRANCH
 4  WERE YOU IN?
 5              JURY PANEL MEMBER:   I WAS IN THE NATIONAL GUARD.
 6              THE COURT:   ALL RIGHT. AND THE GENTLEMAN RIGHT
 7  BEHIND HIM?
 8              JURY PANEL MEMBER:   JUROR NUMBER 3, ████████
 9  ████████
10              THE COURT:   ALL RIGHT, AND WHAT BRANCH WERE YOU
11  IN, MR. ████████
12              JURY PANEL MEMBER:   MARINES.
13              THE COURT:   ALL RIGHT, THE GENTLEMAN RIGHT
14  BEHIND HIM, YOUR NAME AND NUMBER?
15              JURY PANEL MEMBER:   JUROR NUMBER 161, ██████
16  ████████ I WAS IN THE U.S. NAVY.
17              THE COURT:   ALL RIGHT, MR. ████████ AND THE
18  GENTLEMAN TO HIS RIGHT?
19              JURY PANEL MEMBER:   JUROR 52, █████ █████.
20              THE COURT:   ALL RIGHT, MR. █████ AND WHAT
21  BRANCH WERE YOU IN?
22              JURY PANEL MEMBER:   ARMY NATIONAL GUARD.
23              THE COURT:   ALL RIGHT, AND THEN THE GENTLEMAN IN
24  FRONT OF HIM?
25              JURY PANEL MEMBER:   JUROR NUMBER 174, ██████
```

22

1    ████████ UNITED STATES MARINE CORPS.

2            THE COURT:   ALL RIGHT, SO THOSE OF YOU THAT ARE

3    NOW STANDING WERE ANY OF YOU INVOLVED IN SPECIFIC LAW

4    ENFORCEMENT DIVISIONS WITHIN THE ARMED SERVICES IN WHICH

5    YOU SERVED?

6            ALL RESPONSDING JURY PANEL MEMBERS:   NO, SIR.

7            THE COURT:   ALL RIGHT, WOULD YOUR SERVICE IN THE

8    ARMED SERVICES AFFECT YOUR ABILITY TO BE FAIR AND IMPARTIAL

9    TO BOTH THE STATE AND THE DEFENDANT IN THIS CASE?

10           ALL RESPONSDING JURY PANEL MEMBERS:   NO, SIR.

11           THE COURT:   ALL RIGHT, IF IT WOULD AFFECT ANYONE

12   PLEASE RAISE YOUR RIGHT HAND?

13           (NO RESPONSE FROM STANDING JURORS.)

14           THE COURT:   ALL RIGHT, COULD ALL OF YOU OR IS

15   THERE ANYONE, PLEASE SIGNIFY BY RAISING YOUR RIGHT HAND, IS

16   THERE ANYONE WHO WOULD NOT BE ABLE TO DISREGARD YOUR

17   SERVICE IN THE ARMED SERVICES IN ITS ENTIRETY AND BASE YOUR

18   DECISION IN THIS CASE EXCLUSIVELY ON THE TESTIMONY AND

19   EVIDENCE PRESENTED IN THIS CASE?  IF YOU COULD NOT DO THAT

20   PLEASE RAISE YOUR RIGHT HAND?

21           (NO RESPONSE FROM STANDING JURORS.)

22           THE COURT:   ALL RIGHT, THANK YOU VERY MUCH, YOU

23   MAY BE SEATED.

24           DOES ANY MEMBER OF THE JURY PANEL KNOW OF ANY

25   REASON WHATSOEVER WHY HE OR SHE SHOULD NOT SERVE AS A JUROR

22

23

1  IN THIS CASE WITH PARTICULAR EMPHASIS BEING PLACED ON YOUR

2  ABILITY TO BE FAIR AND IMPARTIAL TO BOTH THE STATE AND THE

3  DEFENDANT, IF SO PLEASE STAND?

4          ALL RIGHT, MR. ███████ IF YOU'D PLEASE COME

5  FORWARD?

6          (WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE

7  RECORD IN THE PRESENCE OF THE JURY VENIRE, BUT OUT OF THE

8  HEARING OF THE JURY VENIRE AND THE COURT REPORTER.)

9          THE COURT:  ALL RIGHT, WE'RE GOING TO EXCUSE

10 JUROR 197 MR. ████████

11         IS THERE ANY MEMBER, ONCE AGAIN IS THERE ANY

12 MEMBER OF THE JURY PANEL KNOW OF ANY REASON WHATSOEVER WHY

13 HE OR SHE SHOULD NOT SERVE AS A JUROR IN THIS CASE WITH

14 PARTICULAR EMPHASIS BEING PLACED ON YOUR ABILITY TO BE FAIR

15 AND IMPARTIAL TO BOTH THE STATE AND THE DEFENDANT, IF SO

16 PLEASE STAND?

17         YES, MA'AM, YOUR NAME AND NUMBER?

18         JURY PANEL MEMBER:  285, ████████ ███████

19 ████████

20         THE COURT:  ALL RIGHT, I'VE ALREADY EXCUSED YOU.

21         JURY PANEL MEMBER:  YES, SIR, OKAY.

22         THE COURT:  THANK YOU, ANYONE ELSE?

23         ALL RIGHT, AS I SAID THE INDICTMENTS IN THIS CASE

24 CHARGE THE DEFENDANT WITH DISTRIBUTION OF COCAINE ON TWO

25 DIFFERENT TIMES DURING THE MONTH OF JUNE 2009, IS THERE ANY

24

1    MEMBER OF THE JURY PANEL WHO HAS HEARD ANYTHING, READ

2    ANYTHING, SEEN ANYTHING, DISCUSSED ANYTHING, OR KNOW

3    ANYTHING ABOUT THIS CASE, IF SO PLEASE STAND?

4            ALL RIGHT, ANY ADDITIONAL QUESTIONING FROM THE

5    STATE?

6            MS. BAILEY:   NO, YOUR HONOR.

7            THE COURT:   ALL RIGHT, WITH THE EXCEPTION OF

8    THOSE THAT YOU SUBMITTED ANY ADDITIONAL ONES FROM THE

9    DEFENSE?

10            MR. MCKNIGHT:   NONE FROM THE DEFENSE, YOUR

11    HONOR.

12            THE COURT:   OKAY, ALL RIGHT, I'M GOING TO DENY

13    YOUR REQUEST ON THAT ONE THAT YOU HAD SUBMITTED.

14            MR. MCKNIGHT:   OKAY, COULD WE DO IT ON THE

15    RECORD LATER ON?

16            THE COURT:   YEAH, THAT WOULD BE FINE.

17            MR. MCKNIGHT:   YES, SIR.

18            THE COURT:   ALL RIGHT, ALL RIGHT, SO YOU'VE GOT

19    THOSE THAT WE EXCUSED AND THEN PRINT OUT THE NEW ONES THAT

20    WOULD BE GOOD.

21            ALL RIGHT, LADIES AND GENTLEMEN, PROCEDURALLY

22    WHAT HAPPENS NOW IS THOSE THAT HAVE NOT BEEN EXCUSED FROM

23    THIS PARTICULAR CASE YOUR NAMES ARE FED BACK INTO THE

24    COMPUTER AND SPIT OUT AT RANDOM AND A LIST IS GENERATED AND

25    YOUR NAMES WILL BE CALLED ONE AT A TIME ON THAT LIST, AND

25

1   WHEN YOUR NAMES ARE CALLED IF YOU WOULD, PLEASE, COME

2   FORWARD, STAND IN FRONT OF THE COURT REPORTER HERE AND FACE

3   THE ATTORNEYS AND THE STATE'S ATTORNEY WILL LOOK AT YOU A

4   LITTLE WHILE AND THEN LOOK AT HER NOTES A LITTLE WHILE AND

5   THEN LOOK BACK AT YOU A LITTLE WHILE AND MAYBE TALK TO HER

6   WITNESSES A LITTLE WHILE AND DECIDE WHETHER OR NOT SHE

7   WANTS TO STRIKE YOU OR KEEP YOU AND IF SHE DECIDES SHE

8   WANTS TO KEEP YOU THEN THE DEFENSE ATTORNEY IS GOING TO

9   LOOK AT YOU A LITTLE WHILE AND LOOK AT HIS NOTES A LITTLE

10  WHILE AND DISCUSS IT WITH HIS CLIENT A LITTLE WHILE AND

11  DECIDE WHETHER HE WANTS TO KEEP YOU AND IF THEY DECIDE THEY

12  WANT TO KEEP YOU THEN YOU WILL BE DIRECTED INTO THE JURY

13  BOX.  EACH SIDE GETS A CERTAIN NUMBER OF STRIKES.

14          NOW IF EITHER THE STATE OR THE DEFENSE STRIKES

15  YOU AS A JUROR IN THIS CASE PLEASE DO NOT TAKE IT

16  PERSONALLY.  IT JUST MEANS THAT FOR WHATEVER REASON YOU DO

17  NOT FIT THAT PARTY'S PROFILE THAT THEY'RE LOOKING FOR IN

18  THIS PARTICULAR CASE FOR WHATEVER REASON.  I'VE OFTEN KNOWN

19  ATTORNEYS THAT WILL STRIKE A JUROR IN ONE CASE AND ACCEPT

20  THEM IN THE NEXT CASE.  I'VE ALSO KNOWN THEM TO ACCEPT THEM

21  IN ONE CASE AND THEN STRIKE THEM IN THE NEXT CASE SO,

22  PLEASE, DO NOT TAKE IT PERSONALLY IF YOUR NAME IS STRUCK.

23          WHEN YOUR NAME IS CALLED IF YOU'D, PLEASE, COME

24  FORWARD AND BRING WITH YOU ANY POCKETBOOKS, UMBRELLAS,

25  COATS, OR ANYTHING THAT YOU MAY HAVE WITH YOU.  ALL RIGHT,

26

1  ARE WE READY?

2          MADAM CLERK:    JUROR NUMBER 266, ███████ ███████

3          THE COURT:    JUST TURN AROUND AND FACE THE

4  ATTORNEYS, THANK YOU.

5          MADAM CLERK:    WHAT SAYS THE STATE?

6          MS. BAILEY:    PLEASE PRESENT MS. ████████

7          MADAM CLERK:    WHAT SAYS THE DEFENSE?

8          MR. MCKNIGHT:    PLEASE SEAT MS. ███████

9          MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

10 BOX.

11         THE COURT:    IT'S 5 AND 5, THAT'S WHAT I WAS

12 THINKING, IT'S 5 AND 5, ISN'T IT?

13         MR. MCKNIGHT:    I BELIEVE IT IS.

14         MADAM CLERK:    JUROR NUMBER 268, ████████ ████████

15 WHAT SAYS THE STATE?

16         MS. BAILEY:    PLEASE PRESENT MR. ███████

17         MADAM CLERK:    WHAT SAYS THE DEFENSE?

18         MR. MCKNIGHT:    SEAT MR. ██████   PLEASE.

19         MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

20 BOX.

21         JUROR NUMBER 7, ███████ ██████

22 WHAT SAYS THE STATE?

23         MS. BAILEY:    PLEASE PRESENT MR. ██████

24         MADAM CLERK:    WHAT SAYS THE DEFENSE?

25         MR. MCKNIGHT:    PLEASE SEAT MR. ██████

26

27

1    MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

2  BOX.

3    JUROR NUMBER 15, ███████ ████████████

4    WHAT SAYS THE STATE?

5    MS. BAILEY:    PLEASE EXCUSE MS. ████████████

6    MADAM CLERK:    YOU MAY RETURN TO YOUR SEAT.

7    JUROR NUMBER 161, ███████ ████████

8    WHAT SAYS THE STATE?

9    MS. BAILEY:    PLEASE PRESENT MR. ████████████

10    MADAM CLERK:    WHAT SAYS THE DEFENSE?

11    MR. MCKNIGHT:    PLEASE EXCUSE MR. ████████████

12    MADAM CLERK:    YOU MAY RETURN TO YOUR SEAT.

13    JUROR NUMBER 53, ██████████ ████████

14    WHAT SAYS THE STATE?

15    MS. BAILEY:    PLEASE PRESENT MS. ████████████

16    MADAM CLERK:    WHAT SAYS THE DEFENSE?

17    MR. MCKNIGHT:    PLEASE EXCUSE MS. ████████████

18    MADAM CLERK:    YOU MAY RETURN TO YOUR SEAT.

19    JUROR NUMBER 3, ██████████ ████████

20    WHAT SAYS THE STATE?

21    MS. BAILEY:    PLEASE EXCUSE MR. ████████████

22    MADAM CLERK:    YOU MAY RETURN TO YOUR SEAT.

23    JUROR NUMBER 250, ████████ ████████████

24    WHAT SAYS THE STATE?

25    MS. BAILEY:    WOULD YOU REPEAT MS. ████████████████

28

```
 1  NUMBER, PLEASE?

 2           MADAM CLERK:   250.

 3           MS. BAILEY:    PLEASE PRESENT MS. ████████

 4           MADAM CLERK:   WHAT SAYS THE DEFENSE?

 5           MR. MCKNIGHT:   PLEASE SEAT MS. ████████

 6           MADAM CLERK:   PLEASE TAKE A SEAT IN THE JURY

 7  BOX.

 8           JUROR NUMBER 214, ████ ████████.

 9           WHAT SAYS THE STATE?

10           MS. BAILEY:    PLEASE PRESENT MR. ████████

11           MADAM CLERK:   WHAT SAYS THE DEFENSE?

12           MR. MCKNIGHT:   PLEASE EXCUSE MR. ████████

13           MADAM CLERK:   YOU MAY RETURN TO YOUR SEAT.

14           JUROR NUMBER 30, ████████ ████████

15           WHAT SAYS THE STATE?

16           MS. BAILEY:    PLEASE PRESENT MS. ████████

17           MADAM CLERK:   WHAT SAYS THE DEFENSE?

18           MR. MCKNIGHT:   PLEASE SEAT MS. ████████

19           MADAM CLERK:   PLEASE TAKE A SEAT IN THE JURY

20  BOX.

21           JUROR NUMBER 50, ████████ ██████

22           WHAT SAYS THE STATE?

23           MS. BAILEY:    PLEASE PRESENT MR. ██████

24           MADAM CLERK:   WHAT SAYS THE DEFENSE?

25           MR. MCKNIGHT:   PLEASE SEAT MR. ██████
```

1       MADAM CLERK:   PLEASE TAKE A SEAT IN THE JURY

2  BOX.

3       JUROR NUMBER 206, ███████ ████████

4       WHAT SAYS THE STATE?

5       MS. BAILEY:   PLEASE PRESENT MR. ███████

6       MADAM CLERK:   WHAT SAYS THE DEFENSE?

7       MR. MCKNIGHT:   SEAT MR. ███████.

8       MADAM CLERK:   PLEASE TAKE A SEAT IN THE JURY

9  BOX.

10       JUROR NUMBER 11, ████████ ████████

11       WHAT SAYS THE STATE?

12       MS. BAILEY:   PLEASE PRESENT MS. ████████

13       MADAM CLERK:   WHAT SAYS THE DEFENSE?

14       MR. MCKNIGHT:   SEAT MS. ████████ PLEASE.

15       MADAM CLERK:   PLEASE TAKE A SEAT IN THE JURY

16  BOX.

17       JUROR NUMBER 180, ████████ ████████

18       WHAT SAYS THE STATE?

19       MS. BAILEY:   PLEASE EXCUSE MS. ███████

20       MADAM CLERK:   YOU MAY RETURN TO YOUR SEAT.

21       JUROR NUMBER 246, █████████ ████████

22       WHAT SAYS THE STATE?

23       MS. BAILEY:   PLEASE PRESENT MS. █████████

24       MADAM CLERK:   WHAT SAYS THE DEFENSE?

25       MR. MCKNIGHT:   PLEASE EXCUSE MS. █████████

30

1        MADAM CLERK:    YOU MAY RETURN TO YOUR SEAT.

2        JUROR NUMBER 93, ██████ ███████

3        WHAT SAYS THE STATE?

4        MS. BAILEY:    PLEASE PRESENT MS. █████████████.

5        MADAM CLERK:    WHAT SAYS THE DEFENSE?

6        MR. MCKNIGHT:    PLEASE SEAT MS. ████████

7        MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

8    BOX.

9        JUROR NUMBER 174, ██████ ████████

10        WHAT SAYS THE STATE?

11        MS. BAILEY:    PLEASE PRESENT MR. █████████

12        MADAM CLERK:    WHAT SAYS THE DEFENSE?

13        MR. MCKNIGHT:    SEAT MR. █████████

14        MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

15    BOX.

16        JUROR NUMBER 68, █████████ ███████

17        WHAT SAYS THE STATE?

18        MS. BAILEY:    PLEASE PRESENT MS. ███████

19        MADAM CLERK:    WHAT SAYS THE DEFENSE?

20        MR. MCKNIGHT:    PLEASE SEAT MS. ███████

21        MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY

22    BOX.

23        JUROR NUMBER 21, ██████ ███████

24        WHAT SAYS THE STATE?

25        MS. BAILEY:    PLEASE PRESENT MS. ███████

30

31

```
 1            MADAM CLERK:    WHAT SAYS THE DEFENSE?
 2            MR. MCKNIGHT:    PLEASE SEAT MS. ███████
 3            MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY
 4    BOX.
 5            THE COURT:    ALL RIGHT, LET'S SELECT TWO
 6    ALTERNATES, THE FIRST ALTERNATE THE STATE HAS ONE STRIKE
 7    AND THE DEFENSE HAS TWO STRIKES; AND THEN FOR THE SECOND
 8    ALTERNATE THE STATE WILL HAVE ONE AND THE DEFENSE WILL HAVE
 9    TWO.
10            MADAM CLERK:    JUROR NUMBER 58, ████ ████████
11    WHAT SAYS THE STATE?
12            MS. BAILEY:    PLEASE PRESENT MS. ███████
13            MADAM CLERK:    WHAT SAYS THE DEFENSE?
14            MR. MCKNIGHT:    PLEASE SEAT MS. ███████
15            MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY
16    BOX.
17            JUROR NUMBER 283, ████████ ██████
18    WHAT SAYS THE STATE?
19            MS. BAILEY:    PLEASE PRESENT MS. ████████
20            MADAM CLERK:    WHAT SAYS THE DEFENSE?
21            MR. MCKNIGHT:    PLEASE SEAT MS. ███████
22            MADAM CLERK:    PLEASE TAKE A SEAT IN THE JURY
23    BOX.
24            THE COURT:    LADIES AND GENTLEMEN OF THE JURY,
25    YOU'LL BE THE JURY IN THIS CASE.  I'M GOING TO EXCUSE YOU
```

32

1   BACK TO THE JURY ROOM FOR JUST A MINUTE WHILE I EXCUSE THE

2   REMAINING PANEL AND I GO OVER SOME MATTERS WITH THE

3   ATTORNEYS BEFORE WE START THIS CASE.  IT WILL GIVE YOU AN

4   OPPORTUNITY TO STRETCH YOUR LEGS, SEE THE JURY ROOM WHERE

5   YOU WILL BE DURING THE COURSE OF THIS TRIAL.

6            ALSO WHILE YOU'RE BACK THERE I'M GOING TO ASK YOU

7   TO DO ME A FAVOR AND THAT IS TO SELECT A FOREPERSON FOR THE

8   JURY.  IF YOU CANNOT SELECT A FOREPERSON DON'T WORRY ABOUT

9   IT, I CAN APPOINT SOMEONE TO SERVE AS FOREPERSON, AND MANY

10  JUDGES APPOINT THEIR OWN FOREPERSON.  I LIKE TO LET THE

11  JURY TRY TO SELECT SOMEONE ON THEIR OWN IF THEY CAN AND I

12  KNOW YOU PROBABLY DON'T KNOW EACH OTHER AND YOU DON'T KNOW

13  WHO CAN SERVE IN THAT CAPACITY BUT LET ME JUST TELL YOU

14  THAT THE FOREPERSON HAS ABSOLUTELY NO MORE AUTHORITY, AND

15  NO MORE INFLUENCE, NO MORE IMPORTANCE THAN ANY OTHER JUROR.

16  THE SOLE FUNCTION OF THE FOREPERSON IS TO ACT AS A LIAISON

17  BETWEEN THE COURT AND THE JURY.  IF THE JURY HAS A NEED THE

18  FOREPERSON NOTIFIES THE BAILIFF.  IF THE JURY HAS A

19  QUESTION THE FOREPERSON NOTIFIES THE COURT AND THEN WHEN

20  IT'S TIME TO DELIBERATE THE FOREPERSON WILL PRESIDE OVER

21  THE DELIBERATION BUT OTHER THAN THAT THE FOREPERSON HAS NO

22  MORE IMPORTANCE, NO MORE AUTHORITY, OR NO MORE INFLUENCE

23  THAN ANY OTHER JUROR.

24           THE ONLY RESTRICTION IS THAT MS. ██████ AND MS.

25  ██████ YOU WOULD NOT BE ALLOWED TO SERVE AS FOREPERSON

33

1   BECAUSE AT THIS POINT IN TIME YOU ARE ALTERNATES ON THIS

2   JURY AND NOW WHEN YOU SELECT A FOREPERSON IF YOU WOULD JUST

3   WRITE THE FOREPERSON'S NAME ON A SHEET OF PAPER WITH THE

4   JURY NUMBER GIVE IT TO THE BAILIFF AND THEY WILL BRING IT

5   BACK INTO THE COURT.

6           WHEN YOU COME BACK INTO THE COURTROOM THE

7   FOREPERSON WILL ALWAYS OCCUPY THIS FIRST SEAT CLOSEST TO

8   THE WITNESS STAND.  THE ALTERNATES WILL ALWAYS SIT IN THE

9   SEATS WHERE YOU ARE NOW SEATING AND THE REST OF YOU ARE AT

10  LIBERTY TO SIT IN WHICHEVER SEAT YOU WANT TO SIT IN.  IF

11  YOU WANT TO SIT IN THE SAME SEAT THROUGHOUT THE TRIAL OF

12  THE CASE YOU CAN DO THAT.  IF YOU WANT TO ALTERNATE SEATS

13  THROUGHOUT THE TRIAL OF THE CASE YOU CAN DO THAT.  THE ONLY

14  REQUIREMENT IS THAT THE FOREPERSON SITS CLOSEST TO THE

15  WITNESS AND THE JUDGE AND THE ALTERNATES SIT IN THE SEATS

16  DESIGNATED FOR ALTERNATES AND THAT'S THE ONLY REQUIREMENT.

17          I', GOING TO BRING YOU BACK OUT SHORTLY, WE'LL

18  START THE TRIAL OF THE CASE.  I'LL GIVE YOU SOME

19  PRELIMINARY INSTRUCTIONS AT THAT POINT IN TIME AND I'M

20  GOING TO EXCUSE YOU BACK TO THE JURY ROOM FOR JUST A BRIEF

21  MINUTE, THANK YOU VERY MUCH.  EVERYONE ELSE PLEASE REMAIN

22  SEATED WHILE THE JURY IS EXCUSED.

23          (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

24  10:48 A.M.)

25          THE COURT:   ALL RIGHT, ANY CHALLENGES TO THE

34

1  SELECTION OR COMPOSITION OF THE JURY BY THE STATE?

2          MS. BAILEY:   NONE FROM THE STATE, YOUR HONOR.

3          THE COURT:   ANY FROM THE DEFENSE?

4          MR. MCKNIGHT:   NONE FROM THE DEFENSE, YOUR

5  HONOR.

6          THE COURT:   ALL RIGHT, ALL RIGHT, LADIES AND

7  GENTLEMEN, THOSE OF YOU WHO REMAIN IN THE JURY PANEL WE

8  HAVE OUR JURY FOR THIS CASE AND SO YOUR SERVICES WILL NOT

9  BE NEEDED ON THIS PARTICULAR CASE.  YOU SHOULD HAVE BEEN

10 GIVEN A PHONE NUMBER TO CALL BACK TO THE CLERK'S OFFICE

11 AFTER 6 P.M. TODAY AND THAT WILL GIVE YOU FURTHER

12 DIRECTIONS AS TO WHEN AND WHERE YOU WOULD NEED TO RETURN IF

13 YOUR SERVICES ARE NEEDED, BUT I THANK YOU FOR BEING HERE

14 THIS MORNING BUT I WILL EXCUSE YOU.  I'M ASSUMING JUDGE

15 HYMAN DOESN'T NEED ANYTHING ELSE FOR THE DAY, DOES HE?

16          MADAM CLERK:   CALL BACK.

17          THE COURT:   THEY JUST CALL BACK AFTER 6,

18 CORRECT, PLEASE CALL BACK THAT NUMBER AFTER 6 P.M. TODAY,

19 THANK YOU VERY MUCH, AND YOU'RE FREE TO GO.

20          (WHEREUPON, THE JURY VENIRE WERE EXCUSED AT 10:50

21 A.M.)

22          THE COURT:   ANYTHING FROM THE STATE?

23          MS. BAILEY:   YOUR HONOR, AT THIS TIME THE STATE

24 WOULD LIKE TO MOVE TO AMEND THE TWO INDICTMENTS THAT THE

25 STATE HAS CALLED TO CORRECT SCRIVENERS ERRORS.  ON 2010-GS-

34

35

1   22-00181 IT CURRENTLY READS THAT QUENTIN J. HOLT DID IN

2   GEORGETOWN COUNTY ON OR ABOUT JUNE 15TH OF 2009, THE STATE

3   WOULD MOVE TO AMEND ON THAT PARTICULAR INDICTMENT THAT THE

4   DATE BE CHANGED TO JUNE 17TH OF 2009.

5            AND ON 2010-GS-22-00179 THE INDICTMENT CURRENTLY

6   READS THAT QUENTIN J. HOLT DID IN GEORGETOWN COUNTY ON OR

7   ABOUT JUNE 14TH OF 2009, THE STATE WOULD MOVE TO AMEND THAT

8   INDICTMENT TO CHANGE THE DATE TO JUNE 20TH OF 2009.

9            THE STATE CONTENDS THAT THESE AMENDMENTS ARE

10  PROPER BECAUSE THE INDICTMENT IS A NOTICE DOCUMENT AND THE

11  DEFENDANT WAS PUT ON NOTICE WHEN THE INDICTMENTS WERE

12  WORDED THAT THEY WERE ON OR ABOUT THAT DATE.  IN ADDITION

13  THE DEFENDANT ---

14            THE COURT:  ON OR ABOUT WHAT DATES?

15            MS. BAILEY:  ON OR ABOUT THE ORIGINAL DATES IN

16  THE INDICTMENTS.

17            THE COURT:  OKAY, ALL RIGHT.

18            MS. BAILEY:  AND THAT IN ADDITION TO THAT THE

19  DEFENDANT WAS PROVIDED DISCOVERY IN A TIMELY MANNER THAT

20  PROVIDED THE DATES THAT I AM MOVING TO AMEND TO.

21            IN ADDITION THE STATE HAS THE MOST RECENT CASE

22  LAW OUTLINING THAT, THAT THE INDICTMENTS ARE A NOTICE

23  DOCUMENT AND THAT THE AMENDMENT IS PROPER.

24            THE COURT:  ALL RIGHT, MR. MCKNIGHT, LET ME HEAR

25  FROM YOU?

36

1        MR. MCKNIGHT:    YOUR HONOR, THE, THE DEFENSE

2  RESPECTFULLY OPPOSES ANY AMENDMENT OF ANY OF THE

3  INDICTMENTS AS PROPOSED BY THE STATE.   THE STATE ALLEGES IN

4  ITS MOTION TO AMEND THAT, AND CORRECTLY SO, THAT THE

5  DOCUMENT ITSELF, THE INDICTMENT IS A NOTICE DOCUMENT,

6  HOWEVER, YOUR HONOR, THE DISCOVERY WITH WHICH WE ARE

7  PROVIDED CONTAINS A BROAD AMOUNT OF DATES, THE 15TH OF

8  JUNE, THE 14TH OF JUNE.   THERE'S SOME REFERENCE TO THE 20TH

9  AND THERE'S SOME REFERENCE TO OTHER DAYS.   I DO NOT BELIEVE

10  THAT THE CASE LAW AS IN IS IN SOUTH CAROLINA EVEN THOUGH IT

11  PROVIDES THAT THE, THAT THE INDICTMENT IS A NOTICE DOCUMENT

12  GIVES THEM SUCH BROAD LEEWAY THAT THEY CAN JUST SAY

13  SOMETIME IN THE MONTH OF JUNE AND THEN COME BACK AT THE

14  TIME OF TRIAL WHEN WE ARE READY TO GO FORWARD AND COME UP

15  WITH A SPECIFIC DATE.

16        THE WARRANT ITSELF GOES ON DAYS FROM THE 14TH TO

17  THE 21ST, HOWEVER, YOUR HONOR, THEN YOU GET OTHER DAYS,

18  OTHER DOCUMENTS IN IT THAT REFERENCE OTHER DAYS.   I DO NOT

19  BELIEVE THAT THEY HAVE BEEN, EVEN THOUGH IT'S A NOTICE

20  DOCUMENT IT PUTS YOU ON NOTICE OF (1) THAT THE PERSON IS

21  CHARGED WITH A CRIME, AND JUST THE LOCATION OF THE CRIME

22  AND THE JURISDICTION.   I DON'T BELIEVE THAT THEY MEET THE

23  REQUIREMENT SPECIFIED IN THE INDICTMENT IN THAT WE HAVE TO

24  BE GIVEN A PARTICULAR DATE AS TO WHEN IT IS BECAUSE, YOUR

25  HONOR, WE BASED OUR DEFENSE ON THAT.   ALLOWING THEM TO DO

36

37

1   THAT BASICALLY PUTS US IN THE, IN THE FRAME OF THE MINDSET

2   OF HAVING TO MOUNT A DEFENSE FOR THE ENTIRE MONTH OF JUNE

3   AND I DON'T BELIEVE THAT'S WITHIN THE SCOPE OF WHAT THE

4   SUPREME COURT AND/OR COURT OF APPEALS IN SOUTH CAROLINA

5   INTENDED, SO BASED UPON THAT, YOUR HONOR, WE OPPOSE ANY

6   SUCH AMENDMENT.

7           THE COURT:   WELL I MEAN IN THIS PARTICULAR CASE

8   HOW IS YOUR CLIENT PREJUDICED BY CHANGING INDICTMENT 2010-

9   GS-22-181 FROM JUNE 15TH TO JUNE 17TH AND THEN THE OTHER

10  INDICTMENT FROM CHANGING IT FROM JUNE 14TH TO JUNE 20TH;

11  WHAT IS THE PREJUDICE IN THIS CASE TO YOUR CLIENT?

12          MR. MCKNIGHT:   YOUR HONOR, ANY DEFENSE THAT

13  WE'VE, IF WE CHOOSE TO MOUNT A DEFENSE, IF I CHOOSE TO HAVE

14  MY CLIENT TAKE THE STAND AND CALL WITNESSES THOSE WITNESSES

15  AND MY CLIENT HAVE BEEN PREPPED TO ADDRESS THE DAY OF THE

16  15TH THAT WAS ALLEGED IN THE INDICTMENT.

17          THE COURT:   YEAH, BUT I MEAN HAVE YOU PUT THEM

18  ON NOTICE AS TO ANY ALIBI DEFENSE OR ANYTHING?

19          MR. MCKNIGHT:   YES, YOUR HONOR, I HAVE.

20          THE COURT:   FOR THESE DATES THE 14TH?

21          MR. MCKNIGHT:   NO, NOT FOR THESE DATES ---

22          THE COURT:   AND THE 15TH?

23          MR. MCKNIGHT:   --- BUT FOR ANOTHER DAY.

24          THE COURT:   OKAY, FOR THE, WAS YOUR ALIBI

25  DEFENSE BASED UPON JUNE 14TH AND JUNE 15TH?

38

1          MR. MCKNIGHT:   NO, IT WAS NOT, YOUR HONOR.

2          THE COURT:   OKAY, ALL RIGHT, ANYTHING FURTHER?

3          MS. BAILEY:   YES, YOUR HONOR, JUST, I WOULD JUST

4    NOTE FOR THE RECORD THAT THE INCIDENT REPORTS DO GIVE A

5    SPECIFIC DATE AND THEY GAVE THE DATES THAT THE STATE IS

6    MOVING TO AMEND THE INDICTMENTS TO.

7          THE COURT:   OKAY, BUT HE'S SAYING THAT IT GAVE

8    THOSE DATES BUT IT ALSO GAVE A NUMBER OF OTHER DATES WHICH

9    INCLUDED THE 14TH AND THE 15TH.

10          MS. BAILEY:   YOUR HONOR, THE WARRANTS GAVE A

11   RANGE OF DATES THAT WERE THE 14TH THROUGH THE 20TH BUT THE

12   INCIDENT REPORTS GAVE THE SPECIFIC DATES THAT THESE BUYS

13   HAPPENED AND THOSE ARE THE DATES THAT WE ARE MOVING TO

14   AMEND THESE INDICTMENTS TO.   IN ADDITION WHILE THE DEFENSE

15   DID INFORM THE STATE LAST NIGHT THAT THERE MAY BE AN ALIBI

16   DEFENSE IN THIS CASE, IT WAS NOT DONE PURSUANT TO THE RULE

17   OF 10 DAYS NOTICE AND ALL THAT.

18          THE COURT:   ALL RIGHT.

19          MR. MCKNIGHT:   YOUR HONOR, THEREIN LIES THE

20   PROBLEM.   YOU HAVE THEM RELYING ON AN INCIDENT REPORT BUT

21   THEN SEEKING TO SUBSTITUTE WHICH IS NOT A SWORN DOCUMENT

22   AND THEN SEEMING AS IF THEY WANT TO DISREGARD WHAT WAS IN A

23   SWORN DOCUMENT IN AN ARREST WARRANT IN WHICH THEY WENT

24   BEFORE A MAGISTRATE.

25          THE COURT:   YEAH, BUT AND I CAN SEE YOUR POINT

39

1  IF YOU WERE PRESENTING AN ALIBI DEFENSE FOR THE DATES THAT

2  WERE LISTED IN THE INDICTMENT BUT WHEN YOU'RE NOT

3  PRESENTING AN ALIBI DEFENSE FOR THOSE SPECIFIC DATES I

4  DON'T SEE THE PREJUDICE TO YOUR CLIENT BY ALLOWING THE

5  AMENDMENT SO I'M GOING TO GO AHEAD AND GRANT THE MOTION.

6  HAVE WE GOT THE ORIGINAL INDICTMENTS?

7          MR. MCKNIGHT:   I HAVEN'T SEEN THEM YET.

8          MS. BAILEY:   YOUR HONOR, THE ORIGINAL

9  INDICTMENTS SHOULD BE WITH THE CLERK, ON FILE WITH THE

10 CLERK'S OFFICE.

11         THE COURT:   I WAS GIVEN COPIES.  ALL RIGHT, ALL

12 RIGHT, I'M GOING TO GO AHEAD AND GRANT THE STATE'S MOTION,

13 INDICTMENT NUMBER 2010-GS-22-181 IS AMENDED TO READ THAT

14 QUENTIN J. HOLT DID IN GEORGETOWN COUNT ON OR ABOUT JUNE

15 THE 17TH 2009 AND THEN THE REMAINING INDICTMENT WILL REMAIN

16 THE SAME.

17         LIKEWISE 2010-GS-22-179 IS TO READ THAT QUENTIN

18 J. HOLT DID IN GEORGETOWN COUNTY ON OR ABOUT JUNE 20TH,

19 2009, AND THEN THE REMAINING WOULD READ THE SAME, ALL

20 RIGHT.

21         MS. BAILEY:   THANK YOU, YOUR HONOR.

22         THE COURT:   ALL RIGHT, I'M GOING TO GO AHEAD AND

23 WRITE THESE IN AND INITIAL.  ANYTHING ELSE BEFORE WE GET

24 STARTED?

25         MS. BAILEY:   NOTHING FURTHER FROM THE STATE.

40

1              THE COURT:    ANYTHING FROM THE DEFENSE?

2              MR. MCKNIGHT:    YES, YOUR HONOR, I HAVE SOME

3    MOTIONS I'D LIKE THE COURT TO ADDRESS AT THIS TIME.

4              THE COURT:    ALL RIGHT.

5              MR. MCKNIGHT:    MY FIRST MOTION, YOUR HONOR,

6    WOULD BE A MOTION TO SEQUESTER THE WITNESSES THAT

7    POTENTIALLY GOING TO BE CALLED BY THE STATE.    WE BELIEVE

8    THAT HAVING THEM PRESENT IN THE COURTROOM ROBS THE

9    TESTIMONY OF ITS TRUE VERACITY AND THE FORTHRIGHTNESS AND

10   WOULD MOVE THAT ANYONE, I UNDERSTAND THAT LAW ENFORCEMENT

11   WOULD LIKE TO HAVE ONE PERSON PRESENT AT THE TABLE, THAT'S

12   FINE, BUT THEY'VE GOT FOUR OR FIVE WITNESSES LISTED AND

13   WE'D LIKE TO HAVE THEM SEQUESTERED.

14             BEYOND THAT ACTUAL SEQUESTRATION WE'D ALSO LIKE

15   TO HAVE THEM TELEPHONICALLY AND ELECTRONICALLY SEQUESTERED,

16   THAT IS FROM PREVENTING THEM FROM TEXTING AND/OR E-MAILING

17   EACH OTHER DURING THIS TRIAL.

18             THERE HAVE BEEN INSTANCES IN OTHER TRIALS OUTSIDE

19   OF THIS JURISDICTION WHERE PEOPLE HAVE SENT AN E-MAIL OR

20   TEXTING, I'M NOT SAYING LAW ENFORCEMENT HAS DONE THIS BUT

21   I'VE SEEN DEFENDANTS DO THIS.

22             THE COURT:    OKAY.

23             MR. MCKNIGHT:    AND THAT'S NOT --

24             THE COURT:    ALL RIGHT, MS. BAILEY, WHAT'S YOUR

25   POSITION?

40

1          MS. BAILEY:   YOUR HONOR, THE STATE HAS NO

2     OBJECTION TO THAT OTHER THAN THE STATE WOULD REQUEST UNDER

3     THE RULE THAT REGGIE GRANT WHO IS THE LEAD AGENT ON THIS

4     CASE BE ALLOWED TO STAY IN THE COURTROOM DURING THE

5     DURATION OF THE TRIAL.  IN ADDITION IT'S MY UNDERSTANDING

6     THE SHERIFF'S DEPARTMENT NOR THE CITY DON'T HAVE

7     BLACKBERRY'S OR ANYTHING BUT THAT THEY BE, THAT MY OFFICERS

8     SINCE THEY'RE GOING TO BE SEQUESTERED MAYBE ALL DAY THAT

9     THEY BE ALLOWED TO CHECK IN WITH THEIR SUPERVISORS OR WHAT

10    NOT BUT TO NOT TALK ABOUT THE CASE, THE STATE HAS NO

11    OBJECTION OF THEM NOT TALKING ABOUT THE CASE.

12          THE COURT:   ALL RIGHT, ALL RIGHT, I'M GOING TO

13    GRANT YOUR MOTION TO SEQUESTER THE WITNESSES.  OFFICER

14    GRANT WILL BE ALLOWED TO STAY IN THE COURTROOM FOR THE

15    STATE; THE DEFENDANT WILL BE ALLOWED TO STAY IN FOR THE

16    DEFENSE.  ANYBODY ELSE WHO IS GOING TO TESTIFY IN THIS CASE

17    WILL BE SEQUESTERED AND I'M JUST GOING TO PUT THEM UNDER AN

18    ORDER NOT TO DISCUSS THIS CASE WITH ANYONE WHETHER IT BE BY

19    TEXT, TWITTER, TELEPHONE, PERSONAL CONVERSATION, WHATEVER

20    THE CASE MAY BE, OKAY.

21          MS. BAILEY:   THANK YOU, YOUR HONOR.

22          THE COURT:   ALL RIGHT, ANYTHING ELSE?

23          MR. MCKNIGHT:   ONE OTHER MOTION, YOUR HONOR,

24    THAT'S A MOTION TO REVEAL THE DEAL.  THERE IS A

25    CONFIDENTIAL INFORMANT, WELL HE'S NOT CONFIDENTIAL ANYMORE,

42

1   AND WE BELIEVE THAT THERE WAS A DEAL STRUCK WITH LAW

2   ENFORCEMENT AND THE GENTLEMAN TO SECURE HIS, HIS VALIANT

3   EFFORTS IN THIS CASE AND WE'D LIKE TO KNOW WHAT THE QUID

4   PRO QUO IS BETWEEN MR. JOE NATHAN LEWIS AND/OR THE VARIOUS

5   MEMBERS OF LAW ENFORCEMENT.

6          MS. BAILEY:   YOUR HONOR, THE STATE HAS PROVIDED,

7   YESTERDAY THE STATE PROVIDED TO MR. MCKNIGHT A COPY OF

8   WHAT'S CALLED THE ORGANIZED CRIME BUREAU SURVEILLANCE

9   REPORT ON THIS CONFIDENTIAL INFORMANT FOR THIS BUY, ONE FOR

10  EACH BUY, AND AT THE BOTTOM IT INDICATES THAT MR. LEWIS,

11  THE CONFIDENTIAL INFORMANT, WAS PAID FOR THESE BUYS.  AT

12  THE TIME THAT HE MADE THESE PURCHASES UNDERCOVER HE DID NOT

13  HAVE ANY PENDING CHARGES AND AT THAT TIME HE WAS DOING THIS

14  FOR MONEY.  HE DOES CURRENTLY HAVE PENDING CHARGES AND THE

15  STATE HAS MADE NO DEAL WITH HIM REGARDING HIS TESTIMONY

16  HERE TODAY OTHER THAN THIS.  HE HAS A PENDING CHARGE IN

17  HORRY COUNTY, PENDING CHARGE IN GEORGETOWN COUNTY, THE

18  STATE HAS TOLD HIM WE WILL RESOLVE BOTH OF THOSE CHARGES AT

19  ONE TIME BUT HAS MADE NO OFFERS OR DEALS.

20         THE COURT:   OKAY, SO THE PENDING CHARGES THAT

21  AROSE AFTER HIS WORK ON THESE CASES YOU'VE AGREED TO

22  RESOLVE THEM ALL AT ONE TIME.

23         MS. BAILEY:   YES.

24         THE COURT:   AND HE WAS PAID FOR HIS SERVICES AS

25  A CONFIDENTIAL INFORMANT.

42

43

1           MS. BAILEY:   YES, YOUR HONOR.

2           THE COURT:   ALL RIGHT.

3           MS. BAILEY:   AND JUST FOR THE COURT'S

4    INFORMATION JUST SO EVERYBODY KNOWS HE ALSO HAS A PENDING

5    CHARGE IN CHARLESTON COUNTY.  THE STATE DID CONTACT THE

6    SOLICITOR IN CHARLESTON COUNTY, NOT TO MAKE ANY DEALS OR

7    RECOMMENDATIONS BUT JUST TO INFORM THEM THAT MR. LEWIS WAS

8    INCARCERATED HERE AND CHARLESTON COUNTY INDICATED THAT THEY

9    WERE CONSIDERING TRANSMITTING THE WARRANT HERE FOR

10   DISPOSITION.  THEY HAVE NOT DONE SO AND I DON'T THINK THEY

11   PLAN TO SO HE ALSO HAS ANOTHER PENDING CHARGE.

12          THE COURT:   ALL RIGHT, MR. MCKNIGHT, ANYTHING

13   ELSE?

14          MR. MCKNIGHT:   NOTHING FURTHER, YOUR HONOR.

15          THE COURT:   ALL RIGHT, ANYTHING FROM THE STATE?

16          MS. BAILEY:   NOTHING, YOUR HONOR.

17          THE COURT:   ONE OF THE BAILIFFS YOU WANT TO

18   CHECK TO SEE IF THEY'VE GOT A FOREPERSON YET?

19          MS. BAILEY:   JUST AS A MATTER OF SCHEDULING,

20   YOUR HONOR, THE STATE IS PREPARED TO OPEN AND PUT UP MY

21   FIRST WITNESS WHICH IS MR. REGGIE GRANT.  AFTER THAT THE

22   STATE IS GOING TO REQUEST A BRIEF RECESS BECAUSE WE HAVE

23   SOME TECHNOLOGY TO SET UP FOR THE NEXT WITNESS AND I ALSO

24   NEED TO BRIEFLY SPEAK WITH MY WITNESS WHO IS IN LOCK UP.

25          THE COURT:   ALL RIGHT.

44

1        MR. MCKNIGHT:   YOUR HONOR, JUST SO YOU KNOW AT

2   THE APPROPRIATE TIME I'D LIKE TO MAKE THE NECESSARY

3   OBJECTION AND/OR MOTION WITH REGARD TO THEIR TECHNOLOGICAL

4   SET UP.  THERE'S A PIECE OF EVIDENCE THEY'RE ATTEMPTING

5   THAT WE NEED TO ADDRESS.

6        THE COURT:  ADDRESS IT IN A MOTION IN LIMINE NOW?

7        MR. MCKNIGHT:   NO, I'D LIKE TO CHASE THE WARRANT

8   FIRST.

9        THE COURT:  ALL RIGHT, GOT YOU.  THEY HAVE

10  SELECTED JUROR NUMBER 206 ██████ ███████ AS THE FOREPERSON.

11  THEY JUST WROTE NUMBER 206 ██████ ███████ ON A SHEET OF

12  PAPER, I'M GOING TO MARK THAT AS COURT'S EXHIBIT 1.

13        (WHEREUPON, COURT'S EXHIBIT NUMBER 1 MARKED FOR

14  IDENTIFICATION.)

15        THE COURT:  ALL RIGHT, ANYTHING FURTHER FROM THE

16  STATE BEFORE WE BRING THE JURY IN?

17        MS. BAILEY:  YOUR HONOR, MAY THE STATE TAKE A

18  VERY BRIEF BATHROOM BREAK?

19        THE COURT:  ALL RIGHT, LET'S TAKE ABOUT A 10

20  MINUTE BREAK THEN WE'LL COME BACK AND GET STARTED.

21        MS. BAILEY:  THANK YOU, YOUR HONOR.

22        THE COURT:  ALL RIGHT, THANK YOU.

23        (WHEREUPON, A RECESS WAS TAKEN AND THE FOLLOWING

24  TAKES PLACE ON THE RECORD AFTER THE RECESS.)

25        THE COURT:  ALL RIGHT, ANYTHING FROM THE STATE

**44**

1  BEFORE WE BRING THE JURY IN?

2          MS. BAILEY:   NO, YOUR HONOR.

3          THE COURT:   ANYTHING FROM THE DEFENSE?

4          MR. MCKNIGHT:   NONE FROM THE DEFENSE, YOUR

5  HONOR.

6          THE COURT:   ALL RIGHT, LET'S BRING THE JURY IN.

7          (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

8  11:21 A.M.)

9          THE COURT:   LADIES AND GENTLEMEN, WELCOME BACK,

10  I UNDERSTAND, MR. ████████ YOU'VE BEEN SELECTED AS THE ---

11          THE FOREPERSON:   ████████

12          THE COURT:   --- ████████ I'M SORRY, YEAH, ████████

13  I'M SORRY, YOU'VE BEEN SELECTED AS THE FOREPERSON OF THIS

14  JURY AND I THANK YOU FOR SERVING IN THAT CAPACITY.  IF

15  YOU'D ALWAYS OCCUPY THE SEAT WHERE YOU'RE NOW SITTING.

16  LIKEWISE, MS. ██████ AND MS. ██████ IF YOU'D ALWAYS OCCUPY

17  YOUR SEATS AND THEN THE REST OF YOU AS I SAID EARLIER WOULD

18  NEED TO SIT WHEREVER YOU'D LIKE TO THROUGHOUT THE TRIAL OF

19  THE CASE WHETHER IT BE THE SAME SEAT, ALTERNATE SEATS, OR

20  WHATEVER MAKES YOU FEEL MORE COMFORTABLE.

21          ALL RIGHT, I'M GETTING READY TO GIVE YOU SOME

22  PRELIMINARY INSTRUCTIONS IN THIS CASE BUT AS I TOLD YOU

23  DURING THE JURY QUALIFICATIONS AND THEN DURING THE VOIR

24  DIRE PORTION YOU'RE CONSTANTLY TAKING OATHS, SO ONCE AGAIN

25  I NEED EVERYONE ON THE JURY TO PLEASE STAND AND RAISE YOUR

46

1  RIGHT HAND WHILE THE CLERK OF COURT ADMINISTERS THE OATH

2  FOR YOU IN THIS PARTICULAR CASE.

3          (WHEREUPON, THE JURY WAS SWORN.)

4          THE COURT:   ALL RIGHT, IS THERE ANY MEMBER OF

5  THE JURY PANEL WHO DID NOT RESPOND TO THE OATH BY SAYING I

6  DO, PLEASE STAND?

7          (NO RESPONSE.)

8          THANK YOU VERY MUCH.  ALL RIGHT, LADIES AND

9  GENTLEMEN, WE'RE ABOUT TO BEGIN THE TRIAL OF THE CASE OF

10  THE STATE V. QUENTIN J. HOLT AND MR. HOLT IS CHARGED UNDER

11  TWO INDICTMENTS.  FOR EACH INDICTMENT HE FIRST, ONE, STATES

12  THAT IN GEORGETOWN COUNTY ON OR ABOUT JUNE 17TH, 2009,

13  QUENTIN J. HOLT DID DISTRIBUTE, DISPENSE, OR DELIVER OR DID

14  AID, ABET, ATTEMPT OR CONSPIRE TO DISTRIBUTE, DISPENSE OR

15  DELIVER A QUANTITY OF COCAINE BASE WHICH IS A CONTROLLED

16  SUBSTANCE IN THIS STATE.

17          ALSO, STATES THAT MR. HOLT DID IN GEORGETOWN

18  COUNTY ON OR ABOUT JUNE 20TH, 2009, DISTRIBUTE, DISPENSE,

19  OR DELIVER OR DID AID, ABET, ATTEMPT OR CONSPIRE TO

20  DISTRIBUTE, DISPENSE, OR DELIVER A QUANTITY OF COCAINE BASE

21  WHICH IS A CONTROLLED SUBSTANCE.

22          NOW BEFORE WE BEGIN THIS TRIAL I WANT TO TELL YOU

23  THAT THIS TRIAL WILL PROBABLY BE DIFFERENT FROM WHAT YOU

24  MIGHT EXPECT.  MANY PEOPLE DO NOT HAVE A CHANCE TO ATTEND

25  ACTUAL COURT SESSIONS AS YOU'RE DOING SO NOW AND MAY THINK

46

47

1  FROM WATCHING TELEVISION OR THE MOVIES OR READING BOOKS

2  THAT TRIALS ARE FULL OF A LOT OF DRAMA, A LOT OF ACTION, A

3  LOT OF HIGH ANXIETY, AND WHILE THAT MAY BE THE CASE IN THIS

4  TRIAL IT PROBABLY WON'T BE.  IT IS A FUNDAMENTAL PART OF

5  OUR DEMOCRACY, A SEARCH FOR THE TRUTH IN AN EFFORT TO MAKE

6  SURE THAT JUSTICE IS DONE BETWEEN THE PARTIES IN THIS COURT

7  THAT NOW APPEAR BEFORE THE COURT.

8          SEARCHING FOR THE TRUTH AND MAKING SURE THAT

9  JUSTICE IS DONE IS OFTEN A SLOW DELIBERATE REPETITIVE

10  PROCESS, THE OPPOSITE OF WHAT YOU MIGHT BE ACCUSTOMED TO ON

11  THE MOVIES, T.V., READING BOOKS, AND THINGS OF THAT NATURE.

12          NOW THE ATTORNEYS APPEARING BEFORE YOU ARE

13  ADVOCATES FOR THE PARTIES THEY REPRESENT BUT FIRST AND

14  FOREMOST THEY'RE OFFICERS OF THE COURT.  THEY'RE SWORN TO

15  UPHOLD THE INTEGRITY AND FAIRNESS OF OUR JUDICIAL SYSTEM

16  AND TO HELP YOU IN A SEARCH FOR THE TRUTH.  YOU SHOULD

17  EXPECT THEM TO BE PROFESSIONAL, COMPETENT, AND ETHICAL IN

18  THE REPRESENTATION OF THEIR CLIENT'S INTEREST.

19          NOW WHAT I WILL NOW SAY IS INTENDED TO SERVE AS

20  AN INTRODUCTION TO THE TRIAL OF THIS CASE.  THESE REMARKS

21  ARE NOT A CHARGE ON THE LAW.  I WILL INSTRUCT YOU ON THE

22  LAW APPLICABLE IN THIS CASE AT THE END OF THE TRIAL BEFORE

23  YOU RETIRE TO CONSIDER YOUR VERDICT.  THIS IS MERELY AN

24  EXPLANATION OF THE PROCEDURE THAT WE WILL FOLLOW IN THE

25  TRIAL OF THIS CASE SO THAT YOU CAN BETTER UNDERSTAND WHAT

48

1  MIGHT BE HAPPENING.

2          NOW AS I STATED TO YOU THE DEFENDANT IS CHARGED

3  UNDER TWO INDICTMENTS WITH DISTRIBUTION OF COCAINE BASE, OR

4  WHAT'S COMMONLY REFERRED TO AS CRACK COCAINE, THE ELEMENTS

5  OF WHICH I'LL EXPLAIN TO YOU LATER.  NOW THESE INDICTMENTS

6  ARE SIMPLY THE CHARGE BY WHICH THIS CASE IS BROUGHT INTO

7  COURT AND IS NOT IN ANY SENSE EVIDENCE OF ALLEGATIONS

8  CONTAINED IN THE INDICTMENTS.

9          THE DEFENDANT HAS PLED NOT GUILTY TO THESE

10  INDICTMENTS AND, THEREFORE, THE STATE HAS THE BURDEN OF

11  PROVING EACH ELEMENT OF THE INDICTMENT BEYOND A REASONABLE

12  DOUBT.  IT WILL BE YOUR DUTY, LADIES AND GENTLEMEN, TO

13  DECIDE WHETHER OR NOT THE STATE HAS MET THAT BURDEN.  YOUR

14  PURPOSE AS JURORS IS TO FIND AND DETERMINE THE FACTORS OF

15  THIS CASE.

16          YOU ARE THE SOLE JUDGE OF THE FACTS OF THIS CASE.

17  IF AT ANY TIME I MAKE A COMMENT REGARDING THE FACTS YOU

18  MUST DISREGARD MY COMMENTS.  YOU ARE TO DETERMINE THE FACTS

19  FROM THE TESTIMONY YOU HEAR AND OTHER EVIDENCE INTRODUCED

20  IN COURT.  IT IS UP TO YOU TO DETERMINE THE INFERENCES

21  WHICH YOU MAY FEEL PROPERLY OR WHICH YOU FEEL MAY PROPERLY

22  BE DRAWN FROM THAT EVIDENCE.

23          IT IS ESPECIALLY IMPORTANT THAT YOU PERFORM YOUR

24  DUTY OF DETERMINING THE FACTS DILIGENTLY AND CONSCIOUSLY

25  BECAUSE ORDINARILY THERE'S NO WAY TO REVERSE A FACTUAL

49

1    FINDING BY A JURY.

2              ON THE OTHER HAND AND WITH EQUAL EMPHASIS THE

3    SAME LAW THAT MAKES YOU THE JUDGE OF THE FACTS IN THIS CASE

4    MAKES ME THE JUDGE OF THE LAW.  THE LAW AS GIVEN BY THE

5    COURT IS THE ONLY LAW YOU MAY CONSIDER.  YOU MUST ACCEPT

6    AND FOLLOW THE LAW AS I GIVE IT TO YOU EVEN THOUGH YOU MAY

7    DISAGREE WITH IT.  JUST AS I CANNOT TELL YOU WHAT THE FACTS

8    OF THIS CASE ARE YOU CANNOT DISAGREE WITH ME ABOUT THE LAW

9    TO BE APPLIED IN THIS CASE.  YOUR JOB IS TO TAKE THE LAW AS

10   I GIVE IT TO YOU AND APPLY IT TO THE FACTS AS YOU FIND

11   THOSE FACTS TO BE FROM THE TESTIMONY OF THE WITNESSES AND

12   OTHER EVIDENCE THAT IS INTRODUCED AT TRIAL.  AFTER DOING

13   THAT YOU'LL RENDER YOUR VERDICT, A TRUE AND JUST VERDICT

14   UNDER THE SOLEMN OATH THAT YOU JUST TOOK AS JURORS.

15             NOW UNTIL I ADVISE YOU TO BEGIN YOUR

16   DELIBERATIONS YOU MUST NOT DISCUSS THIS CASE WITH ANYONE

17   INCLUDING YOUR FELLOW JURORS.  DO NOT DISCUSS IT WITH ANY

18   FRIENDS, FAMILY MEMBERS, OR ANYONE INVOLVING THE CASE.

19   AFTER THE CASE IS SUBMITTED TO YOU MUST DISCUSS IT ONLY IN

20   THE JURY ROOM WITH YOUR FELLOW JURORS.  THE ATTORNEYS AND

21   PARTIES IN THIS CASE HAVE BEEN ADVISED THAT THEY'RE NOT TO

22   TALK TO YOU AT ALL SO IF YOU SEE ANYONE INVOLVED IN THE

23   CASE AND THEY DO NOT EVEN SAY HELLO OR SPEAK TO YOU THEY'RE

24   NOT BEING RUDE, THEY'RE JUST FOLLOWING THE INSTRUCTIONS OF

25   THE COURT.

50

1    DURING THE TRIAL I ASK THAT YOU NOT READ, LISTEN

2    TO, OR WATCH ANY NEWS REPORTS ABOUT THE CASE IF THERE ARE

3    ANY.  THIS INCLUDES ANYTHING THAT MAY BE IN THE NEWSPAPER,

4    ON THE INTERNET, THE RADIO, OR TELEVISION.  YOU MUST NOT

5    CONSIDER ANYTHING YOU MAY HAVE READ OR HEARD ABOUT THE CASE

6    OUTSIDE OF THE COURTROOM WHETHER IT IS BEFORE OR DURING THE

7    TRIAL OF THIS CASE.  IT IS IMPORTANT THAT YOU KEEP AN OPEN

8    MIND AND NOT DECIDE ANY ISSUE IN THE CASE UNTIL ALL OF THE

9    EVIDENCE HAS BEEN PRESENTED, THE PARTIES HAVE MADE THEIR

10   CLOSING ARGUMENTS AND I HAVE INSTRUCTED YOU ON THE LAW IN

11   THIS CASE.

12   NOW IT IS YOUR SOLEMN RESPONSIBILITY TO DETERMINE

13   THE GUILT OR INNOCENCE OF THE DEFENDANT AND YOUR VERDICT

14   MUST BE BASED SOLELY ON THE EVIDENCE AS IT IS PRESENTED TO

15   YOU IN THIS TRIAL AND ON THE LAW AS I INSTRUCT YOU DURING

16   AND AT THE CLOSE OF THE TRIAL.

17   IN JUST A MOMENT THE SOLICITOR WILL MAKE WHAT'S

18   CALLED AN OPENING STATEMENT IN WHICH THE SOLICITOR WILL

19   EXPLAIN TO YOU THE ISSUES IN THIS CASE OR AT LEAST WHAT THE

20   SOLICITOR THINKS THE ISSUES IN THIS CASE ARE.  THE ATTORNEY

21   FOR THE DEFENDANT MAY MAKE AN OPENING STATEMENT IF HE

22   WISHES TO DO SO ALTHOUGH HE IS NOT REQUIRED TO DO SO.

23   NOW WHAT THESE ATTORNEYS TELL YOU DURING THEIR

24   OPENING STATEMENT IS NOT EVIDENCE IN THIS CASE.  IT IS ONLY

25   THEIR OPINION AND THEIR CONTENTION AS TO WHAT THE EVIDENCE

50

1  IN THIS CASE IS AND WHAT THE ISSUES IN THIS CASE ARE.

2        NOW EVIDENCE IN THIS CASE WILL BE PRESENTED TO

3  YOU BY TESTIMONY OF SWORN WITNESSES FROM THE WITNESS STAND

4  AND ANY OTHER EXHIBITS THAT THE PARTIES MAY INTRODUCE IN

5  TRIAL.

6        NOW IT IS YOUR RESPONSIBILITY TO DETERMINE WHAT

7  TRUE FACTS, WHAT THE TRUE FACTS IN THIS CASE ARE AND IN

8  DETERMINING WHAT THE TRUE FACTS IN THIS CASE ARE YOU MUST

9  DECIDE WHETHER OR NOT THE TESTIMONY OF THE WITNESSES OR THE

10 EXHIBITS IS BELIEVABLE.  IT WILL BE MY RESPONSIBILITY TO

11 RULE AS A MATTER OF LAW AS TO WHETHER CERTAIN TESTIMONY IS

12 ADMISSIBLE AT ALL OR NOT BUT ONCE TESTIMONY IS ADMITTED

13 WHETHER OR NOT YOU BELIEVE IT IS SOLELY FOR YOU TO

14 DETERMINE.

15        IN DECIDING WHETHER OR NOT TO BELIEVE A WITNESS

16 YOU HAVE THE RIGHT TO CONSIDER THE INTEREST OF ANY WITNESS,

17 THE BIAS OF ANY WITNESS, THE PREJUDICE OF ANY WITNESS, THE

18 OPPORTUNITY FOR THE WITNESS TO HAVE SEEN THE MATTERS AND

19 THINGS ABOUT WHICH THE WITNESS MAY TESTIFY AND THE WAY THE

20 WITNESS ACTS ON THE WITNESS STAND.

21        YOU HAVE THE RIGHT TO CONSIDER ANYTHING THAT IS

22 IN THE RECORD THAT WILL HELP YOU EVALUATE THE TESTIMONY OF

23 THE WITNESS.  THAT MEANS THAT IT IS YOUR DUTY TO PAY CLOSE

24 ATTENTION TO THESE WITNESSES, TO OBSERVE THE WITNESSES, TO

25 LISTEN TO THE WITNESSES, AND TO PAY CLOSE ATTENTION TO THE

52

1  ATTORNEYS AND TO THE COURT.  DON'T LET YOUR THOUGHTS WANDER

2  BUT GIVE STRICT ATTENTION TO THE TESTIMONY IN THIS CASE SO

3  AT THE END OF ALL OF THE TESTIMONY AND AFTER THE ARGUMENTS

4  OF COUNSEL AND A CHARGE ON THE LAW BY THE COURT YOU WILL

5  THEN BE IN A POSITION TO DETERMINE WHAT THE TRUE FACTS ARE

6  AND APPLY THE LAW TO THOSE FACTS AND THUS RENDER A TRUE AND

7  JUST VERDICT.

8          IT'S YOUR ADDED DUTY, MR. FOREMAN, TO PRESIDE IN

9  THE JURY ROOM AS THE JURY SPOKESMAN.  IF YOU HAVE ANY

10  NEEDS, IF YOU HAVE ANY QUESTIONS, IF YOU HAVE ANY CONCERNS

11  IT IS UP TO YOU TO BRING IT TO THE COURT'S ATTENTION.

12          ALL RIGHT, ARE THERE ANY CHALLENGES OR ADDITIONS

13  TO THE OPENING CHARGES BY THE STATE?

14          MS. BAILEY:   NO, YOUR HONOR.

15          THE COURT:   ANY BY THE DEFENSE?

16          MR. MCKNIGHT:   NONE BY THE DEFENSE, YOUR HONOR.

17          THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN, AT

18  THIS TIME WE'LL BEGIN THE TRIAL OF THE CASE WITH THE

19  STATE'S OPENING ARGUMENT.  MS. BAILEY?

20                     **OPENING STATEMENT**

21  **BY MS. BAILEY:**

22          DRUGS ARE DEALT BEHIND CLOSED DOORS AND DRUGS ARE

23  DEALT TO KNOWN FRIENDS, TO KNOWN ASSOCIATES.  FOLKS, MY

24  NAME IS ERIN BAILEY, I'M ASSISTANT SOLICITOR HERE IN

25  GEORGETOWN COUNTY.  YA'LL KNOW THAT IN SOUTH CAROLINA WE

52

53

1    CAN'T DO THINGS LIKE ANY OTHER STATE SO WHERE OTHER STATE'S

2    CALL THEIR ATTORNEYS STATE'S ATTORNEYS OR DISTRICT

3    ATTORNEYS, HERE IN SOUTH CAROLINA WE CALL THEM SOLICITORS.

4    I'M THE PROSECUTING ATTORNEY IN THIS CASE.

5              YOU ALSO MAY SEE SITTING AT THE TABLE WITH ME ONE

6    OF MY ASSOCIATES MS. NANCY COTE IS GOING TO BE RUNNING MY

7    TECHNOLOGY DURING SOME OF MY WITNESSES AND MS. MARGE DUKE

8    IS MY LEGAL ASSISTANT.

9              THIS IS NOT GOING TO BE A COMPLICATED CASE.  IT'S

10   NOT GOING TO BE A LONG CASE.  ON JUNE 17TH OF 2009 QUENTIN

11   HOLT SOLD DRUGS TO A CONFIDENTIAL INFORMANT.  THREE DAYS

12   LATER ON JUNE 20TH OF 2009 QUENTIN HOLT SOLD DRUGS TO THE

13   SAME CONFIDENTIAL INFORMANT.

14             YOU'RE GOING TO HEAR FROM DEPUTY GRANT, HE WAS

15   RUNNING THE OPERATION.  HERE IN GEORGETOWN COUNTY WE DO

16   UNDERCOVER DRUG OPERATIONS TO TRY TO CATCH DRUG DEALERS

17   CAUSE REMEMBER DRUGS ARE DEALT BEHIND CLOSED DOORS AND

18   THEY'RE DEALT TO KNOWN ASSOCIATES, SO IN ORDER TO CATCH

19   DRUG DEALERS YOU HAVE TO ENLIST THE HELP OF CONFIDENTIAL

20   INFORMANTS.  THAT'S WHAT AGENT REGGIE GRANT HAS DONE IN THE

21   PAST.

22             NOW I'M GOING TO WARN YA'LL THE CONFIDENTIAL

23   INFORMANT IS GOING TO WALK INTO THIS COURTROOM NOT THROUGH

24   THAT BACK DOOR WE ALL CAME IN AND OUT.  HE'S GOING TO WALK

25   THROUGH THAT DOOR OVER THERE CAUSE THE CONFIDENTIAL

54

1    INFORMANT IS CURRENTLY INCARCERATED.  HE'S INCARCERATED ON

2    SOMETHING UNRELATED TO THIS CHARGE.  HE HAS A CRIMINAL

3    RECORD.  DRUGS ARE DEALT TO KNOWN ASSOCIATES.

4            SO TODAY YOU'RE GOING TO HEAR FROM DEPUTY GRANT.

5    YOU'RE GOING TO HEAR FROM THE CONFIDENTIAL INFORMANT AND

6    YOU'RE GOING TO HEAR FROM SOME FOLKS AT SLED, THE STATE LAW

7    ENFORCEMENT DIVISION, BECAUSE AFTER THE DRUGS WERE DEALT

8    THEY WERE TRANSPORTED TO SLED WHERE THEY WERE TESTED CAUSE

9    I NEED TO PROVE TO YA'LL THAT THEY WERE ACTUALLY DRUGS, SO

10   YOU'RE GOING TO HEAR FROM THE CHEMIST AND SOME FOLKS WHO

11   HANDLED THE DRUGS.

12           AT THE END OF THE DAY WE'RE GOING TO ASK YOU

13   FOLKS TO GO BACK INTO YOUR JUROR ROOM, DELIBERATE, AND TO

14   FIND QUENTIN J. HOLT GUILTY OF TWO COUNTS OF DISTRIBUTION

15   OF CRACK COCAINE.

16           THE COURT:   MR. MCKNIGHT, DOES THE DEFENSE WISH

17   TO MAKE AN OPENING STATEMENT?

18           MR. MCKNIGHT:   IT DOES, YOUR HONOR, MAY IT

19   PLEASE THE COURT?

20           THE COURT:   YES, SIR.

21                    OPENING STATEMENT

22   BY MR. MCKNIGHT:

23           MS. BAILEY, LADIES AND GENTLEMEN OF THE JURY,

24   GOOD MORNING.  I'M ATTORNEY CEZAR MCKNIGHT AND I HAVE THE

25   PLEASURE OF REPRESENTING THE INTEREST TODAY OF MR. QUENTIN

55

1  HOLT THE GENTLEMAN WHO SITS BESIDE ME IN THE BLACK SHIRT.

2  MY PRACTICE IS IN LAKE CITY, SOUTH CAROLINA; I'M A SMALL

3  SOLO PRACTITIONER.  IT'S JUST ME AND MY PARALEGAL AND I

4  HAVE BEEN AFFORDED THE OPPORTUNITY TO REPRESENT MR. HOLT

5  AND I'M GREATLY APPRECIATIVE OF THAT.

6          FIRST ON BEHALF OF MY CLIENT LET ME THANK YOU FOR

7  THE FACT THAT YOU ALL ARE GOING TO SIT HERE TODAY AND

8  LISTEN TO THE FACTS AND DISPENSE JUSTICE.  I REALIZE

9  WHOLEHEARTEDLY THAT THERE ARE 12 DIFFERENT PLACES THAT YOU

10  ALL WOULD RATHER BE RIGHT NOW RATHER THAN LISTENING TO ME

11  AND LISTENING TO THE JUDGE AND DOING THIS BUT IN THIS

12  COUNTRY THIS IS HOW WE DO JUSTICE.  IN OTHER PLACES IN THE

13  WORLD IT'S NOT LIKE THIS.  IT'S LAWLESSNESS; IT'S PEOPLE

14  SHOT IN THE STREET; IT'S HANDS CUT OFF, BUT HERE IN AMERICA

15  WE HAVE DECIDED THAT 12 FRIENDS AND NEIGHBORS WILL LISTEN

16  TO THE FACTS AS THEY'RE PRESENTED AND THEY WILL BRING

17  TOGETHER THEIR COLLECTIVE EXPERIENCES AND COMMON SENSES AND

18  DETERMINE WHAT THE TRUTH IS AND REGARDLESS OF WHAT IT IS

19  YOU SAY TODAY ONCE YOU'VE DONE THAT THAT'S JUSTICE AND

20  NOBODY CAN BE DISSATISFIED.

21          NOW I DON'T MAKE LIGHT OF YOUR SERVICE BECAUSE

22  WINSTON CHURCHILL SAID HIMSELF THAT NEXT TO A SERVICE TO A

23  PERSONS COUNTRY IN THE TIME OF WAR JURY DUTY IS THE

24  GREATEST CALL.

25          NOW WHEN WE GO ON IN THIS TRIAL YOU'RE GOING TO

56

1  HAVE PEOPLE COME AND SIT ON THAT BOX AND THEY'RE GOING TO

2  TELL YOU VARIOUS THINGS AND YOU'RE GOING TO BE ASKED TO

3  DECIDE AT THE END WHETHER OR NOT YOU'RE GOING TO RULE A

4  VERDICT OF GUILT OR INNOCENCE.  WELL HOW DO YOU DO THAT?

5          HIS HONOR IS GOING TO TELL YOU THAT THE BURDEN IN

6  THIS CASE IS BEYOND A REASONABLE DOUBT.  WELL WHAT'S THAT?

7  THE JUDGE IS GOING TO FURTHER EXPLANATION AND TELL YOU WELL

8  IT'S THE AMOUNT OF DOUBT THAT CAUSES A REASONABLE PERSON TO

9  HESITATE TO ACT.  WELL WHAT'S THAT?

10          THE ANALOGY THAT I BEST USE FOR THAT IS WE'RE

11  GETTING DRESSED FOR WORK OR CHURCH AND WE'RE IRON THIS DAY

12  AND YOU KNOW YOU'RE SORT OF BEHIND, YOU LOOK YOU THINK THE

13  PASTOR IS GOING TO START OR I'M GOING TO BE LATE FOR WORK

14  AND YOU KNOW THAT HESITATION YOU HAVE AS YOU'RE WALKING OUT

15  THE DOOR AS TO WHETHER OR NOT I LEFT THE IRON PLUGGED UP OR

16  NOT.  THAT'S THE KIND OF DOUBT THAT WE'RE TALKING ABOUT.

17          NOW THE JUDGE TOLD YOU CORRECTLY THIS ISN'T PERRY

18  MASON.  THERE'S NOT GOING TO BE SOMEONE THAT WALKS IN THE

19  DOOR AND JUST SCREAMS I DID IT AND WALK OUT OF HERE IN AN

20  HOUR WITH COMMERCIALS.  IT DOES NOT HAPPEN THAT WAY, BUT

21  JUST AS YOUR ATTENTION IS GRABBED BY THE EXCITEMENT THE

22  IMPORTANCE OF THIS MATTER MUST GRAB YOUR ATTENTION BECAUSE

23  THIS IS A VERY SEROUS MATTER.

24          NOW DESPITE WHAT YOUR PRECONCEIVED NOTIONS ARE

25  YOU'VE SWORN TO TAKE AN OATH.  HIS HONOR IS GOING TO TELL

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          57

1  YOU THAT MR. HOLT SITS THERE IN THAT CHAIR AND AS IT SITS

2  RIGHT NOW HE'S AS INNOCENT AS ANY OF YOU 12 AND HE'S GOING

3  TO REMAIN INNOCENT AS ANY OF YOU 12 UNTIL BECAUSE HIS

4  INNOCENCE GRABS ABOUT HIM LIKE A CLOAK AND IT DOESN'T COME

5  OFF UNTIL YOU DECIDE TO STRIP HIM.

6          NOW YOU ALL HAVE VARIOUS CAREERS AND VARIOUS LIFE

7  EXPERIENCES AND YOU HAVE DEVELOPED OVER THE TIME COMMON

8  SENSE.  SOME OF YOU HAVE CHILDREN, SOME OF YOU DO NOT, BUT

9  ALL OF YOU HAVE BEEN AROUND CHILDREN SO WHEN YOU HEAR THE

10 TESTIMONY COMING FROM THAT PERSON COMPARE IT TO THE

11 INSTANCE WHERE YOU THINK A CHILD'S DONE SOMETHING, YOU

12 DIDN'T SEE THEM DO IT BUT THE CRUMBS ARE ABOUT HIM.  THAT

13 COMMON SENSE VOICE THAT SPEAKS TO YOU AND SAYS, YEAH, HE OR

14 SHE DID THIS, THAT'S THE COMMON SENSE THAT'S REQUIRED

15 TODAY.

16          NOW JUST LIKE YOU ALL HAVE DIFFERENT CAREERS IN

17 THIS COUNTRY THE GREAT EQUALIZER OF ALL PERSONS WHETHER

18 THEY BE PAUPERS OR PRINCES IS THIS JURY BOX.  NO ONE'S

19 OPINION IS MORE IMPORTANT THAN THE OTHER, SO IF THERE'S

20 SOMEBODY THAT YOU BELIEVE HAS GOT THIS BIG JOB OR HAS THESE

21 MORE CREDENTIALS THAN YOU AND YOUR OPINION IS DIFFERENT

22 THAN THAT PERSON HOLD ON TO IT.  IT'S YOURS AND YOUR

23 OPINION AND YOUR OPINION ALONE IS WHAT COUNTS AND IF YOU

24 BELIEVE SOMETHING HOLD ONTO IT.

25          NOW YOU ALL MADE A PROMISE WHEN YOU TOOK YOUR

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          58

1  OATH, YOU SAID THAT YOU WOULD LISTEN AND RENDER A TRUE

2  VERDICT.  THAT PROMISE MEANS YOU'RE GOING TO TAKE THE

3  EVIDENCE, YOU'RE GOING TO TURN EACH PIECE, TURN IT INSIDE

4  OUT, WEIGH IT.  WE OFTEN THINK OF JUSTICE AS SCALES, WELL

5  IN THIS BURDEN THAT WE HAVE THE SCALES ARE GOING TO TIP.

6  THEY'VE GOT TO GO ALL THE WAY TO THE SIDE, ALL THE WAY,

7  PARDON ME, TO THE SIDE OF THIS, ALL THE WAY TO THAT SIDE.

8          MY CLIENT DOESN'T HAVE TO SAY A THING.  HE'S NOT

9  HIDING BEHIND ANYTHING, HOWEVER THE LAW SAYS THAT THE

10  BURDEN OF PROOF IS SOLELY UPON THEM.  HE DOESN'T HAVE TO

11  SAY A THING.  HE DOESN'T HAVE TO PROVE A THING.  THEY HAVE

12  TO DO IT AND IF THEY DON'T DO IT YOU, LADIES AND GENTLEMEN,

13  ARE REQUIRED TO DO ONE THING, SPEAK THE VERDICT, LATIN WORD

14  FOR TRUTH, AND SPEAK NOT GUILTY.  THANK YOU FOR YOUR TIME,

15  GOOD TALKING WITH YOU.

16          THE COURT:   ALL RIGHT, MS. BAILEY, YOU CAN CALL

17  YOUR FIRST WITNESS.

18          MS. BAILEY:   THANK YOU, YOUR HONOR, THE STATE

19  CALLS DEPUTY REGINALD GRANT.

20          THE COURT:   ALL RIGHT.

21                    **DEPUTY REGINALD GRANT**

22        **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

23          MADAM CLERK:   PLEASE BE SEATED AND STATE YOUR

24  FULL NAME FOR THE RECORD.

25          THE WITNESS:   REGINALD GRANT.

58

DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY          59

                    DIRECT EXAMINATION

1

2     BY MS. BAILEY:

3          Q     COULD YOU, PLEASE, TELL THE JURY WHAT YOUR

4     CURRENT TITLE IS?

5          A     MY CURRENT TITLE NOW IS DEPUTY SHERIFF OF

6     THE GEORGETOWN COUNTY SHERIFF'S OFFICE.

7          Q     AND HOW LONG HAVE YOU BEEN AT THE SHERIFF'S

8     OFFICE?

9          A     I'VE BEEN AT THE SHERIFF'S OFFICE NOW FOR

10    FOUR YEARS, GOING ON FOUR YEARS.

11         Q     HOW LONG HAVE YOU BEEN IN LAW ENFORCEMENT?

12         A     I'VE BEEN IN LAW ENFORCEMENT RIGHT AT FOUR

13    YEARS, BEFORE THEN I STARTED OUT HELPING OUT AT THE

14    SHERIFF'S OFFICE EVER SINCE I WAS IN HIGH SCHOOL SO IF I

15    HAD TO DO MY YEARS APPROXIMATELY ABOUT SIX YEARS.

16         Q     AND COULD YOU TELL THE JURY IN WHAT ASPECT

17    IN LAW ENFORCEMENT YOU'VE WORKED?

18         A     I'VE WORKED IN PATROL; I'VE WORKED IN

19    WARRANTS DIVISION, BACK IN PATROL, WENT TO THE DRUG TEAM,

20    WHICH IS NOW THE DEU FIFTEENTH CIRCUIT.  AFTER THE DEU GOT

21    OUT OF IT AND NOW I'M WITH THE ICE TEAM.  WHAT THAT IS AN

22    INTENSIFIED CRIME ENFORCEMENT, BASICALLY IT'S A DRUG

23    INTERDICTION, NOTHING BUT A TRAFFIC TEAM YOU GO AND BACK

24    TRAFFIC STOPS AND TRY TO FIND DRUGS.

25         Q     AND A SECOND AGO YOU TALKED ABOUT THE DEU,

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**                60

1   WHAT DOES THAT STAND FOR?

2         A    IT'S A DRUG ENFORCEMENT TEAM, CONSISTS OF

3   HORRY COUNTY AND GEORGETOWN COUNTY.  IT'S RUN BY THE

4   SOLICITOR'S OFFICE.  WE GO UP IN HORRY COUNTY OR WE MAY

5   COME TO GEORGETOWN COUNTY AND BOUGHT DRUGS.  AT THAT TIME

6   ON THIS PARTICULAR DATE IT WAS THE ORGANIZED CRIME BUREAU

7   WHICH WAS THE OCB, WE WASN'T A DEU UNIT THEN.  IT GOT

8   ADOPTED TO THE DEU BACK IN NOVEMBER OF LAST YEAR.

9         Q    IN YOUR CAPACITY IN LAW ENFORCEMENT WHAT

10  KIND OF TRAINING AND EXPERIENCE HAVE YOU HAD?

11        A    I'VE HAD UNITS OF TRAINING AT SOUTH

12  CAROLINA CRIMINAL JUSTICE ACADEMY FOR DRUGS.  I ALSO WENT

13  TO WASHINGTON D.C. WITH THE DEA CLASS UP THERE.  I ALSO

14  TOOK SOME CLASSES AT MT. PLEASANT AT THE AIR FORCE

15  DEPARTMENT IN REFERENCE TO A LOT OF DRUGS CLASSES THERE.

16        Q    AND HOW LONG WERE YOU WERE AT THE CRIMINAL

17  JUSTICE ACADEMY?

18        A    NINE YEARS.

19        Q    OKAY, AND WITH SOME OF THOSE OTHER CLASSES

20  HOW MUCH TRAINING DID YOU HAVE TIME WISE?

21        A    TIME WISE I WOULD SAY ANYWHERE BETWEEN TWO

22  TO FOUR MONTHS.

23        Q    COULD YOU TELL THE JURY BACK WHEN YOU WERE

24  WITH THE ORGANIZED CRIME BUREAU WHICH IS NOW THE DRUG

25  ENFORCEMENT BUREAU COULD YOU TELL THE WHAT TYPE OF

60

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**                61

1  OPERATIONS YA'LL DID?

2          A     WE SET UP SURVEILLANCE, NOT ONLY

3  SURVEILLANCE WE DID UNDERCOVER BUYS.  IF I CAN I

4  PARTICIPATE BUT I COULDN'T DO IT IN GEORGETOWN COUNTY CAUSE

5  I JUST ABOUT KNOW EVERYONE BUT WE WOULD USE INFORMANTS TO

6  GO AND BUY FOR US.  WE WOULD SET THE INFORMANT UP WITH A

7  WIRE, SOMETIMES VIDEO TRANSACTIONS LIKE THAT AND JUST SEND

8  THEM OUT AND BUY DRUGS FOR US, SUSPECTED DRUGS FOR US.

9          Q     OKAY, AND NOW WHEN YOU SAY YOU USE

10  CONFIDENTIAL INFORMANTS HOW DO YA'LL COME TO KNOW ABOUT

11  THOSE PEOPLE?

12          A     WELL WHEN I, WHEN I CAME INTO THE DRUG UNIT

13  I DIDN'T REALLY KNOW ANYONE THAT, IT WAS NEW TO ME SO I WAS

14  INTRODUCED TO MY CONFIDENTIAL INFORMANT WHICH HE WANTED TO

15  GET PAID FOR IT.  USUALLY THEY CONTACT THE SHERIFF'S OFFICE

16  AND SAID, HEY, I WANT TO GO BUY SOME DRUGS SO I CAN MAKE

17  SOME MONEY FOR IT SO I CAN MAKE SOME MONEY TO HELP MY

18  FAMILY SO THEY'LL HAVE SOMETHING TO DO AND WE GAVE THEM $50

19  OR $100 OR SOMETIMES THEY WORK OFF THE CHARGES, WHETHER

20  THERE'S DRUG CHARGES OR SHOPLIFTING OR ANYTHING LIKE THAT.

21          Q     AND IS THIS, WOULD YOU SAY IT'S FAIR TO SAY

22  THAT MOST CONFIDENTIAL INFORMANTS HAVE CRIMINAL RECORDS?

23          A     CORRECT.

24          Q     SINCE THEY HAVE CRIMINAL RECORDS DO YOU PUT

25  PROCEDURES IN PLACE TO SO THAT YA'LL KNOW THAT THEY'RE

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          62

1   RELIABLE AND THEY'RE DOING WHAT THEY SAY THEY'RE GOING TO

2   DO?

3           A     YES, MA'AM, IF AN INFORMANT IS WORKING OFF

4   CHARGES USUALLY WHAT WE DO, WE KIND OF PUT AUDIO AND VIDEO

5   AND DISGUISE AND KEEP CONSTANT SURVEILLANCE OF THEM WHILE

6   THEY'RE GOING TO DO THE BUY.  BEFORE THEY DO THE BUY WE

7   SEARCH THEM, MAKE SURE THEY DON'T HAVE NOTHING ON THEM AT

8   ALL TIMES.  WE DON'T ALLOW THEM TO HAVE EXTRA MONEY OR

9   ANYTHING LIKE THAT BECAUSE WE HAVE IN THE PAST WHERE SOME

10  INFORMANTS WILL GO AND BUY DRUGS AND PINCH THE DRUGS OFF

11  AND GIVE US WHAT THEY WANT TO GIVE US SO USUALLY WE SEARCH

12  THEM PRETTY GOOD AND ---

13          Q     AND YOU HAVE PROCEDURES IN PLACE TO KEEP

14  THAT FROM HAPPENING?

15          A     YES, MA'AM.

16          Q     OKAY, AND YOU SAID YOU SEARCH THEM BEFORE

17  THEY GO?

18          A     WE SEARCH THEM BEFORE THEY GO BACK THE BUY

19  AND AFTER WHEN THEY COME BACK FROM THE BUY.

20          Q     NOW ARE YOU FAMILIAR WITH A CONFIDENTIAL

21  INFORMANT NAMED JOE NATHAN LEWIS?

22          A     CORRECT.

23          Q     AND HOW DO YOU KNOW JOE NATHAN LEWIS?

24          A     I MET JOE NATHAN LEWIS THROUGH, WHICH AT

25  THE TIME I WAS TALKING TO GENO, LIKE I SAID I HAD JUST

62

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          63

1   GOTTEN INTO THE DRUG TEAM, SGT. GENO INTRODUCED ME TO MR.

2   LEWIS BECAUSE HE WAS LEAVING OUT GOING BACK TO PATROL.  AT

3   THAT TIME I MET MR. LEWIS INTRODUCED HIMSELF, I INTRODUCED

4   MYSELF, AND HE TOLD ME HE WANTED TO BUY DRUGS FOR ME SO

5   THAT'S HOW I MET MR. LEWIS THROUGH SGT. GENO.

6           Q      AND APPROXIMATELY HOW MANY DRUG BUYS DID

7   MR. LEWIS PERFORM FOR YOUR OPERATION?

8           A      ANYWHERE BETWEEN 25 TO 30.

9           Q      SO IS IT FAIR TO SAY THAT YOU WORKED WITH

10  MR. LEWIS A GOOD BIT?

11          A      YES, MA'AM.

12          Q      AND DID YOU ALWAYS FIND MR. LEWIS TO BE

13  RELIABLE?

14          A      YES, MA'AM.

15          Q      DID HE ALWAYS DO WHAT HE SAID HE WAS GOING

16  TO DO, COME BACK WITH WHAT HE SAID HE WAS GOING TO GET?

17          A      YES, MA'AM.

18          Q      DID YOU EVER HAVE A PROBLEM WITH

19  IRREGULARITIES?

20          A      NO, MA'AM.

21          Q      WITH MR. LEWIS?

22          A      NO, MA'AM.

23          Q      LET'S TALK SPECIFICALLY ABOUT JUNE 17TH OF

24  2009, COULD YOU TELL THE JURY WHAT HAPPENED THAT DAY?

25          A      YES, MA'AM, USUALLY ON OUR NEXT DAY WE GET

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**               64

1   IN CONTACT WITH THE INFORMANT OR THE INFORMANT TO CONTACT

2   US THE DAY BEFORE.  ON THE 16TH OF JUNE 2009 MR. LEWIS

3   CONTACTED ME AND SAID, HEY, MAN, HE SAID, YOU WANT TO DO

4   SOMETHING TOMORROW ---

5           MR. MCKNIGHT:   OBJECTION, YOUR HONOR, THAT'S

6   HEARSAY.

7           THE COURT:   ALL RIGHT, SUSTAINED.

8           MS. BAILEY:    (CONTINUING)

9           Q     IF YOU COULD JUST, JUST DON'T SAY WHAT MR.

10  LEWIS SAID, JUST DESCRIBE WHAT HAPPENED?

11          A     OKAY, USUALLY THE INFORMANT CONTACT US AND

12  TELL US WHAT THEY WANT TO DO.  AT THAT TIME HE PRESENT US

13  WITH A NAME, WE LOOK THAT PERSON'S NAME UP THEN WE SET UP

14  THE BUY.  ON THAT PARTICULAR DAY ON THE 17TH OF JUNE

15  MEMBERS OF THE ORGANIZED CRIME UNIT, MYSELF AND AGENT WARD

16  MET WITH THE CONFIDENTIAL INFORMANT, REFERRED TO AS 178 AT

17  THAT TIME.  WE REALIZE THAT THAT'S MR. JOE NATHAN LEWIS

18  THAT WOULD BE COMING THROUGH THAT DOOR.  WE MET HIM AT A

19  PREDETERMINED LOCATION AT APPROXIMATELY 1:45.  AT THAT TIME

20  HE WAS BRIEFED AND SEARCHED ON HIS PERSON.  MR. LEWIS WAS

21  THEN GIVEN MONEY OF $20, TWO $20 BILLS AND ONE $10 BILL.

22  AT THAT TIME I ALSO PLACED A WIRE TO TRANSMIT ON MR. LEWIS.

23  MR. LEWIS DID DEPART FROM THE MEETING LOCATION AT

24  APPROXIMATELY 1:53, TRAVELING TO ███████████████

25  WHICH IS THE RESIDENT OF MR. QUENTIN HOLT SEATED TO MY

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          65

1    RIGHT HERE, IN THE ANDREWS SECTION OF GEORGETOWN COUNTY.

2            MR. LEWIS THEN ARRIVED AT THE BUY LOCATION AT

3    APPROXIMATELY 2:03 WHERE HE MET MR. HOLT THERE AND WAS

4    SITTING AT HIS KITCHEN TABLE.  MR. LEWIS THEN STATED THAT

5    MR. HOLT GOT UP AND WALKED TO THE REAR OF THE RESIDENCE AND

6    CAME BACK AND MADE THE TRANSACTION FOR SUSPECTED COCAINE

7    FOR A SUM OF U.S. CURRENCY PROVIDED BY LAW ENFORCEMENT.

8            AT THAT TIME MR. LEWIS LEFT THE BUY LOCATION AT

9    2:08, MET BACK WITH MYSELF AND AGENT SAWYER, MET BACK WITH

10   ME AT APPROXIMATELY 2:19, HANDED THE SUSPECTED CRACK

11   COCAINE TO ME.  I PLACED IT IN A SMALL ENVELOPE AND PLACED

12   TO MY BACK PACK.

13           AT THAT TIME MR. LEWIS WAS SEARCHED AND DEBRIEFED

14   AND HE ALSO WROTE A STATEMENT WHERE HE SIGNED AND STATED

15   THAT HE WALKED INTO MR. HOLT'S RESIDENCE AND PURCHASED A

16   THE CRACK, THE SUSPECTED CRACK COCAINE.

17           Q    ALL RIGHT, SO MR. LEWIS MET UP WITH YA'LL

18   AT A PREDETERMINED LOCATION, YA'LL SEARCHED HIM?

19           A    YES, MA'AM.

20           Q    AND DID YOU FIND ANYTHING WHEN YOU SEARCHED

21   HIM?

22           A    NO, MA'AM.

23           Q    OKAY, AND YOU SENT HIM OFF TO, YOU SAID HE

24   WAS GOING TO GO PURCHASE CRACK COCAINE FROM QUENTIN HOLT?

25           A    YES, MA'AM.

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**                    66

1      MR. MCKNIGHT:   OBJECTION, YOUR HONOR, SHE'S

2  LEADING THE WITNESS.

3      MS. BAILEY:   YOUR HONOR, HE'S ALREADY TESTIFIED

4  TO THIS, I'M JUST --

5      THE COURT:   AND THAT'S SUSTAINED, GO AHEAD.

6      MS. BAILEY:   (CONTINUING)

7      Q    AND WHEN HE, WHEN HE CAME BACK DID HE COME,

8  WHAT DID HE COME BACK WITH?

9      A    HE CAME BACK WITH APPROXIMATELY 0.7 GRAMS

10  OF SUSPECTED CRACK COCAINE.  USUALLY WHEN THEY GO OUT TO

11  BUY A GRAM OF CRACK COCAINE IT'S USUALLY BETWEEN ANYWHERE

12  BETWEEN .4 AND, .4 AND .5 FOR $50.  WE WEIGHED IT AT THE

13  SHERIFF'S OFFICE, IT WEIGHED APPROXIMATELY 0.7 GRAMS.  IT

14  WAS THEN PLACED INTO A BEST BAG AND PUT INTO OUR DRUG DROP

15  BOX AT THE SHERIFF'S OFFICE WHERE IT WAS SENT TO SLED FOR

16  TESTING.

17      Q    AND WHEN YOU SEARCHED HIM WHEN HE CAME BACK

18  HOW DID THAT SEARCH GO?

19      A    WE DIDN'T FIND NO CONTRABAND ON MR. LEWIS

20  AT THAT TIME.

21      Q    OKAY, AND YOU MENTIONED THAT MR. LEWIS WAS

22  PAID FOR THAT?

23      A    YES, MA'AM.

24      Q    HOW MUCH WAS HE PAID?

25      A    HE WAS PAID $50.  USUALLY IF WE SET THEM UP

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          67

1   TO BUY A GRAM WHICH IS $50 WE USUALLY PAY THEM $50.

2          Q     OKAY, DID YOU CONDUCT ---

3          A     ACTUALLY HE WAS PAID $54 TO GET OUR BOOKS

4   STRAIGHT.

5          Q     OKAY, AND DID YOU CONDUCT ANY VISUAL

6   SURVEILLANCE WHILE THIS WAS GOING ON?

7          A     YES, MA'AM, I KEPT CONSTANT VISUAL CONTACT

8   ON MR. LEWIS.  HE WALKED DOWN HOLLYWOOD AVENUE.  ONCE HE

9   GOT TO A CURVE I LOST SIGHT OF MR. LEWIS, THAT'S WHEN HE

10  WENT INTO THE HOLT, THAT'S WHEN HE WENT INTO MR. HOLT'S

11  RESIDENCE BUT ONCE HE WALKED DOWN HOLLYWOOD AVENUE I COULD

12  HAVE SEEN BUT ONCE HE MADE THAT RIGHT I LOST CONTACT WITH

13  HIM.

14         Q     SO YOU DID GET TO WATCH HIM WALK ---

15         A     CORRECT.

16         Q     --- TOWARDS MR. HOLT'S RESIDENCE AND BACK

17  FROM MR. HOLT'S RESIDENCE?

18         A     CORRECT.

19         Q     AND YOU MENTIONED THAT, DID YOU GET, SO

20  HOW, YOU GOT .7 GRAMS OF CRACK COCAINE?

21         A     YES, MA'AM.

22         MR. MCKNIGHT:   OBJECTION, YOUR HONOR, AGAIN

23  SHE'S LEADING THE WITNESS.

24         MS. BAILEY:   I'M JUST TRANSITION, YOUR HONOR.

25         THE COURT:   ALL RIGHT, I THINK HE'S ALREADY

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**            68

1  TESTIFIED TO THAT, I'M GOING TO ALLOW IT, GO AHEAD.

2          MR. MCKNIGHT:   ALL RIGHT.

3          MS. BAILEY:    (CONTINUING)

4          Q     OKAY, AND ONCE YOU ACQUIRED THAT WAS IT

5  HANDED DIRECTLY TO YOU?

6          A     YES, MA'AM, IT WAS HANDED DIRECTLY TO ME, I

7  PUT IT IN THE LITTLE BAGGY AND I PLACED IT INTO MY BOOK BAG

8  WHERE I KEPT IT WITH ME UNTIL I WENT BACK TO THE SHERIFF'S

9  OFFICE.

10          MS. BAILEY:   OKAY, WOULD YOU MARK THAT AS

11  STATE'S EXHIBIT 1 FOR I.D. ONLY?

12          (WHEREUPON, STATE'S EXHIBIT NUMBER 1 MARKED FOR

13  IDENTIFICATION.)

14          MS. BAILEY:    (CONTINUING)

15          Q     AND HOW DID YOU HANDLE IT, THE ENTIRE TIME

16  THAT YOU POSSESSED THE DRUGS IN WHAT WAY, WHAT MANNER DID

17  YOU HANDLE THE DRUGS?

18          A     ALL I DID TO IT WAS ONCE MR. LEWIS HANDED

19  IT TO ME I PLACED IT IN A LITTLE BAGGY, KEPT IT, LIKE I

20  SAID I KEPT IT IN MY BOOK BAG SO NO ONE COULD MESS WITH IT.

21  I WAS THE ONLY ONE THAT HAD ACCESS TO THAT BAG AT THE TIME,

22  WENT BACK TO THE SHERIFF'S OFFICE, LAID IT ON MY DESK,

23  WEIGHED IT ON A SCALE.  LIKE I SAID IT WEIGHED

24  APPROXIMATELY 0.7 GRAMS.  AFTER THAT I FILLED OUT MY BEST

25  PACKET WHICH IS A SLED PACKET, PLACED IT IN THERE, SEALED

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**                69

1  IT, SIGNED IT, AND SENT IT TO THE DRUG DROP BOX WHERE

2  THAT'S THE LAST TIME I SAW IT.

3          Q    AND COULD YOU TELL THE JURY ABOUT THE SLED

4  BEST BAG, WHAT, WHAT DOES THAT MEAN?

5          A    IT'S, A BEST KIT IS A, IS A CHAIN OF

6  CUSTODY, I WAS THE ONLY ONE IN THAT CHAIN THAT HANDLED THAT

7  DRUG OTHER THAN ME AND MR. LEWIS.  I HAVE TO SIGN

8  STATEMENTS ON IT SAYING THAT I RECEIVED THIS DRUG FROM MR.

9  LEWIS THAT HE GOT FROM MR. HOLT AND PLACE IT INTO THAT BAG,

10  SEALED IT, SIGNED IT, AND DROPPED IT AND WE HAVE A LITTLE

11  TECH THAT SENDS IT UP TO SLED TO GET IT TESTED.

12          Q    SO WHEN YOU SAY YOU PUT IT INTO A DRUG DROP

13  BOX, WHAT DOES THAT BOX LOOK LIKE?

14          A    IT'S LIKE A MAILBOX THAT'S BEEN SEALED,

15  LIKE A MAILBOX YOU GO TO THE POST OFFICE AND PUT YOUR MAIL

16  IN.  NO ONE HAS ACCESS TO IT EXCEPT APPROXIMATELY TWO OR

17  THREE PEOPLE AT THE SHERIFF'S OFFICE.

18          Q    OKAY, AND DID YOU ALTER OR CHANGE THE DRUGS

19  IN ANY WAY WHILE YOU HAD THEM?

20          A    NO, MA'AM.

21          Q    OKAY, I'M HANDING YOU WHAT'S BEEN MARKED

22  FOR IDENTIFICATION ONLY AS STATE'S EXHIBIT 1, IF YOU COULD

23  JUST TAKE A GOOD LOOK AT THAT?

24          A    YES, MA'AM.

25          Q    AND DO YOU RECOGNIZE WHAT THAT IS?

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          70

1          A      YES, MA'AM.

2          Q      COULD YOU TELL THE COURT AND JURY WHAT THAT

3    IS?

4          A      AS OF RIGHT NOW MY EXPERIENCE LOOKS LIKE

5    SUSPECTED CRACK COCAINE, IT'S ALL WHITE, ACCURATELY IT'S A

6    POWDER SUBSTANCE ---

7          MR. MCKNIGHT:    OBJECTION, THAT'S SPECULATIVE,

8    YOUR HONOR.  HE IS NOT AN EXPERT IN CHEMICAL ANALYSIS.

9          THE COURT:    I'LL SUSTAIN THE OBJECTION.

10          MS. BAILEY:     (CONTINUING)

11          Q      IS THAT THE MATERIAL THAT YOU, IS THAT

12   CONSISTENT WITH THE MATERIAL THAT YOU SEIZED ON JUNE 17TH?

13          A      NOT ON THAT DEAL, IT WAS ACTUALLY HARD ON

14   THAT DAY ---

15          Q      SO IT LOOKED A LITTLE BIT DIFFERENT ON THAT

16   DAY?

17          A      CORRECT, CORRECT.

18          Q      ALL RIGHT, COULD YOU FLIP IT OVER AND LOOK

19   AT THE BEST BAG AND COULD YOU TELL US FROM THAT BEST BAG

20   WHERE THAT PACKAGE CAME FROM?

21          A      CAME FROM THE SLED DRUG ANALYSIS SECURITY

22   ENVELOPE AND IT WAS SIGNED BY ME ON THE 17TH OF JUNE 2009.

23          Q      OKAY, SO JUNE 17TH YOU, THAT IS THE EXACT

24   BEST BAG?

25          A      CORRECT.

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          71

1          Q     THAT YOU PUT THE DRUGS INTO?

2          A     CORRECT.

3          Q     OKAY ---

4          A     THE ONLY CHANGE TO IT THAT I DID NOT WRITE

5   THESE MARKINGS ON THE BAG, THAT WAS DONE BY, I GUESS BY

6   SLED.

7          Q     ALL RIGHT, THANK YOU --

8          (WHEREUPON, STATE'S EXHIBIT NUMBER 2 MARKED FOR

9   IDENTIFICATION.)

10         MS. BAILEY:    (CONTINUING)

11         Q     ALL RIGHT, NOW LET'S MOVE TO ANOTHER DAY

12  THREE DAYS LATER JUNE 20TH OF 2009.  COULD YOU TELL US WHAT

13  HAPPENED ON THAT DATE?

14         A     YES, MA'AM, ON JUNE 20TH, 2009, MEMBERS OF

15  THE ORGANIZED CRIME BUREAU, AGENT GRANT, MYSELF, AND WARD,

16  AGENT WARD, MET WITH MR. LEWIS HEREAFTER REFERRED TO AS CI

17  178.  WE MET HIM AT A PREDETERMINED LOCATION AT

18  APPROXIMATELY 3:15 IN THE THAT EVENING.  MR. LEWIS WAS

19  SEARCHED AND GIVEN MONEY OF TWO $20 BILLS AND ANOTHER $10

20  BILL.  HE ALSO WAS GIVEN A TRANSMITTER, ALL TAKING PLACE AT

21  3:18.  I WAS THE ONE THAT SEARCHED MR. LEWIS THAT DAY,

22  STILL FINDING NO CONTRABAND ON HIS PERSON AT THAT TIME.

23  MR. LEWIS THEN DEPARTED FROM THE MEETING LOCATION AT

24  APPROXIMATELY 3:22 HOURS, TRAVELING ON FOOT TO ███████████

25  ███████████ IN THE ANDREWS SECTION OF GEORGETOWN COUNTY WHERE

DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY                72

1   HE MET MR. HOLT THERE TO PURCHASE A SUSPECTED QUANTITY OF

2   CRACK COCAINE.

3           ONCE HE ARRIVED HE ARRIVED AT 3:30 WHERE HE MET

4   MR. HOLT THERE.  THE "CI" STATED THAT MR. HOLT OPENED THE

5   DOOR AND HE WENT INTO THE KITCHEN TABLE AND SAT DOWN WHERE

6   HE MADE A TRANSACTION FOR THE SUSPECTED CRACK COCAINE FOR A

7   SUM OF U.S. CURRENCY PROVIDED BY LAW ENFORCEMENT.

8           AT THAT TIME MR. LEWIS CAME BACK, MET WITH MYSELF

9   AND AGENT WARD.  I SEARCHED MR. LEWIS AGAIN, DEBRIEFED HIM

10  AND SECURED THE WIRE AND THE DRUGS FINDING NO CONTRABAND ON

11  HIS PERSON OTHER THAN THE ONE THAT HE BROUGHT BACK THAT HE

12  STATED THAT HE GOT FROM MR. HOLT.

13          AT THAT TIME THE SUSPECTED CRACK COCAINE WEIGHED

14  APPROXIMATELY 0.8 GRAMS.  IT ALSO WAS PLACED INTO A BEST

15  BAG AND DROPPED INTO THE DRUG DROP BOX WHEN I WENT BACK TO

16  THE SHERIFF'S OFFICE.

17          AN AUDIO, THE AUDIO OF THAT TRANSACTION WAS ALSO

18  PLACED IN THE EVIDENCE AND THAT INCIDENT OCCURRED WITHIN A

19  HALF MILE OF ANDREWS PRIMARY SCHOOL.

20          Q     OKAY, AND DID YOU MAINTAIN VISUAL

21  SURVEILLANCE DURING THAT INCIDENT?

22          A     YES, MA'AM.  WE SET UP AT THE SAME LOCATION

23  AND WATCHED HIM WALK DOWN HOLLYWOOD AVENUE AND I LOST

24  VISUAL CONTACT WITH HIM ONCE HE MADE THE RIGHT.

25          Q     OKAY, AND BEFORE MR. LEWIS WENT OFF TO BUY

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**          73

1    DRUGS DID HE HAVE ANY, WHEN YOU SEARCHED HIM DID YOU FIND

2    ANY ---

3          A    NO, MA'AM, HE DIDN'T HAVE ANYTHING ON HIM

4    AT THAT TIME.

5          Q    AND THEN WHEN HE CAME BACK WHAT DID HE HAVE

6    ON HIM?

7          A    HE JUST HAD THE SUSPECTED CRACK COCAINE

8    THAT HE STATED HE RETRIEVED FROM MR. HOLT.

9          Q    AND YOU WATCHED HIM AGAIN ON THE 20TH?  YOU

10   WATCHED HIM ---

11         A    YES, MA'AM, I WATCHED HIM WALK DOWN

12   HOLLYWOOD AVENUE.

13         Q    TOWARDS MR. HOLT'S RESIDENCE?

14         A    CORRECT.

15         Q    OKAY, AND DID YOU WATCH HIM COME BACK FROM

16   THAT SAME WAY?

17         A    YES, MA'AM.

18         Q    OKAY, AND WHAT DID YOU DO WITH, DID MR.

19   LEWIS GIVE YOU THE DRUGS?

20         A    YES, MA'AM, HE GAVE ME THE DRUGS LIKE I

21   SAID I PLACED THEM INTO MY LITTLE BAGGY THAT I KEEP WITH

22   ME, PLACED THEM INTO MY BOOK BAG, WENT BACK TO THE

23   SHERIFF'S OFFICE, WHICH I HAD WEIGHED IT INSIDE THE TRUCK

24   THAT DAY.  LIKE I SAID IT WEIGHED APPROXIMATELY 0.8 GRAMS

25   AT THE TIME, PLACED IT IN THE BACK OF MY, PLACED IT INTO MY

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY**                74

1  BOOK BAG AND THAT WAS IT.

2          Q     OKAY, AND IN WHAT MANNER DID YOU HANDLE

3  THESE DRUGS?

4          A     I HANDLED IT THE SAME WAY I DID ON THE

5  17TH.  IT STAYED WITH ME UNTIL I GOT BACK TO THE SHERIFF'S

6  OFFICE, ENTERED IT INTO A BEST BAG AND DROPPED IT INTO THE

7  DRUG DROP BOX, WHICH IS A SEALED MAILBOX.

8          Q     FOR THE RECORD I'M SHOWING YOU STATE'S

9  EXHIBIT FOR IDENTIFICATION PURPOSES ONLY STATE'S EXHIBIT 2,

10 IF YOU COULD JUST TAKE A MINUTE TO LOOK AT THAT?  WHAT CAN

11 YOU TELL US ABOUT WHAT YOU'RE LOOKING AT?

12         A     IT'S JUST A CLEAR BAGGY WHICH I HAD IN MY

13 POSSESSION AT THE TIME THAT I PLACED THE SUSPECTED DRUGS

14 IN.  LIKE I SAID, WHEN I GOT IT ON THE 17TH IT WAS A HARD

15 SUBSTANCE THEN NOW IT'S CRUMPLED UP.

16         Q     HOW ABOUT THE BEST BAG ON THE FRONT, CAN

17 YOU TELL US ANYTHING FROM THE BEST BAG?

18         MR. MCKNIGHT:   OBJECTION, LEADING.

19         THE COURT:   OVERRULED, I'LL ALLOW THAT.

20         THE WITNESS:   (CONTINUING)

21         A     LIKE I SAID, SLED DRUG ANALYSIS, WHICH IS

22 THEIR SECURITY ENVELOPE, ON IT IS OUR AGENCY NUMBER 22, I

23 SIGNED IT, I PRINT MY NAME AND SIGN MY NAME ON THE 20TH AND

24 PLACE IT INTO THE DRUG DROP BOX; AND THE ONLY CHANGES DONE

25 TO IT LIKE I SAID ON THE LAST ONE IS THAT I DID NOT PUT

74

**DEPUTY GRANT - DIRECT EXAMINATION BY MS. BAILEY** 75

1  THESE MARKINGS ON MY LITTLE, ON THIS LITTLE BAGGY.  IT WAS

2  DONE BY SLED.

3          MR. MCKNIGHT:   OBJECTION, THAT'S SPECULATIVE,

4  YOUR HONOR.  HE DOESN'T KNOW WHO MADE THE MARKINGS ON THE

5  BAG.

6          THE COURT:   ALL RIGHT, SUSTAINED.

7          MS. BAILEY:   YOUR HONOR, THE STATE WILL CONCEDE

8  THAT.  BEG THE COURT'S INDULGENCE.

9          THE COURT:   ALL RIGHT.

10         MS. BAILEY:    (CONTINUING)

11         Q     YOU MENTIONED THAT THESE BUYS HAPPENED ON

12  WHAT ROAD?

13         A     IT HAPPENED ON ██████████████

14         Q     OKAY, AND DO YOU KNOW WHICH COUNTY IT WAS

15  LOCATED IN?

16         A     IT HAPPENED IN GEORGETOWN COUNTY, THE

17  OPPOSITE SIDE OF THE ROAD IS WILLIAMSBURG COUNTY.

18         Q     OKAY, BUT THE SIDE OF THE ROAD THAT THESE

19  HAPPENED IN WAS GEORGETOWN?

20         A     IT WAS GEORGETOWN, CORRECT.

21         MS. BAILEY:   I HAVE NO FURTHER QUESTIONS FOR

22  THIS WITNESS, YOUR HONOR.

23         THE COURT:   ALL RIGHT, MR. MCKNIGHT?

24         MR. MCKNIGHT:   THANK YOU, YOUR HONOR.  MAY I

25  PROCEED, YOUR HONOR?

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**          76

1          THE COURT:   YES, SIR.

2                    **CROSS EXAMINATION**

3  **BY MR. MCKNIGHT:**

4          Q     MR. GRANT, WHERE ARE YOU FROM ORIGINALLY?

5          A     ORIGINALLY I'M FROM DOWNTOWN CHARLESTON.

6          Q     HOW LONG HAVE YOU LIVED IN GEORGETOWN

7  COUNTY?

8          A     LIVED IN GEORGETOWN COUNTY ABOUT TWO YEARS

9  NOW PROBABLY.

10          Q     YOU TESTIFIED THAT YOU WORKED AT THE

11 SHERIFF'S DEPARTMENT IN HIGH SCHOOL?

12          A     I VOLUNTEERED AT THE SHERIFF'S OFFICE WHEN

13 I WAS IN HIGH SCHOOL.

14          Q     WHAT YEAR DID YOU COME OUT OF HIGH SCHOOL?

15          A     I CAME OUT IN '03.

16          Q     AND YOU MOVED TO GEORGETOWN COUNTY WHAT

17 YEAR?

18          A     IT WAS, I WENT TO GEORGETOWN, I WAS BACK

19 AND FORTH BETWEEN CHARLESTON AND GEORGETOWN COUNTY.

20          Q     WHAT YEAR DID YOU MOVE?

21          A     I CAN'T REMEMBER.

22          Q     WHEN DID YOU START LIVING HERE?

23          A     I CAN'T REMEMBER.

24          Q     YOU'RE A DEPUTY NOW, RIGHT?

25          A     YES, SIR.

76

DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT          77

1          Q     AT THE TIME OF THIS INCIDENT YOU HAD A

2    DIFFERENT TITLE, DIDN'T YOU?

3          A     YES, AT THE TIME OF THAT INCIDENT I WAS AN

4    AGENT WITH THE ORGANIZED CRIME BUREAU.

5          Q     WHAT HAPPENED, WHY ARE YOU NO LONGER AN

6    AGENT?

7          A     WHY I AM NO LONGER AN AGENT?  MY MOM TOOK

8    SICK.  MY MOM GOT A HEART ATTACK, SHE WENT BACK, SHE WENT

9    TO CHARLESTON TO HAVE A SURGERY THERE.  I CAME OFF THE DRUG

10   TEAM BECAUSE I COULDN'T WORK THE HOURS SO THEY ASKED ME IF

11   I WANTED TO GO BACK ON PATROL AND I STATED, DIDN'T REALLY

12   WANT TO DO THAT SO THE CAPTAIN CAME TO ME AND ASKED ME

13   WOULD I GO TO THE DRUG INTERVENTION TEAM.  I WAS LIKE CAN

14   YOU DO THAT, SO THAT'S WHY I CAME OFF THE DRUG TEAM.

15         Q     WHAT HOURS DO YOU WORK NOW?

16         A     MY HOURS I WORK NOW IS FROM THREE TO THREE,

17   3 P.M. TO 3 A.M.

18         Q     SO HOW IS IT THEN THAT THAT'S MORE

19   CONVENIENT FOR YOU NOW WORKING FROM 3 P.M. TO 3 A.M. AS

20   OPPOSED TO WHEN YOU WERE WORKING THAT 3 P.M. DURING THE DAY

21   DURING THE MORNING HOURS?

22         A     WELL A LOT OF MY MOM'S APPOINTMENT WAS IN

23   THE MORNING TIME.  SHE HAD NO ONE TO TAKE HER TO THE DOCTOR

24   APPOINTMENT SO THAT'S WHY I DECIDED TO GO WITH THAT.  IT

25   WAS NEW, IT WAS A NEW DIVISION THAT WE WERE DOING AND I WAS

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**          78

1    INTERESTED IN THAT.

2          Q     SO LET ME GET THIS STRAIGHT.  IT'S YOUR

3    TESTIMONY HERE UNDER OATH THAT IT'S MORE CONVENIENT FOR YOU

4    TO WORK ALL NIGHT LONG AND THEN TAKE YOUR MOTHER TO THE

5    DOCTOR AS OPPOSED TO WORKING DURING THE DAY AND GETTING OFF

6    AND TAKING HER TO THE DOCTOR?

7          A     YES, IT IS MORE CONVENIENT BECAUSE IN A

8    DRUG TEAM WE DO A LOTS OF SURVEILLANCE.  WE START OFF IN

9    THE MORNING AND LIKE I SAID I CAN'T WORK THE HOURS AND TAKE

10   CARE OF MY MOM.

11         Q     SO WHEN DO YOU SLEEP?

12         A     I GET MY REST, I DO GET MY REST.

13         Q     ONCE AGAIN THE QUESTION IS WHEN DO YOU

14   SLEEP?

15         A     WHENEVER I GO TO SLEEP.

16         Q     IS THAT WHY YOU REGULARLY POST ON FACEBOOK

17   ALL DURING THE DAY?

18         A     NO.

19         Q     DO YOU RECALL, DO YOU HAVE A FACEBOOK PAGE?

20         A     YES, I DO.

21         Q     OKAY, I'LL TALK ABOUT THAT IN A MINUTE.

22   YOU SAID YOUR MOM GOT SICK WHEN?

23         A     IT WAS RIGHT BEFORE CHRISTMAS, RIGHT BEFORE

24   CHRISTMAS.

25         Q     SO NOW AND YOU'RE BEING HONEST WITH ME, YOU

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**    79

1  DIDN'T GET IN ANY TROUBLE AND GET DEMOTED, DID YOU?

2          A     NOPE.

3          Q     YOU CERTAIN ABOUT THAT?

4          A     I'M POSITIVE ABOUT THAT.

5          Q     NOW YOU SAID THAT YOU KEPT MR. LEWIS UNDER

6  CONSTANT SURVEILLANCE DURING THIS TRANSACTION?

7          A     YES, I DID.

8          Q     DID YOU SEE HIM ENTER THE RESIDENCE IN

9  QUESTION?

10          A     I DID NOT SEE HIM ENTER THE RESIDENCE, NO,

11  I DIDN'T.

12          Q     SO, THEREFORE, YOU DID NOT KEEP HIM UNDER

13  CONSTANT SURVEILLANCE?

14          A     I DID TESTIFY THAT ONCE MR. LEWIS WAS

15  WALKING TO HOLLYWOOD THAT HE MADE THE RIGHT THAT'S WHEN I

16  LOST VISUAL CONTACT OF HIM.

17          Q     AGAIN YOU DID NOT KEEP HIM UNDER CONSTANT

18  SURVEILLANCE?

19          A     NOT UNTIL HE MADE THE RIGHT ON HOLLYWOOD

20  AVENUE, NO, I DIDN'T.

21          Q     DID YOU AT ANY TIME SEE QUENTIN HOLT?

22          A     NO, I DIDN'T.

23          Q     WHAT DOES MR. HOLT'S HOUSE LOOK LIKE?

24          A     IT'S A MOBILE HOME, THAT'S ALL I CAN SAY.

25  IT'S A MOBILE HOME.

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT            80**

1        Q        DOUBLE WIDE, SINGLE WIDE, UNDERPINNED?

2        A        I DON'T KNOW.

3        Q        YOU'VE NEVER SEEN IT?

4        A        I'VE SEEN IT BUT I CAN'T REMEMBER IF IT WAS

5   A DOUBLE WIDE OR A SINGLE WIDE.

6        Q        DID YOU TAKE ANY PICTURES OF IT?

7        A        NO, SIR, I DIDN'T.

8        Q        YOU WENT THERE TWICE SO DO YOU KNOW WHETHER

9   OR NOT MR. LEWIS ENTERED THE HOUSE OF QUENTIN HOLT?

10       A        FROM HIS STATEMENT THAT HE TOLD US, YES.

11       Q        NO, SIR, DO YOU OF YOUR OWN KNOWLEDGE KNOW

12  WHETHER OR NOT HE ENTERED THE HOME OF QUENTIN HOLT?

13       A        NO, I DON'T.

14       Q        SO IT'S POSSIBLE THAT HE WENT INTO SOMEBODY

15  ELSE'S HOUSE?  SIR?

16       A        POSSIBLE.

17       Q        THANK YOU.  THE COURT REPORTER NEEDS TO

18  TAKE YOUR RESPONSE, SHE CAN'T TAKE GESTURES.  IS IT

19  POSSIBLE?

20       A        POSSIBLE.

21       Q        THANK YOU.  WHAT MAKES YOU THINK THAT THE

22  HOUSE YOU ENTERED OR YOUR "CI" MR. LEWIS WAS THE HOME OF

23  MR. HOLT?

24       A        ACCORDING TO MR. LEWIS THAT'S WHAT IT WAS.

25  LIKE I SAY WE WENT BACK AND LOOKED UP MR. HOLT'S ADDRESS

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**                 81

1   AND THAT'S THE ADDRESS WE CAME UP WITH.

2           Q     SO THE ONLY WAY YOU BASED YOUR ENTIRE

3   INVESTIGATION IS ON THAT OF MR. LEWIS, IS IT NOT?

4           A     CORRECT.

5           Q     DO YOU KNOW WHAT MR. LEWIS' RECORD IS?

6           A     NO, I DIDN'T AT THE TIME.

7           Q     WOULD IT SURPRISE YOU THAT HE HAD BEEN

8   CONVICTED OF ARMED ROBBERY?

9           A     IT WOULDN'T SURPRISE ME.

10          Q     WOULD IT SURPRISE YOU THAT HE HAD MULTIPLE

11  CONVICTIONS FOR SHOPLIFTING?

12          A     THAT WOULDN'T SURPRISE ME.

13          Q     IS IT NORMALLY THE POLICY OF THE GEORGETOWN

14  COUNTY SHERIFF'S OFFICE TO GIVE MONEY TO PEOPLE WHO ARE

15  KNOWN ABUSERS OF CRACK COCAINE?  DID YOU KNOW HE HAD A

16  SUBSTANCE ABUSE PROBLEM?

17          A     I DIDN'T KNOW THAT.

18          Q     AFTER YOU GAVE HIM THE $50 THAT YOU CLAIM

19  DO YOU KNOW WHAT HE DID WITH IT?

20          A     ACCORDING TO HIM HE WENT TO MR. HOLT'S

21  RESIDENCE AND PURCHASED THE SUSPECTED CRACK COCAINE WHICH

22  HE CAME BACK WITH.

23          Q     NO, SIR, I'M TALKING ABOUT THE MONEY YOU

24  GAVE HIM FOR HIS SERVICES.  DO YOU KNOW WHAT HE DID WITH

25  IT?

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT          82**

1          A    OH, NO, SIR, NO, SIR.

2          Q    YOU TESTIFIED THAT YOU GAVE HIM WAS IT $54

3  ONE TIME?

4          A    YES, SIR, $54.34.

5          Q    AND 34 CENTS, WHY 34 CENTS?

6          A    WELL WE DID A BUY, WE WENT AND BOUGHT HIM

7  SOMETHING AND WE HAD TO GET OUR BOOKS STRAIGHT SO THAT'S

8  WHY WE, TO EVEN IT OUT WE GIVE HIM 54.34 TO MAKE OUR BOOK

9  STRAIGHT.

10          Q    YOU'RE TELLING ME THAT YOU BOUGHT DOPE FROM

11  SOMEBODY AND THEY SOLD IT FOR YOU NOT FOR A ROUND NUMBER

12  BUT FOR SOME MONEY AND SOME CHANGE?

13          A    WE DIDN'T GIVE MR. HOLT THE CHANGE, WE GAVE

14  HIM $54.34.

15          Q    WHY?

16          A    BECAUSE I HAD TO GET MY BOOKS STRAIGHT,

17  THAT'S WHY.

18          Q    AND WHAT MADE YOUR BOOKS GO OFF?

19          A    WE WENT AND BOUGHT MR. LEWIS SOMETHING AND

20  WE LIKE TO HAVE EVEN NUMBERS IN OUR BOOKS SO THAT'S WHY WE

21  GAVE HIM 54.34.

22          Q    WHAT DID YOU BUY HIM?

23          A    I CAN'T REMEMBER AT THIS TIME.

24          Q    BUT YOU DID A SHEET, RIGHT?

25          MR. MCKNIGHT:    PERMISSION TO APPROACH THE

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**          83

1   WITNESS, YOUR HONOR?

2              THE COURT:   ALL RIGHT.

3              MR. MCKNIGHT:   (CONTINUING)

4              Q     DO YOU RECOGNIZE THAT DOCUMENT?

5              A     YES, SIR.

6              Q     COULD YOU EXAMINE IT FOR ME, PLEASE?

7              A     YES, SIR.

8              Q     YOU MIGHT WANT TO TURN IT OVER TO EXAMINE

9   IT MAKE SURE IT'S A TRUE DOCUMENT.  IS THAT, DO YOU

10  RECOGNIZE THIS DOCUMENT?

11             A     YES, SIR.

12             Q     WHAT IS THAT DOCUMENT?

13             A     IT'S A STATEMENT THAT MR. LEWIS AND I

14  WROTE.

15             Q     ON THAT STATEMENT ARE YOU NOT REQUIRED TO

16  LIST EVERYTHING YOU GIVE TO THE "CI"?

17             A     NO, SIR, ACTUALLY IT WAS A DIFFERENT BUY

18  WHERE WE BOUGHT MR. LEWIS SOMETHING, NOT THIS BUY.  I JUST

19  HAD TO GET MY BOOKS STRAIGHT WITH THAT BUY; IT'S TOTALLY

20  DIFFERENT CASES.

21             Q     WELL WHERE IS THAT SHEET?

22             A     IT'S NOT IN REFERENCE TO THIS CASE SO I

23  DON'T NEED THAT SHEET.

24             Q     BUT IT'S AT ISSUE NOW.  WHAT DID YOU BUY

25  HIM?

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**          84

1        A     I CAN'T REMEMBER, I CAN'T REMEMBER.  IT'S

2   NOT, IT'S NOT IN REFERENCE TO THIS CASE SO --

3        Q     SO NOW WE KNOW THAT YOU GAVE MR. LEWIS

4   SOMETHING AND SOME MONEY, WHAT IT WAS WE DON'T KNOW, RIGHT?

5        A     CORRECT.

6        Q     HOW MANY HOUSES ARE BACK THERE WHERE MR.

7   HOLT'S HOUSE IS?

8        A     ANYWHERE BETWEEN I BELIEVE FOUR TO FIVE.

9        Q     SO IT'S POSSIBLE THAT HE COULD HAVE, HE HAD

10   A ONE IN FIVE CHANCE TO GOING TO MR. HOLT'S HOUSE?  HE

11   COULD HAVE GONE TO SOMEBODY ELSE'S HOUSE?

12       A     HE COULD HAVE.

13       Q     HAVE YOU EVER SHOWN HIM A PICTURE OF MR.

14   HOLT?

15       A     NO, SIR.

16       Q     SO YOU DON'T, SO IT'S POSSIBLE THAT HE TOLD

17   YOU SOMEBODY ELSE AND WAS CALLING HIM QUENTIN; IS IT

18   POSSIBLE?

19       A     IT'S POSSIBLE BUT --

20       Q     YOU WENT INTO GREAT DETAIL ABOUT YOUR BEST

21   KIT, RIGHT?

22       A     YES, SIR.

23       Q     BEST IS AN ACRONYM, IS IT NOT?

24       A     I HAVE NO IDEA.

25       Q     DO YOU KNOW WHAT IT STANDS FOR?

84

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**                85

1          A     NO, SIR.

2          Q     YOU WENT TO THE ACADEMY, RIGHT?

3          A     YES, SIR, WE DIDN'T TOUCH ON THE BEST BAG

4   OR WENT OVER THE BEST BAG AT THE ACADEMY.

5          Q     SO IS YOUR TESTIMONY THAT YOU DON'T KNOW

6   HOW TO PROPERLY HANDLE DRUGS?

7          A     I DO KNOW HOW TO PROPERLY HANDLE DRUGS.

8          Q     WHAT DOES CRACK LOOK LIKE?

9          A     IT'S AN OFF WHITE HARD ROCK LIKE SUBSTANCE.

10         Q     OFF WHITE HARD ---

11         A     CORRECT.

12         Q     --- ROCK LIKE SUBSTANCE, CORRECT?

13         A     CORRECT.

14         Q     THIS LOOK HARD TO YOU?

15         A     NO, AND I TESTIFIED TO THAT.

16         Q     SO IT'S VERY POSSIBLE THIS AIN'T CRACK?

17  COULD BE PARMESAN CHEESE, COULD IT NOT?

18         A     COULD BE.

19         Q     THIS A HARD ROCK LIKE SUBSTANCE?

20         A     NO, SIR.

21         Q     DID YOU BOTHER TO TAKE ANY PICTURES OF THE

22  DRUGS BEFORE YOU PUT IT IN THE BEST BAG?

23         A     YES, SIR.

24         Q     YOU DID?

25         A     YES, SIR, BUT THROUGH OUR TECHNOLOGY ON OUR

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**                86

1    COMPUTER SOMETHING HAPPENED TO OUR PICTURES ON OUR

2    COMPUTERS.

3              Q    SOMETHING HAPPENED?  WHAT HAPPENED?

4              A    I HAVE NO IDEA, I'M NOT A COMPUTER TECH.

5              Q    DID YOU DO A REPORT SAYING, "HEY, WE LOST

6    SOME EVIDENCE?"

7              A    NO, BECAUSE AT THE TIME WE DIDN'T KNOW

8    EVIDENCE WAS LOST.

9              Q    SO WHEN YOU FOUND OUT DID YOU DO A REPORT?

10             A    NO, I DIDN'T BECAUSE I JUST FOUND OUT.

11             Q    JUST FOUND OUT WHEN?

12             A    AS OF LAST WEEK FRIDAY WHEN I KNOW I HAD TO

13   COME TO COURT FOR THIS CASE.

14             Q    DID YOU TELL THE SOLICITOR THAT?

15             A    SHE KNOWS THAT.

16             Q    DID YOU TELL HER THAT?

17             A    NO, I DIDN'T.

18             Q    HOW DO YOU KNOW SHE KNEW?

19             A    BECAUSE I'M PRETTY SURE MY LIEUTENANT GOT

20   IN CONTACT WITH HER.

21             Q    SO YOU DIDN'T DO IT AND YOU DON'T KNOW FOR

22   SURE IF YOUR LIEUTENANT DID, DO YOU?

23             A    I DON'T KNOW, NO.

24             MR. MCKNIGHT:   THE COURT'S INDULGENCE.

25             THE COURT:   ALL RIGHT.

86

**DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT**                87

1          MR. MCKNIGHT:    PERMISSION TO APPROACH, YOUR

2   HONOR?

3          THE COURT:    ALL RIGHT.

4          MR. MCKNIGHT:   (CONTINUING)

5          Q     DO YOU RECOGNIZE THAT DOCUMENT?

6          A     YES, SIR.

7          Q     WHAT IS IT?

8          A     IT'S A DOCUMENT OF OUR CONFIDENTIAL

9   INFORMANT SHEET.

10          Q     AND THAT CONFIDENTIAL INFORMANT SHEET SAYS

11   THAT YOU MADE PURCHASES THAT HE DEPARTED AND RETURNED AT

12   WHAT TIME?

13          A     AT 15, AT 3:30 AND I GOT HIM COMING BACK AT

14   3:40.

15          Q     OKAY, YOU GOT THAT IN MILITARY TIME, RIGHT,

16   SO THAT'S 1530?

17          A     YES.

18          Q     AND IN MILITARY TIME 1530 IS 3:30 P.M.?

19          A     CORRECT.

20          Q     CORRECT?

21          A     YES, SIR.

22          Q     LIKEWISE IF IT IS 2:00 IT WOULD BE 1400

23   HOURS?

24          A     CORRECT.

25          Q     WHICH WOULD MEAN IT WOULD BE 2 P.M.

DEPUTY GRANT - CROSS EXAMINATION BY MR. MCKNIGHT          88

1          A      CORRECT.

2          Q      HOW IS IT THAT YOU PHOTOCOPIED THAT FORM AT

3    1440 BUT YOU LISTED DEPARTURE AND ARRIVAL TIMES AS BEING

4    1530; HOW IS THAT POSSIBLE?

5          A      BECAUSE IT ALL DEPENDS ON YOUR SITUATION.

6    EITHER SOMEONE COULD HAVE PULLED UP TO OUR PREDETERMINED

7    LOCATION WHERE WE WOULD HAVE HAD TO SECURE THE INFORMANT

8    THAT SO NO ONE CAN SEE HIM.  THERE'S BEEN SEVERAL TIMES THE

9    WIRE MAY NOT HAVE BEEN WORKING RIGHT AND WE HAD TO FIGURE

10   OUT WHICH FREQUENCY TO PUT THE WIRE ON SO THAT TAKES TIME

11   ALSO, SO THAT'S WHY IT MADE THE TIME LAPSE LIKE THAT.

12         Q      BUT THE TIME WOULD LAPSE FORWARD NOT GO

13   BACKWARDS?

14         A      IT DIDN'T WENT BACKWARDS.  IT WENT FROM

15   PHOTOCOPY AT 1440 ---

16         Q      1440?

17         A      I PHOTOCOPIED AT THE SHERIFF OFFICE AT

18   1440, THAT'S WHAT IT WAS PHOTOCOPIED, THE MONEY.

19         Q      YOU DON'T SAY ANYTHING ABOUT MONEY ON HERE,

20   DO YOU?

21         A      UP UNTIL THE TIME I PAID HIM, YEAH.

22         Q      IT SAYS, READ THAT LINE, IT SAYS

23   PHOTOCOPIED BY WHO?

24         A      GRANT.

25         Q      WHAT TIME?

88

DEPUTY GRANT - REDIRECT BY MS. BAILEY                     89

1           A     AT 1440.

2           Q     WHERE IS THE REFERENCE TO MONEY?

3           A     AT THE SERIAL NUMBERS ABOVE THAT.

4           Q     SO IS THIS YOUR TESTIMONY THAT YOU

5  PHOTOCOPIED THE MONEY AT 2:40?

6           A     YES, SIR.

7           Q     AND YOU ARE CERTAIN, AND THIS IS VERY

8  IMPORTANT AND YOU TOOK AN OATH, YOU ARE CERTAIN THAT THIS

9  TRANSACTION THAT YOU'VE ALLEGED THAT MY CLIENT DID OCCURRED

10 AT ██████████████████

11          A     ACCORDING TO THE COMPUTERS THAT WE HAVE IN

12 OUR SHERIFF'S OFFICE OF MR. HOLT'S ADDRESS THAT'S WHAT IT

13 COMES UP TO ██████████████

14          Q     YOU'RE CERTAIN THAT'S HIS ADDRESS?

15          A     I'M NOT CERTAIN BUT IT'S IN THAT VICINITY.

16          Q     CAN I HAVE THAT FORM?

17          A     YES, SIR.

18          MR. MCKNIGHT:   NO MORE QUESTIONS OF THIS

19 WITNESS.

20          THE COURT:   REDIRECT?

21          MS. BAILEY:   BRIEFLY, YOUR HONOR.

22                    REDIRECT EXAMINATION

23 BY MS. BAILEY:

24          Q     IS THE HOLT RESIDENCE RIGHT ON THE ROAD?

25          A     YES, MA'AM.

**DEPUTY GRANT - REDIRECT BY MS. BAILEY** 90

1  Q    OKAY, IS THERE A CURVE IN THE ROAD NEAR THE

2  HOLT RESIDENCE?

3  A    THERE'S A CURVE APPROXIMATELY A HALF MILE,

4  YEAH, CORRECT.

5  Q    OKAY, AND DID YOU WANT ANYONE WHO WAS

6  SITTING IN THE HOLT RESIDENCE TO BE ABLE TO SEE YOU?

7  A    NO, MA'AM.

8  Q    SITTING THERE?

9  A    NO, MA'AM.

10  Q    WERE YOU IN AN SUV?

11  A    YES, MA'AM, THAT IS VERY NORMAL.

12  Q    SO YOUR SUV YOU THINK IS KNOWN IN THE

13  COMMUNITY?

14  A    CORRECT.

15  Q    OKAY, SO YOU DIDN'T WANT THEM TO SEE YOU?

16  A    CORRECT.

17  Q    ALL RIGHT, YOU TESTIFIED JUST A FEW MINUTES

18  AGO THAT IT'S POSSIBLE THAT THE "CI" BOUGHT THE DRUGS FROM

19  SOMEBODY ELSE; DID YOU HAVE ANY REASON TO THINK THAT THAT'S

20  TRUE?

21  A    NO, MA'AM.

22  Q    DID YOU HAVE ANY REASON TO THINK THAT THE

23  "CI" BOUGHT THE DRUGS FROM ANYBODY OTHER THAN QUENTIN HOLT?

24  A    NO, MA'AM, I THINK HE BOUGHT IT FROM, LIKE

25  HE SAID HE WAS, I NEVER HAD MR. LEWIS TO LIE TO ME THAT I

90

**DEPUTY GRANT - REDIRECT BY MS. BAILEY**                                    91

1   KNOW OF.

2          Q     OKAY, YOU TESTIFIED THAT YOU GAVE SOMETHING

3   TO MR. LEWIS, THE CONFIDENTIAL INFORMANT, A DIFFERENT BUY?

4          A     CORRECT.

5          Q     WHICH IS WHY WE'VE GOT THAT ODD NUMBER?

6          A     CORRECT.

7          Q     THE 54.36?

8          A     CORRECT.

9          Q     AND YOU DON'T, DO YOU REMEMBER WHAT IT WAS

10  YOU GAVE HIM?

11         A     I DON'T REMEMBER BUT IT WAS PREVIOUS BUYS

12  BEFORE THAT AND IF I HAVE TO TAKE A GUESS ON IT IT WOULD BE

13  A SHIRT THAT WE WENT TO FAMILY DOLLAR AND BUY FOR THE

14  BUTTON CAM.

15         Q     SO DO YOU REMEMBER IF YOU BOUGHT HIM A

16  HOUSE?

17         A     NO, MA'AM.

18         Q     DID YOU BUY HIM A CAR?

19         A     NO, MA'AM.

20         Q     DID YOU BUY HIM AN IPOD?

21         A     NO, MA'AM.

22         Q     IS IT YOUR TESTIMONY THAT IT'S MOST LIKELY

23  THAT SOMETHING IN DOLLAR-WISE LIKE A SHIRT?

24         A     CORRECT.

25         Q     AND WE DIDN'T REALLY GET TO TALK ABOUT THIS

**DEPUTY GRANT - REDIRECT BY MS. BAILEY**                    92

1  BUT JUST CLARIFY FOR THE JURY'S INFORMATION, ON THAT FORM

2  THAT MR. MCKNIGHT WAS REFERENCING IT TALKS ABOUT

3  PHOTOCOPYING FOR THE TIME.  WHAT IS IT THAT YOU

4  PHOTOCOPIED?

5            A     I PHOTOCOPIED THE MONEY THAT WAS PROVIDED

6  BY LAW ENFORCEMENT.

7            Q     AND WOULD THAT HAVE BEEN DONE BEFORE OR

8  AFTER THE BUY?

9            A     BEFORE.

10           Q     OKAY, SO IT WAS BEFORE THE BUY AT 1440 YOU

11 PHOTOCOPIED THE MONEY?

12           A     CORRECT.

13           Q     AND THEN THE BUY HAPPENED AT WHEN, 3:30?

14           A     3:30.

15           MS. BAILEY:   OKAY, NO FURTHER QUESTIONS.

16           THE COURT:   ALL RIGHT, YOU MAY STEP DOWN.

17           THE WITNESS:   THANK YOU, SIR.

18           THE COURT:   LET ME SEE THE ATTORNEYS FOR A

19 SECOND.

20           (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE

21 RECORD IN THE PRESENCE OF THE JURY, BUT OUT OF THE HEARING

22 OF THE JURY AND THE COURT REPORTER.)

23           THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN, WE

24 WERE JUST TRYING TO GET SOME SCHEDULING.  BEFORE WE TAKE

25 THIS NEXT WITNESS I THINK WE'RE GOING TO GO AHEAD AND BREAK

**DEPUTY GRANT - REDIRECT BY MS. BAILEY**                    93

1  FOR LUNCH SO I'M GOING TO EXCUSE YOU TO GO TO LUNCH.  IT'S

2  ABOUT 12:20, PLEASE BE BACK AT 1:45, THAT WILL GIVE YOU

3  ABOUT AN HOUR AND 25 MINUTES TO EAT LUNCH, BE BACK IN THE

4  JURY ROOM AT 1:45.

5          PLEASE DO NOT DISCUSS THE CASE EVEN AMONG

6  YOURSELVES AT THIS POINT IN TIME; IT'S TOO EARLY TO BEGIN

7  DELIBERATIONS.  I'LL TELL YOU WHEN YOU CAN DISCUSS THE

8  CASE.  DO NOT DISCUSS THE CASE WITH ANYONE.  DON'T CONDUCT

9  ANY INDEPENDENT INVESTIGATIONS, DON'T GO LOOKING ON THE

10 INTERNET TO TRY TO FOUND OUT ANYTHING ABOUT THE CASE OR

11 LOOKING IN THE NEWSPAPERS OR DISCUSSING ANYTHING WITH

12 ANYONE.  YOUR DECISION IS TO BE BASED EXCLUSIVELY ON THE

13 TESTIMONY AND THE EVIDENCE PRESENTED IN THE TRIAL.

14          I'LL EXCUSE YOU TO LUNCH, HOPE EVERYONE HAS A

15 GOOD LUNCH AND WE'LL SEE YOU BACK AT 1:45, THANK YOU VERY

16 MUCH.  EVERYBODY PLEASE REMAIN SEATED WHILE THE JURY IS

17 EXCUSED.

18          (WHEREUPON, THE JURY WAS EXCUSED FOR LUNCH AT

19 12:21 P.M.)

20          THE COURT:  ALL RIGHT, ANYTHING FROM THE STATE

21 BEFORE WE BREAK FOR LUNCH?

22          MS. BAILEY:  NOTHING, YOUR HONOR.

23          THE COURT:  ANYTHING FROM THE DEFENSE?

24          MR. MCKNIGHT:  YOUR HONOR, JUST AS A MATTER JUST

25 FOR CLARITY, I KNOW THAT WITH THE COURT WHEN A PERSON

**DEPUTY GRANT - REDIRECT BY MS. BAILEY**                                    94

1   APPEARS THEIR BOND IS SATISFIED AND SO FOR THE PURPOSES OF

2   LUNCH IS MY CLIENT FREE TO LEAVE THE COURTHOUSE OR YOU

3   GOING TO TAKE HIM INTO CUSTODY?

4            THE COURT:    WHAT'S THE STATE'S POSITION?

5            MS. BAILEY:    YOUR HONOR, THE STATE'S POSITION IS

6   SIMPLY THAT AS LONG AS MR. HOLT UNDERSTANDS THAT THIS TRIAL

7   WILL CONTINUE IN HIS ABSENCE.

8            THE COURT:    OKAY, ANY FAILURES TO APPEAR OR

9   ANYTHING OF THAT NATURE WITH HIM?

10            MR. MCKNIGHT:    YOUR HONOR, SO YOU KNOW HE DID,

11   THERE WAS A FAILURE TO APPEAR BUT THAT WAS BASED ON AN

12   ERROR IN MAILING.

13            THE COURT:    OKAY.

14            MR. MCKNIGHT:    IT SIMPLY GOT MIXED UP BUT I'VE

15   BEEN REPRESENTING HIM AT LEAST FOR THE LAST THREE OR FOUR

16   MONTHS AND I'VE HAD NO PROBLEMS GETTING HIM.

17            THE COURT:    ALL RIGHT, WELL I'LL GO AHEAD AND

18   I'LL ALLOW HIM TO GO TO LUNCH.    JUST KEEP IT IN MIND THAT

19   THE TRIAL IS GOING TO GO FORWARD REGARDLESS OF WHETHER HE'S

20   PRESENT OR NOT PRESENT, OKAY.

21            MR. MCKNIGHT:    YES, SIR.

22            THE COURT:    ALL RIGHT, AND HE IS REMINDED IF HE

23   DOESN'T APPEAR THEN THERE WILL BE A BENCH WARRANT THAT

24   WE'LL ISSUE ON THAT AND HE CAN BE CHARGED WITH FAILURE TO

25   APPEAR, OKAY.

94

**DEPUTY GRANT - REDIRECT BY MS. BAILEY**                                    95

1          MR. MCKNIGHT:   YES, SIR.

2          THE COURT:   ALL RIGHT, THANK YOU VERY MUCH.

3    WE'LL STAND IN RECESS TILL 1:45.

4          MS. BAILEY:   THANK YOU, YOUR HONOR.

5          (WHEREUPON, COURT WAS RECESSED FOR LUNCH AND THE

6    FOLLOWING TAKES PLACE ON THE RECORD AFTER THE LUNCH

7    RECESS.)              (WHEREUPON, STATE'S EXHIBITS

8    NUMBER 3 AND 4 MARKED FOR IDENTIFICATION.)

9          THE COURT:   ANYTHING FROM THE STATE BEFORE WE

10   BEGIN?

11         MS. BAILEY:   NOTHING, YOUR HONOR.

12         THE COURT:   ANYTHING FROM THE DEFENSE?

13         MR. MCKNIGHT:   NOTHING FROM THE DEFENSE, YOUR

14   HONOR.

15         THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

16   ---

17         MS. BAILEY:   YOUR HONOR, WE'RE GETTING READY TO

18   CALL THE CONFIDENTIAL INFORMANT, I GUESS WE SHOULD PROBABLY

19   GO OVER HIS RECORD BRIEFLY.  THE STATE RECOGNIZES THAT

20   THERE WILL BE SEVERAL CONVICTIONS THAT WOULD COME IN ON THE

21   DEFENDANT'S RECORD.

22         IN '91 ARMED ROBBERY FOR WHICH HE SERVED A 10-

23   YEAR SENTENCE, I THINK HE'S STILL UNDER THAT SENTENCE 10

24   YEARS FROM TODAY, I THINK THAT COMES IN.

25         THERE IS, IN '97 THERE'S A CRIMINAL SEXUAL

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY** 96

1  CONDUCT FIRST WITH NO DISPOSITION AND THE STATE JUST WANTED

2  TO BE SURE THAT WAS NOT GOING TO BE ADDRESSED.

3          OKAY, AND THEN A WHOLE BUNCH OF SHOPLIFTINGS AND

4  A BREACH OF TRUST.

5          AND JUST WANTED TO PUT ON THE RECORD THAT WE'RE

6  ALL ON THE SAME PAGE AS TO WHAT ---

7          MR. MCKNIGHT:   SHOPLIFTING AND BREACH OF TRUST?

8          MS. BAILEY:   RIGHT.

9          THE COURT:   ALL RIGHT, SO YOU'VE GOT AN ARMED

10  ROBBERY THAT CAN COME IN?

11          MS. BAILEY:   YES, YOUR HONOR.

12          THE COURT:   HOW MANY SHOPLIFTINGS?

13          MS. BAILEY:   I COUNTED SEVEN CONVICTIONS AND

14  THREE PENDING.

15          MR. MCKNIGHT:   THAT'S WHAT I COUNTED AS WELL,

16  JUDGE, SEVEN ARMED ROBBERIES, I MEAN SHOPLIFTINGS, EXCUSE

17  ME.

18          THE COURT:   SEVEN SHOPLIFTINGS THAT CAN COME IN?

19          MR. MCKNIGHT:   YES, SIR.

20          THE COURT:   AND WHAT WAS THE OTHER?

21          MS. BAILEY:   AND BREACH OF TRUST.

22          MR. MCKNIGHT:   AND THE ARMED ROBBERY.

23          MS. BAILEY:   AND THE ARMED ROBBERY.

24          THE COURT:   ALL RIGHT, SO ONE ARMED ROBBERY CAN

25  COME IN, SEVEN SHOPLIFTINGS CAN COME IN, AND ONE BREACH OF

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY** 97

1  TRUST?

2         MS. BAILEY:   YES, YOUR HONOR.

3         MR. MCKNIGHT:   YES, SIR.

4         THE COURT:   OKAY.

5         MS. BAILEY:   I THINK WE ALL AGREE ON THAT?

6         THE COURT:   ALL RIGHT, ANYTHING ELSE?

7         MS. BAILEY:   THAT'S IT FROM THE STATE.

8         MR. MCKNIGHT:   NOTHING FROM THE DEFENSE.

9         THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

10  THE JURY IN.

11         (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

12  2:01 P.M.)

13         THE COURT:   LADIES AND GENTLEMEN, WELCOME BACK,

14  I HOPE EVERYONE HAD A GOOD LUNCH.  WE'RE READY TO RESUME

15  THE TRIAL OF THIS CASE.  MS. BAILEY, YOU CAN CALL YOUR NEXT

16  WITNESS.

17         MS. BAILEY:   THANK YOU,  YOUR HONOR, THE STATE

18  CALLS JOE NATHAN LEWIS.

19         THE COURT:   ALL RIGHT.  ALL RIGHT, MR. LEWIS, IF

20  YOU'D COME AROUND HERE, PLEASE.

21                  **JOE NATHAN LEWIS**

22      **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

23         MADAM CLERK:   PLEASE BE SEATED AND STATE YOUR

24  FULL NAME FOR THE RECORD.

25         THE WITNESS:   JOE NATHAN LEWIS.

MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY                    98

1              THE COURT:    ALL RIGHT, IF YOU COULD SPEAK UP,

2    PLEASE, AND SPEAK INTO THE MICROPHONE, THANK YOU.

3              THE WITNESS:    JOE NATHAN LEWIS.

4              THE COURT:    ALL RIGHT, MS. BAILEY.

5              MS. BAILEY:    THANK YOU, YOUR HONOR.

6                        **DIRECT EXAMINATION**

7    BY MS. BAILEY:

8              Q     MR. LEWIS, DO YOU KNOW SOMEONE NAMED

9    QUENTIN HOLT?

10             A     YES, I DO.

11             Q     OKAY, HOW DO YOU KNOW SOMEONE NAMED QUENTIN

12   HOLT?

13             A     I MADE A SALE FROM HIM.

14             Q     OKAY, DID YOU KNOW HIM BEFORE THAT?

15             A     YES.

16             Q     HOW LONG HAVE YOU KNOWN HIM?

17             A     PROBABLY ABOUT 10 YEARS.

18             Q     TEN YEARS, AND HOW DID YOU GET TO KNOW HIM?

19             A     FROM BUYING DRUGS FROM HIM.

20             Q     AND DID HE HAVE ANY STREET NAMES OR OTHER

21   NAMES HE WENT BY?

22             A     BARLEY.

23             Q     WOULD YOU SAY THAT AGAIN?

24             A     BARLEY.

25             Q     BARLEY?

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                99

1              A      YEAH.

2              Q      OKAY, AND ON JUNE 17TH OF 2009 DID YOU BUY

3    DRUGS FROM HIM?

4              A      YES, I DID.

5              Q      OKAY, CAN YOU TELL US ABOUT HOW IT HAPPENED

6    THAT DAY?

7              A      YES.  ME AND SOME AGENTS WE SET UP THE BUY,

8    CALLED HIM, HE SAID HE HAD IT, SO I WENT AND BOUGHT IT,

9    CAME BACK WITH IT.

10             Q      OKAY, DO YOU REMEMBER WHERE YOU WENT?

11             A      TO HIS TRAILER HOUSE.

12             Q      TO HIS TRAILER?

13             A      YEAH.

14             Q      DO YOU REMEMBER WHAT ROAD THAT WAS ON?

15             A      ███████████

16             THE COURT:    EXCUSE ME, SIR, YOU'RE GOING TO HAVE

17   TO SPEAK UP.  THE COURT REPORTER SAYS SHE CANNOT HEAR YOU.

18   SPEAK UP LOUD AND CLEARLY INTO THE MICROPHONE, PLEASE.

19             THE WITNESS:   (CONTINUING)

20             A      ON THE ███████████

21             Q      DID THEY SEARCH YOU BEFORE YOU WENT?

22             A      YES, THEY DID.

23             Q      AND DID THEY SEARCH YOU AFTER YOU GOT BACK?

24             A      YES, THEY DID.

25             Q      ON JUNE, THAT SAME DAY ON JUNE 17TH WHEN

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                100

1  YOU WENT OUT THERE DID, DID THEY PUT ANY KIND OF WIRE ON

2  YOU?

3           A     YES.

4           Q     RECORDER?

5           A     YES.

6           Q     AND DO YOU REMEMBER HOW MUCH MONEY YOU GAVE

7  MR. HOLT?

8           A     YES, $50.

9           Q     OKAY, AND DO YOU REMEMBER HOW MUCH HE GAVE

10  YOU BACK, IF ANYTHING?

11           A     HE GAVE ME DRUGS, THAT'S IT.

12           Q     OKAY, DO YOU KNOW HOW MUCH DRUGS?

13           A     $50 WORTH.

14           Q     OKAY, WHAT DID YOU THINK THOSE DRUGS WERE,

15  WHAT KIND OF DRUGS?

16           A     CRACK COCAINE.

17           Q     OKAY, I'M GOING TO HAND --

18           MS. BAILEY:   FOR THE RECORD I'M HANDING MR.

19  LEWIS WHAT HAS BEEN PREVIOUSLY MARKED AS STATE'S EXHIBIT 3

20  FOR IDENTIFICATION PURPOSES ONLY.

21           MS. BAILEY:    (CONTINUING)

22           Q     DO YOU RECOGNIZE THAT, MR. LEWIS?

23           A     YES, I DO.

24           Q     OKAY, HAVE YOU LISTENED TO THAT BEFORE

25  TODAY?

100

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                101

1        A      YES, ONCE.

2        Q      ONCE, OKAY, WHEN DID YOU HAVE OCCASION TO

3   LISTEN TO THAT?

4        A      THE INVESTIGATOR CAME BY THE JAIL.

5        Q      OKAY, SO SOMEBODY CAME OUT TO THE JAIL AND

6   PLAYED THIS FOR YOU; IS THAT CORRECT?

7        A      YES.

8        Q      OKAY, AND WHEN YOU LISTENED TO THIS WAS

9   THIS A TRUE AND ACCURATE RECORDING OF WHAT HAPPENED ON THE

10  DAY OF JUNE 17TH OF 2009?

11       A      CORRECT.

12       Q      OKAY, WERE THERE ANY ADDITIONS OR DELETIONS

13  ON THIS RECORDING BASED ON YOUR MEMORY?

14       A      NO, NO.

15       Q      DO YOU HAVE ANY ADDITIONS OR DELETIONS THAT

16  YOU NEED TO MAKE TO THIS TO MAKE IT TRUE AND ACCURATE?

17       A      NO, I DON'T.

18       MS. BAILEY:   YOUR HONOR, AT THIS TIME THE STATE

19  WOULD MOVE TO INTRODUCE STATE'S EXHIBIT NUMBER 3 INTO

20  EVIDENCE; THIS IS AN AUDIO RECORDING?

21       THE COURT:   ALL RIGHT, MR. MCKNIGHT?

22       MR. MCKNIGHT:   YES, SIR, YOUR HONOR, I DO HAVE

23  SOME OBJECTIONS, THE FIRST OF IT BEING HEARSAY.  IF THERE'S

24  ANYTHING ON IT ---

25       MS. BAILEY:   YOUR HONOR, I THINK WE SHOULD DO

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                102

1  THIS OUTSIDE, IF THAT'S OKAY.

2          MR. MCKNIGHT:   YES.

3          THE COURT:   ALL RIGHT, ALL RIGHT, LADIES AND

4  GENTLEMEN, I'M GOING TO EXCUSE YOU BACK TO THE JURY ROOM.

5  WE HAVE AN ISSUE OF LAW THAT WE NEED TO TAKE UP AND I'LL

6  TELL YOU WHY WE EXCUSE YOU BACK TO THE JURY ROOM.  IT'S NOT

7  THAT WE'RE TRYING TO HIDE ANYTHING FROM YOU OR KEEP

8  ANYTHING FROM YOU, BUT AS I TOLD YOU EARLIER YOU ARE THE

9  SOLE JUDGE OF THE FACTS OF THIS CASE.  I AM THE JUDGE OF

10  THE LAW IN THIS CASE BUT WHEN WE DECIDE SOME OF THESE

11  ISSUES OF LAW IT REQUIRES THE ATTORNEYS AND MYSELF TO

12  DISCUSS FACTUAL ISSUES.  WELL THAT IS NOT EVIDENCE SO WE

13  DON'T WANT ANYTHING THAT THE ATTORNEYS MAY SAY OR ANYTHING

14  THAT I MAY SAY TO INFLUENCE YOU IN YOUR FACTUAL

15  DETERMINATION BECAUSE YOU'RE TO DETERMINE THE FACTS

16  EXCLUSIVELY FROM THE TESTIMONY OF THE WITNESSES, AND SO

17  THAT'S WE EXCUSE YOU BACK TO THE JURY ROOM.  I'M GOING TO

18  EXCUSE YOU BACK AT THIS TIME AND WE'LL BRING YOU BACK OUT

19  IN JUST A MINUTE, THANK YOU VERY MUCH.

20          (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

21  2:08 P.M.)

22          THE COURT:   ALL RIGHT, MR. MCKNIGHT, LET ME HEAR

23  FROM YOU?

24          MR. MCKNIGHT:   YOUR HONOR, I HAVE SOME

25  OBJECTIONS, FIRST OF ALL BEING HEARSAY.  IF THERE IS ANY

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**     103

1  TESTIMONY ON THERE FROM ANYONE OTHER THAN THE PERSON THAT'S

2  IN COURT IT'S BEING OFFERED FOR THE TRUTH OF THE MATTER

3  ASSERTED, THEREFORE, THE TESTIMONY IS MOST DEFINITELY

4  HEARSAY.  BEYOND THAT IF THERE'S ANYTHING THAT'S PURPORTED

5  TO BE MY CLIENT WE WOULD OBJECT UNDER THE FIFTH AMENDMENT

6  OF THE UNITED STATES CONSTITUTION.  THOSE ARE MY TWO

7  PRIMARY OBJECTIONS.

8         THE COURT:  ALL RIGHT.

9         MS. BAILEY:  YOUR HONOR, ANY STATEMENTS BY THE

10  DEFENDANT ON THE AUDIO RECORDING ARE GOING TO BE STATEMENTS

11  ALREADY NOTED.

12         THE COURT:  WELL I MEAN THAT'S, AND I THINK HIS

13  OBJECTION IS ANY STATEMENTS MADE BY SOMEONE ELSE OTHER THAN

14  THIS WITNESS OR THE DEFENDANT.

15         MS. BAILEY:  TO THE BEST OF MY KNOWLEDGE THERE'S

16  NOT.  EVEN IF THERE WAS I WOULD SUBMIT THAT IF PROPERLY

17  AUTHENTICATED THE RECORDING IS ADMISSIBLE.  I DON'T THINK

18  THAT THERE IS THOUGH.

19         THE COURT:  ALL RIGHT, HOW LONG IS IT?

20         MS. BAILEY:  IT'S ABOUT 30 MINUTES.

21         THE COURT:  OKAY, WELL --

22         MS. BAILEY:  THE RELEVANT PART IS MUCH SHORTER,

23  A LOT OF WALKING, I MEAN PROBABLY, AND THEN THE TALKING ON

24  IT.

25         THE COURT:  OKAY, WELL, YOU KNOW, I DON'T KNOW

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                104

1   HOW TO RULE UNLESS YOU CAN TELL ME THAT THERE'S NOTHING

2   ELSE ON THERE BECAUSE I CAN TELL YOU IF IT'S STATEMENTS

3   MADE BY THE DEFENDANT AND STATEMENTS MADE BY THIS WITNESS

4   IT'S ADMISSIBLE.

5              MS. BAILEY:   OKAY ---

6              THE COURT:   IF IT'S SOMETHING ELSE I DON'T KNOW

7   WHAT IS SAID OR WHAT --

8              MS. BAILEY:   MAY I INQUIRE AS TO THE DEFENDANT,

9   I MEAN AS TO THE WITNESS IF ANYBODY ELSE WAS THERE, IF

10  ANYBODY SAID ANYTHING?

11             THE COURT:   WELL I MEAN DO WE NEED TO GET THE

12  JURY BACK IN FOR THAT TESTIMONY OR --

13             MS. BAILEY:   WELL COULD I PROFFER IT NOW AND

14  THEN PROFFER IT AGAIN WHEN THE JURY COMES IN?

15             THE COURT:   WELL LET'S, I GUESS THE THING TO DO

16  NOW IS TO GO AHEAD AND PROFFER IT AND LET ME TAKE A LOOK AT

17  IT AND SEE IF THERE'S ANY, ANYTHING OBJECTIONABLE.  I DON'T

18  KNOW WHY WE COULDN'T HAVE DONE THIS IN A MOTION IN LIMINE

19  OR SOMETHING OF THAT NATURE BUT LET'S GO AHEAD AND DO IT

20  AND LET ME TAKE A LOOK AT IT AND SEE WHAT, WHAT IT SHOWS.

21             MS. BAILEY:    (CONTINUING)

22             Q    MR. LEWIS, WAS, WAS ANYBODY PRESENT WHEN

23  THE DRUGS AND MONEY WERE EXCHANGED EXCEPT FOR YOU AND MR.

24  HOLT?

25             A    YES.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                    105

1          Q      OKAY, WHO ELSE WAS THERE?

2          A      HIS GIRLFRIEND.

3          Q      OKAY, AND DID SHE SAY ANYTHING ON THE, THAT

4    YOU REMEMBER?

5          A      YES.

6          MS. BAILEY:   OKAY, YOUR HONOR, I DID NOT

7    SUBPOENA HER CAUSE SHE'S THE DEFENDANT'S GIRLFRIEND.

8          THE COURT:   OKAY.

9          MS. BAILEY:   I BELIEVE THAT SHE'S AVAILABLE TO

10   TESTIFY.

11         THE COURT:   WELL, AND I DON'T KNOW IF IT RENDERS

12   IT INADMISSIBLE OR NOT.  I'LL HAVE TO CHECK IT AND SEE, SEE

13   WHAT'S SAID ON THE, ON THE CD SO LET'S, LET'S GO AHEAD AND

14   PLAY IT AND LET ME LISTEN TO IT.

15         MS. BAILEY:   WOULD THE DEFENDANT CONSENT TO I

16   FAST FORWARD THROUGH THE WALKING?

17         THE COURT:   WELL WE NEED TO GO AHEAD AND

18   WHATEVER YOU'RE GOING TO PLAY FOR THE JURY, LET'S GO AHEAD

19   AND PLAY IT NOW.

20         MS. BAILEY:   OKAY.

21         (WHEREUPON, STATE'S EXHIBIT NUMBER 3 PLAYED IN

22   CAMERA FOR THE COURT.)

23         THE COURT:   LET'S TURN THE SCREEN SO HE CAN SEE

24   IT.

25         MS. BAILEY:   IT'S ALL AUDIO, NO VIDEO.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                106

1          THE COURT:   OH, IT'S ALL AUDIO.

2          MS. BAILEY:   FOR THE COURT'S INFORMATION THAT'S

3  AGENT GRANT.

4          THE COURT:   EXCUSE ME FOR INTERRUPTING BUT IS

5  THE REST OF THIS HIM JUST WALKING BACK TO THE CAR?

6          MS. BAILEY:   YES, YOUR HONOR, THERE'S A BRIEF

7  MINUTE THERE AT THE END WHERE HE SPEAKS TO THE AGENT.

8          THE COURT:   OKAY, ALL RIGHT, YOU CAN GO AHEAD

9  AND TURN IT OFF IF THAT'S -- ALL RIGHT, I'LL SUSTAIN THE

10  OBJECTION AS TO WHERE IT'S JUST THE CONVERSATION BETWEEN

11  THE AGENT AND THE WITNESS, I AGREE THAT'S HEARSAY.

12          THAT PORTION IF YOU WANT TO LIMIT IT TO THAT

13  PORTION AS TO WHEN HE PURPORTS IT TO BE AT THE RESIDENCE TO

14  MAKE THE BUY I'LL ALLOW THAT.  I THINK THAT IS ADMISSIBLE

15  BECAUSE THAT'S THE ALLEGED TRANSACTION BETWEEN THE WITNESS

16  AND THE DEFENDANT, BUT ANYTHING THAT HAPPENS BETWEEN THE

17  WITNESS AND THE AGENT OUTSIDE THE PRESENCE OF THE DEFENDANT

18  I'M GOING TO SUSTAIN THAT AS HEARSAY.

19          MR. MCKNIGHT:   JUST FOR CLARITY WOULD THAT

20  INCLUDE, WOULD THAT INCLUDE THE PORTION AT THE END WHERE

21  THE AGENT AND WHOMEVER HE TALKS TO IS THAT NOT ALLOWED AS

22  WELL?

23          THE COURT:   YEAH, THAT'S MY UNDERSTANDING IS

24  THAT THAT, THAT ALL OF THAT TOOK PLACE, I THINK, YEAH,

25  THAT'S IT.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                107

1              MR. MCKNIGHT:   YES, SIR.

2              THE COURT:   I'M GOING TO ALLOW THAT PORTION OF

3   THE RECORDING THAT DEALS WITH THE WITNESS AT WHERE HE SAYS

4   THAT HE WAS AT THE DEFENDANT'S HOUSE MAKING THE BUY.   THE

5   PRELIMINARY STUFF, THE WALK TO THE HOUSE, THE WALK BACK

6   FROM THE HOUSE, ANYTHING AFTER THAT IS INADMISSIBLE, IF YOU

7   WANT TO LIMIT IT TO THAT PORTION WHEN HE IS AT THE HOUSE.

8              MS. BAILEY:   YOUR HONOR, JUST FOR, FOR CLARITY

9   SAKE, WHAT, WHAT RULE, WHY, WHY ARE --

10             THE COURT:   WELL IT'S HEARSAY.   IT IS OUT OF

11  COURT STATEMENT OFFERED FOR THE TRUTH OF THE MATTER

12  ASSERTED.   THERE'S NOT AN ADMISSION OR ANYTHING IN THERE BY

13  THE DEFENDANT.   IT WOULD, YOU KNOW, IT'S, I JUST DON'T SEE

14  THE VALUE OF IT.   I DON'T KNOW WHAT ALL THEY SAID BUT THE,

15  THE PREJUDICIAL EFFECT FAR OUTWEIGHS THE PROBATIVE VALUE.

16  I THINK YOU ARE ENTITLED TO HAVE THAT PORTION THAT

17  CONSTITUTES THE RES GESTAE GET IN BUT I MEAN THEY, JUST

18  BECAUSE THE AGENT AND THE WITNESS MAY HAVE CARRIED ON THREE

19  HOURS ABOUT TALKING ABOUT BUYING DRUGS FROM THE DEFENDANT

20  BEFORE HE GOT TO THE HOUSE AND MAY HAVE TALKED ABOUT IT FOR

21  SIX HOURS AFTERWARDS BUT THAT'S NOT PROOF THAT THEY BOUGHT

22  DRUGS FROM THE DEFENDANT.   IT'S JUST LIMITED TO THAT

23  PORTION AS TO WHEN THEY MADE THE BUY BECAUSE WHAT THEY SAID

24  BETWEEN THE TWO OF THEM IS NOT EVIDENCE THAT THE DEFENDANT

25  COMMITTED A CRIME, ALL RIGHT.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**          108

1           MS. BAILEY:   THANK YOU, YOUR HONOR.

2           THE COURT:   ALL RIGHT.

3           MS. COTE:   YOUR HONOR, MAY I HAVE A MINUTE JUST

4    TO ---

5           THE COURT:   YEAH, IF YOU WANT TO ---

6           MS. COTE:   --- FIGURE OUT EXACTLY WHERE TO START

7    AND WHERE TO STOP?

8           THE COURT:   THAT'S RIGHT, IF YOU WANT TO FIGURE

9    IT OUT.

10          MS. BAILEY:   AND WHILE SHE'S DOING THAT FINDING

11   THE TIME FRAME FOR ME THERE'S A SECOND RECORDING.

12          THE COURT:   OKAY.

13          MS. BAILEY:   WHILE WE HAVE THE JURY OUT AND IF

14   WE COULD GO AHEAD AND AUTHENTICATE.

15          MR. MCKNIGHT:   THAT'S FINE.

16          THE COURT:   ALL RIGHT, AND WHAT IS IT A

17   RECORDING OF?

18          MS. BAILEY:   THE JUNE 20TH BUY.

19          THE COURT:   AND IT'S THE SAME TYPE SITUATION?

20          MS. BAILEY:   YES.

21          MR. MCKNIGHT:   IT'S THE SAME TYPE OF SITUATION

22   WHERE IT'S JUST A WHOLE LOT OF CONVERSATIONS BEGINNING,

23   WALKING, AND THEN, I WILL, I WILL STIPULATE PER YOUR RULING

24   ON THE PREVIOUS TAPE.

25          THE COURT:   OKAY.

108

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY** 109

1      MS. BAILEY:   YOUR HONOR, I WOULD ASK, THE STATE

2   WOULD ASK THAT THE COURT INSTRUCT THE JURY THAT THE TAPE

3   HAS BEEN REDACTED FOR JUDICIAL EFFICIENCY BUT NOT GO INTO

4   WHY IT'S BEEN REDACTED AND INSTRUCT THAT THE ATTORNEY NOT

5   TO ARGUE AT CLOSING THAT IT'S BEEN REDACTED FOR SOME

6   CONSPIRACY THEORY OR TO KEEP OUT EVIDENCE IN THE CASE.

7      THE COURT:   WELL I MEAN HOW ARE THEY GOING TO

8   KNOW THAT IT'S BEEN REDACTED, OH, OH, I SEE WHAT YOU'RE

9   SAYING BECAUSE WHEN WE SEND IT BACK AND WE SEND IT BACK FOR

10  THEIR DELIBERATIONS.

11     MS. BAILEY:   WELL I MEAN EVEN WHEN THEY, WHEN

12  THEY HEAR IT THEY'RE GOING TO HEAR, THEY WON'T HEAR HIM

13  BEING HOOKED UP OR THE BEGINNING OF THE, OF THE TAPE.

14  THERE'S NOT A CLEAR BEGINNING OR END, THEY'RE JUST GOING TO

15  HEAR HIM ---

16     THE COURT:   WELL I MEAN I THINK YOU CAN BRING IT

17  OUT, ASK HIM IS THIS A RECORDING OF THE TRANSACTION AND HE

18  SAYS, YES, AND THEN YOU CAN PLAY THE TRANSACTION.

19     MY NEXT QUESTION IS GOING TO BE HOW ARE WE GOING

20  TO GET THIS BACK TO THE JURY FOR THEIR DELIBERATIONS JUST

21  THAT PORTION?

22     MS. BAILEY:   YOUR HONOR, I WOULD JUST SUBMIT

23  THAT IF THEY WOULD LIKE TO HEAR IT AGAIN WE'RE HAPPY TO

24  PLAY IT OUT HERE.

25     THE COURT:   I GUESS THAT'S PROBABLY BE THE WAY

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**            110

1          THE COURT:   I GUESS THAT'S PROBABLY BE THE WAY

2    TO HANDLE IT, YEAH, WE'LL DO IT THAT WAY.  ALL RIGHT, AND

3    SO YOU STIPULATE, MR. MCKNIGHT, THAT ON THE SECOND

4    RECORDING LIKEWISE THAT, I'M RULING INADMISSIBLE ANY

5    CONVERSATIONS THAT ARE JUST STRICTLY BETWEEN THE AGENT AND

6    THE WITNESS, BUT THE RECORDING OF THE ACTUAL TRANSACTION OR

7    THE RES GESTAE OF THE CRIME I'M RULING IS ADMISSIBLE; YOU

8    DON'T NEED TO HEAR THAT PART?

9          MR. MCKNIGHT:   NO, I DO NOT, YOUR HONOR.

10          THE COURT:   ALL RIGHT, ALL RIGHT.

11          MS. BAILEY:   YOUR HONOR, I HONESTLY DO NOT

12    RECALL IF THERE'S A THIRD PERSON PRESENT DURING THE ACTUAL

13    BUY.

14          THE COURT:   WELL EVEN IF THERE IS I THINK THE

15    FACT THAT IF IT IS A RECORDING OF THE ACTUAL PURPORTED

16    CRIME IT IS ADMISSIBLE.  AS I SAY MY RULING IS I DON'T WANT

17    THE JURY INFLUENCED BY THE AGENT AND THE WITNESS, WHATEVER

18    THEY TALK ABOUT, THEY MIGHT BE TALKING ABOUT MURDER, BUT

19    THAT'S DOESN'T MEAN THAT THE DEFENDANT COMMITTED MURDER, SO

20    I'M GOING TO ALLOW THE, THE RECORDING OF THE ACTUAL CRIME

21    OR WHAT IS THE PURPORTED CRIME.

22          MS. BAILEY:   THANK YOU.

23          THE COURT:   ALL RIGHT.

24          MS. BAILEY:   YOUR HONOR, WE WOULD NEED JUST A

25    MOMENT.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**          111

1            THE COURT:   ALL RIGHT.

2            MS. BAILEY:   TO TAKE NOTE OF THE TIMES THAT WE

3    NEED TO PLAY.

4            THE COURT:   THAT'S GOOD.

5            MS. BAILEY:   AND THEN WE'LL BE READY.

6            THE COURT:   YOU KNOW BASICALLY THE STARTING TIME

7    IS WHAT YOU NEED BECAUSE YOU CAN TELL WHEN THEY LEAVE AND

8    START WALKING BACK AND YOU CAN JUST STOP IT THEN, ON BOTH

9    RECORDINGS?

10            MS. BAILEY:   YES, YOUR HONOR, WE ARE SEARCHING

11   FORWARD ON BOTH OF THESE RECORDINGS.

12            THE COURT:   ALL RIGHT, ANYTHING FURTHER FROM THE

13   STATE BEFORE WE BRING THE JURY BACK IN?

14            MS. BAILEY:   NO, YOUR HONOR, JUST FOR

15   CLARIFICATION I WAS MOVING THIS INTO EVIDENCE AND THERE WAS

16   AN OBJECTION, I BELIEVE, THEN YOU RULED ON THAT WHILE THE

17   JURY WAS OUT, FOR CLARIFICATION HAS EXHIBIT 3 BEEN MOVED

18   INTO EVIDENCE?

19            THE COURT:   ALL RIGHT, YEAH, I'M GOING TO GO

20   AHEAD AND ADMIT PLAINTIFF'S EXHIBIT 3 INTO EVIDENCE OVER

21   THE DEFENDANT'S OBJECTION WITH THE EXCEPTION THAT I SUSTAIN

22   HIS OBJECTION AS TO EVERYTHING THAT TRANSPIRES PRIOR TO THE

23   WITNESS GETTING TO THE DEFENDANT'S RESIDENCE AND EVERYTHING

24   THAT HAPPENS AFTER THE DEFENDANT LEFT, I MEAN AFTER THE

25   WITNESS LEFT THE DEFENDANT'S RESIDENCE, ALL RIGHT.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                    112

1          (WHEREUPON, STATE'S EXHIBIT NUMBER 3 ENTERED INTO

2     EVIDENCE.)

3          MS. BAILEY:   AND AS TO STATE'S EXHIBIT 4 I

4     BELIEVE SOME, SOME OF STATE'S EXHIBIT 4 WAS STIPULATED TO

5     UNDER SIMILAR GROUNDS AS STATE'S EXHIBIT 3, CAN I GO AHEAD

6     AND MOVE STATE'S EXHIBIT 4 INTO EVIDENCE FOR JUDICIAL

7     EFFICIENCY?

8          THE COURT:   ANY OBJECTION?

9          MR. MCKNIGHT:   I DON'T HAVE ANY OBJECTION.

10          THE COURT:   ALL RIGHT, STATE'S EXHIBIT NUMBER 4

11     IS ADMITTED INTO EVIDENCE SUBJECT TO THE DEFENDANT'S

12     OBJECTION WITH THE SAME RULING AS WITH STATE'S EXHIBIT 3,

13     OKAY.

14          (WHEREUPON, STATE'S EXHIBIT NUMBER 4 ENTERED INTO

15     EVIDENCE.)

16          MS. BAILEY:   THANK YOU, YOUR HONOR, AND WHEN THE

17     JURY COMES OUT MAY I PUBLISH IT TO THEM?

18          THE COURT:   YES, ANY OBJECTION?

19          MR. MCKNIGHT:   NO, YOUR HONOR.

20          THE COURT:   ALL RIGHT, ALL RIGHT, ANYTHING FROM

21     THE STATE BEFORE WE BRING THE JURY BACK IN?

22          MS. BAILEY:   NO, YOUR HONOR.

23          THE COURT:   ANYTHING FROM THE DEFENSE?

24          MR. MCKNIGHT, ANYTHING BEFORE WE BRING THE JURY

25     BACK IN?

112

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**            113

1                MR. MCKNIGHT:  NOTHING FURTHER, YOUR HONOR.

2                THE COURT:    ALL RIGHT, LET'S BRING THE JURY IN.

3                (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

4    2:56 P.M.)

5                THE COURT:    ALL RIGHT, LADIES AND GENTLEMEN, I

6    APOLOGIZE FOR KEEPING YOU OUT SO LONG, WE'RE READY TO

7    RESUME THE TRIAL OF THE CASE, MS. BAILEY.

8                MS. BAILEY:   THANK YOU, YOUR HONOR.

9                Q     (CONTINUING) MR. LEWIS, THANK YOU FOR YOUR

10   PATIENCE.  WE WERE TALKING ABOUT JUNE 17TH, HAVE YOU HAD AN

11   OPPORTUNITY TO REVIEW THAT REPORT AND IS THAT RIGHT?

12               A     THAT'S RIGHT.

13               MS. BAILEY:   AND THE STATE HAS MOVED STATE'S

14   EXHIBIT 3 INTO EVIDENCE AND WOULD LIKE TO PUBLISH THAT TO

15   THE JURY AT THIS TIME.

16               THE COURT:    ALL RIGHT, STATE'S EXHIBIT 3

17   ADMITTED INTO EVIDENCE.  I WILL ALLOW YOU TO GO AHEAD AND

18   PUBLISH IT TO THE JURY.

19               (WHEREUPON, STATE'S EXHIBIT 3 PLAYED IN OPEN COURT AND

20   THE DIRECT EXAMINATION OF MR. LEWIS CONTINUES AFTER THE

21   PLAYING OF THE EXHIBIT.)

22               MS. BAILEY:    (CONTINUING)

23               Q     ALL RIGHT, MR. LEWIS, AND WHAT WAS THAT A

24   RECORDING OF?

25               A     THE ACTUAL BUY.

MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY                    114

1          Q     WHO ALL WAS PRESENT?

2          A     HIM AND HIS GIRLFRIEND.

3          Q     OKAY, AND WHAT VOICES DID YOU HEARD ON THAT

4    RECORDING?

5          A     QUENTIN HOLT AND HIS GIRLFRIEND'S VOICE.

6          Q     WAS YOUR VOICE ON THERE, TOO?

7          A     YES.

8          Q     DO YOU SEE MR. HOLT, THE PERSON THAT YOU

9    BOUGHT FROM ON THAT RECORDING, IS HE IN THE COURTROOM HERE

10   TODAY?

11         A     YES.

12         Q     WOULD YOU POINT HIM OUT FOR ME?

13         A     RIGHT HERE.

14         Q     THERE'S THREE PEOPLE SITTING AT THE TABLE

15   OVER THERE, WOULD YOU DESCRIBE WHICH ONE HE IS?

16         A     BLACK SIT.

17         Q     IS HE THE ONE IN THE MIDDLE?

18         A     YES.

19         Q     AFTER YOU LEFT MR. HOLT'S RESIDENCE WHERE

20   DID YOU GO WHEN YOU LEFT THERE?

21         A     WENT BACK TO AGENT GRANT.

22         Q     AND DID YOU, WHAT DID YOU ---

23         THE COURT:     EXCUSE ME FOR A SECOND.  PLEASE

24   SPEAK UP.  THE COURT REPORTER SAYS SHE CAN'T HEAR YOU.

25         MS. BAILEY:   (CONTINUING)

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                    115

1          Q    WHAT DID YOU DO WITH THE DRUGS YOU JUST

2    PURCHASED?

3          A    IT WAS ALREADY IN A BAG.

4          Q    WHAT KIND OF BAG WAS IT IN?

5          A    IN A SMALL ZIPLOC BAG.

6          Q    AND WHAT DID YOU DO WITH IT WHEN YOU GOT

7    BACK TO AGENT GRANT?

8          A    I RETURNED IT TO HIM.

9          Q    DID YOU ALTER IT OR CHANGE IT WHILE YOU HAD

10   IT?

11         A    NO.

12         Q    DID YOU TAKE ANY OUT OF IT; DID YOU DO

13   ANYTHING TO IT OTHER THAN DELIVER IT TO AGENT GRANT?

14         A    NO.

15         MS. BAILEY:    FOR THE RECORD I'M SHOWING

16   MR. LEWIS WHAT'S PREVIOUSLY MARKED AS STATE'S EXHIBIT

17   NUMBER 1 FOR IDENTIFICATION ONLY.

18         Q    (CONTINUING) MR. LEWIS IS THERE A SMALL BAG

19   IN THERE?

20         A    YES, THERE IS.

21         Q    DOES IT LOOK LIKE WHAT YOU PURCHASED THAT

22   DAY?

23         A    YES.

24         Q    MR. LEWIS, A COUPLE OF DAYS LATER ON JUNE

25   20TH, DID YOU AGAIN HAVE INTERACTION WITH MR. HOLT?

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                116

1          A    YES.

2          Q    WHAT HAPPENED ON THAT DATE?

3          A    DID ANOTHER BUY.

4          A    YES.

5          Q    WERE YOU SEARCHED BEFORE HAND?

6          A    YES.

7          Q    WHICH AGENT WAS INVOLVED IN THAT?

8          A    AGENT GRANT.

9          Q    AND AFTER YOU WERE SEARCHED WHERE DID YOU

10  GO?

11         A    WENT TO HIS RESIDENCE AND BOUGHT THE

12  QUANTITY OF CRACK COCAINE.

13         Q    AT WHOSE RESIDENCE?

14         A    YES.

15         Q    WHOSE RESIDENCE?

16         A    QUENTIN HOLT.

17         Q    AND HOW MUCH MONEY DID YOU GIVE HIM THAT

18  DAY?

19         A    $50.

20         Q    AND HOW MUCH DID HE GIVE YOU BACK, OR WHAT

21  DID HE GIVE YOU BACK?

22         A    CRACK COCAINE.

23         Q    AND AFTER YOU LEFT MR. HOLT'S RESIDENCE

24  WHERE DID YOU GO ON THAT DAY?

25         A    I CAME BACK TO THE AGENTS.

116

MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY                    117

1        Q    AND WHAT DID YOU DO WITH THE CRACK COCAINE

2  AT THAT POINT?

3        A    RETURNED IT TO THEM.

4        Q    DID YOU ALTER OR CHANGE IT IN ANY WAY?

5        A    NO I DIDN'T.

6        MS. BAILEY:    FOR THE RECORD, THE STATE IS

7  PUBLISHING WHAT'S BEEN PREVIOUSLY MARKED AS STATE'S EXHIBIT

8  NUMBER 4 THAT'S BEEN STIPULATED TO BY THE DEFENSE.

9        THE COURT:    ALL RIGHT.    STATE'S EXHIBIT NUMBER

10  4 ADMITTED INTO EVIDENCE.

11        (WHEREUPON, STATE'S EXHIBIT NUMBER 4 ENTERED INTO

12  EVIDENCE.)

13        (WHEREUPON, STATE'S EXHIBIT 4 PLAYED IN OPEN

14  COURT.)

15        MS. BAILEY:    (CONTINUING)

16        Q    AND WHAT WAS THAT A RECORDING OF, MR.

17  LEWIS?

18        A    THE ACTUAL BUY.

19        Q    WHOSE VOICES WERE ON THAT RECIRDING?

20        A    ME AND QUENTIN HOLT'S.

21        Q    OKAY, WAS THAT A FAIR AND ACCURATE

22  DEPICTION OF WHAT HAPPENED THAT DAY?

23        A    YES.

24        Q    AND DO YOU KNOW THE ADDRESS THAT YOU BOUGHT

25  FROM?

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                118

1          A     ALL I KNOW IS ███████████ I DON'T

2    KNOW THE ACTUAL ADDRESS.

3          Q     OKAY, BUT YOU KNOW IT IS ███████████

4          A     YES.

5          Q     ALL RIGHT, AND YOU KNOW IT'S WHERE MR.

6    QUENTIN HOLT WAS LOCATED; IS THAT CORRECT?

7          A     YES.

8          Q     ALL RIGHT, DID YOU MAKE ANY STOPS AFTER YOU

9    LEFT?

10         A     NO, NO, I DIDN'T.

11         Q     YOU WENT STRAIGHT BACK TO THE AGENT; IS

12   THAT RIGHT?

13         A     YES.

14         Q     OKAY, DID YOU BUY DRUGS FROM ANYBODY ELSE

15   DURING THAT RECORDED PERIOD?

16         A     NO, NO, I DID NOT.

17         Q     OKAY, HOW ABOUT ON, THERE WERE TWO DATES,

18   THE JUNE 17TH AND JUNE 20TH.  ON EITHER OF THOSE TWO DAYS

19   THAT YOU, WHILE YOU WERE BEING MONITORED UNDER SURVEILLANCE

20   FROM THE ORGANIZED CRIME BUREAU, DID YOU BUY DRUGS FROM

21   ANYBODY ELSE?

22         A     NO, I DID NOT.

23         Q     OKAY, AND ON EACH OF THOSE DAYS HOW MUCH

24   MONEY DID YOU GIVE MR. HOLT?

25         A     $50.

118

MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY                119

1        Q     AND WHAT DID HE GIVE YOU IN RETURN?

2        A     CRACK COCAINE.

3        Q     OKAY, NOW IT'S NO SECRET THAT YOU'RE HERE

4  IN CHAINS AND IN A JUMPSUIT, DO YOU HAVE CURRENT PENDING

5  CHARGES?

6        A     YES, I DO.

7        Q     WHAT PENDING CHARGES DO YOU CURRENTLY HAVE?

8        A     SHOPLIFTING.

9        Q     OKAY, WHERE ALL DO YOU HAVE SHOPLIFTING

10 CHARGES FROM?

11       A     HORRY, BERKLEY, GEORGETOWN, THAT'S THE ONLY

12 THREE.

13       Q     OKAY, AND DO YOU HAVE A CRIMINAL RECORD?

14       A     YES, I DO.

15       Q     YOU HAVE A RECORD FOR ARMED ROBBERY?

16       A     YES, ABOUT ALMOST 20 YEARS AGO.

17       Q     1991, DOES THAT SOUND RIGHT?

18       A     YES.

19       Q     AND YOU HAVE A RECORD FOR BREACH OF TRUST?

20       A     YES, I DO.

21       Q     AND YOU HAVE A RECORD FOR PROBABLY SEVEN OR

22 MORE SHOPLIFTINGS?

23       A     YES.

24       Q     IN THE TIME PERIOD BETWEEN?

25       A     YES.

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                    120

1          Q        NOW ON THE DAY WHEN YOU WERE WORKING WITH

2    ORGANIZED CRIME BUREAU, THOUGH, WERE YOU WORKING OFF

3    CHARGES?

4          A        NO, I WASN'T.

5          Q        WERE YOU UNDER PENDING CHARGES AT THE TIME

6    THAT YOU WERE MAKING A DEAL FOR?

7          A        NO.

8          Q        OKAY, AT THAT TIME WHY DID YOU DO THIS WORK

9    AS CONFIDENTIAL INFORMANT?

10          A        I NEEDED THE MONEY.

11          Q        OKAY, SO THEY, DID THEY PAY YOU?

12          A        YES.

13          Q        OKAY, ABOUT HOW MUCH DID THEY PAY YOU FOR

14    THESE TWO?

15          A        I THINK IT WAS LIKE $50.

16          Q        OKAY, NOW WE JUST DISCUSSED THAT YOU DO

17    CURRENTLY HAVE PENDING CHARGES, HAVE I MADE ANY DEALS WITH

18    YOU?

19          A        NO, NO.

20          Q        HAVE I PROMISED YOU ANYTHING IN EXCHANGE

21    FOR YOUR TESTIMONY TODAY?

22          A        NO, YOU HAVEN'T.

23          Q        AND HAS MY INVESTIGATOR OR ANYBODY FROM MY

24    OFFICE OR THE SHERIFF'S DEPARTMENT PROMISED YOU ANYTHING

25    FOR YOUR TESTIMONY HERE TODAY?

120

**MR. LEWIS - DIRECT EXAMINATION BY MS. BAILEY**                    121

1          A     NO.

2          Q     OKAY, I'M SHOWING THE DEFENDANT WHAT'S BEEN

3     PREVIOUSLY MARKED AS STATE'S EXHIBIT 4 ON THAT JUNE 20TH

4     BUY, THAT SECOND RECORDING WE JUST LISTENED TO, WHAT DO YOU

5     SEE THERE IN STATE'S EXHIBIT 2?

6          A     IT'S A BAG OF CRACK COCAINE.

7          Q     OKAY, IS THAT SIMILAR OR VERY CLOSE TO THE

8     BAG OF CRACK COCAINE THAT YOU PURCHASED THE DAY ON JUNE

9     20TH?

10          A     YES.

11          Q     OKAY, AND IS THAT THE SAME SMALL BAG?

12          A     YES.

13          Q     THE SAME ONE THAT YOU DELIVERED TO AGENT

14     GRANT?

15          A     YES, IT IS.

16          Q     THE AREA THAT MR. HOLT WHERE YOU WENT TO

17     BUY THOSE DRUGS ARE THERE OTHER HOLT'S THAT LIVE IN THAT

18     AREA?

19          A     YES, THERE IS.

20          Q     OKAY, IS IT, IS IT SEVERAL HOMES IN ONE

21     SMALL AREA?

22          A     YES.

23          Q     OKAY, ARE THEY ALL HOLT'S THAT LIVE THERE?

24          A     YES, TO MY KNOWLEDGE IT IS.

25          MS. BAILEY:   NO FURTHER QUESTIONS.

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    122

1             THE COURT:    ALL RIGHT, MR. MCKNIGHT?

2             MR. MCKNIGHT:    MAY IT PLEASE THE COURT?

3             THE COURT:    YES, SIR.

4             MR. MCKNIGHT:    THANK YOU.

5                         **CROSS EXAMINATION**

6    **BY MR. MCKNIGHT:**

7             Q       SIR, HOW OLD ARE YOU?

8             A       FORTY.

9             Q       YOU WENT TO HIGH SCHOOL IN WILLIAMSBURG

10   COUNTY?

11            A       YES, I DID.

12            Q       WHEN DID YOU GRADUATE?

13            A       EXCUSE ME?

14            Q       WHAT YEAR DID YOU GRADUATE?

15            A       '88.

16            Q       DO YOU SUFFER FROM ANY MENTAL ILLNESSES?

17            A       NO, I DON'T.

18            Q       SO YOU, YOU'RE NOT SUFFERING FROM

19   KLEPTOMANIA OR ANY OF THESE DISORDERS THAT MAKE YOU STEAL,

20   DO YOU?

21            A       NO.

22            Q       WHY DO YOU HAVE SO MANY SHOPLIFTING

23   OFFENSES?

24            A       IT JUST HIT A BAD SPOT IN MY LIFE.  I JUST

25   DECIDED TO DO IT, THINKING I CAN GET AWAY WITH IT.

122

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    123

1      Q      YOU'VE BEEN IN SEVEN DIFFERENT BAD SPOTS IN

2  YOUR LIFE?

3      A      PROBABLY MORE THAN THAT.

4      Q      DO YOU USE ANY ILLEGAL DRUGS?

5      A      I HAVE IN THE PAST.

6      Q      YOU'VE USED CRACK COCAINE?

7      A      I HAVE.

8      Q      HOW MANY TIMES HAVE YOU USED CRACK?

9      A      I CAN'T EVEN REMEMBER.

10      Q      THEY CALL CRACK ROCK, DON'T THEY?

11      A      YES.

12      Q      AND THEY CALL IT ROCK WHY?

13      A      SOME OF IT LOOK LIKE ROCK, SOME LOOK

14  CRUMPLED UP, SOME, I MEAN IF YOU BUY IT SOME OF IT THAT'S

15  HOW IT JUST LOOK.

16      Q      IT LOOK LIKE ROCK, LIKE BROKE UP PIECES OF

17  ROCK, RIGHT?

18      A      SOME OF IT, SOMETIMES.

19      Q      LIKE IF YOU TOOK A IVORY SOAP BAR AND

20  CHOPPED IT UP IN LITTLE PIECES LOOK LIKE CRACK?

21      A      SOME OF IT.

22      Q      SOME OF IT?

23      A      YEAH, YEAH.

24      Q      THIS LOOKS MORE LIKE POWDER COCAINE,

25  DOESN'T IT?

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                  124

1          A      IT CAN BE BOUGHT THE SAME WAY.

2          Q      IT CAN BE BOUGHT THE SAME WAY?

3          A      AND LOOK THE SAME, TOO.

4          Q      LOOK THE SAME WAY?

5          A      YEAH.

6          Q      I GOT YOU.  YOU GOT A PENDING SHOPLIFTING

7    OFFENSE, DO YOU NOT?

8          A      THREE.

9          Q      THREE?

10         A      YEAH.

11         Q      AND IF YOU GET CONVICTED OF THEM HOW LONG

12   DO YOU GO TO JAIL?

13         A      I DON'T KNOW HOW LONG IT WILL BE, IT ALL

14   DEPENDS ON WHAT THEY DECIDE TO DO.

15         Q      WHAT THEY DECIDE TO DO?

16         A      YEAH.

17         Q      AND WHO'S THE "THEY" YOU TALKING ABOUT?

18         A      MY LAWYER AND THE SOLICITOR, I MEAN

19   SOMETIME THEY PLEA BARGAIN, SOMETIMES JUST HAVE TO WAIT IT

20   OUT TO GET TIME SERVED.

21         Q      WHAT'S GOING TO GET YOU A BETTER DEAL?

22         A      EXCUSE ME?

23         Q      WHAT IS GOING TO GET YOU A BETTER DEAL?

24         A      MEANING WHAT?

25         Q      IF YOU WALKED OFF THE STAND RIGHT NOW AND

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    125

1   SAYS I'M NOT COOPERATING DO YOU STAND TO GET MORE TIME?

2            A       I REALLY DON'T KNOW.

3            Q       YOU WOULDN'T DO THAT, WOULD YOU?

4            A       I'M ALREADY HERE WHAT'S THE USE OF WALKING

5   OFF.

6            Q       RIGHT, YOU KNOCKED ON THE DOOR AND ASKED

7   FOR WHO THE FIRST TIME?

8            A       EXCUSE ME?

9            Q       YOU KNOCKED ON THE DOOR, ON THE TAPE, CAN

10  YOU HEAR ME?

11           A       YEAH.

12           Q       OKAY ---

13           A       SOME OF IT I CAN'T HEAR YOU, SOME OF IT I

14  CAN.

15           Q       OKAY, YOU KNOCKED ON THE DOOR ON THE TAPE

16  ON THE CD THERE AND YOU ASKED FOR SOMEONE --

17           A       YES.

18           Q       WHO DID YOU ASK FOR?

19           A       BARLEY.

20           Q       BARLEY?

21           A       YEAH.

22           Q       OKAY, MY CLIENT'S NAME IS WHAT?

23           A       QUENTIN HOLT.

24           Q       OKAY, AND YOU DIDN'T ASK FOR QUENTIN AT ANY

25  TIME, DID YOU?

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    126

1           A      NO, I DIDN'T.

2           Q      WHAT HOUSE DID YOU GO TO?

3           A      I WENT TO HIS HOUSE.

4           Q      YOU WENT TO HIS HOUSE?

5           A      YES.

6           Q      AND YOU WENT INSIDE THE HOUSE?

7           A      YES, I DID.

8           Q      OKAY, WHERE IN THE HOUSE DID YOU GO?

9           A      IN THE KITCHEN AREA.

10          Q      OKAY, WHAT DOES THE KITCHEN LOOK LIKE?

11          A      IT HAS A TABLE, REFRIGERATOR, STOVE.

12          Q      RIGHT?

13          A      SINK.

14          Q      OKAY, WHAT COLOR ARE THE WALLS?

15          A      AT THAT TIME THEY WERE BROWN.

16          Q      THEY WERE BROWN?

17          A      AT THAT TIME.

18          Q      AND YOU'RE SURE ABOUT THAT?

19          A      YEAH.

20          Q      YOU'RE NOT COLOR BLIND, ARE YOU?

21          A      NO, I'M NOT.

22          Q      OKAY, SO YOU KNOW, YOU KNOW YOUR REDS, YOUR

23   BLUES, AND YOUR GREENS?

24          A      RIGHT.

25          Q      AND YOU'RE CERTAIN THAT IT WAS BROWN?

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    127

1          A     YES.

2          Q     OKAY, HOUSE SINGLE WIDE OR DOUBLE WIDE?

3          A     SINGLE, SINGLE.

4          Q     YOU'RE SURE?

5          A     POSITIVE.

6          Q     NOW THERE'S SOMETHING ON THE TAPE ABOUT

7     SELLING COLOGNE, ARE YOU SURE YOU DIDN'T GO THERE TO SELL

8     ANY COLOGNE?

9          A     NO.

10         Q     I MEAN ARE YOU THE AVON MAN OR SOMETHING?

11         A     THAT'S, THAT'S SOME OF THE STUFF THAT I WAS

12    DOING WHEN I WAS OUT THERE, SELL PERFUME AND COLOGNE.

13         Q     OKAY, NOW LET ME ASK YOU THIS, DO YOU KNOW

14    THAT GENTLEMAN SITTING RIGHT THERE, HIM?

15         A     AGENT GRANT.

16         Q     AGENT GRANT?

17         A     YEAH.

18         Q     DID HE GIVE YOU MONEY TO BUY SOMETHING?

19         A     YEAH, CRACK COCAINE.  HE DIDN'T GIVE IT TO

20    ME, I MEAN HE GIVE IT TO ME FOR THE BUY.

21         Q     OKAY, BUT AT ANY TIME DURING ONE OF THESE

22    BUYS DID YA'LL GO TO THE STORE AND BUY SOMETHING FOR YOU?

23         A     FOR ME, NO.

24         Q     YES, SIR?

25         A     NO.

MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT                128

1          Q      YOU'RE SURE?

2          A      POSITIVE.

3          Q      YOU'RE SURE THAT EITHER ON THE 17TH OF JUNE

4    OR THE 20TH OF JUNE YOU AND MR. GRANT DIDN'T GO TO THE

5    STORE AND BUY SOMETHING?

6          A      NO.

7          Q      HE DIDN'T BUY, DID HE BUY YOU A SHIRT?

8          A      IF HE DID I WASN'T THERE.

9          Q      DID YOU EVER RECEIVE A SHIRT FROM HIM?

10         A      THE SHIRT THAT WE USED FOR THE BUY.

11         Q      OKAY, BUT YOU DIDN'T GO WITH HIM TO BUY THE

12   SHIRT?

13         A      NO, I DID NOT.

14         Q      OKAY, AND AS FAR AS YOU KNOW HE DIDN'T GIVE

15   YOU NO MONEY TO BUY NOTHING BUT CRACK, RIGHT?

16         A      THAT'S IT.

17         Q      AND THE MONEY WHICH HE PAID YOU?

18         A      RIGHT.

19         Q      TO DO THAT, OKAY, DID HE EVER GIVE YOU, YOU

20   SAID HE GAVE YOU $50 EVERY TIME, RIGHT?

21         A      YES.

22         Q      DID HE EVER GIVE YOU LIKE $54?

23         A      IF HE DID I CAN'T REMEMBER BUT EVERY TIME

24   IT WAS $50.

25         Q      DID HE EVER GIVE YOU ANY CHANGE?

128

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    129

1      A     YES, AT ONE POINT, YEAH, YEAH, NOT DURING

2  THOSE TWO BUYS.

3      Q     NOT DURING THOSE BUYS?

4      A     NO.

5      Q     JUST SOLID PAPER MONEY, RIGHT?

6      A     YES.

7      Q     OKAY, I WANT YOU TO THINK BACK TO THE 20TH

8  OF JUNE 2009, ARE YOU CERTAIN THAT THAT BUY HAPPENED

9  BETWEEN THE TIME OF 3:15 AND 3:32 IN THE AFTERNOON?

10      A     TO BE HONEST WITH YOU THE TIME I DON'T KNOW

11  EXACT THAT THAT'S WHEN THE BUY HAPPENED I MEAN.

12      Q     DAY TIME, NIGHT TIME?

13      A     IT WAS DAY TIME.

14      Q     THIS IS SUMMER TIME, WAS THE SUN HIGH IN

15  THE SKY?

16      A     YES.

17      Q     OR WAS IT KIND OF LOW IN THE SKY?

18      A     IT WAS, IT WAS GETTING TOWARD LIKE MID

19  AFTERNOON LIKE, YOU KNOW, SOMEWHERE AROUND THAT TIME.

20      Q     I GOT YOU.  NOW YOU LISTENED TO THE TAPE.

21  HOW DID YOU GET THE DRUGS IF THE PERSON ON THE TAPE TOLD

22  YOU THAT THEY WEREN'T SELLING ANY WEIGHT?

23      A     HOW DID I GET IT?

24      Q     YEAH?

25      A     CAUSE I ASKED HIM TO GIVE ME WHAT HE CAN

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    130

1   GIVE ME.

2          Q     DIDN'T YOU HEAR THE PERSON ON THE TAPE SAY

3   I AIN'T GOT NO GRAMS?

4          A     SAID I DON'T SELL GRAMS.  HE HAD GRAMS, BUT

5   HE WASN'T GOING TO SELL THE WHOLE GRAM.  HE SAID HE WOULD

6   GIVE ME WHAT HE CAN GIVE.  I SAID, WELL WHATEVER YOU CAN

7   DO.

8          Q     OKAY, RIGHT, BUT NOT ONE TIME ON THAT TAPE

9   DO I HEAR YOU MENTION HOW MUCH MONEY YOU HAD?

10         A     WELL I MEAN WHEN YOU GO AND ASK SOMEONE FOR

11  A GRAM ON THE STREET THAT'S KNOWN AS $50 REGARDLESS.  I

12  MEAN IT'S NOT 49, NOT 58, IT'S 50.

13         Q     OKAY, THAT'S 50 AND YOU GET A WHOLE GRAM,

14  RIGHT?

15         A     SUPPOSED TO.

16         Q     BUT HOW MUCH DID YOU GET THIS TIME?

17         A     THE ACTUAL WEIGHT I DON'T KNOW.  HE JUST

18  FIXED IT UP, HE SAID.  HE TOLD ME IT WASN'T A WHOLE GRAM SO

19  I KNEW IT WASN'T A GRAM.

20         Q     SO YOU JUST GAVE AWAY THE MONEY?

21         A     THAT WAS THE BUY.  I DIDN'T GIVE IT AWAY,

22  HE GAVE ME SOMETHING IN RETURN.

23         Q     BUT YOU DIDN'T GET WHAT YOU WANTED

24  ALLEGEDLY?

25         A     IF IT WAS MY MONEY WHEN I WAS OUT THERE I

130

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    131

1  STILL WOULD HAVE BOUGHT IT.

2         Q      HOOKED ON IT THAT BAD, HUH?

3         A      I WOULDN'T SAY HOOKED ON THAT BAD BUT I WAS

4  ON IT.

5         Q      OKAY, NOW YOU MENTIONED ON DIRECT THAT YOU

6  RETURNED THE CRACK TO AGENT GRAY, OR GRANT, YOU RETURNED IT

7  TO HIM?

8         A      UH-HUH.

9         Q      DID YOU GET IT FROM HIM BEFORE AND THEN

10  BRING IT BACK?

11        A      NO.

12        Q      OKAY, I JUST WANT TO BE CLEAR NOW HE DIDN'T

13  GIVE YOU THE DOPE TO GO OVER THERE AND YOU BROUGHT IT BACK

14  TO HIM?

15        A      NO.

16        Q      NO?

17

18        A      NO, NO, HE DIDN'T.

19        Q      NOW WHEN YOU BROUGHT THIS BACK THIS IS WHAT

20  YOU BROUGHT IT IN, RIGHT?

21        A      YES.

22        Q      DO YOU RECALL HIM TAKING ANY PICTURES OF

23  IT?

24        A      YES, THEY DID.

25        Q      THEY DID?

**MR. LEWIS - CROSS EXAMINATION BY MR. MCKNIGHT**                    132

1          A      YES.

2          Q      THEY TOOK SOME PICTURES OF IT?

3          A      YES.

4          Q      BUT YOU HAVEN'T SEEN ANY PICTURES?

5          A      I HAVEN'T SEEN THEM.

6          Q      DO YOU KNOW HOW MANY PICTURES THEY TOOK?

7          A      I DON'T KNOW.

8          Q      WHAT DID YOU DO WITH THE MONEY YOU GOT, I

9    MEAN THE MONEY THEY PAID YOU?  WHAT DID YOU USE IT FOR?

10         A      A LOT OF DIFFERENT THINGS.  I MIGHT HAVE

11   PUT IN GAS IN THE CAR OR BUY SOMETHING TO EAT WHATEVER, I

12   MEAN --

13         Q      YOU GOT A CAR, YOU HAD A CAR?

14         A      STILL GOT ONE.

15         MR. MCKNIGHT:   THE COURT'S INDULGENCE JUST ONE

16   MINUTE, YOUR HONOR?

17         THE COURT:   ALL RIGHT.

18         MR. MCKNIGHT:  (CONTINUING)

19         Q      SO LET'S BE CLEAR, NOW YOU WENT IN THE

20   HOUSE AND ONLY WENT IN THE BATHROOM?

21         A      EXCUSE ME?

22         Q      YOU WENT IN THE HOUSE, EXCUSE ME, YOU WENT

23   IN THE HOUSE AND ONLY WENT IN THE KITCHEN?

24         A      YES.

25         Q      AND THE KITCHEN WALLS WERE BROWN?

132

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 133

1          A      AT THAT TIME THEY WERE.

2          Q      GOT ANY CURTAINS?

3          A      YEAH, IT WAS OVER THE SINK AND THE WINDOW

4    BY THE TABLE IN THE KITCHEN.

5          MR. MCKNIGHT:   ALL RIGHT, THEIR WITNESS.

6          THE COURT:   REDIRECT?

7          MS. BAILEY:   I'VE GOT NOTHING FURTHER, YOUR

8    HONOR.

9          THE COURT:   ALL RIGHT, YOU MAY STEP DOWN.

10         THE WITNESS:   THANK YOU, SIR.

11         THE COURT:   ALL RIGHT, MS. BAILEY, YOU CAN CALL

12   YOUR NEXT WITNESS.

13         MS. BAILEY:   THANK YOU, YOUR HONOR, THE STATE

14   CALLS MICHAEL THACKER.

15         THE COURT:   ALL RIGHT.

16              **INVESTIGATOR MICHAEL THACKER**

17       **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

18         MADAM CLERK:   PLEASE BE SEATED AND STATE YOUR

19   FULL NAME FOR THE RECORD.

20         THE WITNESS:   MICHAEL THACKER.

21                **DIRECT EXAMINATION**

22   **BY MS. BAILEY:**

23         Q      WHAT'S YOUR POSITION, MR. THACKER?

24         A      THE EVIDENCE CUSTODIAN WITH THE SHERIFF'S

25   OFFICE.

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 134

1          Q        AND WHAT'S YOUR CURRENT TITLE?

2          A        INVESTIGATOR.

3          Q        INVESTIGATOR?

4          A        YES, MA'AM.

5          Q        AND HOW LONG HAVE YOU BEEN WITH THE

6  SHERIFF'S DEPARTMENT?

7          A        FOR 10 YEARS.

8          Q        HOW LONG HAVE YOU BEEN IN EVIDENCE?

9          A        SINCE MARCH, 2009.

10         Q        OKAY, WHAT KIND OF TRAINING AND EXPERIENCE

11  HAVE YOU HAD?

12         A        WELL MOST OF WHAT I DO IS WITH, IN THE, NOT

13  ON THE EVIDENCE SIDE WITH THE, WITH THAT PART BUT WITH THE

14  CRIME SCENE AND I ALSO DO THAT WITH THE SHERIFF'S OFFICE.

15         Q        OKAY, NOW AS FAR AS RELATES TO THIS CASE

16  DID YOU HAVE REASON TO HOLD ANY EVIDENCE IN THIS CASE OUT

17  OF THAT DRUG DROP BOX?

18         A        YES, MA'AM.

19         Q        AND COULD YOU TELL THE JURY WHEN YOU

20  REMOVED THAT EVIDENCE?

21         A        I CAN, IT WAS JULY 2ND, 2009.

22         Q        OKAY, ON THAT DATE WE HAVE TWO SEPARATE

23  PIECES OF EVIDENCE IN THIS CASE, ONE, DID YOU PULL OUT TWO

24  PIECES OF EVIDENCE IN THIS CASE?

25         A        YES, MA'AM.

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 135

1      Q     AND DID YOU HANDLE BOTH OF THOSE THE SAME?

2      A     YES, MA'AM.

3      Q     AND DID YOU HANDLE BOTH AT THE SAME TIME ON

4 THE SAME DAY?

5      A     THAT'S CORRECT.

6      Q     OKAY, AND SO WHERE DID YOU RETRIEVE THEM

7 FROM?

8      A     THEY WERE TAKEN FROM OUR DRUG DROP BOX.

9      Q     AND CAN YOU TELL US ABOUT THAT BOX, IS IT

10 SECURE?

11     A     SURE, IT'S A, IT LOOKS, IT'S BASICALLY AN

12 OLD, THE OLDER STYLE MAILBOX THAT THEY HAD OUTSIDE ON

13 CORNERS AND THAT'S GOT ONE SLOT FOR THE ITEMS TO GO INTO

14 AND LOCKED ON THE OTHER SIDE WITH PADLOCKS.

15     Q     AND WHO HAS THE KEYS TO THAT?

16     A     I DO.

17     Q     ANYBODY ELSE?

18     A     ONLY ONE OTHER PERSON THAT'S MY SUPERVISOR

19 AND THE KEYS ARE ACTUALLY IN MY OFFICE.  HE HAS A KEY TO

20 MY, MY DOOR.

21     Q     OKAY, AND SO AFTER, SO, AFTER MR. -- AGENT

22 GRANT DROPPED THE DRUGS INTO THE DRUG DROP BOX WOULD IT

23 HAVE BEEN POSSIBLE FOR ANYBODY ELSE TO ACCESS THEM?

24     A     NO, NOT, NOT WITHOUT ME BECAUSE I, ONCE I

25 HAVE THOSE THERE THEN THEY'RE SECURED IN THERE.

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 136

1          Q      OKAY, AND COULD THEY HAVE BEEN ALTERED OR

2    CHANGED IN ANY WAY WHILE THEY WERE STORED IN THAT BOX?

3          A      NOT AT ALL, NO, MA'AM.

4          Q      OKAY, AND AFTER YOU RETRIEVED THEM FROM

5    THAT BOX WHAT DID YOU DO WITH THEM?

6          A      ONCE I TOOK THEM FROM THERE THEN I TAKE

7    THEM TO SLED.

8          Q      OKAY, AND WHO DID YOU DROP, WHO DID YOU

9    SIGN THEM OVER TO AT SLED OR DROP THEM OFF WITH?

10          A      BOTH ITEMS WERE SIGNED OVER TO SELENA

11    KINARD.

12          Q      OKAY, AND THAT, WHERE, WHICH LOCATION OF

13    SLED WAS THAT?

14          A      THAT WAS AT THEIR EVIDENCE LOG IN IN

15    COLUMBIA.

16          Q      AND HOW DID THEY GET FROM HERE TO THERE?

17          A      I TRANSPORT THEM BY VEHICLE.

18          Q      YOU DROVE THEM UP THERE?

19          A      YES, MA'AM.

20          Q      OKAY, AND WHILE THEY WERE IN YOUR

21    POSSESSION AND THEY WERE IN YOUR VEHICLE DID YOU ALTER THEM

22    OR CHANGE THEM IN ANY WAY?

23          A      NO, MA'AM, THEY'RE ACTUALLY SEALED

24    THEIRSELVES.

25          Q      AND DO YOU LEAVE THEM IN A, IN A HOT CAR

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 137

1  UNATTENDED OR ANYTHING?

2          A      NO, MA'AM.  THEY GO FROM THE TIME I LEAVE I

3  TOOK THEM OUT OF THE BOX, TWO AND A HALF HOURS, DEPENDING

4  ON TRAFFIC TO GET THERE.

5          Q      OKAY, AND YOU MENTIONED THAT THEY WERE

6  SEALED WHAT KIND OF BAG ARE THEY IN?

7          A      THEY CALL THEM BEST BAGS, ONCE THE OFFICER

8  PUTS THE PAPER WORK AND THE ITEMS IN THERE THEY SEAL THEM

9  UP AND THEIR TAMPER PROOF TAPE ON IT SO THERE'S, I DON'T

10 MESS WITH THAT AT ALL, BUT JUST TO LOOK AT THE PAPER WORK

11 AND MAKE SURE IT'S FILLED OUT CORRECTLY AND, AND THAT'S IT,

12 BUT THEY CAN'T BE OPENED.

13         Q      OKAY, SO DO YOU EVER BREAK THAT SEAL?

14         A      I DO NOT.

15         Q      OKAY, AND IN THIS CASE DID YOU BREAK THAT

16 SEAL?

17         A      I DID NOT.

18         Q      OKAY, FOR THE RECORD I'M HANDING

19 INVESTIGATOR THACKER WHAT'S BEEN PREVIOUSLY MARKED FOR

20 IDENTIFICATION AS STATE'S EXHIBITS 1 AND 2; DO YOU

21 RECOGNIZE THOSE ITEMS?

22         A      YES, MA'AM.

23         Q      AND COULD YOU DESCRIBE FOR THE JURY WHAT

24 THOSE ARE?

25         A      THESE ARE THE TWO BEST BAGS WITH THE ITEMS

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 138

1  THAT WERE TURNED IN FOR THESE TWO PARTICULAR CASES.

2         Q     NOW NOT THIS PLASTIC BAG HERE BUT THIS BLUE

3  BAG UNDERNEATH THAT'S ALSO PLASTIC WITH THE GREEN SEAL,

4  WHAT CONDITION WAS THAT IN WHEN YOU PULLED IT OUT OF THE

5  DRUG DROP BOX?

6         A     THIS WAS SEALED AS IT, AS IT SHOULD, SHOULD

7  BE INSIDE OF THIS PACKAGING.

8         Q     AND THAT WAS FOR BOTH OF THESE; IS THAT

9  CORRECT?

10        A     THAT'S CORRECT.

11        Q     OKAY, AND IT'S A LITTLE BIT OF A

12  TRANSLUCENT BAG THERE, COULD YOU SEE ANY ITEMS LOCATED

13  WITHIN IT?

14        A     INSIDE THE BAG IS THE ITEMS, YOU CAN, YOU

15  CAN SEE THEM INSIDE THE PACKAGING, YES, MA'AM.

16        Q     OKAY, AND DO THEY LOOK ANY DIFFERENT TODAY

17  THAN THEY DID BACK THEN?

18        A     ONLY THAT WITH THE NUMBERS WRITTEN ON THEM

19  ONCE THEY'VE BEEN ANALYZED.

20        Q     WE'LL GO INTO THAT WITH THE PERSON THAT

21  DOES THAT STAGE?

22        A     YES.

23        Q     THAT'S THE ONLY CHANGE FROM WHEN YOU

24  TRANSPORTED THEM?

25        A     THAT'S CORRECT.

138

**INVESTIGATOR THACKER - DIRECT EXAMINATION BY MS. BAILEY** 139

1    Q    OKAY, NOW NOT SPECIFICALLY TO THESE BUT

2  LET'S TALK GENERALLY ABOUT WHAT YOUR PROCEDURE IS FOR AFTER

3  THE DRUGS HAVE BEEN ANALYZED AT SLED, AFTER A CHEMIST LOOKS

4  AT THEM.  DO YOU GO PICK THEM UP, DO THEY, DO YOU STORE

5  THEM, DOES SLED STORE THEM, HOW DOES THAT WORK?

6    A    WHEN I GOT TO SLED TO TAKE ANY ITEMS NO

7  MATTER IF IT'S THIS TYPE OF CASE OR ANY OTHER TYPE OF CASE

8  THEY KEEP A LOG OF THINGS THAT ARE READY TO BE RETURNED AND

9  AT THAT TIME IF THERE'S SOMETHING THAT NEEDS TO BE RETURNED

10  I'LL GET THOSE ITEMS BACK AND I ACTUALLY HAVE SIGNED FOR

11  THEM.  I SIGN THEM OUT FROM SOMEONE JUST LIKE I DO WHEN I

12  SIGN SOMETHING IN.  I BRING THEM BACK AND THEY GO, THEY'RE

13  STORED AT OUR OFFICE.

14    Q    OKAY, AND HOW DO THEY, HOW WOULD THESE

15  ITEMS HAVE BEEN STORED IN YOUR OFFICE?

16    A    JUST AS YOU SEE THERE THE PACKAGE IS THE

17  SAME, I DON'T TOUCH THAT AT ALL SINCE IT'S ALREADY SEALED.

18  I GIVE IT A NUMBER, THEY STORE ON THE SHELF THAT I'M GOING

19  TO STORE IT ON AND IT GOES ON THE SHELF AND THAT'S WHERE

20  IT'S AT UNTIL DISPOSITIONS.

21    Q    DO YOU RECOGNIZE THIS FOLDER RIGHT HERE?

22    A    UH-HUH.

23    Q    OKAY, IS THIS WHAT YOU BROUGHT THE DRUGS

24  HERE?

25    A    I DID.

INVESTIGATOR THACKER - CROSS EXAM. BY MR. MCKNIGHT          140

1          Q      TODAY IN?

2          A      YES, MA'AM.

3          Q      OKAY, AND WERE THEY INSIDE THIS MANILA

4     ENVELOPE?

5          A      YES, MA'AM.

6          Q      OKAY, DO YOU EVER STACK THESE OR FILE THEM

7     OR ANYTHING LIKE THAT OTHER EVIDENCE AROUND THEM?

8          A      NO, THOSE ARE ON THE SHELF, THEY'RE ON A

9     SHELF UNLESS I TAKE THEM OFF FOR COURT OR TO BE DESTROYED.

10         Q      NOW THESE, THE CONDITION THAT THESE DRUGS

11    ARE IN DOES IT EVER HAPPEN THAT SOMETIMES SOME WEIGHT GETS

12    PUT ON TOP OF THE ENVELOPE?

13         MR. MCKNIGHT:   OBJECTION, YOUR HONOR, THAT CALLS

14    FOR SPECULATION.

15         THE COURT:   OVERRULED.

16         THE WITNESS:   (CONTINUING)

17         A      IT COULD BE POSSIBLE AND, YOU KNOW, ONCE,

18    WHEN I BRING SOMETHING BACK, FOR INSTANCE, FROM SLED

19    EVERYTHING IS IN A EITHER A BOX OR A LARGE BAG SO THERE'S

20    OTHER ITEMS IN THERE.  THEY PUT BANDS AROUND THEM TO KEEP

21    THEM TOGETHER AND WHEN I ---

22         Q      THEY MIGHT GET RUSTLED AROUND IN THERE?

23         A      IT'S POSSIBLE AND AS FAR AS THE ITEMS

24    THEIRSELF, YOU KNOW, I DON'T KNOW EXACTLY THE PROCESSES

25    THEY GO THROUGH WITH THE ANALYSIS SO --

INVESTIGATOR THACKER - CROSS EXAM. BY MR. MCKNIGHT        141

1        Q       TO THE BEST OF YOUR KNOWLEDGE RUSTLING THEM

2   AROUND IN THE BOX IS NOT GOING TO CHANGE THE CHEMICAL

3   COMPOSITION; IS THAT CORRECT?

4        A       I WOULD SAY NOT.

5        MS. BAILEY:   NO FURTHER QUESTIONS, YOUR HONOR.

6        THE COURT:   MR. MCKNIGHT?

7        MR. MCKNIGHT:   VERY BRIEFLY.

8                       CROSS EXAMINATION

9   BY MR. MCKNIGHT:

10       Q       INVESTIGATOR THACKER?

11       A       YES, SIR.

12       Q       YOU HAVE NO REASON TO KNOW THESE ITEMS HERE

13  WERE CRUSHED, DO YOU?

14       A       I DO NOT.  AS, AS I HAD STATED BEFORE THE

15  ITEMS ARE ALREADY PLACED IN THE BAGS, THEY'RE SEALED.  I

16  TAKE THEM UP THERE AND TURN THEM IN AND WHEN I GET THEM

17  BACK THEY'RE SEALED IN A PACKAGE LIKE THAT.  I DON'T KNOW

18  WHAT'S, WHAT'S DONE WITH THEM FROM THEIR POINT.

19       Q       THAT'S THAT BEST KIT IN THERE, RIGHT?

20       A       YES, SIR.

21       Q       YOU WENT TO THE ACADEMY, DID YOU NOT?

22       A       YES, SIR.

23       Q       YOU WENT FOR NINE WEEKS?

24       A       YES, SIR.

25       Q       WHAT DOES BEST STAND FOR?

**MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY**                    142

1              A      I DO NOT KNOW, SIR.

2              Q      THEY DON'T TEACH YOU WHAT THAT MEANS?

3              A      I DON'T KNOW EITHER, NO, SIR.

4              MR. MCKNIGHT:    YOUR WITNESS.

5              THE COURT:    REDIRECT?

6              MS. BAILEY:    NOTHING FURTHER, YOUR HONOR.

7              THE COURT:    ALL RIGHT, SIR, YOU MAY STEP DOWN.

8              THE WITNESS:    THANK YOU.

9              THE COURT:    MS. BAILEY, YOU CAN CALL YOUR NEXT

10   WITNESS.

11             MS. BAILEY:    THANK YOU, YOUR HONOR, THE STATE

12   CALLS SELINA KINARD.

13             THE COURT:    ALL RIGHT.

14             MS. BAILEY:    YOUR HONOR, CAN INVESTIGATOR

15   THACKER BE RELEASED FROM HIS SUBPOENA?

16             MR. MCKNIGHT:    I DON'T HAVE ANY INTENT ON

17   CALLING HIM BACK.

18             THE COURT:    ALL RIGHT, THAT WILL BE FINE, HE'S

19   FREE TO GO, THANK YOU VERY MUCH.

20                          **SELINA KINARD**

21          **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

22             MADAM CLERK:    PLEASE BE SEATED AND STATE YOUR

23   FULL NAME FOR THE RECORD.

24             THE WITNESS:    SELINA KINARD.

25                       **DIRECT EXAMINATION**

142

**MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY**                    143

1    BY MS. BAILEY:

2              Q      WHAT'S YOUR POSITION?

3              A      I AM A FORENSIC TECHNICIAN WITH SLED.

4              Q      WHAT DOES SLED STAND FOR?

5              A      THE SOUTH CAROLINA LAW ENFORCEMENT

6    DIVISION.

7              Q      AND WHAT TYPE OF EVIDENCE DO YOU HANDLE AS

8    A FORENSIC TECHNICIAN?

9              A      I AM IN THE ACTUAL INTAKE OF THE EVIDENCE

10   SO WE HANDLE ALL TYPES OF EVIDENCE FROM EACH AGENCY ACROSS

11   THE STATE.

12             Q      OKAY, SO DO YOU EVER HANDLE DRUGS?

13             A      YES, WE DO.

14             Q      ILLEGAL DRUGS?

15             A      YES.

16             Q      BUT YOU ALSO HANDLE OTHER KINDS OF

17   EVIDENCE; IS THAT RIGHT?

18             A      THAT'S CORRECT, WE COULD HAVE WEAPONS,

19   CLOTHING FROM SCENES, BASICALLY ANYTHING FROM A CRIME

20   SCENE,

21             Q      OKAY, WHAT ARE YOUR PROCEDURES FOR

22   EVIDENCE?

23             A      THE AGENCY WILL COME INTO SLED AND THEY

24   WILL SIGN IN WITH OUR RECEPTIONIST AND WE WILL CALL EACH

25   AGENCY BACK AS WE ARE READY FOR THEM TO LOG IN THEIR

**MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY**                144

1   EVIDENCE.  THEY WILL SET DIRECTLY IN FRONT OF US AT OUR

2   DESK AND THEY WILL HAND US EACH CASE.  WE WORK EACH CASE

3   SEPARATELY AND ONE AT A TIME AND WE LOG THAT EVIDENCE IN TO

4   OUR COMPUTER SYSTEM.  ONCE IT'S LOGGED IN AND ALL

5   INFORMATION IS VERIFIED THE SUBMITTING OFFICER WILL SIGN A

6   ELECTRONIC SIGNATURE PAD AND OUR COMPUTER CAPTURES THAT

7   SIGNATURE AND ONCE THAT'S SAVED A UNIQUE LAB NUMBER IS

8   ASSIGNED TO THAT CASE AND THAT'S HOW IT'S TRACKED THROUGH

9   THE LAB.

10          Q       AND IN THIS CASE DID THAT HAPPEN?

11          A       YES, IT DID.

12          Q       AND WHAT DATE DID THE EVIDENCE COME INTO

13  YOUR LAB?

14          A       LET ME VERIFY WITH MY CHAIN OF CUSTODY,

15  ACCORDING TO MY CHAIN OF CUSTODY I RECEIVED THAT ON JULY

16  THE 2ND OF 2009 FROM MICHAEL THACKER WITH GEORGETOWN.

17          Q       AND HOW MANY PIECES OF EVIDENCE DID YOU

18  RECEIVE?

19          A       ACCORDING TO MY CHAIN IT WAS ONE, WE LIST

20  IT AS ONE BEST KIT.

21          Q       AND DO YOU HAVE A SECOND CHAIN OF CUSTODY?

22          A       I DO, AND THAT WAS, I RECEIVED BOTH ON THE

23  SAME, SAME DAY, JULY THE 2ND.

24          Q       FOR THE RECORD I'M SHOWING THE WITNESS WHAT

25  HAD BEEN PREVIOUSLY MARKED AS STATE'S EXHIBITS 1 AND 2 FOR

144

**MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY**            145

1   IDENTIFICATION, TAKE A MOMENT TO LOOK AT THOSE?

2            A     OKAY, YES, I DO RECOGNIZE THESE.

3            Q     YOU RECOGNIZE THESE?

4            A     UH-HUH.

5            Q     OKAY, AND WHAT ARE THOSE?

6            A     THESE ARE WHAT WE CALL BEST KITS OR THESE

7   ARE NOW PACKAGED DIFFERENTLY THAN I WOULD RECEIVE THEM

8   DURING INTAKE FROM THE OFFICER, BUT I RECOGNIZE THEM FROM

9   THE YELLOW LABEL THAT IS AFFIXED ON THE INSIDE.  THAT HAS

10  THE LAB NUMBER AND THEN THE ITEM NUMBER FOR EACH CASE AND

11  ONE IS L0907986, ITEM NUMBER ONE; AND ONE IS L0908007, ITEM

12  NUMBER ONE.

13           Q     AND WHO DID YOU RECEIVE THOSE FROM?

14           A     MICHAEL THACKER WITH GEORGETOWN COUNTY

15  SHERIFF'S OFFICE.

16           Q     AND WHAT DATE WAS THAT?

17           A     ON JULY THE 2ND OF 2009.

18           Q     AND WHILE THE DRUGS WERE IN YOUR POSSESSION

19  AND INTAKE DID YOU ALTER OR CHANGE THEM IN ANY WAY?

20           A     NO, I DID NOT.

21           Q     DID YOU OPEN THAT BEST KIT?

22           A     THE ONLY THING THAT WE OPEN THE INNER

23  PACKAGE OF THAT OUTSIDE PACKAGE THAT IS CALLED A K-PAK

24  POUCH ACTUALLY COMES IN AN ENVELOPE WHEN IT'S ORIGINALLY

25  SUBMITTED TO US SO WE DO OPEN THAT CLASP BECAUSE THE

MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY          146

1  ENVELOPE HAS A UNIQUE NUMBER THAT WE CALL A BEST KIT NUMBER

2  OR A CONTROL NUMBER AND WE WILL COMPARE THAT NUMBER ON THE

3  OUTSIDE ENVELOPE TO THE INNER POUCH THAT'S IN THE ENVELOPE

4  AND VERIFY THAT IT'S, THAT THAT IS SEALED ON THE INSIDE OF

5  THE ENVELOPE.

6          Q      SO THE INTERIOR ENVELOPE REMAINS SEALED; IS

7  THAT RIGHT?

8          A      THAT'S CORRECT, THAT'S CORRECT, YEAH, THAT,

9  THE GREEN PART OF I GUESS YOU WOULD SAY OF THE INNER ---

10         Q      THIS PART RIGHT HERE?

11         A      RIGHT, THE GREEN PART IS WHAT WE WOULD

12 CHECK TO MAKE SURE IT'S SEALED AND SIGNED BY THE OFFICER

13 AND THEN THE OUTER PACKAGE IS ACTUALLY AN ENVELOPE.

14         Q      AND SO AFTER THE OFFICER SIGNS THEM OVER TO

15 YOU AND YOU TAKE POSSESSION WHAT DO YOU DO WITH THE

16 EVIDENCE THEN?

17         A      AT THAT TIME IT'S STILL IN MY CUSTODY.

18 WHEN I FINISH LOGGING IT IN, LOGGING ALL HIS CASES I WILL

19 TAKE THAT EVIDENCE BACK TO OUR EVIDENCE ROOM AND PUT THAT

20 EVIDENCE INTO OUR LOCKED EVIDENCE ROOM AND OUR DRUGS AND

21 WEAPONS ARE LOCKED DOWN SEPARATELY THAN ALL OF OUR OTHER

22 EVIDENCE.

23         Q      AND WHO HAS ACCESS TO THAT LOCKED EVIDENCE

24 ROOM, THE DRUGS AND THE WEAPONS?

25         A      WE HAVE FIVE TECHNICIANS WITHIN EVIDENCE

**MS. KINARD - DIRECT EXAMINATION BY MS. BAILEY**                    147

1  CONTROL AND THEN OUR CAPTAIN.

2          Q    SO THAT'S SIX PEOPLE IN THE STATE?

3          A    SIX, RIGHT.

4          Q    HAVE KEYS TO THAT ROOM?

5          A    RIGHT.

6          Q    AND WHILE THEY'RE IN THAT ROOM CAN ANYBODY

7  OTHER THAN THOSE SIX PEOPLE GET INTO THAT ROOM OR ALTER OR

8  CHANGE THE EVIDENCE IN ANY WAY?

9          A    NO, THEY CANNOT.

10         Q    OKAY, AND DID THEY IN THIS CASE?

11         A    NO, NOT TO MY KNOWLEDGE.

12         Q    OKAY, AND THEN DID YOU HAVE REASON TO

13 HANDLE THESE DRUGS ONE OTHER TIME?

14         A    YES, I DID.

15         Q    AND WHEN WAS THAT?

16         A    THAT WAS ACTUALLY ON BOTH CASES THE SAME

17 DAY, JULY THE 2ND OF 2009 I TOOK THOSE OUT OF DRUG EVIDENCE

18 INTAKE STORAGE AND PUT THEM INTO MY CUSTODY AGAIN AND AT

19 THAT TIME TRANSFERRED THEM TO MARIBETH BURROUGHS WHO IS THE

20 FORENSIC SCIENTIST FOR DRUG I.D.

21         Q    OKAY, AND WHEN YOU TOOK, NOW FAR IS IT FROM

22 YOUR DRUG STORAGE FACILITY TO MARIBETH BURROUGHS OFFICE?

23         A    ACTUALLY, SHE ACTUALLY, TYPICALLY WHAT THE

24 ANALYST DO IS THEY WILL E-MAIL US A LIST OF THEIR CASES

25 THAT THEY WOULD LIKE TO PICK UP AT THAT TIME AND WE WILL GO

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          148

1   TO OUR EVIDENCE ROOM WHICH ACTUALLY WHERE WE SIT IT'S JUST

2   RIGHT BEHIND US AND THERE'S ONLY ONE DOOR TO ACCESS THE

3   EVIDENCE ROOM AND WE WILL GO BACK TO THE EVIDENCE ROOM AND

4   PICK THOSE CASES AND LET THEM KNOW WHEN THEY'RE READY FOR

5   PICK UP, SO THEY ACTUALLY COME TO US.

6          Q    OKAY, AND SO UNTIL YOU DELIVERED IT TO

7   MARIBETH BURROUGHS PERSONALLY HOW LONG DID YOU, HOW LONG

8   WAS IT OUT OF THE EVIDENCE STORAGE ROOM?

9          A    LET'S SEE APPROXIMATELY A MINUTE, AT 1326 I

10  PUT IT IN MY CUSTODY AND 1327 I PUT IT INTO MARIBETH'S

11  CUSTODY.

12         Q    AND WAS IT ALTERED OR CHANGED IN ANY WAY AT

13  THAT TIME?

14         A    NO.

15         MS. BAILEY:  I'VE GOT NO FURTHER QUESTIONS.

16         THE COURT:  ALL RIGHT, MR. MCKNIGHT?

17         MR. MCKNIGHT:  NO QUESTIONS OF THIS WITNESS.

18         THE COURT:  ALL RIGHT, YOU MAY STEP DOWN, THANK

19  YOU VERY MUCH.

20         THE WITNESS:  THANK YOU.

21         MS. BAILEY:  YOUR HONOR, MAY MS. KINARD BE

22  RELEASED FROM HER SUBPOENA SO SHE CAN GO BACK TO COLUMBIA.

23         MR. MCKNIGHT:  WITHOUT OBJECTION FROM THE

24  DEFENSE, YOUR HONOR.

25         THE COURT:  ALL RIGHT, YOU'RE FREE TO GO, THANK

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          149

1   YOU VERY MUCH.

2          A     THANK YOU.

3          THE COURT:   MS. BAILEY, YOU CAN CALL YOUR NEXT

4   WITNESS.

5          MS. BAILEY:   THANK YOU, YOUR HONOR, THE STATE

6   CALLS MARIBETH BURROUGHS.

7          THE COURT:   ALL RIGHT.

8                    **MARIBETH BURROUGHS**

9       **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

10         MADAM CLERK:   PLEASE BE SEATED AND STATE YOUR

11  FULL NAME FOR THE RECORD.

12         THE WITNESS:   MARIBETH BURROUGHS.

13                    **DIRECT EXAMINATION**

14  BY MS. BAILEY:

15         Q     SPELL YOUR LAST NAME FOR THE COURT

16  REPORTER?

17         A     B-U-R-R-O-U-G-H-S.

18         Q     THANK YOU, WHAT'S YOUR CURRENT POSITION?

19         A     I'M A FORENSIC CHEMIST IN THE DRUG ANALYSIS

20  DEPARTMENT AT THE SOUTH CAROLINA STATE LAW ENFORCEMENT

21  DIVISION ALSO KNOWN AS SLED.

22         Q     WHAT KIND OF EDUCATION AND TRAINING DO YOU

23  HAVE?

24         A     I HAVE A BACHELOR OF SCIENCE DEGREE IN

25  CHEMISTRY AND ALSO A MASTERS IN SECONDARY SCIENCE

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          150

1    EDUCATION, BOTH FROM THE UNIVERSITY OF SOUTH CAROLINA.

2          Q       AND NOW LONG HAVE YOU BEEN IN YOUR CURRENT

3    POSITION?

4          A       FOR TWO AND A HALF YEARS.

5          Q       AND BEFORE THAT WERE YOU IN SCHOOL OR

6    COLLEGE?

7          A       BEFORE THAT I WAS A PHYSICAL SCIENCE

8    TEACHER.

9          Q       AND CAN YOU TELL THE JURY GENERALLY WHAT

10   YOU DO AS PART OF YOUR JOB?

11         A       YES, I ANALYZE NON BIOLOGICAL EVIDENCE FOR

12   THE PRESENCE OF CONTROLLED SUBSTANCES.

13         Q       AND BY CONTROLLED SUBSTANCES YOU MEAN

14   ILLEGAL DRUGS?

15         A       YES.

16         Q       AND IN THIS CASE STATE V. QUENTIN J. HOLT

17   DID YOU ANALYZE ANY EVIDENCE?

18         A       YES.

19         Q       FIRST LET ME ASK YOU HOW MANY, HAVE YOU

20   EVER TESTIFIED IN COURT BEFORE?

21         A       YES.

22         Q       HOW MANY TIMES HAVE YOU TESTIFIED?

23         A       FIVE TIMES.

24         Q       AND HAVE YOU BEEN QUALIFIED AS AN EXPERT

25   PREVIOUSLY?

150

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          151

1          A      YES.

2          MS. BAILEY:   OKAY, AND AT THIS TIME THE STATE

3   WOULD MOVE TO ADMIT MS. MARIBETH BURROUGHS AS AN EXPERT IN

4   FORENSIC LABORATORY ANALYSIS.

5          THE COURT:   ALL RIGHT, MR. MCKNIGHT, ANY

6   CHALLENGES OR QUESTIONS?

7          MR. MCKNIGHT:   YES, YOUR HONOR, WE'D LIKE SOME

8   LIMITED VOIR DIRE.

9          THE COURT:   ALL RIGHT, I'LL ALLOW THAT.

10                      **VOIR DIRE**

11  **BY MR. MCKNIGHT:**

12         Q      MARIBETH, YOU GRADUATED WITH A BACHELORS OF

13  SCIENCE AND CHEMISTRY?

14         A      YES, SIR.

15         Q      FROM THE UNIVERSITY OF SOUTH CAROLINA?

16         A      YES.

17         Q      AND YOU'RE CERTIFIED TO TEST NON BIOLOGICAL

18  SUBSTANCES FOR THE PRESENCE OF ILLEGAL DRUGS; IS THAT

19  RIGHT?

20         A      YES.

21         Q      AND THAT MEANS THAT YOU USE OFTENTIMES A

22  MASS SPECTROSCOPY; IS THAT CORRECT, SAY THAT WORD FOR ME?

23         A      IT'S GAS CHROMATOGRAPHY, MASS SPECTROSCOPY.

24         Q      IS THAT LIKE WHERE YOU BURN THE SUBSTANCE

25  AND LOOK AT THE LIGHTS IN IT TO TELL WHAT SUBSTANCES ARE

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**                152

1    THERE?

2              A      NO, SIR.

3              Q      WHAT DO YOU DO?

4              A      ACTUALLY THE SUBSTANCE IS VOLATILIZED AND

5    ELECTRONS HIT THE SUBSTANCE AND A SPECTRUM IS PRODUCED.

6    EVERY COMPOUND HAS A SPECTRUM THAT IS UNIQUE FOR THAT

7    COMPOUND AND WE ALSO RUN STANDARDS, IN THIS CASE LIKE KNOWN

8    COCAINE, AND I COMPARE THE SPECTRUM THAT IS PRODUCED FROM

9    MY SAMPLE TO THE STANDARD.

10              Q      NOW YOU SAID YOU HAD LIGHT ELECTRONS, FOR

11   LIGHT, RIGHT?  YOU GOT TO GET IT TO PRODUCE LIGHT, DON'T

12   YOU, TO LOOK AT THE SPECTRUM?

13              A      IT IS HEATED IN AN OVEN.

14              Q      RIGHT, SO YOU BURN IT BUT YOU'VE GOT TO

15   WARM IT SO YOU CAN THE LIGHT?

16              A      IT IS HEATED.

17              Q      RIGHT, IT'S SORT OF LIKE WHAT THE

18   SCIENTISTS DO WITH THE STAR LIGHT TO TELL WHAT STARS ARE

19   BURNING AND LOOK AT THE THE LIGHT SIGNATURE, WHATEVER THAT

20   LITTLE LABEL OF COLOR SIGNATURES YOU CAN TELL WHAT IT IS,

21   IS THAT HOW IT WORKS?

22              A      NO, SIR.

23              Q      WELL HOW DO YOU TELL, YOU USE A SPECTRUM OR

24   YOU USE ---

25              A      CAN YOU REPEAT THE QUESTION, PLEASE?

152

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          153

1       Q       OKAY, I'LL GIVE YOU AN EXAMPLE, I BURN THIS

2  PAPER IT'S GOING TO GIVE ME A PARTICULAR SPECTRUM, WILL IT

3  NOT, IF I WARM IT, WILL IT NOT?

4       A       I, THAT'S NOT --

5       Q       SO YOU'RE TELLING ME, SO HOW IS IT THAT

6  YOU'RE GOING TO BE ABLE TO TELL WHAT THE SUBSTANCE IS IF

7  YOU'RE LOOKING AT A SPECTRUM RANGE, ISN'T IT GOING TO GIVE

8  YOU DIFFERENT COLORS, IT'S GOING TO GIVE YOU A DIFFERENT

9  SHADE OF VIOLENT, A DIFFERENT SHADE OF BLUE, A DIFFERENT

10 SHADE OF YELLOW?

11      A       WE DO NOT USE COLORS ACTUALLY IT'S, THE

12 COMPOUND IS BROKEN DOWN INTO FRAGMENTS WHICH ARE GROUPS OF

13 IONS AND THAT'S HOW WE TELL BUT IT'S NOT WITH COLORS OR --

14      Q       DO YOU GET A PRINT OUT?

15      A       YES, SIR.

16      Q       BUT IT COMES FROM COMPUTER, RIGHT?

17      A       YES.

18      Q       AND IT TELLS YOU WHETHER OR NOT YOU, WHAT

19 IT IS, RIGHT?

20      A       IT GIVES US A LIBRARY MATCH OF WHAT IT IS.

21      Q       DO YOU CALIBRATE THE COMPUTER YOURSELF?

22      A       NO, SIR.

23      Q       WHO DOES?

24      A       WE DON'T CALIBRATE THAT INSTRUMENT, WE TUNE

25 THAT INSTRUMENT.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          154

1          Q     DO YOU TUNE IT?

2          A     YES, SIR.

3          Q     OKAY, AND YOU'RE SURE YOU TUNED IT ON THE

4   DAY IN QUESTION YOU TESTED THE SUBSTANCE?

5          A     IT'S TUNED WEEKLY.

6          Q     DO YOU HAVE ANYTHING TO SUPPORT THE FACT

7   THAT YOU TUNED IT DURING THE WEEK THAT YOU DID IT ALLEGEDLY

8   HERE?

9          A     WE WOULD HAVE THAT IN OUR OFFICE AND I

10  COULD PROVIDE THAT FOR YOU BUT I DON'T HAVE IT WITH ME

11  TODAY.

12         Q     HAVE YOU EVER BEEN DISQUALIFIED AS A

13  WITNESS FOR THE DEFENSE, AS AN EXPERT WITNESS?

14         A     NO, SIR.

15         MR. MCKNIGHT:   YOUR HONOR, I DO HAVE AN

16  OBJECTION.

17         THE COURT:   ALL RIGHT.

18         MR. MCKNIGHT:   PLAIN AND SIMPLY, YOUR HONOR ---

19         MS. BAILEY:   YOUR HONOR, I'D REQUEST WE DO THIS

20  OUTSIDE THE PRESENCE OF THE JURY.

21         THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN, LET

22  ME EXCUSE BACK TO THE JURY ROOM BRIEFLY WHILE WE TAKE UP

23  THESE MATTERS OF LAW.   THANK YOU VERY MUCH.

24         (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

25  3:50 P.M.)

154

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          155

1          THE COURT:   ALL RIGHT, MR. MCKNIGHT?

2          MR. MCKNIGHT:   YOUR HONOR, AT THIS TIME THE

3    DEFENSE OBJECTS TO THIS WITNESS TO BE STIPULATED AS AN

4    EXPERT IN THE FIELD OF FORENSIC TESTING OF ILLEGAL

5    SUBSTANCES, WHATEVER IT IS SHE SEEKS TO ENTER.  WE DON'T

6    BELIEVE SHE'S QUALIFIED IN THAT SHE'S GOING TO TESTIFY THAT

7    USING A MACHINE WITH WHICH TO GET A RESULT FROM AND BY HER

8    OWN ADMISSION ON THE STAND SHE HAS NO WAY OF VERIFYING AND

9    PRESENT TO THE COURT THAT THAT MACHINE WAS CALIBRATED OR

10   TUNED AS SHE PUT IT.

11         THE COURT:   ALL RIGHT.

12         MR. MCKNIGHT:   PRIOR TO IT BEING USED TO TEST

13   ILLICIT SUBSTANCE IN QUESTION HERE TODAY I BELIEVE THAT

14   THAT CAST SOME SERIOUS DOUBT AND I DON'T BELIEVE THAT SHE

15   SHOULD BE ALLOWED TO TESTIFY AS TO WHETHER OR NOT THE

16   SUBSTANCE IN QUESTION IS OR IS NOT CRACK COCAINE.

17         THE COURT:   ALL RIGHT, MS. BAILEY?

18         MS. BAILEY:   YOUR HONOR, FIRST OF ALL THAT

19   DOESN'T GO TO ADMISSIBILITY, IT WOULD SIMPLY GO TO HE CAN

20   CROSS EXAMINE THE WITNESS ON THAT.

21         SECOND OF ALL THE QUESTION AS TO WHETHER OR NOT

22   SHE CAN BE QUALIFIED AS AN EXPERT IS SIMPLY THIS, DOES SHE

23   HAVE EDUCATION AND/OR EXPERIENCE TO ASSIST THE TRIER IN

24   FACT BEYOND WHAT, WHAT A NORMAL PERSON WOULD AND GIVEN SHE

25   HAS A MASTERS DEGREE IN SCIENCES AND SHE HAS AN

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**        156

1  UNDERGRADUATE DEGREE IN SCIENCES AND SHE HAS BEEN TRAINED

2  BY SLED AND SHE KNOWS HOW TO WORK THIS EQUIPMENT THE STATE

3  WOULD SUBMIT THAT SHE IS; AND SHE'S BEEN QUALIFIED BEFORE

4  THAT'S ANOTHER PRONG OF THE TEST THAT SHE IS IN FACT AN

5  EXPERT AND ANY, ANY ADDITIONAL PROBES AS TO HOW RELIABLE

6  HER TESTING WAS CAN BE DONE ON CROSS EXAMINATION.

7          THE COURT:   ALL RIGHT, I'M GOING TO OVERRULE THE

8  OBJECTION.  I'M GOING TO FIND THAT SHE IS QUALIFIED AS AN

9  EXPERT IN THE FIELD OF FORENSIC CHEMISTRY.  ALL RIGHT,

10  ANYTHING BEFORE WE BRING THE JURY BACK IN?

11          MS. BAILEY:   NOTHING FROM THE STATE.

12          MR. MCKNIGHT:   NOTHING FROM THE DEFENSE.

13          THE COURT:   ALL RIGHT.  ALL RIGHT, BEFORE WE

14  PROCEED -- THAT'S ONE OF THE SITTING JURORS?

15          MADAM CLERK:   YES, SIR.

16          THE COURT:   ALL RIGHT, ONE OF THE JURORS HAS

17  JUST ADVISED THE BAILIFF THAT SHE KNOWS THE DEFENDANT.

18          MR. MCKNIGHT:   CAN WE APPROACH, YOUR HONOR?

19          THE COURT:   YEAH, COME ON UP.

20          MR. MCKNIGHT:   ARE YOU GOING TO THEN SUBSTITUTE

21  WITH THE ALTERNATE?

22          MS. BAILEY:   YOUR HONOR, I WOULD JUST REQUEST

23  THAT YOUR HONOR INQUIRE AS TO WHETHER THERE'S BEEN ANY

24  DISCUSSION IN THAT ROOM, IN THE JURY ROOM EVEN THOUGH

25  THEY'RE TOLD NOT TO, WHETHER THERE'S BEEN ANY DISCUSSION AS

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          157

1    TO THAT SHE KNOWS THE DEFENDANT OR HOW ELSE SHE KNOWS HIM

2    OR RELAYED ANY INFORMATION.

3            THE COURT:   WELL I THINK I'M GOING TO BRING HER

4    OUT AND ASK HER THAT.   I MEAN DO YA'LL AGREE THAT WE NEED

5    TO SEAT ONE OF THE ALTERNATES OR WHAT DO YA'LL THINK?

6            MR. MCKNIGHT:   I THINK IT'S DEPENDING UPON WHAT

7    SHE COMES OUT HERE AND TELLS YOU, YOUR HONOR, BUT, YEAH,

8    SEATING ONE OF THE ALTERNATES IS DEFINITELY A CURE IF

9    THERE'S BEEN ANYTHING THAT'S ADVERSELY DONE UNLESS SHE'S

10   JUST POISONED THE JURY POOL IN SHAPE FORM OR FASHION.

11           THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

12   HER OUT HERE AND LET ME QUESTION HER RIGHT QUICK.

13           (WHEREUPON, JUROR #266 ENTERS THE COURTROOM.)

14           THE COURT:   YES, MA'AM, IF YOU'D COME STAND

15   RIGHT HERE AND STAND IN FRONT OF THE COURT REPORTER.   YOUR

16   NAME?

17           JUROR NUMBER 266:   ███████ █ ██████.

18           THE COURT:   ALL RIGHT, MS. ████████ JUROR NUMBER

19   266, IS THAT CORRECT?

20           MS. ████████   YES, SIR.

21           THE COURT:   ALL RIGHT, THE BAILIFF TOLD ME THAT

22   YOU INFORMED HIM THAT YOU KNEW THE DEFENDANT?

23           MS. ████████   I DON'T KNOW HIM BY FACE BUT THE

24   NAMES, THE NICKNAME OF BARLEY IF IT'S THE SAME BARLEY THAT

25   I THINK IT IS I KEEP HIS SCHOOL KIDS ALL THE TIME.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          158

1          THE COURT:   OKAY.

2          MS. ████████     HIS EX-GIRLFRIEND'S NAME IS FELICIA

3    COOPER, IF IT'S THE SAME ONE.

4          THE COURT:   OKAY, ALL RIGHT, I MEAN DO YOU

5    RECOGNIZE HIM OR KNOW HIM OR YOU JUST RECOGNIZE ---

6          MS. ████████    I'VE NEVER SEEN HIM BEFORE.  HE'S

7    NOT WITH HER NOW.  I JUST KNOW THAT HER CHILDREN'S FATHER'S

8    NAME IS BARLEY.

9          THE COURT:   OKAY, AND SO YOU KEPT THE CHILDREN?

10          MS. ████████    YES.

11          THE COURT:   AND YOU JUST KNOW THE NAME BARLEY?

12          MS. ████████    I JUST KNOW THE NAME BARLEY, I

13    DON'T KNOW HIM PERSONALLY.

14          THE COURT:   OKAY, AND WHAT WAS, WHAT WAS THE EX-

15    GIRLFRIEND'S NAME?

16          MS. ████████    FELICIA COOPER.

17          THE COURT:   ALL RIGHT, I GUESS IS THIS THE ONE

18    AND THE SAME PERSON OR DO YOU KNOW?

19          MR. MCKNIGHT:   ARE YOU INQUIRING?

20          THE COURT:   YEAH?

21          MR. MCKNIGHT:   YOUR HONOR, I SPOKE WITH MY

22    CLIENT AND HE SAYS THAT THAT THE MOTHER, HE HAS TWO SETS OF

23    CHILDREN BY TWO DIFFERENT YOUNG LADIES AND THAT NEITHER OF

24    THEM ARE NAMED THE PERSON THAT THE JUROR JUST GAVE YOU.

25          MS. ████████     IT MUST NOT BE THE SAME.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          159

1       THE COURT:   OKAY, SO IT COULD BE SOMEONE

2   DIFFERENT?

3       MS. ████████   YES, SIR.

4       THE COURT:   ALL RIGHT, HAVE YOU DISCUSSED THIS

5   FACT WITH ANYONE IN THE JURY ROOM?

6       MS. ████████   NO, JUST --

7       THE COURT:   OTHER THAN THE BAILIFF ANY OF THE

8   OTHER JURORS HAVE YOU MENTIONED THIS TO ANY OF THE OTHER

9   JURORS?

10      MS. ████████   TO ONE PERSON.

11      THE COURT:   AND WHAT DID YOU ---

12      MS. ████████   I THOUGHT I MIGHT KNOW HIM.

13      THE COURT:   OKAY, ALL RIGHT, BUT ARE YOU TELLING

14  ME NOW THAT YOU DO NOT KNOW HIM?

15      MS. ████████   I DO NOT.  I WASN'T, I NEVER, I

16  DON'T KNOW HIS FACE.  I JUST KNOW THAT THE FRIEND OF MINE

17  HER KIDS FATHER'S NICKNAME IS BARLEY.

18      THE COURT:   OKAY.

19      MS. ████████   THEY USE THE NICKNAME.  I WASN'T

20  SURE IF THAT WAS HIM OR NOT.

21      THE COURT:   WELL LET ME ASK YOU THIS, WOULD THE

22  FACT THAT FACT AFFECT YOUR ABILITY TO GIVE A FAIR AND

23  IMPARTIAL TRIAL TO BOTH THE STATE AND THE DEFENDANT IN THIS

24  CASE?

25      MS. ████████   SINCE HE SAYS HE'S NOT THAT PERSON.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**      160

1      THE COURT:   IT WOULD OR WOULD NOT AFFECT YOUR

2  ABILITY?

3      MS. ████████   I DON'T THINK IT WOULD.

4      THE COURT:   OKAY, AND I APPRECIATE YOUR HONESTY,

5  BUT THE ATTORNEYS AND THE PARTIES NEED TO BE SURE THAT

6  YOU'RE NOT GOING TO BE INFLUENCED BY ANY OUTSIDE

7  CONSIDERATION AND THAT YOUR DECISION IN THIS CASE WOULD BE

8  BASED EXCLUSIVELY ON THE TESTIMONY AND EVIDENCE IN THIS

9  CASE AND THAT'S WHAT I'VE GOT TO BE CERTAIN OF IS THAT

10  YOU'RE NOT INFLUENCED BY ANYTHING OUTSIDE THE COURTROOM,

11  AND IF YOU ARE THAT'S FINE, I JUST NEED TO KNOW IT.  THAT'S

12  THE PROBLEM THAT WE HAVE TO DETERMINE.  LIKE I SAY IF YOU

13  ARE OR IF YOU'RE NOT THAT'S FINE, IF YOU ARE INFLUENCED

14  THAT'S FINE.  WE JUST NEED TO KNOW IF YOU ARE INFLUENCED BY

15  ANY OUTSIDE CONSIDERATION.

16      MS. ████████   I THINK I COULD BE FAIR.

17      THE COURT:   OKAY, NOW THERE AGAIN I APPRECIATE

18  YOU SAYING YOU THINK YOU COULD BE FAIR BUT I NEED TO KNOW

19  THAT YOU WILL BE FAIR TO BOTH PARTIES AND THAT YOU'RE NOT

20  GOING TO BE INFLUENCED BY ANYTHING THAT TRANSPIRED OR HAS

21  TRANSPIRED OUTSIDE THIS TRIAL.

22      MS. ██████   HONESTLY I DON'T THINK SO.

23      THE COURT:   YOU DON'T?  OKAY, ALL RIGHT, I

24  APPRECIATE, I APPRECIATE YOUR HONESTY.  I THINK WHAT WE

25  NEED TO DO IS THEN SEAT ONE OF THE ALTERNATES; IS THAT

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          161

1  AGREEABLE?

2           MR. MCKNIGHT:   YES, YOUR HONOR.

3           MS. BAILEY:   THE STATE HAS NO OBJECTION.

4           THE COURT:   ALL RIGHT, AS I UNDERSTAND IT I

5  THINK WE JUST, LET'S SEE ON THIS ONE WE HAVE TO DRAW IT AT

6  RANDOM UNLIKE A CIVIL CASE WHERE YOU SEAT THEM IN ORDER WE

7  NEED TO DRAW THEM AT RANDOM, CORRECT?  OKAY.

8           MS. BAILEY:   THE STATE HAS AGREES.

9           THE COURT:   I THINK IF I RECALL THE LAW IT'S IF

10  YOU SEAT AN ALTERNATE YOU JUST DRAW IT BY LOT.  ALL RIGHT,

11  SO THE ALTERNATES ARE JUROR NUMBER 58, ████ ██ ██████, AND

12  JUROR NUMBER 283, ██████████ ██████.

13           ALL RIGHT, NOW LET ME ASK YOU, MS. ██████ DO YOU

14  RECALL WHICH JUROR YOU SPOKE WITH?

15           MS. ████████    YES.

16           THE COURT:   OKAY, AND WHO WAS THAT?

17           MS. ████████   ██████ ████.

18           THE COURT:   ██████ ████, HAVE YOU DISCUSSED IT

19  WITH ANYONE ELSE?

20           MS. ████████   NO.

21           THE COURT:   AND WHAT DID YOU TELL MR. █████?

22           MS. ████████    WHEN I CAME BACK IN I SAID I THINK

23  I MAY KNOW WHO THAT IS.

24           THE COURT:   AND THAT'S ALL YOU SAID?

25           MS. ████████    THAT'S ALL I SAID.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          162

1      THE COURT:   OKAY, DID YOU GIVE ANY INDICATION TO

2  MR. ████ ONE WAY OR THE OTHER AS TO WHETHER OR NOT YOU KNEW

3  HIM IN A GOOD LIGHT OR A BAD LIGHT?

4           MS. ████████   NO.

5      THE COURT:   OKAY, ALL RIGHT, ANY NEED TO

6  QUESTION MR. ████?

7           MS. BAILEY:   NOT FROM THE STATE.

8           MR. MCKNIGHT:   YOUR HONOR, IN AN ABUNDANCE OF

9  CAUTION I JUST THINK WE REALLY SHOULD.

10          THE COURT:   OKAY.

11          MR. MCKNIGHT:   JUST A PRELIMINARY PRECAUTION.

12          THE COURT:   ALL RIGHT.  ALL RIGHT, MA'AM, I'M

13  GOING TO GO AHEAD AND EXCUSE YOU.  YOU'RE FREE TO GO AND

14  DON'T, DON'T WORRY, DON'T THINK YOU'VE DONE ANYTHING WRONG

15  OR ANYTHING OF THAT NATURE.  A LOT OF THIS IS JUST

16  PRECAUTIONARY STUFF TO ENSURE THAT EVERYBODY BOTH THE STATE

17  AND THE DEFENSE GET A FAIR AND IMPARTIAL TRIAL.  YOU SHOULD

18  HAVE BEEN GIVEN A NUMBER, A PHONE NUMBER THAT YOU'LL NEED

19  TO CALL BACK AFTER 6 P.M. TODAY AND THAT WILL GIVE YOU

20  FURTHER INSTRUCTIONS AS TO WHEN YOU NEED TO RETURN, OKAY?

21  ALL RIGHT, THANK YOU VERY MUCH FOR YOUR SERVICE AND I WANT

22  TO THANK YOU FOR THAT, OKAY?

23          ALL RIGHT, HAVE YOU GOT ANYTHING IN THERE YOU

24  NEED TO PICK UP?  OKAY, WELL YOU'RE FREE TO GO, YOU CAN GO

25  AHEAD AND GO BACK THAT WAY.

162

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          163

1          LET'S GO AHEAD AND BRING MR. ███ OUT HERE RIGHT

2  QUICK PLEASE.

3          (WHEREUPON, JUROR NUMBER 7 ENTERS THE COURTROOM.)

4          THE COURT:    MR. ████?

5          MR. ████    YES, SIR.

6          THE COURT:    OKAY, AND THE ONLY REASON WE'RE

7  CALLING YOU OUT HERE IS MS. ██████ WHO IS ONE OF THE JURORS

8  THOUGHT THAT SHE MAY HAVE RECOGNIZED THE NAME OF THE

9  DEFENDANT AND THAT SHE MAY HAVE MENTIONED THAT TO YOU; IS

10 THAT CORRECT?

11         MR. ████    SHE DID.

12         THE COURT:    OKAY, DID HER DISCUSSION OF THE

13 DEFENDANT OR ANYTHING SHE SAY TO YOU AFFECT YOUR ABILITY TO

14 GIVE BOTH THE STATE AND THE DEFENDANT IN THIS CASE A FAIR

15 AND IMPARTIAL TRIAL?

16         MR. ████    NO, THE ONLY THING SHE TOLD ME THAT

17 SHE THOUGHT SHE KNOW HIM.

18         THE COURT:    OKAY, AND THAT WAS IT?

19         MR. ████    YES.

20         THE COURT:    DID SHE SAY THAT TO YOU IN A GOOD

21 LIGHT, BAD LIGHT, OR INDIFFERENT LIGHT?

22         MR. ████    WHEN SHE CAME IN AND SHE TOLD ME HER

23 SINUS WAS PLUGGED UP AND SHE GOT TO THINK I KNOW THAT GUY.

24         THE COURT:    AND THAT'S ALL SHE SAID?

25         MR. ████    THAT'S IT.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          164

1          THE COURT:   ALL RIGHT, WOULD THAT AFFECT YOUR

2    ABILITY IN ANY WAY TO BE FAIR AND IMPARTIAL TO BOTH

3    PARTIES?

4          MR. ████   NO, SIR.

5          THE COURT:   OKAY, ALL RIGHT, THANK YOU VERY

6    MUCH.  YOU CAN RETURN TO THE JURY ROOM, THANK YOU.

7          (WHEREUPON, JUROR NUMBER 7 RETIRED TO THE JURY

8    ROOM.)

9          THE COURT:   ALL RIGHT, WHO DO WE WANT TO CHOOSE

10   THE JUROR, ALTERNATE JUROR?

11          ALL RIGHT, MS. BABB, YOU WANT TO REACH UP HERE

12   AND PICK ONE OF THESE OUT?

13          (WHEREUPON, AN ALTERNATE JUROR IS DRAWN RANDOMLY

14   FROM A CUP BY THE COURT REPORTER.)

15          THE COURT:   ALL RIGHT, SHE SELECTED JUROR NUMBER

16   283, ████████ █████ WHO WILL NOW BE SEATED.  ALL RIGHT,

17   ANYTHING FROM THE STATE BEFORE WE BRING THE JURY BACK IN?

18          MS. BAILEY:   NOTHING FURTHER REGARDING THE JURY,

19   YOUR HONOR.

20          THE COURT:   ANYTHING FROM THE DEFENSE?

21          MR. MCKNIGHT:   NOTHING FROM THE DEFENSE, YOUR

22   HONOR.

23          THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

24   THE JURY BACK IN.

25          (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

164

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**                165

1    4:04 P.M.)

2              THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN,

3    WELCOME BACK, DURING THE BREAK WE TOOK CARE OF SEVERAL

4    LEGAL MATTERS.   ONE OF THE LEGAL MATTERS WAS WE HAD TO

5    EXCUSE ONE OF THE JURORS THAT WAS SITTING ON THE JURY.   IT

6    WAS NOTHING IMPROPER OR NOTHING WRONG WAS DONE BUT JUST AS

7    A PRECAUTIONARY MEASURE WE DID EXCUSE MS. ████████.   WE HAVE

8    NOW SEATED MS. ██████, ██████████ ██████ IS NOW A MEMBER OF THE

9    JURY.

10             MS. ██████, ALL RIGHT, YOU CAN STAY IN THAT SEAT

11   BUT NEXT TIME WHEN WE BREAK IF YOU WOULD, PLEASE, JUST HAVE

12   A SEAT WITH THE REGULAR JURY AND YOU'RE NO LONGER REQUIRED

13   TO SIT IN THE ALTERNATE CHAIR, OKAY?   ALL RIGHT, THANK YOU

14   VERY MUCH.

15             NOW ALSO DURING THE BREAK I HAVE RULED AND

16   QUALIFIED THIS WITNESS MARIBETH BURROUGHS AS AN EXPERT IN

17   THE FIELD OF FORENSIC CHEMISTRY.   NOW ORDINARILY A WITNESS

18   CANNOT RENDER AN OPINION.   A WITNESS CAN ONLY TESTIFY AS TO

19   WHAT THEY PERSONALLY KNOW, IN OTHER WORDS WHAT THEY SAW,

20   WHAT THEY SMELLED, WHAT THEY FELT, OR WHAT THEY HEARD,

21   THINGS OF THAT NATURE, HOWEVER AN EXCEPTION UNDER THE RULE

22   OF LAW IS FOR PEOPLE WHO ARE QUALIFIED AS EXPERTS.   PEOPLE

23   WHO THROUGH EDUCATION AND/OR EXPERIENCE HAVE GAINED SOME

24   TYPE OF EXPERTISE IN A PARTICULAR FIELD WHETHER IT BE A

25   SCIENCE, AN ART, OR A PROFESSION OR SOMETHING OF THAT

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          166

1  NATURE THEY ARE QUALIFIED AS EXPERTS AND ALL THAT MEANS IS

2  THEY ARE ALLOWED TO GIVE AN OPINION IN THAT FIELD FOR WHICH

3  THEY ARE QUALIFIED AS AN EXPERT.  I'LL GIVE YOU SOME

4  FURTHER INSTRUCTIONS ON EXPERT TESTIMONY WHEN I CHARGE YOU

5  ON THE LAW BUT SUFFICE IT TO SAY FOR THE TIME BEING ALL

6  THIS MEANS IS THAT THIS WITNESS MS. BURROUGHS WILL BE

7  ALLOWED TO RENDER AN OPINION IN THE FIELD OF FORENSIC

8  CHEMISTRY.

9          ALL RIGHT, MS. BAILEY?

10          MS. BAILEY:  THANK YOU, YOUR HONOR.

11          MS. BAILEY:  (CONTINUING)

12          Q    WHEN YOU'RE PRESENTED WITH WHAT PURPORTS TO

13  BE AN ILLEGAL NARCOTIC WHAT TYPES OF TEST DO YOU RUN ON IT?

14          A    I RUN A PRELIMINARY TEST AND A CONFIRMATORY

15  TEST.

16          Q    AND DURING THAT, SO YOU RUN THE SAME TEST

17  TWICE; IS THAT RIGHT?

18          A    NO, THE PRELIMINARY TEST IN THIS CASE WAS A

19  COLOR TEST OR A CHEMICAL TEST AND THE CONFIRMATORY TEST WAS

20  THE GAS CHROMATOGRAPHY MASS SPECTROSCOPY.

21          Q    NOW IN THAT PRELIMINARY TEST CAN YOU

22  EXPLAIN TO US HOW THAT WORKED?

23          A    YES, I TOOK A SMALL AMOUNT OF THE SAMPLE

24  AND PLACED IN AN AGENT, MAY I REFER TO MY NOTES, PLEASE?

25          Q    YES.

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          167

1          A    ALL RIGHT, THIS PARTICULAR COLOR TEST WAS

2   TWO STEPS AND WHEN I PLACED THE SUBSTANCE IN THE AGENT

3   THERE WAS A LIGHT BLUE COLOR REACTION AND IN THE SECOND

4   STEP THERE WAS A BRIGHT BLUE SO THAT CONCLUSION LED ME TO

5   THE CONFIRMATORY TEST WHICH AGAIN WAS GAS CHROMATOGRAPHY

6   MASS SPECTROSCOPY.

7          Q    NOW IN THAT PRELIMINARY TEST WHAT IS IT

8   THAT MAKES IT TURN COLORS?

9          A    JUST THE REACTION OF THE CHEMICALS, IT'S

10  COBALT THIOCYANATE AND A STANDICE CHLORIDE REACTION.  IT IS

11  NOT EXCLUSIVE TO COCAINE BUT IT JUST KIND OF NARROWS THE

12  FIELD BUT THAT'S WHY ANOTHER TEST IS DONE.  IT'S NOT --

13         Q    IF THIS WAS BABY POWDER WOULD IT HAVE

14  TURNED THAT COLOR?

15         A    I CAN'T SAY DEFINITELY NOT BUT THAT'S WHY

16  WE RUN A CONFIRMATORY TEST.

17         Q    AND WHAT HAPPENS IN A CONFIRMATORY TEST?

18         A    IN THE CONFIRMATORY TEST THE RESULTS THAT I

19  GET A STANDARD IS RUN SO I RAN A STANDARD OF KNOWN COCAINE

20  COMPARE THAT TO THE RESULTS THAT I GOT FROM RUNNING THE

21  SAMPLE AND THEY WERE ALIKE, THEREFORE, I CONFIRMED THAT IT

22  WAS COCAINE BASE.

23         Q    AND IF YOU HAD PERFORMED THAT TEST AND THE

24  SUBSTANCE WAS PARMESAN CHEESE WOULD IT HAVE COME OUT WITH

25  THE SAME RESULT OR WOULD IT HAVE HAD A DIFFERENT RESULT?

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY        168**

1          A      IT WOULD HAVE A DIFFERENT RESULT.  EVERY

2  COMPONENT HAS A UNIQUE SPECTRUM, THEREFORE, IT, IT WOULD

3  NOT HAVE BEEN THE SAME RESULT.

4          Q      OKAY, NOW YOU MENTIONED THAT THE STANDARD

5  IS COCAINE, WHAT IS THE DIFFERENCE BETWEEN COCAINE AND

6  COCAINE BASE?

7          A      COCAINE HYDROCHLORIDE IS MORE OF THE POWDER

8  FORM AND COCAINE BASE IS COMMONLY KNOWN AS CRACK.  IT'S

9  MORE OF A ROCK FORM AND THE MAJOR DIFFERENCE IS COCAINE

10  BASE OR CRACK HAS A LOWER MELTING POINT SO THAT'S, THAT'S

11  THE MAIN DIFFERENCE.

12          Q      OKAY, AND YOU MENTIONED THAT YOU HAVE TO

13  HEAT THE SUBSTANCE, DOES IT EVER HAPPEN THAT, THAT A

14  SUBSTANCE LOOKS A LITTLE BIT DIFFERENT AFTER YOUR TESTS ARE

15  DONE WITH IT?

16          A      WELL THE, THE AMOUNT THAT I USE THAT IS,

17  IT'S DESTROYED BASICALLY.  I MEAN IT CANNOT BE, IT'S

18  VAPORIZED, THEREFORE, IT'S NOT A POWDER ANYMORE.  IT'S,

19  IT'S GONE BASICALLY.

20          Q      OKAY, SO YOU END UP DESTROYING A LITTLE BIT

21  OF IT?

22          A      YES, I DO.

23          Q      OKAY, AS PART OF YOUR TEST DID YOU WEIGH

24  THE AMOUNT OF THE SUBSTANCE?

25          A      YES, THAT'S THE FIRST THING THAT HAPPENS.

168

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          169

1          Q     DO YOU DO THAT BEFORE THE DESTRUCTIVE TEST?

2          A     YES.

3          Q     OKAY, AND EVEN WITH A DESTRUCTIVE TEST IN

4    ORDER TO GET THE SAMPLE OUT OF WHAT IS PROVIDED TO YOU DO

5    YOU HAVE TO ALTER WHAT'S GIVEN TO YOU SOMETIMES, CHIP OFF

6    PART OF IT?

7          A     YES, I WILL TAKE A SMALL AMOUNT OF THAT

8    SUBSTANCE.

9          Q     OKAY, NOW FOR THE COURT'S INFORMATION I'M

10   HANDING UP WHAT'S BEEN PREVIOUSLY MARKED FOR IDENTIFICATION

11   ONLY STATE'S EXHIBITS 1 AND 2, WOULD YOU TAKE A LOOK AT

12   THOSE FOR A MINUTE?  DO YOU RECOGNIZE THOSE?

13         A     YES, I DO.

14         Q     WHAT ARE THOSE?

15         A     THESE ARE HEAT SEALED POUCHES CONTAINING

16   THE BEST KIT WHICH CONTAINED THE EVIDENCE THAT I WAS GIVEN

17   AND THEY EACH CONTAINED A ZIPLOC BAG CONTAINING ROCK

18   SUBSTANCE.

19         Q     OKAY, AND DO YOU KNOW IF THESE ARE THE ONES

20   FROM, FROM THIS PARTICULAR CASE AND THE ONE THAT YOU

21   TESTED?

22         A     YES.

23         Q     AND HOW DO YOU KNOW THAT WE'RE TALKING

24   ABOUT THE SAME MATERIAL?

25         A     I KNOW THAT BECAUSE THE LAB NUMBERS MATCH

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY**          170

1   UP WITH THE LABELS WITH MY REPORT AND ALSO THE BEST KIT

2   NUMBER THEY'RE TWO SETS OF NUMBERS AND MY INITIALS ARE ALSO

3   ON THE BAGS AND ON THE HEAT SEALED POUCHES AS WELL.

4            Q      SO YOU'VE GOT INITIALS, A SEAL, AND ANOTHER

5   STICKER; IS THAT RIGHT, ALL OF THOSE TELL YOU THAT IT'S THE

6   SAME DRUGS?

7            A      YES.

8            Q      OKAY, AND THIS SMALL POUCH IN THE BACK OF

9   EACH OF THESE, ARE THERE SOME MARKINGS ON THERE?

10           A      YES, I HAND WROTE THE LAB NUMBERS AND ALSO

11  MY INITIALS ON THE ZIPLOC BAGS CONTAINING THE ROCK

12  SUBSTANCE.

13           Q      AND WHAT'S THE PURPOSE OF DOING THAT?

14           A      JUST FOR IDENTIFICATION.

15           Q      OKAY, AND DO YOU ACTUALLY, ARE YOU THE ONE

16  THAT UNSEALS THE BEST BAG?

17           A      YES.

18           Q      OKAY, AND SO AFTER YOU UNSEAL THE BEST BAG

19  HOW DO YOU HANDLE THE MATERIALS?

20           A      AFTER I UNSEAL IT I RECORD WHAT WAS IN THE

21  BAG ON MY WORK SHEET.  I WEIGH IT AND THEN I BEGIN WITH MY

22  TESTING AND THEN WHATEVER I DON'T USE I'LL PLACE BACK IN

23  THE PACKAGING IF IT IS SEALABLE, IF NOT I USE MY OWN BAG,

24  IN THIS CASE THEY WERE SEALABLE ZIPLOC BAGS, AND THEN I

25  PLACE THE EVIDENCE IN THE BEST KIT IN THIS HEAT SEALED

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY          171**

1  POUCH, INITIAL IT, AND DATE IT AND THEN I PLACE IT IN OUR

2  EVIDENCE VAULT.

3          Q    NOW IS IT POSSIBLE WHEN THESE DRUGS ARE IN

4  YOUR LAB DOES ANYBODY ELSE HAVE ACCESS TO THEM OTHER THAN

5  YOU?

6          A    THE OTHER CHEMISTS HAVE ACCESS TO OUR

7  VAULT.

8          Q    AND HOW MANY CHEMISTS ARE THERE?

9          A    THERE ARE EIGHT CHEMISTS.

10          Q    OKAY, SO ANYBODY OTHER THAN THOSE EIGHT

11  CHEMISTS, DO THEY DO THE SAME THING YOU DO?

12          A    THEY DO, OUR LIEUTENANT ALSO HAS ACCESS.

13          Q    OKAY, ANYBODY OTHER THAN THAT?

14          A    NO.

15          Q    SO NOBODY OTHER THAN THOSE EIGHT CHEMISTS

16  AND ONE LIEUTENANT CAN GET IN AND ACCESS THESE DRUGS; IS

17  THAT CORRECT?

18          A    CORRECT.

19          Q    OKAY, AND WERE THEY ALL, IN THIS PARTICULAR

20  CASE IN THESE TWO CASES WERE THESE DRUGS ALTERED OR CHANGED

21  IN ANY WAY OTHER THAN THE WAY THAT YOU'VE DESCRIBED DURING

22  TO YOUR TESTING WHILE THEY WERE IN YOUR POSSESSION?

23          A    NO.

24          Q    OKAY, AND WHEN THEY CAME TO YOU WAS THE

25  BEST BAG SEALED SHUT?

172

**MS. BURROUGHS - DIRECT EXAMINATION BY MS. BAILEY          172**

1          A      IT WAS SEALED.

2          Q      OKAY, SO IT STILL HAD, DID IT HAVE THIS

3  GRADE SEAL INTACT?

4          A      IT DID AND ALSO BEFORE I OPEN THE BEST BAG

5  I ALWAYS EXAMINE IT TO SEE IF IT HAS BEEN OPENED AND I

6  WRITE OKAY IF IT HAD NOT BEEN TAMPERED WITH SO THAT'S HOW I

7  KNOW THAT IT WAS OKAY.

8          Q      OKAY, AND FROM WHAT YOU OBSERVED, NOW YOU,

9  YOU TEST THE COCAINE AND CRACK COCAINE; IS THAT RIGHT?

10          A      YES.

11          Q      AND CRACK COCAINE IS THE SAME THING AS

12  COCAINE BASE; IS THAT RIGHT?

13          A      YES.

14          Q      OKAY, AND FROM WHAT YOU HAVE OBSERVED TODAY

15  LOOKING AT THESE IS THIS CONSISTENT WITH COCAINE BASE OR

16  CRACK COCAINE?

17          A      IT IS.

18          Q      OKAY, AND WOULD POWDER COCAINE LOOK

19  DIFFERENT FROM THAT?

20          A      YES, IN THIS CASE IT, THE SUBSTANCE IS

21  FINELY CRUSHED SO, YOU KNOW, AT THIS POINT IT DOES LOOK

22  LIKE A POWDERY SUBSTANCE BUT BASED ON MY TESTING IT IS

23  COCAINE BASE.

24          Q      OKAY, SO YOU MADE NOTES AT THE TIME THAT

25  THE DRUGS WERE IN YOUR POSSESSION THAT IT WAS ROCK LIKE AT

**MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT**          173

1  THAT TIME?

2          A     YES, BUT AFTER THE HANDLING AND, AND WHAT

3  NOT IT, IT COULD HAVE BEEN CRUSHED.

4          Q     OKAY, IS IT COMMON, I MEAN IN YOUR

5  EXPERIENCE THAT, THAT SOMETIMES THE ROCK LIKE SUBSTANCE

6  GETS A LITTLE GROUND UP?

7          A     YES.

8          MS. BAILEY:  AT THIS TIME THE STATE WOULD MOVE,

9  WOULD LIKE TO MOVE STATE'S EXHIBITS 1 AND 2 INTO EVIDENCE?

10         THE COURT:  ANY OBJECTION?

11         MR. MCKNIGHT:  WITHOUT OBJECTION FROM THE

12  DEFENSE, YOUR HONOR.

13         THE COURT:  ALL RIGHT, STATE'S EXHIBITS NUMBER 1

14  AND NUMBER 2 ADMITTED INTO EVIDENCE WITHOUT OBJECTION.

15         (WHEREUPON, STATE'S EXHIBITS NUMBER 1 AND 2

16  ENTERED INTO EVIDENCE.)

17         MS. BAILEY:  (CONTINUING)

18         Q     SO IN THE BEST BAGS THAT CAME TO YOU THAT

19  WERE FROM THE CASE OF QUENTIN J. HOLT THAT WAS ASSIGNED A

20  LAB NUMBER BY THE STATE LAW ENFORCEMENT DIVISION INSIDE OF

21  THOSE BEST BAGS WERE TWO SMALL BAGS AND WHAT DEFINITIVELY

22  DID THE TEST COME BACK AS AFTER TESTING THEM?

23         A     OKAY, FOR EACH THERE ARE TWO DIFFERENT

24  CASES, THE FIRST ONE WAS COCAINE BASE OR CRACK FOUND .48

25  GRAMS; AND THE SECOND WAS COCAINE BASE OR CRACK FOUND .44

174

**MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT**          174

1  GRAMS.

2          MS. BAILEY:   NO OTHER QUESTIONS.

3          THE COURT:   ALL RIGHT, MR. MCKNIGHT, CROSS

4  EXAMINATION?

5          MR. MCKNIGHT:   PLEASE THE COURT, YOUR HONOR?

6          THE COURT:   YES, SIR.

7                    **CROSS EXAMINATION**

8  **BY MR. MCKNIGHT:**

9          Q    MS. BURROUGHS, ON YOUR, TELL ME THIS WHAT

10 DOES BEST STAND FOR?

11         A    BEST EVIDENCE SAMPLING SAMPLE TESTING.

12         Q    DOES ONLY THE TECHNICIANS KNOW THAT?

13         A    ONLY ---

14         Q    THAT KNOW WHAT THAT ACRONYM MEANS CAUSE I

15 ASKED EVERYBODY AND YOU'RE THE ONLY PERSON THAT KNOWS WHAT

16 IT MEANS?

17         A    I'M UNAWARE.

18         Q    OKAY, ALL RIGHT, YOU SAID TO DETERMINE

19 WHETHER OR NOT IT'S CRACK YOU'VE GOT TO MELT SOMETHING,

20 RIGHT, CAUSE IT HAS A LITTLE MELTING POINT THAN POWDER,

21 RIGHT?

22         A    NO, SIR, I, I SAID THAT'S THE DIFFERENCE

23 BETWEEN, ONE OF THE MAIN DIFFERENCES BETWEEN COCAINE AND

24 COCAINE BASE IS THAT IT HAS A LOWER MELTING POINT BUT THAT

25 DOESN'T HAVE ANYTHING TO DO WITH WHAT, WITH MY ANALYSIS.

MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT          175

1      Q      WHAT DID YOU DO TO TELL WHETHER OR NOT IT

2   WAS COCAINE BASE CRACK OR POWDER COCAINE, WHAT SPECIFICALLY

3   DO YOU DO?

4      A      I PERFORMED A PHYSICAL TEST BASED ON

5   SOLUBILITY.  POWDER COCAINE IS INSOLUBLE AND HEX ANE SO,

6   THEREFORE, IF IT WAS POWDER COCAINE THERE WOULD HAVE BEEN

7   NO RESULT, SO THE FACT THAT I DID RECEIVE A RESULT TELLS ME

8   THAT IT IS COCAINE BASE CRACK BECAUSE I USED A HEX ANE

9   EXTRACTION SO THAT ON MY REPORT WHERE I MARKED PHYSICAL

10  TEST THAT IS WHAT, THAT'S WHAT WE USE TO DETERMINE THE

11  DIFFERENCE BETWEEN COCAINE AND COCAINE BASE.

12     Q      THIS HEX ANE YOU SAID SINCE IT'S INSOLUBLE

13  I ASSUME IT WAS HEX ANE A LIQUID, RIGHT?

14     A      IT IS.

15     Q      WHAT COLOR IS IT?

16     A      IT'S CLEAR.

17     Q      LIKE THIS, LIKE WATER?

18     A      YES, IT'S CLEAR.

19     Q      OKAY, AND SO YOU, I ASSUME YOU TAKE A

20  LITTLE BIT OF THE SUSPECT SUBSTANCE PUT IT IN THERE AND IF

21  IT DISSOLVES IT'S CRACK?

22     A      NO.

23     Q      WHAT IS IT?

24     A      WELL DO YOU WANT ME TO GO THROUGH --

25     Q      YEAH, PLEASE?

176

1          A     OKAY, I PUT A LITTLE SAMPLE OF THE

2     SUBSTANCE IN A TEST TUBE, PUT HEX ANE IN IT ABOUT MAYBE

3     THIS MUCH HEX ANE.  I VORTEX IT WHICH IT SPINS IT AROUND A

4     LOT THEN I PLACE IT IN A GLASS VIAL AND CAP IT.  THEN THAT

5     IS PLACED IN OUR INSTRUMENT WHICH IS THE GAS CHROMATOGRAPHY

6     MASS SPECTROSCOPY.  A NEEDLE IS INJECTED AND PULLS OUT JUST

7     A TINY BIT OF THAT LIQUID AND THEN THE PROCESS HAPPENS AND

8     THEN A SPECTRUM IS PRODUCED AND LIKE I SAID IF IT WAS

9     COCAINE THERE WOULD HAVE BEEN NO SPECTRUM.  IT JUST WOULD

10    HAVE BEEN BLANK BECAUSE COCAINE WILL NOT SHOW UP IF THERE'S

11    AN HEX ANE EXTRACTION.  WELL IN THIS CASE THERE WAS A

12    SPECTRUM PRODUCED, THEREFORE, I KNOW THAT IT WAS COCAINE

13    BASED.

14          Q     WHAT DID YOU DO, WHAT PRECAUTIONS DO YOU

15    TAKE TO MAKE SURE THAT THE HEX ANE ISN'T CONTAMINATED?

16    WHEN WE'RE AT HOME IF WE LEAVE THE TOP OFF THE PEROXIDE

17    IT'S MESSED UP ---

18          A     RIGHT.

19          Q     WHAT DO YOU DO IN YOUR LAB TO MAKE SURE IT

20    DOESN'T GET THAT WAY?

21          A     WELL OUR BOTTLES ARE PLACED UNDER A HOOD

22    AND THEY ARE TIGHTLY CAPPED AND ALSO IF THERE WAS SOME SORT

23    OF CONTAMINATION IT WOULD SHOW UP IN THE SPECTRUM AND IF

24    THERE WAS ANYTHING THAT LOOKED DIRTY OR NOT RIGHT THEN WE

25    WOULD RUN IT AGAIN.

**MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT**          177

1          Q      OKAY, NOW AND THIS DEVICE YOU USE, I'M

2   USUALLY GOOD AT TALKING BUT I CAN'T PRONOUNCE IT, YOU SAID

3   IT'S A MASS WHAT NOW?

4          A      MASS SPECTROSTOPHER [SIC], MASS, SORRY, THE

5   PROCESS IS GAS CHROMATOGRAPHY MASS SPECTROSCOPY.

6          Q      AND THIS IS A MACHINE, RIGHT?

7          A      IT'S AN INSTRUMENT.

8          Q      INSTRUMENT?

9          A      YES.

10          Q      AND IT HAS TO BE TUNED, DOES IT NOT?

11          A      WE TUNE ONCE A WEEK AT THAT TIME, YES.

12          Q      OKAY, SO WHAT DO YOU HAVE TODAY TO SHOW THE

13   JURY THAT THAT DEVICE WAS TUNED WHEN YOU TESTED THIS

14   SUBSTANCE?

15          A      TODAY I DO NOT HAVE A TUNE, IT IS

16   ELECTRONICALLY STORED IN OUR LAB WHICH I CAN PRODUCE BUT I

17   DO NOT HAVE THAT TODAY.

18          Q      OKAY, SO IS IT POSSIBLE THEN, WHAT'S TO SAY

19   IT WAS OFF?  IT WASN'T TUNED RIGHT, SOMEBODY BUMPED IT,

20   SPILLED SOME, IT'S AROUND 4TH OF JULY, SOME MUSTARD ON IT

21   OR SOMETHING COULD YOU GET A FALSE POSITIVE?

22          A      NO.

23          Q      IF IT'S TUNED WRONG YOU'RE STILL GOING TO

24   GET AN ACCURATE RESULT?

25          A      WELL IF THE TUNE WAS OFF WE WOULD, WE WOULD

**MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT        178**

1   DO MAINTENANCE, WE WOULD NOT RUN ANY SAMPLES.

2          Q      WELL HOW DO YOU KNOW IF IT'S OFF UNLESS YOU

3   TUNE IT?

4          A      WE TUNE IT ONCE A WEEK AND BASED ON THE

5   RESULTS FROM THAT TUNE WE EITHER GO FORWARD WITH ANALYSIS

6   OR LEAVE IT TO MAINTENANCE.

7          Q      BUT THERE'S NO WAY OF YOU SHOWING OTHER

8   THAN YOU TELLING THE JURY HAVING THEM TAKE YOU AT FACE

9   VALUE?

10         A      RIGHT, WELL I HAVE THE EVIDENCE IN THE LAB

11  THAT'S, IT'S IN OUR LAB IF YOU WOULD LIKE IT PROVIDED.

12         Q      WELL WE NEED IT TODAY SO THE ONLY THING WE

13  HAVE TODAY IS YOUR WORD, RIGHT?

14         A      YES, UNLESS YOU WOULD LIKE IT FAXED.

15         Q      OKAY, WELL LET'S ASSUME THAT IT'S NOT TUNED

16  RIGHT, CAN YOU GET A FALSE RESULT?

17         A      I DO NOT KNOW BECAUSE IF IT WASN'T TUNED

18  PROPERLY I WOULDN'T HAVE USED IT.

19         Q      BUT HOLD ON NOW LET'S SAY SOMEBODY DIDN'T

20  DO WHAT THEY WERE SUPPOSED, DO YOU DO THE TUNING OR DOES

21  SOMEONE ELSE DO THE TUNING?

22         A      I SHARE AN INSTRUMENT WITH ANOTHER CHEMIST

23  AND WE BOTH, WHOEVER COMES IN FIRST ON MONDAY WILL DO IT

24  SO.

25         Q      OKAY, WELL LET'S SAY YOU DID COME IN FIRST?

**MS. BURROUGHS - CROSS EXAMINATION BY MR. MCKNIGHT**          179

1          A      OKAY.

2          Q      YOU KNOW, I'M SAYING, MS. BURROUGHS, THE

3    TURN ABOUT TUNING BUT IT'S NOT YOUR TIME TO TUNE IT AND

4    LET'S SAY JEFF, I DON'T KNOW WHAT THE OTHER GUY'S NAME IS

5    JEFF, JEFF WAS KIND OF LAZY AND JEFF JUST SAYS, YEAH,

6    MARIBETH, I TUNED IT.  IF YOU, IT'S NOT TUNED RIGHT CAN YOU

7    GET A FALSE RESULT?

8          A      I REALLY, I'M NOT SURE ABOUT A FALSE

9    POSITIVE.

10          Q      SO ARE YOU SUGGESTING TO THE JURY THAT THIS

11    DEVICE IS INFALLIBLE?

12          A      NO, SIR, I'M NOT.  I JUST, I HAVE NEVER RUN

13    THE INSTRUMENT IN ANALYSIS WHEN IT'S NOT TUNED PROPERLY

14    BECAUSE IN OUR POLICY IF THE TUNE DOES NOT MEET THE

15    SPECIFICATIONS THEN WE DO MAINTENANCE AND THEN --

16          Q      WHEN WAS THE LAST TIME YOU DID MAINTENANCE

17    ON IT PRIOR TO THIS TEST?

18          A      I WOULD HAVE TO REFER TO OUR MAINTENANCE

19    LOG, I CANNOT GIVE YOU A SPECIFIC DATE.

20          Q      SO YOU DON'T KNOW?

21          A      NOT NOW, WELL THE TESTING WAS DONE IN 2009,

22    SO I COULD GO BACK AND LOOK, BUT THEN AGAIN I WOULD HAVE TO

23    CONTACT MY LAB.

24          Q      SO YOU DON'T KNOW?

25          A      NO, I DON'T KNOW.

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY       180**

1       Q       SO ARE YOU SUGGESTING THAT THIS THING IS

2    ALWAYS RIGHT?

3       A       SIR?

4       Q       HAVE YOU EVER HAD A FALSE, I TELL YOU WHAT,

5    HAVE YOU EVER HAD A FALSE POSITIVE ON ANY, IN ANY RESULT

6    YOU'VE EVER DONE?  HANGING AROUND IN THE LAB YOU KNOW THAT

7    NEW SPECIMEN DO YOU HAVE PLAY AROUND AND SOMETIMES DROP

8    STUFF IN HERE AND THAT WILL TURN IT BLUE AS OPPOSED JUST

9    LIKE COCAINE AND WILL BE CLEAR AND YOU GET FALSE POSITIVES?

10      A       YES, WITH A PRELIMINARY TEST THAT'S WHY WE

11   DO THE CONFIRMATORY TEST BUT THAT'S THE DIFFERENCE BETWEEN

12   A PRELIMINARY TEST.  IT'S NOT ALL INCLUSIVE TO COCAINE

13   THAT'S WHY WE PERFORM A CONFIRMATORY TEST WHICH IS THE

14   COCAINE SPECTRUM THAT'S UNIQUE TO COCAINE ONLY.  EVERY

15   COMPOUND IN, IN THE WORLD HAS ITS OWN UNIQUE SPECTRUM AND

16   HOW I KNOW IT'S COCAINE I RUN A KNOWN STANDARD THAT I KNOW

17   IS COCAINE FROM A CHEMICAL COMPANY AND COMPARE THOSE TWO

18   SPECTRUMS AND THAT'S HOW I GET MY RESULT.

19      Q       DID YOU CLEAN THE LAST TIME BEFORE YOU, I

20   MEAN DID YOU CLEAN IT BEFORE YOU USED IT THIS TIME HERE,

21   LIKE THE LAST TIME YOU USED IT YOU HAD COCAINE DID YOU

22   CLEAN IT OUT AND MAKE SURE IT DIDN'T HAVE ANY RESIDUE IN

23   IT?

24      A       WE USE NEW VIALS EVERY, FOR EVERY SAMPLE.

25      Q       SO IS THAT A YES YOU CLEANED IT BEFORE YOU

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY         181**

1   USED IT?

2          A     WELL THE ACTUAL INSTRUMENT IT'S A CLOSED

3   ENVIRONMENT SO YOU DON'T OPEN IT UP AND CLEAN IT BUT WE DO

4   USE I MEAN GLOVES EVERY TIME, CLEAN VIALS, CLEAN

5   INSTRUMENTS, SO THAT'S HOW WE KNOW THAT IT'S NOT

6   CONTAMINATED.

7          Q     AGAIN BUT YOU HAVE NO WAY OF SHOWING US

8   THAT YOU TUNED IT?

9          A     NOT PHYSICALLY HERE, NO, NOT RIGHT NOW.

10         MR. MCKNIGHT:    YOUR WITNESS.

11         THE COURT:    ALL RIGHT.

12                    **REDIRECT EXAMINATION**

13  BY MS. BAILEY:

14         Q     WHEN YOU SAY YOU TUNE IT DO YOU MEAN YOU

15  CHECK ITS CALIBRATION?

16         A     YES ---

17         Q     I'M NOT A SCIENTIST?

18         A     --- BUT IT'S CALLED A TUNE.

19         Q     SO TUNING IT IF IT WERE OFF TUNE TUNING IT

20  WOULDN'T FIX IT, IT WOULD JUST TELL YOU THAT IT WAS OFF

21  TUNE?

22         A     CORRECT, THEREFORE, WE WOULD KNOW IT WOULD

23  NEED MAINTENANCE IN WHICH WE WILL THEN DO.

24         Q     SO IF IT CAME BACK AS OFF TUNE YOU WOULDN'T

25  FIX IT AND THEN CONTINUE TO USE IT INSTEAD YOU WOULD SEND

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY        182**

1   IT OFF, YOU WOULD SEND IT AWAY FOR MAINTENANCE; IS THAT

2   RIGHT?

3          A      IT DEPENDS ON WHAT'S WRONG.  SOMETIMES IT

4   COULD BE AS SIMPLE AS TIGHTENING SOMETHING; IT DEPENDS THE

5   LEVEL OF MAINTENANCE THAT IS REQUIRED.

6          Q      OKAY, BUT WHEN YOU SAY TUNING THE TUNING

7   ITSELF IS NOT THE MAINTENANCE LIKE ON A PIANO WHEN YOU TUNE

8   A PIANO YOU'RE ACTUALLY ADJUSTING THE PIANO, WHEN YOU TUNE

9   YOUR INSTRUMENT ARE YOU REALLY, IT'S JUST LIKE A DIAGNOSTIC

10  TEST?

11         A      RIGHT.

12         Q      WOULD THAT BE ACCURATE?

13         A      YES.

14         Q      OKAY, SO TUNING ITSELF IS NOT GOING TO

15  ALTER THE WAY THE MACHINE WORKS OR THE INSTRUMENT WORKS; IS

16  THAT CORRECT?

17         A      CORRECT.

18         Q      OKAY, SO IT'S YOUR TESTIMONY THAT YOU OR

19  ONE OTHER PERSON TUNE THIS INSTRUMENT ONCE A WEEK EVERY

20  WEEK; IS THAT RIGHT?

21         A      YES.

22         Q      SO YOU TEST IT ONCE A WEEK EVERY SINGLE

23  WEEK?

24         A      YES.

25         Q      AND IS THAT YOUR HABIT, IS THAT YOUR

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**        183

1   ROUTINE PRACTICE?

2          A     YES.

3          Q     OKAY, AND IS THAT IN CONFORMANCE WITH THE

4   STATE LAW ENFORCEMENT DIVISION POLICY?

5          A     YES.

6          MS. BAILEY:   OKAY, NO FURTHER QUESTIONS.

7          THE COURT:   ALL RIGHT, YOU MAY STEP DOWN, THANK

8   YOU VERY MUCH.

9          THE WITNESS:    THANK YOU.

10          MS. BAILEY:   YOUR HONOR, AT THIS TIME THE STATE

11   WOULD REQUEST THAT MS. BURROUGHS BE RELEASED FROM HER

12   SUBPOENA SO SHE CAN RETURN TO COLUMBIA.

13          THE COURT:   ANY OBJECTION?

14          MR. MCKNIGHT:   NONE, YOUR HONOR.

15          THE COURT:   ALL RIGHT, YOU'RE FREE TO GO, THANK

16   YOU VERY MUCH.  ALL RIGHT, MS. BAILEY, YOU CAN CALL YOUR

17   NEXT WITNESS.

18          MS. BAILEY:   YOUR HONOR, AT THIS TIME THE STATE

19   RESTS.

20          THE COURT:   ALL RIGHT, LET ME SEE THE ATTORNEYS

21   FOR JUST A SECOND.

22          (WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE

23   RECORD IN THE PRESENCE OF THE JURY, BUT OUT OF THE HEARING

24   OF THE JURY AND THE COURT REPORTER.)

25          THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN, IT

184

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY        184**

1    IS 4:30 AND THE STATE HAS RESTED THEIR CASE SO IT'S A GOOD

2    TIME FOR US TO GO AHEAD AND BREAK FOR THE DAY, TO LET YOU

3    GET HOME, HAVE A GOOD NIGHTS REST.   PLEASE BE BACK TOMORROW

4    MORNING AT 9:30, WELL LET'S GO AHEAD AND BE BACK AT 9:15 SO

5    WE'LL TRY TO GET STARTED AT 9:30, THAT WILL GIVE YOU AN

6    OPPORTUNITY TO GET HERE.   HOPEFULLY THEY'LL HAVE SOME

7    COFFEE AND MAYBE A BISCUIT OR SOMETHING LIKE THAT WHEN YOU

8    GET BACK, SO IF YOU'D PLEASE BE BACK IN THE JURY ROOM AT

9    9:15 TOMORROW MORNING AND WE'LL TRY TO GET STARTED RIGHT AT

10   9:30.

11          I CAUTION AGAIN PLEASE DO NOT DISCUSS THE CASE

12   WITH ANYONE EVEN AMONG YOURSELVES AT THIS POINT IN TIME.

13   DON'T CONDUCT ANY INDEPENDENT INVESTIGATION, DON'T GO ON

14   THE INTERNET AND TRY TO FIND OUT ANYTHING ABOUT THE CASE.

15   IF THERE IS ANY NEWS ACCOUNTS PLEASE DON'T LISTEN TO ANY OR

16   TRY TO FIND ANYTHING ON THE NEWSPAPER ABOUT IT.

17          I HOPE YOU HAVE A NICE RESTFUL EVENING AND WE'LL

18   SEE YOU BACK TOMORROW MORNING, THANK YOU VERY MUCH.

19   EVERYONE ELSE PLEASE REMAIN SEATED WHILE THE JURY IS

20   EXCUSED.

21          (WHEREUPON, THE JURY WAS EXCUSED FOR THE EVENING

22   AT 4:30 P.M.)

23          THE COURT:   ALL RIGHT, MR. MCKNIGHT, ANY

24   MOTIONS?

25          MR. MCKNIGHT:   YOUR HONOR, AT THIS TIME THE

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY        185**

1    DEFENDANT RESPECTFULLY MOVES FOR A DIRECTED VERDICT.  WE

2    BELIEVE THAT THERE'S NOT BEEN ENOUGH EVIDENCE PRESENTED BY

3    THE PROSECUTION TO MEET THEIR BURDEN, THEREFORE, WE

4    RESPECTFULLY MOVE FOR A DIRECTED VERDICT.

5          THE COURT:  ALL RIGHT, MOTION IS NOTED, I'M

6    GOING TO DENY IT.  I THINK THEY'VE PRESENTED ENOUGH CASE,

7    ENOUGH TO AT LEAST GET IT AROUND THE DIRECTED VERDICT,

8    OKAY, THANK YOU VERY MUCH.

9          LET ME GO AHEAD AT THIS POINT IN TIME, I DON'T

10   KNOW WHAT YOUR CLIENT'S DESIRES ARE BUT LET ME GO AHEAD AND

11   QUESTION HIM AND THAT WILL AT LEAST GIVE HIM TIME TO THINK

12   ABOUT OVERNIGHT WHETHER OR NOT HE WISHES TO TESTIFY.

13         MR. MCKNIGHT:  IF THE COURT WOULD ALLOW MY

14   CLIENT AND MYSELF HAVE DISCUSSED IT AT LENGTH AND UNLESS HE

15   CHANGES HIS MIND HE'S GOING TO TESTIFY.

16         THE COURT:  OKAY, ALL RIGHT, WELL LET ME GO

17   AHEAD AND GIVE HIM THESE INSTRUCTIONS AT THIS POINT IN TIME

18   AND THEN I'LL GO AHEAD AND GIVE HIM THE INSTRUCTIONS AGAIN

19   TOMORROW BUT AT LEAST THIS WILL GIVE HIM, IT'S A NICE BREAK

20   THAT GIVES HIM AN OPPORTUNITY TO THINK ABOUT IT, OKAY.

21         ALL RIGHT, LET'S PUT THE DEFENDANT UNDER OATH,

22   PLEASE.

23                    QUENTIN J. HOLT

24      BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

25         THE COURT:  ALL RIGHT, SIR, YOUR NAME IS QUENTIN

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**          186

1    J. HOLT?

2            DEFENDANT HOLT:   YES, SIR.

3            THE COURT:   ALL RIGHT, MR. HOLT, AT THIS TIME

4    I'M GOING TO EXPLAIN TO YOU CERTAIN RIGHTS THAT YOU HAVE

5    AND IF YOU DO NOT UNDERSTAND ANYTHING I SAY PLEASE LET ME

6    KNOW.  IF YOU WANT ME TO EXPLAIN ANYTHING IN MORE DETAIL

7    PLEASE LET ME KNOW; DO YOU UNDERSTAND THAT?

8            DEFENDANT HOLT:   YES, SIR.

9            THE COURT:   OKAY, WE'VE NOW REACHED THE STAGE OF

10   THE TRIAL WHERE YOU MAY PRESENT YOUR DEFENSE.  YOU HAVE THE

11   RIGHT TO CLAIM THE PROTECTIONS GIVEN TO YOU BY THE FIFTH

12   AMENDMENT OF THE UNITED STATES CONSTITUTION WHICH STATES IN

13   PART THAT NO PERSON SHALL BE COMPELLED IN ANY CRIMINAL CASE

14   TO BE A WITNESS AGAINST HIMSELF.  THIS MEANS THAT YOU

15   CANNOT BE REQUIRED TO TESTIFY IN THIS CASE.

16           YOU HAVE THE RIGHT TO TESTIFY ON YOUR OWN BEHALF,

17   HOWEVER NO ONE CAN MAKE YOU TESTIFY.  THIS IS A PERSONAL

18   RIGHT AND NO ONE CAN WAIVE THIS RIGHT EXCEPT FOR YOU.

19           IF YOU DECIDE TO TESTIFY YOU WILL BE SUBJECT TO

20   THE SAME RULES THAT GOVERN OTHER WITNESSES AND YOU MAY BE

21   EXAMINED AND CROSS EXAMINED ON ANY RELEVANT ISSUE IN THIS

22   CASE.

23           IN ADDITION IF YOU HAVE ANY CONVICTIONS INVOLVING

24   DISHONESTY OR FALSE STATEMENT OR FOR CRIMES PUNISHABLE BY

25   IMPRISONMENT FOR MORE THAN ONE YEAR AND THIS COURT

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**        187

1  DETERMINES THAT THE PROBATIVE VALUE OF ADMITTING THE

2  EVIDENCE OUTWEIGHS ITS PREJUDICIAL EFFECT TO YOU THEN THE

3  SOLICITOR MAY BE ABLE TO INTRODUCE YOUR RECORD TO ATTACK

4  YOUR CREDIBILITY.

5          IF YOU DECIDE TO TESTIFY THIS DECISION ON YOUR

6  PART MUST BE FREELY, VOLUNTARILY, AND INTELLIGENTLY MADE,

7  WITH KNOWLEDGE OF THE PROTECTIONS GIVEN TO YOU BY THE FIFTH

8  AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE

9  CONSEQUENCES OF YOUR DECISION TO TESTIFY.

10          IF YOU DECIDE NOT TO TESTIFY I WILL INSTRUCT THE

11  JURORS THAT THEY CANNOT GIVE THE FACT THAT YOU DID NOT

12  TESTIFY ANY CONSIDERATION WHATSOEVER AND THAT THERE IS TO

13  BE ABSOLUTELY NO PREJUDICE TO YOU BECAUSE YOU DID NOT

14  TESTIFY.  IT IS LEFT ENTIRELY UP TO YOU WHETHER OR NOT YOU

15  TESTIFY.

16          YOU MAY TALK WITH YOUR ATTORNEY, YOUR FAMILY AND

17  FRIENDS, OR ANYONE ELSE BUT THE FINAL DECISION WILL BE LEFT

18  ENTIRELY UP TO YOU; DO YOU UNDERSTAND WHAT I'VE EXPLAINED

19  TO YOU?

20          DEFENDANT HOLT:   YES, SIR.

21          THE COURT:   DO YOU HAVE ANY QUESTIONS ABOUT WHAT

22  I'VE EXPLAINED TO YOU?

23          DEFENDANT HOLT:   NO, SIR.

24          THE COURT:   ALL RIGHT, I'M NOT GOING TO ASK YOUR

25  DECISION AT THIS POINT IN TIME WHETHER OR NOT YOU WISH TO

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**         188

1   TESTIFY BECAUSE THIS WILL GIVE YOU OVERNIGHT TO DECIDE

2   ABOUT IT, OKAY, ALL RIGHT, BUT WHEN WE BRING YOU BACK

3   TOMORROW IT WILL BE TIME TO PRESENT A DEFENSE IF YOU CHOOSE

4   TO PRESENT A DEFENSE IN THIS CASE AND SO AT THAT TIME I

5   WILL BE ASKING YOU WHETHER OR NOT YOU WISH TO TESTIFY,

6   OKAY?

7              DEFENDANT HOLT:   YES, SIR.

8              THE COURT:   ALL RIGHT, THANK YOU VERY MUCH,

9   ANYTHING FROM THE STATE BEFORE WE BREAK?

10             MS. BAILEY:   NOTHING, YOUR HONOR.

11             THE COURT:   ANYTHING FROM THE DEFENSE?

12             MR. MCKNIGHT:   NO, SIR, NOTHING, YOUR HONOR.

13             THE COURT:   ALL RIGHT, WHAT IS THE STATE'S

14   POSITION WITH REGARD TO THE DEFENDANT'S BOND?

15             MS. BAILEY:   YOUR HONOR, THE STATE IS, IS FINE

16   WITH THE DEFENDANT REMAINING ON BOND AS LONG AS HE'S

17   ADMONISHED THAT THE TRIAL WILL CONTINUE TOMORROW WITH OR

18   WITHOUT HIS ABSENCE AND THERE WILL BE A SEALED SENTENCE IF

19   HE'S CONVICTED TOMORROW.

20             THE COURT:   ALL RIGHT, ALL RIGHT, WITHOUT

21   OBJECTION I WILL ALLOW THE DEFENDANT TO GO AHEAD AND COME

22   BACK TOMORROW, IN OTHER WORDS WE WON'T HOLD HIM OVERNIGHT,

23   BUT PLEASE KEEP IN MIND, MR. HOLT, IF YOU FAIL TO APPEAR

24   THE TRIAL WILL STILL GO FORWARD.  A BENCH WARRANT WILL BE

25   ISSUED FOR YOUR ARREST, YOU WILL BE CHARGED WITH FAILURE TO

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY      189**

1  APPEAR IN COURT, AND THEN YOU WILL BE SUBJECT TO WHATEVER

2  VERDICT THE JURY RENDERS, OKAY?

3              DEFENDANT HOLT:   YES, SIR.

4              THE COURT:   ALL RIGHT.

5              MS. BAILEY:   YOUR HONOR, THE STATE ALSO REQUESTS

6  THAT THE COURT ADMONISH MR. HOLT THAT NOT, THE STATE WOULD

7  REQUEST THAT MR. HOLT NOT CONTACT EITHER THE CONFIDENTIAL

8  INFORMANT OR THE CONFIDENTIAL INFORMANT'S FAMILY OVERNIGHT

9  IN THE MIDST OF TRIAL.

10              THE COURT:   ALL RIGHT, WELL THE CONFIDENTIAL

11  INFORMANT IS INCARCERATED SO I'M NOT GOING TO WORRY TOO

12  MUCH ABOUT HIM BUT CERTAINLY THERE'S TO BE NO CONTACT WITH,

13  WHAT'S HIS NAME, MR. LEWIS, MR. LEWIS' FAMILY, OKAY.

14              DEFENDANT HOLT:   YES, SIR.

15              MS. BAILEY:   THANK YOU.

16              THE COURT:   ALL RIGHT, THANK YOU VERY MUCH.

17  WE'LL STAND IN RECESS UNTIL 9:30 TOMORROW MORNING.   I

18  WANTED THE JURY BACK AT 9:15 SO LET'S TRY TO GET STARTED

19  RIGHT AT 9:30, OKAY.

20              MS. BAILEY:   YES, YOUR HONOR, THANK YOU.

21              THE COURT:   ALL RIGHT, THANK YOU.

22              (WHEREUPON, COURT WAS ADJOURNED FOR THE EVENING

23  AND RESUMES ON SEPTEMBER 22, 2010 AT 9:15 A.M.)

24              (WHEREUPON, DEFENDANT'S EXHIBITS 1, 2, 3, AND 4

25  MARKED FOR IDENTIFICATION.)

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**      190

1           THE COURT:   PLEASE STAND UP AND LET'S PUT HIM

2    UNDER OATH AGAIN, PLEASE.

3                     QUENTIN J. HOLT

4        BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

5           THE COURT:   ALL RIGHT, MR. HOLT, I WENT OVER

6    SOME OF THESE RIGHTS WITH YOU YESTERDAY AND I WANT TO GO

7    OVER THEM WITH YOU AGAIN AS I INSTRUCTED YOU YESTERDAY THAT

8    I WOULD.   AT THIS TIME I'M GOING TO EXPLAIN TO YOU CERTAIN

9    RIGHTS THAT YOU HAVE UNDER THE UNITED STATES CONSTITUTION

10   AND IF YOU DO NOT UNDERSTAND ANYTHING I SAY PLEASE LET ME

11   KNOW.   IF YOU WANT ME TO EXPLAIN ANYTHING IN MORE DETAIL

12   PLEASE LET ME KNOW; DO YOU UNDERSTAND THAT?

13          DEFENDANT HOLT:   YES, SIR.

14          THE COURT:   ALL RIGHT, NOW AS I TOLD YOU

15   YESTERDAY WE'VE REACHED THE STAGE OF THE TRIAL WHERE YOU

16   MAY PRESENT YOUR DEFENSE IF YOU CHOOSE TO DO SO.

17          YOU HAVE THE RIGHT TO CLAIM THE PROTECTIONS GIVEN

18   YOU BY THE FIFTH AMENDMENT TO THE UNITED STATES

19   CONSTITUTION WHICH STATES IN PART THAT NO PERSON SHALL BE

20   COMPELLED IN ANY CRIMINAL CASE TO BE A WITNESS AGAINST

21   HIMSELF.

22          THIS MEANS THAT YOU CANNOT BE REQUIRED TO TESTIFY

23   IN THIS CASE.   YOU HAVE THE RIGHT TO TESTIFY ON YOUR OWN

24   BEHALF, HOWEVER NO ONE CAN MAKE YOU TESTIFY.   THIS IS A

25   PERSONAL RIGHT AND NO ONE CAN WAIVE THIS RIGHT EXCEPT FOR

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY**       191

1    YOU.

2          IF YOU DECIDE TO TESTIFY YOU'LL BE SUBJECT TO THE

3    SAME RULES THAT GOVERN OTHER WITNESSES AND YOU MAY BE

4    EXAMINED AND CROSS EXAMINED ON ANY RELEVANT ISSUE IN THIS

5    CASE.

6          IN ADDITION IF YOU HAVE ANY CONVICTIONS INVOLVING

7    DISHONESTY OR FALSE STATEMENT OR FOR CRIMES PUNISHABLE BY

8    IMPRISONMENT FOR MORE THAN ONE YEAR AND THIS COURT

9    DETERMINES THAT THE PROBATIVE VALUE OF ADMITTING THE

10   EVIDENCE OUTWEIGHS ITS PREJUDICIAL EFFECT TO YOU THEN THE

11   SOLICITOR WILL BE ABLE TO INTRODUCE YOUR RECORD TO ATTACK

12   YOUR CREDIBILITY.

13         IF YOU DECIDE TO TESTIFY THIS DECISION ON YOUR

14   PART MUST BE FREELY, VOLUNTARILY, AND INTELLIGENTLY MADE,

15   WITH KNOWLEDGE OF THE PROTECTIONS GIVEN TO YOU BY THE FIFTH

16   AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE

17   CONSEQUENCES OF YOUR DECISION TO TESTIFY.

18         IF YOU DECIDE NOT TO TESTIFY I WILL INSTRUCT THE

19   JURORS THAT THEY CANNOT GIVE THE FACT THAT YOU DID NOT

20   TESTIFY ANY CONSIDERATION WHATSOEVER AND THAT THERE IS TO

21   BE ABSOLUTELY NO PREJUDICE TO YOU BECAUSE YOU DID NOT

22   TESTIFY.  IT IS LEFT ENTIRELY UP TO YOU WHETHER OR NOT TO

23   TESTIFY.  YOU MAY TALK TO YOUR ATTORNEY, YOUR FAMILY AND

24   FRIENDS, OR ANYONE ELSE, BUT THE FINAL DECISION WILL BE

25   LEFT ENTIRELY UP TO YOU; NOW DO YOU UNDERSTAND WHAT I'VE

**MS. BURROUGHS - REDIRECT EXAMINATION BY MS. BAILEY          192**

1  EXPLAINED TO YOU?

2          DEFENDANT HOLT:   YES, SIR.

3          THE COURT:   DO YOU HAVE ANY QUESTIONS ABOUT WHAT

4  I'VE EXPLAINED TO YOU?

5          DEFENDANT HOLT:   NO, SIR.

6          THE COURT:   HAVE YOU DISCUSSED THIS MATTER WITH

7  YOUR LAWYER?

8          DEFENDANT HOLT:   YES, SIR.

9          THE COURT:   ALL RIGHT, HAVE YOU HAD AN AMPLE

10 OPPORTUNITY TO DISCUSS THIS MATTER WITH YOUR LAWYER?

11         DEFENDANT HOLT:   YES, SIR.

12         THE COURT:   DO YOU NEED ANY ADDITIONAL TIME TO

13 TALK TO YOUR LAWYER ABOUT THIS?

14         DEFENDANT HOLT:   NO, SIR.

15         THE COURT:   ALL RIGHT, DO YOU WISH TO TESTIFY IN

16 THIS CASE?

17         DEFENDANT HOLT:   YES, SIR.

18         THE COURT:   ALL RIGHT, THANK YOU VERY MUCH.  ALL

19 RIGHT, ANYTHING FROM THE STATE BEFORE WE BRING IN THE JURY?

20         MS. BAILEY:   YOUR HONOR, JUST THAT WE WERE IN

21 THE PROCESS OF SETTING UP THIS EQUIPMENT FOR PURPOSES THE

22 DEFENSE HAS BROUGHT SOME DOCUMENTS THIS MORNING WHERE

23 EVERYBODY CAN SEE THE DOCUMENTS WE JUST HAVE A MINUTE OR

24 TWO TO MAKE SURE IT'S WORKING.

25         THE COURT:   ALL RIGHT, ALL RIGHT, I MEAN IS IT

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          193

1  SOMETHING THAT YA'LL NEED TO JUST COME GET ME WHEN YOU'RE

2  READY OR CAN WE GO AHEAD AND DO IT RIGHT NOW?

3          ARE WE WAITING ON ANYTHING ELSE?

4          MS. BAILEY:   NO, YOUR HONOR.

5          THE COURT:   OKAY, ANYTHING FROM THE DEFENSE

6  BEFORE WE BRING THE JURY IN?

7          MR. MCKNIGHT:   NOTHING, YOUR HONOR.

8          THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

9  IN THE JURY, PLEASE.

10          OKAY, COME ON IN, THANK YOU.

11          (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

12  9:59 A.M.)

13          THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN,

14  WELCOME BACK, I HOPE EVERYONE HAD A GOOD RESTFUL EVENING.

15  WE'RE NOW READY TO PROCEED WITH THE TRIAL OF THIS CASE.

16  BEFORE WE DO SO I WANT TO THANK EVERYONE FOR BEING PROMPT

17  THIS MORNING, THAT MEANS A LOT TO US.  AS I TOLD YOU WE

18  DON'T ALWAYS GET TO YOU RIGHT AWAY AND WE HAVE BEEN TENDING

19  TO SOME COURT'S BUSINESS BUT I WANT TO THANK YOU FOR BEING

20  PROMPT.

21          THE STATE CONCLUDED THEIR CASE YESTERDAY AND NOW

22  IS THE TIME IN THE TRIAL WHERE THE DEFENSE CAN PRESENT A

23  DEFENSE IF THEY CHOOSE TO DO SO.  MR. MCKNIGHT, YOU MAY

24  CALL YOUR FIRST WITNESS.

25          MR. MCKNIGHT:   THANK YOU, YOUR HONOR, MAY IT

194

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                    194

1    PLEASE THE COURT, AT THIS TIME WE CALL MR. QUENTIN HOLT TO

2    THE STAND.

3                THE COURT:   ALL RIGHT, SIR, IF YOU'D PLEASE COME

4    AROUND.

5                        **QUENTIN J. HOLT**

6        **BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:**

7                MADAM CLERK:   PLEASE BE SEATED AND STATE YOUR

8    FULL NAME FOR THE RECORD.

9                THE WITNESS:   QUENTIN HOLT.

10                       **DIRECT EXAMINATION**

11   BY MR. MCKNIGHT:

12           Q     MR. HOLT, GOOD AFTERNOON, WHERE DO YOU

13   LIVE?

14           A     ███████████

15           Q     WHAT'S YOUR ADDRESS AT ███████████

16           A     █████  ████████████

17           Q     IT'S ███ ---

18           A     I DIDN'T HEAR YOU, ████████████

19           Q     HOW LONG HAVE YOU LIVED THERE?

20           A     ABOUT OVER A YEAR, ABOUT A YEAR.

21           Q     ABOUT A YEAR FROM NOW SO YOU'VE ONLY BEEN

22   LIVING THERE FROM SEPTEMBER 2009 UNTIL SEPTEMBER 2010?

23           A     UH-UH.

24           Q     WELL THEN HOW LONG HAVE YOU BEEN LIVING

25   THERE?

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**         195

1               A     SINCE APRIL OF '09.

2               Q     DID YOU BUY THE HOUSE AND MOVE IT THERE?

3               A     YES, SIR.

4               Q     WHO DID YOU BUY THE HOUSE FROM?

5               A     A YOUNG LADY SHANE BRINKLEY.

6               Q     YOU BOUGHT THE HOUSE IN APRIL AND MOVED IT

7      THERE?

8               A     YES, SIR.

9               Q     QUENTIN, HAVE YOU EVER BEEN IN TROUBLE WITH

10     THE LAW BEFORE?

11              A     YES, SIR.

12              Q     A LOT OR A LITTLE?

13              A     A LITTLE BIT.

14              Q     WHEN DID YOU FIRST GET ARRESTED?

15              A     1990, 90, MAYBE SIX.

16              Q     HOW OLD WERE YOU THEN?

17              A     I WANT TO SAY LIKE ---

18              Q     TAKE YOUR TIME, HOW OLD, DO THE MATH AND

19     HOW OLD WERE YOU IN 1996?

20              A     SEVENTEEN.

21              Q     WERE YOU STILL IN SCHOOL?

22              A     YES, SIR.

23              Q     THIS ISN'T YOUR FIRST DRUG CHARGE, IS IT?

24              A     NO, SIR.

25              Q     IN FACT HOW MANY TIMES HAVE YOU BEEN

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                196

1  CONVICTED OF SELLING DRUGS?

2          A      ABOUT TWO TIMES.

3          Q      AND YOU WENT TO PRISON, DIDN'T YOU?

4          A      THE FIRST TIME, YES, SIR.

5          Q      THE SECOND TIME YOU WERE ON PROBATION,

6  RIGHT?

7          A      YES, SIR.

8          Q      ARE YOU PROUD OF THAT FACT?

9          A      NO, SIR.

10         Q      HAVE YOU TRIED TO CHANGE YOUR LIFE?

11         A      YES, SIR.

12         Q      WHAT HAVE YOU DONE TO TRY TO CHANGE YOUR

13  LIFE?

14         A      I STARTED, GOT A JOB, STARTED WORKING, AND

15  BOUGHT THE MOBILE HOME FOR ME AND MY FAMILY.

16         Q      WHERE DO YOU WORK?

17         A      COASTAL WIRE.

18         Q      HOW LONG HAVE YOU BEEN THERE?

19         A      ABOUT TWO YEARS.

20         Q      AND WHEN DID YOU START WORKING THERE?

21         A      I THINK IT WAS LIKE 2008, SOME PART OF

22  2008.

23         Q      SO THAT WOULD BE MORE THAN TWO YEARS, WOULD

24  IT NOT?

25         A      YEAH, SOMEWHAT.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          197

1          Q      WHAT DO YOU DO AT COASTAL WIRE?

2          A      I RUN A WIRE MACHINE.

3          Q      OKAY, WHEN YOU RUN A WIRE MACHINE EXACTLY

4    WHAT IS IT?

5          A      IT'S LIKE YOU SET THE MACHINE LIKE FOR 100

6    POUND WEIGHTS OF WIRE AND THEN WHEN IT STOPS YOU GOT TO TIE

7    IT OFF, PUT IT ON A CONVEYOR BELT AND SEND IT OFF.

8          Q      HOW MUCH DO YOU GET PAID AT THAT JOB?

9          A      ELEVEN DOLLARS A HOUR.

10          Q      AND WHAT SHIFTS DO YOU WORK?

11          A      MORNING, EVENING AND GRAVEYARD.

12          Q      AND YOU WORK EVERY DAY OF THE WEEK?

13          A      YES, SIR.

14          Q      ARE YOU OFF ANY DAYS?

15          A      SOMETIMES ON SUNDAYS.

16          Q      DO YOU EVER WORK ANY OVERTIME?

17          A      YES, SIR.

18          Q      HOW OFTEN DO YOU WORK OVERTIME?

19          A      A LOT.

20          Q      OKAY, A LOT, QUANTIFY A LOT, MOST OF THE

21    WEEK, A LITTLE BIT OF THE WEEK, HOW OFTEN DO YOU WORK

22    OVERTIME?

23          A      PROBABLY TWO TIMES EVERY WEEK.

24          Q      HOW MANY CHILDREN DO YOU HAVE?

25          A      THREE.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                    198

1       Q       WHAT ARE THEIR NAMES AND WHAT ARE THEIR

2   AGES?

3       A       Minor 1  IS 10, Minor 2 IS SEVEN AND Minor 3

4   IS FIVE.

5       Q       LET'S DEAL WITH, YOU HEARD THE TESTIMONY,

6   YOU'VE HEARD FROM OFFICER GRANT?

7       A       YES, SIR.

8       Q       YOU HEARD FROM MR. LEWIS?

9       A       YES, SIR.

10      Q       DID YOU AT ANY TIME SELL CRACK COCAINE OR

11  IT'S KNOWN AS COCAINE BASE TO JOE LEWIS ON THE 17TH AND THE

12  20TH OF JUNE?

13      A       NO, SIR.

14      Q       YOU HEARD ME ASK MR. LEWIS ABOUT YOUR

15  KITCHEN, RIGHT?

16      A       YES, SIR.

17      Q       AND I ASKED HIM WHAT COLOR YOUR KITCHEN

18  WALL WAS, DID I NOT?

19      A       YES, SIR.

20      MR. MCKNIGHT:   PERMISSION TO APPROACH THE

21  WITNESS, YOUR HONOR?

22      THE COURT:   YES, SIR.

23      MR. MCKNIGHT:   (CONTINUING)

24      Q       I'D LIKE TO SHOW YOU WHAT'S BEEN PREMARKED

25  AS DEFENSE EXHIBITS 3 AND 4, DO YOU RECOGNIZE THAT OBJECT

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          199

1    IN THE PICTURE?

2          A    YES, SIR.

3          Q    WHAT IS IT?

4          A    MY KITCHEN,

5          Q    YOUR KITCHEN LOCATED WHERE?

6          A    AT ████  █████████████████

7          Q    AND WHAT COLOR IS THAT KITCHEN WALL?

8          A    PINK.

9          Q    HOW LONG HAS IT BEEN PINK?

10         A    SINCE THE TIME I MOVED IN.

11         Q    HAVE YOU PAINTED THAT WALL IN ANY WAY SINCE

12   JUNE 20TH, 2009?

13         A    NO, SIR.

14         MR. MCKNIGHT:    YOUR HONOR, AT THIS TIME I MOVE

15   TO ENTER INTO EVIDENCE DEFENDANT'S EXHIBITS 3 AND 4, I'M

16   SORRY, DEFENSE EXHIBITS 3 AND 4.

17         THE COURT:    ANY OBJECTION?

18         MS. BAILEY:    YOUR HONOR, I'M NOT SURE THAT THE

19   DEFENSE LAWYER HAS PROPERLY AUTHENTICATED AND THAT HE'S

20   REPRESENTED THAT THEY ARE TRUE AND ACCURATE REPRESENTATION

21   OF HOW THEY WERE AT THE TIME OF THE INCIDENT WHAT'S

22   NECESSARY FOR AUTHENTICATION.

23         THE COURT:    OKAY, ALL RIGHT, I THINK HE'S

24   AUTHENTICATED IT ENOUGH.  I'M GOING TO GO AHEAD OVER THE

25   OBJECTION OF THE STATE I'LL ADMIT DEFENDANT'S EXHIBIT

200

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          200

1  NUMBER 3 AND 4 INTO EVIDENCE.

2          (WHEREUPON, DEFENDANT'S EXHIBITS NUMBER 3 AND 4

3  ADMITTED INTO EVIDENCE.)

4          MR. MCKNIGHT:   THANK YOU, YOUR HONOR, WITH YOUR

5  PERMISSION I'D LIKE TO PUBLISH IT TO THE JURY.

6          THE COURT:   ALL RIGHT.

7          MS. BAILEY:   YOUR HONOR, I DO OBJECT TO THE

8  PUBLICATION OF ELECTRONIC DOCUMENT.  I THINK THAT THE ITEMS

9  THAT HAVE BEEN MARKED AS EXHIBITS SHOULD BE PUBLISHED TO

10 THE JURY NOT THE ELECTRONIC EXHIBIT.

11         MR. MCKNIGHT:   YOUR HONOR, IF I MAY, THE

12 SOLICITOR'S OFFICE HAS GONE TO GREAT DEAL OF EFFORT WITH

13 THEIR TECHNOLOGY YESTERDAY AND IN AN EFFORT TO SHOW AND

14 ILLUSTRATE THE PICTURES WHICH ARE CLEAR AND ACCURATE AND

15 PRIOR TO THIS COMING IN SHE HAD NO PROBLEM WITH IT.

16         MS. BAILEY:   YOUR HONOR, THEY'RE GOING TO HAVE

17 THE PRINTED PICTURES IN THE JURY ROOM.  I JUST THINK WE

18 SHOULD ALL BE LOOKING AT THE SAME PICTURES.

19         THE COURT:   ALL RIGHT, LET'S GO AHEAD AND JUST

20 GIVE THEM THE EXHIBIT, WE'LL DO IT THAT WAY.

21         MR. MCKNIGHT:   THANK YOU.

22         Q     (CONTINUING) NOW ON YOUR WALL YOU'VE GOT

23 PINK FLOWERS AT THE TOP, RIGHT?

24         A     YES, SIR.

25         Q     AND YOU GOT THE CURTAINS AT THE BOTTOM THAT

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          201

1    KIND OF MATCH WITH THE PINK, RIGHT?

2         A    YES, SIR.

3         Q    OKAY, NOW YOU HEARD THE TESTIMONY THAT THEY

4    GAVE THAT THIS HAPPENED AT, THAT, YOU KNOW, HE WENT TO

5    GREAT LENGTHS TO DESCRIBE THE FACT THAT HE WENT TO A

6    RESIDENCE, I BELIEVE, WHEN I SAY HE I MEAN MR. LEWIS, THAT

7    HE WENT TO ███████████████████ IS THAT CORRECT, DID YOU

8    HEAR HIM SAY THAT?

9         A    YES, SIR.

10         Q    HAVE YOU EVER LIVED THERE?

11         A    NO, SIR.

12         Q    AT ANY TIME?

13         A    NO, SIR.

14         Q    WHAT'S YOUR DRIVERS LICENSE GOT ON IT?

15         A    MY MOTHER'S.

16         Q    WHERE'S YOUR DRIVERS LICENSE?

17         A    IN THE CAR.

18         Q    OKAY, WHAT'S YOUR MAMA'S ADDRESS?

19         A    ██████████████████.

20         Q    WAS THAT EVER ████████████████

21         A    NO, SIR.

22         MR. MCKNIGHT:    PERMISSION TO APPROACH THE

23    WITNESS, YOUR HONOR?

24         THE COURT:    ALL RIGHT.

25         MR. MCKNIGHT:    (CONTINUING)

202

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**            202

1          Q     I'M GOING TO SHOW YOU WHAT'S BEEN

2  PREVIOUSLY MARKED AS DEFENSE EXHIBIT 1 FOR IDENTIFICATION

3  PURPOSES; WHAT IS THAT?

4          A     A PERMIT.

5          Q     LOOK AT THE OTHER DOCUMENTS?  WHAT'S THE

6  OTHER DOCUMENT BEHIND THE PERMIT?

7          A     A BILL OF SALE, AND A BILL OF SALE.

8          Q     OKAY, NOW THE DATE ON THE BILL OF SALE IS

9  WHAT?

10          A     6-25-09.

11          Q     AND THAT'S AFTER 6-20, IS IT NOT?

12          A     YES, SIR.

13          Q     BUT YOU WERE ALREADY LIVING IN THE HOUSE;

14  IS THAT RIGHT?

15          A     YES, SIR.

16          Q     AND WHO DID YOU BUY THE HOUSE FROM?

17          A     SHANE BRINKLEY.

18          Q     DID YOU GIVE HER THE MONEY PRIOR TO 6-17-

19  2009?

20          A     YES, SIR.

21          Q     AND DID YOU START LIVING IN THERE PRIOR TO

22  6-17-2009?

23          A     YES, SIR.

24          Q     SO WHAT TOOK YOU SO LONG TO GET YOUR PAPER

25  WORK READY FOR MS. BRINKLEY.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          203

1          A     THE PAPER WORK WHAT SHE HAD WASN'T CORRECT.

2          Q     AND SO WHAT DID YOU HAVE TO DO?

3          A     GO TO THE CLERK OF COURT AND WAIT TILL THEY

4    STRAIGHTEN OUT THE PAPER WORK AND PAY SOME MONEY.

5          Q     IS THAT A TRUE AND ACCURATE COPY OF THE

6    BILL OF SALE FOR YOUR MOBILE HOME AND THE MOBILE HOME

7    PERMIT?

8          A     YES, SIR.

9          MR. MCKNIGHT:   YOUR HONOR, AT THIS TIME I'D LIKE

10   TO MOVE THAT EXHIBIT INTO EVIDENCE AS PLAINTIFF'S EXHIBIT

11   1.

12         MS. BAILEY:   YOUR HONOR, IT'S HEARSAY.  IT'S A

13   BUSINESS RECORD AND NOBODY WHO CREATED THEM AS RECORD OR

14   SIGNED THEM AS RECORD IS HERE TO AUTHENTICATE THE RECORD.

15         THE COURT:   ALL RIGHT, I THINK HE'S IDENTIFIED

16   AS WHAT WAS GIVEN TO HIM AT THE TIME OF PURCHASE.  I'LL GO

17   AHEAD AND ADMIT DEFENDANT'S EXHIBIT NUMBER 1 OVER THE

18   OBJECTION OF THE STATE.

19         (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 1 ENTERED

20   INTO EVIDENCE.)

21         MR. MCKNIGHT:   I'M SORRY, YOUR HONOR, WITH YOUR

22   PERMISSION CAN I PUBLISH IT TO THE JURY?

23         THE COURT:   YES, THAT WILL BE FINE.

24         MR. MCKNIGHT:   (CONTINUING)

25         Q     NOW, QUENTIN, DO YOU REMEMBER WHAT OFFICER

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**          204

1  GRANT SAID, THEY SAID YOU WAS AT ---

2         MS. BAILEY:   OBJECTION, YOUR HONOR, THAT'S

3  PITTING THE WITNESS AGAINST OTHER WITNESSES AND ONCE AGAIN

4  THAT'S IMPROPER.

5         THE COURT:   LET ME HEAR THE QUESTION FIRST, GO

6  AHEAD AND FINISH THE QUESTION.

7         Q      THEY SAID YOU WERE AT WORK ON THE 20TH, I'M

8  SORRY, THEY SAID YOU WERE AT HOME ON THE 20TH AND THAT YOU

9  WERE SELLING DRUGS, WHERE WERE YOU?

10        A      AT WORK.

11        Q      YOU SURE?

12        A      YES, SIR.

13        Q      WHAT WERE YOU DOING AT WORK?

14        A      WORKING OVER RUNNING THE WIRE MACHINE.

15        THE COURT:   ALL RIGHT, BEFORE WE GO ON I'M GOING

16 TO OVERRULE THE OBJECTION, I'LL ALLOW THE QUESTION, GO

17 AHEAD.

18        MR. MCKNIGHT:   THANK YOU, YOUR HONOR, PERMISSION

19 TO APPROACH THE WITNESS?

20        THE COURT:   ALL RIGHT.

21        MS. BAILEY:   YOUR HONOR, THE STATE HAS HAD AN

22 OPPORTUNITY TO VIEW THESE DOCUMENTS AND THE STATE IS GOING

23 TO BE OBJECTING TO THESE DOCUMENTS AND THE INTRODUCTION OF

24 THEM BEING IN THE RECORD.  I DON'T KNOW IF YOU WANT TO DO

25 THAT OUTSIDE THE PRESENCE OF THE JURY?

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT** 205

1          THE COURT:   ALL RIGHT, LET'S GO AHEAD AND DO

2    THAT.  LET THEM FINISH THE PUBLICATION OF THIS ONE FIRST.

3          ALL RIGHT, WE'LL LET YOU FINISH REVIEWING THAT

4    FOR JUST A MINUTE BUT RIGHT NOW WE'VE GOT A MATTER OF LAW

5    THAT I NEED TO TAKE UP WITH THE ATTORNEYS SO I'M GOING TO

6    EXCUSE YOU BACK TO THE JURY ROOM BRIEFLY.  I'LL BRING YOU

7    BACK OUT SHORTLY.  PLEASE DO NOT DISCUSS THE CASE EVEN

8    AMONG YOURSELVES AT THIS POINT IN TIME.  IF YOU WANT TO

9    JUST LEAVE THAT ON THE RAIL RIGHT THERE AND WE'LL PICK IT

10   UP AND GIVE IT BACK TO YOU AS SOON AS YOU RETURN.

11   EVERYBODY ELSE PLEASE REMAIN SEATED.

12          (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

13   10:14 A.M.)

14          THE COURT:   ALL RIGHT, MS. BAILEY, LET ME HEAR

15   YOUR OBJECTION?

16          MS. BAILEY:   THANK YOU, YOUR HONOR, WHAT THE

17   DEFENSE IS GOING TO BE PURPORTING TO INTRODUCE IS

18   SUPPOSEDLY A TIME SHEET.  THAT TIME SHEET THE ONLY WAY IT

19   WOULD BE ADMISSIBLE BUSINESS RECORD, FOR BUSINESS RECORDS

20   TO BE ADMISSIBLE THE CUSTODIAN OR OTHER WITNESS WHO CAN

21   TESTIFY AS TO THE MOTIVE, PREPARATION AND THE IDENTITY OF

22   THAT TIME CLOCK, THE PERSON WHO ACTUALLY KEEPS THE RECORD

23   AND PRODUCES IT FOR TRIAL IS THE ONLY ONE THAT CAN

24   AUTHENTICATE THE HEARSAY THAT'S LOCATED IN THE BUSINESS

25   RECORD.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**      206

1          IN THIS PARTICULAR CASE THIS IS PARTICULARLY

2   UNRELIABLE.  IT'S HARD TO READ WHETHER IT'S A.M. OR P.M.,

3   THE PARTICULAR MINUTES.  I MEAN REALLY WE NEED THE PERSON

4   WHO ASSISTS IN THE PREPARATION OF CREATING THIS BUSINESS

5   RECORD TO EVEN UNDERSTAND WHAT IT SAYS AND IT'S THE STATE'S

6   CONTENTION THAT IN ADDITION TO THAT IT WOULD ONLY SERVE TO

7   CONFUSE THE JURY, WOULD BE MORE PREJUDICIAL THAN PROBATIVE.

8          THE COURT:   ALL RIGHT, WHAT KIND OF TIME RECORD

9   IS IT, I MEAN IS IT A CARD HE FILLS OUT OR IS IT --

10          MR. MCKNIGHT:   A PUNCH CARD.

11          THE COURT:   OKAY.

12          MR. MCKNIGHT:   A TIME SHEET.

13          THE COURT:   BUT I MEAN IS IT THE RESULTS OF THE

14   PUNCH CARD OR IS IT THE PUNCH CARD ITSELF?

15          MR. MCKNIGHT:   IT'S THE PUNCH CARD ITSELF.

16          THE COURT:   AND HE'S THE ONE THAT PUNCHES IT IN?

17          MR. MCKNIGHT:   HE'S THE ONE AND IT'S WITH HIS

18   HANDWRITING AT THE TOP.

19          THE COURT:   OKAY, ALL RIGHT, I'LL OVERRULE THE

20   OBJECTION, I WILL ALLOW THAT IN.  NOW HE'S GOING TO HAVE TO

21   LAY THE FOUNDATION.

22          MR. MCKNIGHT:   YES, SIR.

23          THE COURT:   I'M JUST SAYING THAT SINCE HE'S THE

24   ONE THAT SIGNS IT, HE'S THE ONE THAT PUNCHES THE CARD AND

25   IT'S JUST A COPY OF THE PUNCH CARD ITSELF THEN I'LL ALLOW

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                    207

1    IT.  NOW ANY FURTHER INTERPRETATION, YOU KNOW, IF IT HAD

2    BEEN A LEDGER SHEET I SAW WHERE THERE'S ANOTHER SHEET

3    BEHIND IT --

4              MR. MCKNIGHT:   THAT'S THE WORK SCHEDULE.

5              THE COURT:   THE WORK SCHEDULE PREPARED BY --

6              MR. MCKNIGHT:   THAT'S NOT PREPARED BY HIM,

7    THAT'S PREPARED BY SOMEONE ELSE THAT HE WORKED FOR.

8              THE COURT:   OKAY, YEAH, YOU'RE GOING TO HAVE

9    WHOEVER PREPARED THAT HERE TO AUTHENTICATE IT BUT I WILL

10   PERMIT THE PUNCH CARD THAT HE PUNCHED AND SIGNED.

11             MR. MCKNIGHT:   THANK YOU.

12             THE COURT:   ALL RIGHT.

13             MR. MCKNIGHT:   I'M TAKING IT OUT.

14             THE COURT:   OKAY.

15             MR. MCKNIGHT:   JUST THAT ONE PAGE, ALL RIGHT.

16             THE COURT:   ALL RIGHT, ANYTHING ELSE BEFORE WE

17   BRING THE JURY BACK IN?

18             MS. BAILEY:   WHILE THE JURY IS OUT I JUST WANTED

19   TO CLARIFY WHAT I CAN CROSS EXAMINE THIS DEFENDANT ON AS

20   FAR AS HIS CRIMINAL RECORD.

21             THE COURT:   ALL RIGHT.

22             MS. BAILEY:   MR. MCKNIGHT HAS ALREADY GONE INTO

23   THE FACT OF PAST DRUG CONVICTION NA OPENED THE DOOR.  I

24   BELIEVE THE STATE HAS THE ABILITY TO CONTINUE THAT LINE OF

25   QUESTIONING AND THEN IN ADDITION TO THAT THERE IS A FAILURE

208

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                208

1    TO STOP FOR A BLUE LIGHT CONVICTION THAT IS WITHIN LAST 10

2    YEARS.  IT CARRIES MINIMUM ONE YEAR BUT HE WAS STILL

3    SERVING PROBATION ON THAT CHARGE IN THE LAST 10 YEARS AND

4    SO THE STATE CONTENDS THAT WE SHOULD HAVE THE ABILITY TO

5    BRING IT UP ON CROSS EXAMINATION.

6              THE COURT:   ALL RIGHT.  MR. MCKNIGHT?

7              MR. MCKNIGHT:   THAT'S FINE.

8              THE COURT:   ALL RIGHT.  ALL RIGHT, ANYTHING ELSE

9    BEFORE WE BRING THE JURY IN?

10             MS. BAILEY:   THAT'S IT, YOUR HONOR.

11             THE COURT:   ALL RIGHT, MR. MCKNIGHT?

12             MR. MCKNIGHT:   I'M READY, YOUR HONOR.

13             THE COURT:   ALL RIGHT, LET'S BRING THE JURY BACK

14   IN.

15             (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

16   10:18 A.M.)

17             THE COURT:   LADIES AND GENTLEMEN, WELCOME BACK,

18   I APOLOGIZE FOR THAT BREAK THERE.  MR. MCKNIGHT, YOU CAN

19   CONTINUE WITH YOUR QUESTIONING.

20             MR. MCKNIGHT:   THANK YOU, YOUR HONOR.

21             Q     (CONTINUING) MR. HOLT, DO YOU RECOGNIZE

22   THAT DOCUMENT UP THERE WITH YOU?

23             A     YES, SIR.

24             Q     WHAT IS IT?

25             A     A TIME CARD.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                209

1          Q      AND IT'S A TIME CARD FOR WHAT?

2          A      WHEN YOU CLOCK IN AND CLOCK OUT AT WORK.

3          Q      AND THAT'S AT YOUR WORK, IT'S AT COASTAL

4    WIRING?

5          A      YES, SIR.

6          Q      IS THAT COPY THAT YOU HAVE THERE AN

7    ACCURATE AND TRUE DEPICTION OF YOUR TIME CARD DURING THE

8    MONTH OF JUNE 2009?

9          A      YES, SIR.

10         Q      THERE'S A NAME WRITTEN AT THE TOP ON THAT

11   CARD WHOSE NAME IS THAT?

12         A      QUENTIN HOLT.

13         Q      WHO WROTE THAT?

14         A      ME.

15         Q      AND IS IT CUSTOMARY FOR YOU GUYS TO WRITE

16   THE NAME, YOUR NAME ON THE TOP OF THESE TIME CARDS?

17         A      YES, SIR.

18         Q      AND WHEN YOU'RE WITH YOUR TIME CARDS DO YOU

19   JUST LEAVE THEM BY THE CLOCK?

20         A      IT'S LIKE A SLOT.

21         Q      IS IT RIGHT THERE BESIDE WHERE THE TIME

22   CLOCK IS?

23         A      YES, SIR.

24         MR. MCKNIGHT:    YOUR HONOR, AT THIS TIME WE'D

25   MOVE THAT INTO EVIDENCE AS DEFENSE EXHIBIT NUMBER 2.

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                210

1          THE COURT:  ALL RIGHT, DEFENSE EXHIBIT NUMBER 2

2     ADMITTED INTO EVIDENCE.

3          (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER 2 ADMITTED

4     INTO EVIDENCE.)

5          MR. MCKNIGHT:  YOUR HONOR, WITH YOUR PERMISSION

6     I'D LIKE TO PUBLISH IT TO THE JURY.

7          THE COURT:  ALL RIGHT.

8          Q     NOW, QUENTIN, BEFORE I PUBLISH IT TO THE

9     JURY, DO YOU SEE THE DATE JUNE THE 20TH ON THERE?

10         A     YES, SIR.

11         Q     WHAT TIME DID YOU GO TO WORK?

12         A     ELEVEN O'CLOCK.

13         Q     ELEVEN O'CLOCK WHAT, A.M. OR P.M.?

14         A     IT WAS NIGHTTIME, WELL P.M.

15         Q     P.M.?

16         A     YES, SIR.

17         Q     WHAT TIME DID YOU GET OFF OF WORK?

18         A     LIKE 3:00 THE NEXT DAY.

19         Q     THREE O'CLOCK ON WHAT DATE WOULD THAT BE?

20         A     ON THE 20TH.

21         Q     SO YOU WENT IN ON THE 19TH AND GOT OFF AT

22     3:00 P.M.?

23         A     I WAS SCHEDULED TO GET OFF AT SEVEN THAT

24     MORNING ---

25         Q     RIGHT?

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**                211

1          A       --- BUT I WORKED OVER FOR A GUY THAT DIDN'T

2     COME IN.

3          Q       OKAY --

4          A       YES, SIR.

5          Q       HOW FAR IS COASTAL WIRE FROM YOUR HOUSE?

6          A       PROBABLY ABOUT 20 MINUTES, 20, 30 MINUTES.

7          Q       WHERE IS IT?

8          A       COASTAL WIRING?

9          Q       YES?

10         A       LIKE JUST BEFORE YOU GET INTO GEORGETOWN.

11         Q       OKAY, IS THAT PAST WHAT THEY CALL THE NINE

12    MILE CURVE?

13         A       YES, SIR.

14         Q       SO YOU'D HAVE TO GET OFF FROM WORK AND THEN

15    GET HOME, RIGHT?

16         A       WELL YOU HAVE TO, WELL USUALLY WHEN YOU

17    CLOCK OUT YOU GO WASH UP AND THEN YOU LEAVE.  YOU HAVE OIL

18    AND ---

19         Q       WHY DO YOU WASH UP?

20         A       CAUSE YOU BE OILY.

21         Q       WHAT DO YOU MEAN OILY, HOW DO YOU GET OILY

22    FROM RUNNING A MACHINE?

23         A       BECAUSE THE WIRING HAVE LIKE A CERTAIN OIL

24    IN IT WHEN IT COOKS IT SO IT GETS ON YOUR CLOTHES AND YOUR

25    HANDS AND STUFF LIKE THAT.

212

**MR. HOLT - DIRECT EXAMINATION BY MR. MCKNIGHT**              212

1          Q      NOW YOU'RE NOT JUST MAKING THAT UP NOW, YOU

2   WASH EVERY TIME YOU COME HOME?

3          A      YES, SIR.

4          Q      SO WHAT TIME DID YOU GET HOME THAT DAY?

5          A      IT MAYBE WAS PROBABLY AFTER FOUR,

6   SOMEWHERE, SOMEWHERE UP IN THERE.

7          Q      SO IS IT SAFE TO SAY THAT NORMALLY IF YOU

8   GET OFF FROM WORK AT A SPECIFIC TIME WITH YOU SHOWERING AND

9   DRIVING IT TAKES YOU ABOUT AN HOUR TO GET HOME?

10         A      SOMETIMES.

11         Q      NOW ON THE 17TH OF JUNE DO YOU RECALL WHERE

12  YOU WERE?  DID YOU WORK THAT DAY?

13         A      YES, SIR, I WORKED.

14         Q      WHAT TIME DID YOU WORK?

15         A      WENT IN AT THREE.

16         Q      YOU WENT IN AT THREE?

17         A      YES, SIR.

18         Q      YOU'RE SURE, 3:00 WHAT TIME, A.M. OR P.M.?

19         A      P.M.

20         Q      WHAT TIME DO YOU NORMALLY LEAVE HOME TO

21  WORK, TO GET TO WORK?

22         A      I NORMALLY LEAVE ABOUT PROBABLY LIKE 2:15,

23  2:20.

24         Q      YOU DIDN'T CALL IN SICK THAT DAY, DID YOU?

25         A      NO, SIR.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    213

1          Q     YOU WERE AT WORK?

2          A     YES, SIR.

3          Q     AND THAT'S ON THAT TIME SHEET RIGHT THERE?

4          A     YES, SIR.

5          Q     QUENTIN, YOU'VE GOT OTHER STUFF ON YOUR

6    CRIMINAL RECORD, DON'T YOU?

7          A     YES, SIR.

8          Q     YOU'VE GOT A FAILURE TO STOP FOR A BLUE

9    LIGHT, DON'T YOU?

10         A     YES, SIR.

11         Q     YOU'VE GOT CONTRIBUTING TO THE DELINQUENCY

12   OF A MINOR CHARGE ON THERE, DON'T YOU?

13         A     YES, SIR.

14         Q     BUT THAT WAS FROM "96 WHEN YOU WERE 17,

15   RIGHT?

16         A     YES, SIR.

17         Q     YOU ALSO GOT A, YOU ALSO BEAT SOMEBODY UP

18   AND GOT CONVICTED OF ASSAULT AND BATTERY, DIDN'T YOU?

19         A     YES, SIR.

20         Q     SO WHEN YOU SAID YOUR RECORD WAS LITTLE YOU

21   WERE SORT OF DOWNPLAYING IT, WEREN'T YOU?

22         A     YES, SIR.

23         Q     SORT OF SIGNIFICANT?

24         A     YES, SIR.

25         Q     HAVE YOU TURNED AWAY FROM YOUR LIFE OF

214

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    214

1  CRIME BEFORE?

2          A     YES, SIR.

3          MR. MCKNIGHT:   THE COURT'S INDULGENCE.

4          THE COURT:   ALL RIGHT.

5          MR. MCKNIGHT:   YOUR WITNESS, MS. BAILEY.

6          MS. BAILEY:   THANK YOU, YOUR HONOR.

7                      **CROSS EXAMINATION**

8  **BY MS. BAILEY:**

9          Q     MR. HOLT, DID YOU MOVE TO YOUR CURRENT

10  ADDRESS A YEAR AGO IN SEPTEMBER?

11          MR. MCKNIGHT:   YOUR HONOR, IF I MAY.  IF I HAD

12  TO ONLY PUBLISH TO THE JURY THE PICTURES AS THEY ACCURATELY

13  WERE, THE ACTUAL PHOTO, THEN I ASK THAT THERE BE SOME

14  RECIPROCITY TO REQUIRE THE SOLICITOR'S OFFICE TO DO THE

15  SAME.  SHE'S ATTEMPTING TO USE HER ELECTRONIC DEVICE JUST

16  AS THE SAME AS I WAS GOING TO USE MINE.

17          MS. BAILEY:   YOUR HONOR, I'M WAS NOT GOING TO

18  USE THE PHOTOGRAPHS, I WAS GOING TO USE JUST SOME

19  DOCUMENTS.

20          MR. MCKNIGHT:   SHE WAS GOING TO DO IT FOR THE

21  DOCUMENTS.

22          THE COURT:   WE'RE GOING TO DO IT ALL UNIFORM SO

23  JUST PRESENT IT THE OTHER WAY.

24          MS. BAILEY:   OKAY, I WILL.

25          Q     (CONTINUING) MR. HOLT, YOU MOVED TO YOUR

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                215

1    CURRENT ADDRESS IN SEPTEMBER?

2              A    NO, MA'AM.

3              Q    YOU TESTIFIED EARLIER YOU MOVED THERE A

4    YEAR AGO?

5              A    YEAH, A YEAR AGO, A LITTLE OVER A YEAR AGO.

6              Q    OKAY, SO DID YOU MOVE THERE IN SEPTEMBER?

7              A    NO, MA'AM.

8              Q    ALL RIGHT, DID YOU MOVE THERE IN APRIL,

9    2009?

10             A    SOME, SOMEWHERE UP IN THERE.

11             Q    YOU TESTIFIED THAT YOU MOVED THERE IN

12   APRIL?

13             A    UH-HUH.

14             Q    IS THAT WHEN YOU MOVED THERE?

15             A    YES, SIR, BECAUSE MY GRANDFATHER PASSED.

16             Q    DID YOU MOVE THERE IN JUNE?

17             A    NO, MA'AM.

18             Q    THAT'S WHEN THE DOCUMENTS SAY YOU MOVED

19   THERE?

20             A    YEAH.

21             Q    OKAY, SO WE HAVE THREE DIFFERENT ANSWERS AS

22   TO WHEN YOU MOVED THERE?

23             A    I MOVED THERE IN APRIL BEFORE MY

24   GRANDMOTHER, I MEAN MY GRANDFATHER PASSED.

25             Q    BUT YOU DON'T HAVE ANY DOCUMENTS TO PROVE

216

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                216

1    THAT; IS THAT CORRECT?

2           A    I DON'T HAVE WHAT?

3           Q    OKAY, THE DOCUMENTS SAY YOU MOVED THERE IN

4    JUNE 23RD; IS THAT CORRECT?

5           A    UH-HUH.

6           Q    AND YOUR YOUNGEST SON'S NAME IS [Minor 3    ]; IS

7    THAT CORRECT?

8           A    YES, MA'AM.

9           Q    YOU'RE A CONVICTED DRUG DEALER; IS THAT

10   CORRECT?

11          A    YES, MA'AM.

12          Q    DO YOU MAKE MORE MONEY SELLING DRUGS THAN

13   YOU DO WORKING A REAL JOB?

14          A    NO, MA'AM.

15          Q    SELLING DRUGS IS EASIER WORK THAN A REAL

16   JOB, ISN'T IT?

17          A    THAT'S WHAT THEY SAY.

18          Q    YOU'VE GOT THREE KIDS TO SUPPORT, RIGHT?

19          A    YES, MA'AM.

20          Q    DO YOU HAVE TO PAY CHILD SUPPORT?

21          A    YES, MA'AM.

22          Q    HOW MUCH DO YOU PAY IN CHILD SUPPORT?

23          A    $50 ---

24          MR. MCKNIGHT:    OBJECTION, YOUR HONOR, RELEVANCE.

25          MS. BAILEY:    YOUR HONOR, IT GOES TO MOTIVE.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    217

1        THE COURT:    OVERRULED, I'M GOING TO ALLOW IT, GO

2   AHEAD.

3        MS. BAILEY:    (CONTINUING)

4        Q    HOW MUCH DO YOU PAY CHILD SUPPORT?

5        A    $50.

6        Q    $50 FOR ALL THREE?

7        A    NO, MA'AM, ONE.

8        Q    $50 EACH?

9        A    JUST FOR ONE, MY DAUGHTER.

10       Q    OKAY, BUT THE OTHER TWO YOU SUPPORT AS

11  WELL, RIGHT?

12       A    YES, MA'AM.

13       Q    YOU BUY DIAPERS?

14       A    NO, MA'AM.

15       Q    THEY'RE FIVE, THEY'RE OUT OF DIAPERS?

16       A    YES, MA'AM.

17       Q    BUT YOU HAVE TO BUY TOYS AND SCHOOL

18  SUPPLIES, CLOTHES; IS THAT RIGHT?

19       A    YES, MA'AM.

20       Q    OKAY, THEY'RE EXPENSIVE; AREN'T THEY?

21       A    YES, MA'AM.

22       Q    AND YOU HAVE EXPERIENCE AS A DRUG DEALER;

23  IS THAT RIGHT?

24       A    NO, MA'AM.

25       Q    YOU DON'T HAVE EXPERIENCE AS A DRUG DEALER,

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    218

1  DIDN'T YOU ADMIT TO US EARLIER THAT YOU'VE BEEN CONVICTED

2  OF DEALING DRUGS TWICE BEFORE?

3          A    POSSESSION, YES, MA'AM.

4          Q    POSSESSION?

5          A    UH-HUH.

6          Q    ALL RIGHT, LET'S TALK ABOUT YOUR TIME CARD,

7  YOU WROTE YOUR NAME ON THE TOP OF THAT TIME CARD; IS THAT

8  RIGHT?

9          A    YES, MA'AM.

10         Q    OKAY, AND YOU ARE THE ONE WHO PUNCHED IN

11  THAT TIME CARD; IS THAT CORRECT?

12         A    YES, MA'AM.

13         Q    ALL RIGHT, DID YOU EVER PROVIDE THAT TIME

14  CARD BEFORE TODAY?

15         A    NO, MA'AM.

16         Q    THIS CASE HAS BEEN PENDING FOR A YEAR AND A

17  HALF; IS THAT CORRECT?

18         A    ABOUT, I THINK ABOUT A YEAR.

19         Q    OKAY, THIS CASE HAS BEEN PENDING FOR A

20  YEAR?

21         A    YES, MA'AM.

22         Q    YOU'VE COME FOR ROLL CALL SEVERAL TIMES?

23         A    UH-HUH.

24         Q    THROUGH YOUR ATTORNEY YOU'VE COMMUNICATED

25  WITH THE STATE BUT YOU'VE NEVER TOLD US BEFORE TODAY THAT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    219

1    YOU HAD AN ALIBI?

2            A    I WAS NEVER ASKED.

3            Q    AND YOU HAVE PROOF IS WHAT YOU SAY, YOU SAY

4    YOU HAVE PROOF OF AN ALIBI BUT YOU'VE NEVER PROVIDED THAT

5    BEFORE TODAY?

6            A    UH-HUH.

7            Q    NOW ON THAT TIME CARD THERE'S SLOTS FOR

8    A.M. AND THERE'S SLOTS FOR P.M. ---

9            A    YEAH.

10           Q    --- IS THAT CORRECT?

11           A    YES, MA'AM.

12           Q    FOR THE DATE OF JUNE 17TH BOTH OF THOSE

13   TIME CLOCK PUNCHES ARE IN THE A.M. CATEGORY; IS THAT

14   CORRECT?

15           A    I BELIEVE SO.

16           Q    SO YOU GET OFF AT 3:00 A.M. ON JUNE 17TH;

17   IS THAT CORRECT?

18           A    JUNE 17TH, NO, MA'AM.

19           Q    BUT THE PUNCH IS IN THE 3 A.M. CATEGORY;

20   ISN'T IT?

21           A    UH-UH.

22           Q    IT'S NOT IN THE A.M. SECTION?

23           A    P.M.

24           Q    IT'S IN THE P.M. SECTION; THAT'S YOUR

25   TESTIMONY?  IS THAT YOUR TESTIMONY THAT IT'S IN THE P.M.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    220

1  SECTION?

2          A     I BELIEVE SO.

3          Q     AND FOR THE JUNE 20TH TIME CLOCK PUNCH

4  THERE'S ONLY ONE PUNCH ON JUNE 20TH; IS THAT CORRECT?

5          A     ONE PUNCH IS TWO.

6          Q     YOU THINK THERE'S TWO PUNCHES FOR JUNE

7  20TH?

8          A     WHEN I CLOCK IN AND CLOCK OUT.

9          Q     OKAY, DID YOU CLOCK IN ON THE 19TH AT 11?

10         A     UH-HUH.

11         Q     AND DID YOU CLOCK OUT ON THE 20TH AT 3?

12         A     AT 3 A.M.

13         Q     OKAY, SO YOU WANT US TO BELIEVE THAT YOU

14  WORKED FROM 11:00 AT NIGHT UNTIL THREE IN THE AFTERNOON?

15         A     UH-HUH.

16         Q     NOW THOSE TWO PUNCHES ARE RIGHT NEXT TO

17  EACH OTHER; IS THAT CORRECT?

18         A     YES, MA'AM.

19         Q     AS IF THEY WERE ONE DAY; IS THAT CORRECT?

20         A     UH-HUH.

21         Q     ONE SHIFT, THEY DON'T GO TO THE NEXT DAY,

22  YOU DON'T SKIP A SLOT TO SHOW THAT IT'S THE NEXT DAY THAT

23  YOU CLOCKED OUT; IS THAT CORRECT?

24         A     NO, WHEN YOU, WHEN YOU CLOCK IN LIKE THAT,

25  WHEN YOU CLOCK IN AT THAT 11 AND THEN TILL YOU GET OFF THAT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                221

1   EVENING THEY GOING TO SHOW P.M., THAT'S THE, THE CLOCK JUST

2   LIKE A REGULAR CLOCK.

3          Q    SO EVEN THOUGH YOU'VE GOT TWO DIFFERENT

4   DATES AND YOU'VE GOT TWO DIFFERENT TIMES THAT ARE RIGHT

5   NEXT TO EACH OTHER SO IT LOOKS LIKE YOU ONLY CLOCKED ONCE

6   ON THE 20TH; IS THAT RIGHT?

7          A    YEAH, YEAH, CLOCK OUT.

8          Q    AND IT'S YOUR TESTIMONY HERE TODAY THAT YOU

9   WORKED FROM 11:00 AT NIGHT ALL THE WAY UNTIL 3:00 THE NEXT

10  DAY?

11         A    I PULLED A DOUBLE.

12         Q    OKAY, AND IT'S YOUR TESTIMONY HERE TODAY

13  THAT IT TAKES YOU A HALF AN HOUR FROM YOUR WORK TO GET TO

14  YOUR HOME?

15         A    YES, MA'AM.

16         Q    YOU KNOW JOE LEWIS, DON'T YOU?

17         A    SOMEWHAT.

18         Q    DO YOU WORK, I MEAN WHEN HE WALKED IN HERE

19  YESTERDAY YOU DIDN'T SAY, WHO IS THAT, YOU KNEW HIM, DIDN'T

20  YOU?

21         A    YEAH, I DONE SEE HIS FACE BEFORE.

22         Q    YOU'VE KNOWN HIM FOR A WHILE, RIGHT?

23         A    COUPLE OF YEARS.

24         Q    HE'S BOUGHT DRUGS FROM YOU BEFORE, HASN'T

25  HE?

222

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                222

1          A      NO, MA'AM.

2          Q      I'M GOING TO SHOW YOU WHAT'S PREVIOUSLY

3   BEEN MARKED AS STATE'S EXHIBIT, DEFENSE EXHIBITS 3 AND 4;

4   COULD YOU DESCRIBE WHAT'S HANGING OVER THE WINDOW, OVER THE

5   SINK?

6          A      OVER THE WINDOWS, A CURTAIN.

7          Q      THERE'S CURTAINS OVER THE SINK, OVER THE

8   WINDOW THAT'S RIGHT OVER THE SINK; IS THAT RIGHT?

9          A      YES, MA'AM.

10         Q      AND THE WALLS ARE PAINTED, THE WALLS ARE

11  NOT WHITE; IS THAT CORRECT?

12         A      THEY'RE PINK.

13         Q      THEY'RE PINK, NOW WHERE YOU LIVE SOME

14  PEOPLE CALL THAT HOLT PLANTATION?

15         A      YES, MA'AM.

16         Q      WHY DO THEY CALL IT THAT?

17         A      I DON'T KNOW.

18         Q      BECAUSE A LOT OF PEOPLE YOU'RE RELATED TO

19  LIVE OUT THERE?

20         A      YES, MA'AM, YEAH, I GUESS.

21         Q      OKAY, SO NONE OF US HAVE EVER BEEN THERE

22  BUT BASICALLY WE'RE TALKING ABOUT ONE PIECE OF PROPERTY

23  WITH SEVERAL HOMES ON IT; IS THAT CORRECT?

24         A      YES, MA'AM.

25         Q      OKAY, AND YOURS IS ONE OF THOSE HOMES,

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                223

1    RIGHT?

2         A    YES, MA'AM.

3         Q    AND THIS ADDRESS, THIS ████ THAT THE

4    DOCUMENTS SHOW YOU MOVED IN IN JUNE 23RD THAT IS OUT THERE

5    ON THAT PIECE OF PROPERTY; IS THAT RIGHT?

6         A    YES, MA'AM.

7         Q    BUT YOU LIVED ON THAT PROPERTY BEFORE JUNE

8    23RD; ISN'T THAT RIGHT?

9         A    UH-HUH.

10        Q    OKAY, AND EVEN BEFORE YOU MOVED INTO THIS

11   MOBILE HOME YOU LIVED ON THAT PROPERTY WITH SOMEBODY,

12   RIGHT?

13        A    NO, MA'AM.

14        Q    WHERE DID YOU LIVE BEFORE THAT?

15        A    ████████████████

16        Q    OKAY, AND IS HOLLYWOOD AVENUE RIGHT NEXT

17   DOOR?

18        A    UH-UH.

19        Q    THAT ISN'T THE ROAD THAT INTERSECTS COUNTY

20   LINE ROAD?

21        A    NO, MA'AM.

22        Q    THE ROAD NEXT TO IT?

23        A    IT'S CLOSE BUT NOT THAT CLOSE, NOT WHERE I

24   WAS STAYING AT.

25        Q    OKAY, BUT YOU'VE MOVED ON OR NEAR THAT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                224

1  PROPERTY; ISN'T THAT RIGHT?

2          A     WHICH PROPERTY?

3          Q     ██████████      AND HOLLYWOOD ROAD?

4          A     IT'S LIKE, HOLLYWOOD AVENUE AND THEN THIS

5  ROAD IS COUNTY LINE, I LIVED AT THE FRONT.

6          Q     OKAY, BUT IT'S ALL THE HOLT PLANTATION

7  AREA; IS THAT RIGHT?

8          A     NO, MA'AM.

9          Q     NO?

10         A     UH-UH.

11         Q     WELL WHO OWNS THAT AREA?  WE SAW DOCUMENTS

12 WHERE YOU BOUGHT A MOBILE HOME, WE DIDN'T SEE ANY DOCUMENTS

13 WHERE YOU BOUGHT LAND.

14         MR. MCKNIGHT:   YOUR HONOR, IF SHE'S GOING TO ASK

15 HIM QUESTIONS SHE NEEDS TO LET THE WITNESS ANSWER THE

16 QUESTION AND NOT TESTIFY.

17         THE COURT:   ALL RIGHT, ASK YOUR QUESTION.

18         MS. BAILEY:     (CONTINUING)

19         Q     WHO OWNS THE LAND?

20         A     ANNETTE POPE.

21         Q     THAT PERSON OWNS HOLT PLANATION?

22         A     NO, MA'AM.

23         Q     AND YOU MOVED TO ██████   IN JUNE, ON JUNE

24 23RD OF 2009?

25         A     SOMETIME IN APRIL.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    225

1              Q      OR WAS IT SEPTEMBER?

2              A      SOMETIME IN APRIL.

3         MS. BAILEY:    ALL RIGHT, NO FURTHER QUESTIONS.

4         THE COURT:    REDIRECT?

5         MR. MCKNIGHT:    THE COURT'S INDULGENCE?

6         THE COURT:    ALL RIGHT.

7         MR. MCKNIGHT:    NO QUESTIONS FOR THIS WITNESS,

8    YOUR HONOR.

9         THE COURT:    ALL RIGHT, YOU MAY STEP DOWN.

10        THE WITNESS:    THANK YOU.

11        THE COURT:    YOU CAN CALL YOUR NEXT WITNESS.

12        MR. MCKNIGHT:    YOUR HONOR, THE DEFENSE RESTS.

13        THE COURT:    ALL RIGHT, ALL RIGHT, MS. BAILEY,

14   ANYTHING IN REPLY?

15        MS. BAILEY:    NO, YOUR HONOR.

16        THE COURT:    ALL RIGHT, ALL RIGHT, LADIES AND

17   GENTLEMEN, THE DEFENSE HAS PRESENTED THEIR CASE NOW IS THE

18   TIME IN THE TRIAL WHERE I HAVE TO TAKE UP SOME ADDITIONAL

19   MATTERS OF LAW BEFORE WE BRING YOU OUT TO DO CLOSING

20   ARGUMENTS AND CLOSING, EXCUSE ME, CLOSING ARGUMENTS AND

21   THEN A CHARGE ON THE LAW, SO I'M GOING TO EXCUSE YOU BACK

22   TO THE JURY ROOM FOR JUST A FEW MINUTES.  WE'LL BRING YOU

23   BACK OUT SHORTLY.  PLEASE DO NOT DISCUSS THE CASE EVEN

24   AMONG YOURSELVES AT THIS POINT IN TIME BUT IT WILL GIVE YOU

25   A NICE LITTLE BREAK WHERE YOU CAN STRETCH YOUR LEGS, GET

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                226

1  SOMETHING TO DRINK AND THINGS OF THAT NATURE AND WE'LL

2  BRING YOU BACK OUT SHORTLY, OKAY.  EVERYBODY ELSE PLEASE

3  REMAIN SEATED WHILE THE JURY IS EXCUSED.

4          (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

5  10:36 A.M.)

6          THE COURT:  ALL RIGHT, ANY MOTIONS AT THIS TIME?

7          MR. MCKNIGHT:  YOUR HONOR, THE DEFENSE RENEWS

8  ITS MOTION FOR A DIRECTED VERDICT AT THIS TIME.

9          THE COURT:  ALL RIGHT, THAT MOTION IS NOTED BUT

10  I'M GOING TO DENY IT.

11          MR. MCKNIGHT:  YES, SIR.

12          THE COURT:  ANYTHING, YES, MA'AM?

13          MS. BAILEY:  YOUR HONOR, THE STATE WOULD MOVE

14  THAT THE DEFENSE NOT BE ALLOWED IMPROPER ARGUMENT IN

15  CLOSING.  THE DEFENSE OBJECTED TO LARGE PORTIONS OF THE

16  STATE'S EVIDENCE INCLUDING FOR THE TIME THAT THE "CI"

17  WAS WIRED UNTIL THE BUY HAPPENED AND THEN UNTIL THE "CI"

18  GOT BACK.  THE "CI" WAS UNDER SURVEILLANCE AND THAT

19  EVIDENCE WAS AVAILABLE BUT THE COURT RULED IT INADMISSIBLE

20  AND SINCE IT'S INADMISSIBLE ---

21          THE COURT:  WAIT A MINUTE, SAY THAT AGAIN NOW?

22          MS. BAILEY:  THE PORTIONS OF THE AUDIO RECORDING

23  ---

24          THE COURT:  RIGHT.

25          MS. BAILEY:  --- FROM WHEN THE "CI", THE WIRE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    227

1   WAS PLACED ON THE "CI" ---

2              THE COURT:   RIGHT.

3              MS. BAILEY:   --- TILL THE BUY HAPPENED AND FROM

4   AFTER THE BUY UNTIL THE "CI" GOT BACK TO THE AGENTS THE

5   COURT RULED THAT EVIDENCE INADMISSIBLE.

6              THE COURT:   CORRECT.

7              MS. BAILEY:   AS SUCH THE STATE ARGUES THAT IT IS

8   IMPROPER ARGUMENT FOR THE DEFENSE TO SAY THAT WE DON'T HAVE

9   ANY RECORD OF IT OR THAT THERE'S A PROBLEM WITH THE CHAIN

10  OF CUSTODY DURING THOSE TIME PERIODS.

11             THE COURT:   OH, OKAY, I AGREE WITH THAT.  WHAT

12  CAN I HEAR FROM YOU, MR. MCKNIGHT, ON THAT?

13             MR. MCKNIGHT:   OH, WITHOUT ANY OBJECTION I

14  AGREE, THAT'S FINE.

15             THE COURT:   OKAY, ALL RIGHT, ANYTHING ELSE?

16             MS. BAILEY:   THAT'S ALL FROM THE STATE, YOUR

17  HONOR, THAT'S FINE.

18             THE COURT:   ALL RIGHT, I'VE GOT TO INSERT ONE

19  MORE INSTRUCTION INTO MY JURY CHARGE.  THE ONLY THING THAT

20  I HAVE NOT PUT IN AND IT WAS BECAUSE I DIDN'T KNOW UNTIL

21  THE DEFENDANT TESTIFIED WAS THE CHARGE WHERE THEY CANNOT

22  CONSIDER THE DEFENDANT'S RECORD AS PROOF OF GUILT BUT ONLY

23  ADDRESS IT AS TO CREDIBILITY AND I'M GOING TO INSERT THAT

24  AND THEN I'LL BRING YOU OUT A COPY OF MY CHARGE AND LET YOU

25  LOOK AT THAT BEFORE WE DO CLOSING ARGUMENTS, OKAY.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    228

1              MR. MCKNIGHT:   YES, SIR.

2              MS. BAILEY:   THANK YOU, YOUR HONOR.

3              THE COURT:   ALL RIGHT, WHAT I'M GOING TO DO LET

4     ME GET YOU A COPY OF MY CHARGE, LET YOU TAKE A LOOK AT IT,

5     IF YOU HAVE ANY ADDITIONS YOU WANT INSERTED, RATHER THAN

6     YOU HANDING ME UP A BUNCH OF JURY CHARGES NOW LET ME SHOW

7     YOU WHAT I'VE GOT AND THEN YOU CAN MOVE TO STRIKE PART OF

8     IT, ADD TO IT OR WHATEVER YOU DEEM APPROPRIATE, OKAY.

9              MR. MCKNIGHT:   YES, SIR.

10             THE COURT:   ALL RIGHT.

11             MS. BAILEY:   THANK YOU.

12             THE COURT:   GIVE ME ABOUT FIVE MINUTES TO INSERT

13    THIS ONE PART AND I'LL BRING YOU BACK A COPY, OKAY.

14             MS. BAILEY:   THANK YOU, YOUR HONOR.

15             MR. MCKNIGHT:   THANK YOU.

16             THE COURT:   THANK YOU.

17             (WHEREUPON, A RECESS WAS TAKEN AND THE FOLLOWING

18    TAKES PLACE ON THE RECORD AFTER THE RECESS.)

19             THE COURT:   MR. MCKNIGHT, MY CLERK HAS GIVEN YOU

20    A COPY OF MY CHARGE ON THE LAW ON THIS CASE; IS THAT

21    CORRECT?

22             MR. MCKNIGHT:   YES, SIR, YOUR HONOR, HE HAS.

23             THE COURT:   ALL RIGHT, AT THIS POINT IN TIME

24    HAVE YOU HAD AN OPPORTUNITY TO LOOK OVER THAT?

25             MR. MCKNIGHT:   THE DEFENSE HAS, YOUR HONOR.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    229

1          THE COURT:   HAS THE STATE?

2          MS. BAILEY:   YES, YOUR HONOR.

3          THE COURT:   ALL RIGHT, ANY OBJECTIONS OR

4    ADDITIONS BEFORE, I LIKE TO GIVE YOU A COPY TO LOOK OVER

5    BEFORE WE BEGIN CLOSING ARGUMENTS.  I'LL GIVE YOU AN

6    OPPORTUNITY TO RESPOND AT A LATER TIME BUT BEFORE WE MAKE

7    CLOSING ARGUMENTS ARE THERE ANY QUESTIONS ABOUT IT OR ANY

8    CHALLENGES OR ADDITIONS?

9          MR. MCKNIGHT:   NONE FROM THE DEFENSE, YOUR

10   HONOR.

11         MS. BAILEY:   NONE FROM THE STATE, YOUR HONOR.

12         THE COURT:   ALL RIGHT, ANYTHING FROM THE STATE

13   BEFORE WE BRING THE JURY IN?

14         MS. BAILEY:   NO, YOUR HONOR.

15         THE COURT:   ANYTHING FROM THE DEFENSE?

16         MR. MCKNIGHT:   NOTHING, YOUR HONOR.

17         THE COURT:   ALL RIGHT, LET'S GO AHEAD AND BRING

18   THE JURY IN.

19         (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

20   11:15 A.M.)

21         THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN,

22   WELCOME BACK, THE STATE HAS COMPLETED THEIR CASE AND THE

23   DEFENSE HAS CONCLUDED THEIR DEFENSE IN THIS CASE AND NOW IS

24   THE TIME OF THE TRIAL WHERE THE ATTORNEYS WILL MAKE THEIR

25   CLOSING ARGUMENTS TO THE JURY.

230

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    230

1             NOW JUST LIKE THE OPENING STATEMENTS FROM THE

2    ATTORNEYS THESE CLOSING ARGUMENTS ARE NOT EVIDENCE IN THIS

3    CASE.  IT IS SIMPLY THE ATTORNEYS CONTENTION OR THE

4    ATTORNEYS ARGUMENT AS TO WHAT THEY THINK THE FACTS IN THIS

5    CASE ARE AND WHAT THEY THINK THE CHARGE WILL BE OR WHAT THE

6    LAW IN THIS CASE TO BE APPLIED IS.

7             JUST LIKE EVERYTHING ELSE IF THEY MAKE A

8    STATEMENT OF FACT THAT DISAGREES WITH YOUR FINDING OF THE

9    FACTS YOU'RE TO DISREGARD THEIR STATEMENT.  LIKEWISE IF

10   THEY MAKE A REFERENCE TO THE LAW THAT DISAGREES WITH WHAT I

11   CHARGE YOU THE LAW TO BE AT THE CONCLUSION OF THEIR

12   ARGUMENTS YOU'RE TO DISREGARD THEIR ARGUMENTS IN THAT

13   RESPECT.  THIS IS ONLY THEIR OPINION OR THEIR CONTENTION AS

14   TO WHAT THE FACTS ARE, WHAT THE CASE HAS SHOWN, WHAT THE

15   ISSUES ARE, AND WHAT THE LAW IS, ALL RIGHT.

16            MS. BAILEY, DOES THE STATE WAIVE OPENING OR DO

17   YOU WANT TO GO AHEAD?

18            MS. BAILEY:   YES, YOUR HONOR, THE STATE WAIVES

19   OPENING.

20            THE COURT:   ALL RIGHT, MR. MCKNIGHT?

21            MR. MCKNIGHT:   THANK YOU, YOUR HONOR, MS.

22   BAILEY.

23            THE COURT:   MR. MCKNIGHT.

24                        **CLOSING ARGUMENT**

25   **BY MR. MCKNIGHT:**

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**            231

1      LADIES AND GENTLEMEN OF THE JURY, GOOD MORNING,

2  ON BEHALF OF MY CLIENT I WANT TO THANK YOU FOR AGAIN FOR

3  YOUR ATTENTION.   I KNOW WE'RE ALMOST AT THE END BUT I NEED

4  FOR YOU TO PAY ATTENTION FOR A LITTLE BIT LONGER AND LISTEN

5  TO ME JUST CAREFULLY AS YOU CAN.

6      YOU'VE HEARD THE TESTIMONY THAT'S BEEN GIVEN HERE

7  OVER YESTERDAY AND TODAY.  YOU'VE HEARD FROM A NUMBER OF

8  WITNESSES AND I'D LIKE TO TALK TO YOU ABOUT SOME OF THOSE

9  THINGS.

10      WE HEARD, THIS CASE IS SUMMED UP BEST BY THAT OLD

11  SPIRITUAL SONG 99 AND A HALF JUST WON'T DO.  YOU KNOW YOU

12  HAD OFFICER GRANT THAT HAD THIS "CI" THAT HE HAD BEEN

13  PAYING, MR. LEWIS, BUT A LOT OF THIS COULD HAVE BEEN CURED

14  BY OFFICER GRANT GOING AND LOOKING AT THE PLACE IT WAS THAT

15  HE SAID, THAT JOE LEWIS SAID HE GOT THE DRUGS FROM.  HE

16  DIDN'T DO THAT.  DID HE BOTHER TO GO AT ANY TIME AND LOOK

17  AND SAY, YEAH, THE NUMBERS ON THE HOUSE MATCH UP, NO, HE

18  DIDN'T DO THAT.  DID HE BOTHER TO GO AND JUST LOOK AND KIND

19  OF SEE IF HE WENT ACTUALLY WHERE HE WENT, NO, HE DIDN'T DO

20  THAT.  WHAT DID HE DO?  HE RELIED SOLELY ON INFORMATION

21  GIVEN TO HIM BY A KNOWN CRACK HEAD WHO WOULD AND HAS DONE

22  ANYTHING FOR MONEY.  THAT'S WHAT OFFICER GRANT DID, JUST

23  WHATEVER I'LL DO, I'LL BELIEVE HIM, I GOT MY MAN, THAT'S

24  WHAT THE RECORDS SHOW.

25      WHAT ABOUT LOOKING YOURSELF, THAT WASN'T, THAT

232

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    232

1   WHOLE NOTION OF DOING YOUR JOB ISN'T SOMETHING

2   EXTRACURRICULAR, IT'S WHAT YOU'RE SUPPOSED TO DO.  YEAH,

3   YOU MIGHT TRUST BUT YOU'VE GOT TO, WHAT, VERIFY, VERIFY.

4            NOW THEY GIVE YOU THIS WHOLE BUSINESS ABOUT I

5   BOUGHT JOE A SHIRT, JOE DOESN'T KNOW ANYTHING ABOUT SOME

6   SHIRT.  WHY AREN'T THE NUMBERS ADDING UP?  WHY?  34 CENTS

7   HERE, 64, WHERE'S THE MONEY GOING.  I'M DOING THIS, NO, HE

8   DOESN'T DO ANYTHING THAT HE'S SUPPOSED TO DO, BUT HE WANTS

9   YOU ALL TO DO HIS JOB FOR HIM, NO, SIR, NO, MA'AM, THAT'S

10  NOT YOUR RESPONSIBILITY.  HE'S SUPPOSED TO BRING THE FACTS

11  TO THE SOLICITOR, THE SOLICITOR IS SUPPOSED TO PRESENT

12  THEM, AND THEN, LADIES AND GENTLEMEN, YOU ISSUE THE

13  VERDICT.  HE HASN'T GIVEN YOU ENOUGH INFORMATION FOR YOU TO

14  RELY UPON CONFIDENTLY.  HE HASN'T GIVEN YOU ENOUGH

15  INFORMATION FOR YOU, LADIES AND GENTLEMEN, TO GET RID OF

16  YOUR NATURAL HESITATION TO ACT.

17            YOU HEARD FROM THE CHEMIST, VERY NICE YOUNG LADY,

18  BUT I'M NOT AT ALL CONVINCED AT HER COMPETENCE TO TEST

19  CHEMICALS.  SHE COULDN'T TELL YOU THE LAST TIME THAT THE

20  INSTRUMENT THAT SHE USED TO TEST THE SUBSTANCE IN QUESTION

21  WAS CALIBRATED OR VERIFIED.  ANOTHER PERSON WHO, OH, WELL

22  I'M GOING TO RELY ON WHAT SOMEBODY ELSE DID INSTEAD OF

23  MAKING SURE.

24            NOW THEY HAVE GIVEN YOU ALL ON ITS FACE NOTHING

25  THAT THEY'VE PUT INTO EVIDENCE.  WE DON'T, WE'RE NOT EVEN

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    233

1   SURE IF THAT'S CRACK.  SHE SAYS IT IS BUT SHE CAN'T TELL

2   YOU IF THE MACHINE WAS RIGHT.

3          NOW WHAT DO WE HAVE, WE HAVE MY CLIENT WHO, YES,

4   HE HAS A CHECKERED PAST AND AS HE PUT IT.  BUT YOU KNOW

5   WHAT HE COULD HAVE DONE, HE COULD HAVE SAT AT THAT TABLE

6   RIGHT THERE HIDE BEHIND THE FIFTH AMENDMENT AND SAID

7   NOTHING AND HIS HONOR WOULD HAVE INSTRUCTED YOU HAD THAT

8   HAPPENED THAT YOU CANNOT HOLD THAT AGAINST HIM BUT HE PUT

9   ASIDE HIS SHIELD OF THE FIFTH AMENDMENT.  HE SHED THAT

10  ENTIRE PROTECTION THAT HE HAD WHERE HE COULD HAVE PLAYED IT

11  SAFE AND HE GOT ON THE STAND AND HE TOLD YOU UNDER OATH

12  WHAT IT WAS, WHAT WAS WHAT, THAT HE WAS WHERE, AT WORK, A

13  LEGITIMATE JOB, DOING WHAT HE WAS SUPPOSED TO DO, AND THAT

14  HIS NORMAL ROUTINE ON THOSE DAYS WAS TO, WHAT, WORK,

15  SHOWER, AND COME HOME, AND GUESS WHAT.  WHEN HE GOT

16  OVERTIME WHAT DID HE DO WITH HIS OVERTIME HE TOOK THE

17  OVERTIME.  YOU KNOW MS. BAILEY MADE IT SEEM AS IF IT WAS A

18  STRETCH BEYOND THE IMAGINATION THAT SOMEONE WOULD PULL A

19  DOUBLE.  THERE'S SOME PEOPLE THAT'S DYING TO PULL A TRIPLE,

20  NOT JUST A DOUBLE, BUT TO HER, OH, MY GOD, THAT'S

21  INCREDIBLE, HE COULDN'T HAVE WORKED A DOUBLE, NO.

22          WHAT DID HE DO, WHAT DID HE BRING YOU, LADIES AND

23  GENTLEMEN?  HE BROUGHT YOU, LADIES AND GENTLEMEN, HIS TIME

24  CARD, THAT GOES IN THE CLOCK.  YOU TAKE IT BACK TO YOUR

25  ROOM, YOUR JURY ROOM, YOU READ, YOU'LL SEE IF YOU HAVEN'T

234

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    234

1  ALREADY.

2          NOW LET'S BACK UP FOR A MINUTE I GOT A LITTLE

3  AHEAD OF MYSELF, YOU KNOW JOE, DID YOU HEAR ME WHEN I HAD

4  JOE ON THE STAND WHEN HE CAME IN IN SHACKLES, DID YOU HEAR

5  ME ASK HIM ARE YOU SURE WHAT COLOR WAS THE KITCHEN, I ASKED

6  HIM THAT, AND HE SAID, WHAT, BROWN, AND I ASKED HIM AGAIN,

7  I SAID, JOE, ARE YOU SURE IT WAS BROWN.  WHAT DID HE SAY,

8  I'M SURE IT WAS BROWN.  GUESS WHAT, I AIN'T TOO GOOD WITH

9  COLORS BUT BROWN AND PINK DON'T LOOK ANYTHING ALIKE AND THE

10  COLOR OF THAT KITCHEN THAT YOU HAVE THE PICTURES OF IS

11  PINK, PINK AND GREEN.  IT'S GOT PINK FLOWERS ABOVE THE

12  DECORATED WITH GREENERY, IT'S PINK, NOT BROWN.  SOMEBODY IS

13  NOT TELLING THE TRUTH.

14          REMEMBER DURING THE OPENING I SAID THAT YOU BRING

15  YOUR COLLECTIVE COMMON SENSE EXPERIENCES HERE AND THAT SOME

16  OF US HAVE CHILDREN AND SOME OF US DON'T AND THAT EVEN

17  THOUGH WE AIN'T GOT TO SEE LITTLE JOEY GRAB THE COOKIE OUT

18  OF THE COOKIE JAR THAT LITTLE VOICE INSIDE OF YOU THAT

19  TELLS YOU HE DID THAT'S THE VOICE YOU NEED TO LISTEN TO

20  NOW.

21          I'LL TELL YOU WHAT HAPPENED, JOE WALKED AROUND

22  THAT CORNER AND HE MIGHT HAVE BOUGHT SOME CRACK BUT HE

23  DIDN'T BUY IT FROM MY GUY BECAUSE WHAT HE SAID DIDN'T

24  HAPPEN AND IT WASN'T TRUE BECAUSE HE SAYS THAT THE KITCHEN

25  IS BROWN, IT'S NOT, NO.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          235

1          NOW THEY MADE A BIG DEAL ABOUT THIS ADDRESS, IT'S

2   ██████, WHATEVER, IT AIN'T THE RIGHT ADDRESS.  MY CLIENT

3   BOUGHT A MOBILE HOME, PUT IT THERE AND MOVED IN THERE

4   AROUND APRIL AND FINALLY GOT THE PAPER WORK STRAIGHT RIGHT

5   ABOUT THEN.  NOW WHAT THEY GOING TO TRY TO MAKE YOU, LADIES

6   AND GENTLEMEN, THOUGH, THAT HE'S A DRUG DEALER, HE'S GOT SO

7   MUCH MONEY THAT WHEN HE FINALLY GETS POPPED, GETS ARRESTED

8   HE GOES OUT AND BUYS ANOTHER ADDRESS SO THAT CAN BE THE

9   ALIBI.  NO, NO, IT TAKES A WHILE TO REGISTER MOBILE, TO

10  REGISTER MOBILE HOMES AND GET THE BILLS OF SALE.  HE WAS

11  LIVING IN THE HOUSE AND AS YOU CAN SEE IT'S REAL CLOSE TO

12  THE TIME, FIVE DAYS AFTER.  HE WAS LIVING WHERE HE SAID HE

13  WAS LIVING, NOT WHERE THE POLICE OR WHEREVER MR., WHERE

14  AGENT GRANT WAS SUGGESTING THAT HE LIVED.

15          NOW HIS HONOR IS GOING TO TELL, LADIES AND

16  GENTLEMEN, IN A MINUTE THAT THE BURDEN OF PROOF LIES UPON

17  THE STATE, UPON MS. BAILEY THE OFFICE OF THE SOLICITOR,

18  THAT THEY'RE GOING TO HAVE TO PROVE BEYOND A REASONABLE

19  DOUBT THAT MY CLIENT DID IN FACT DISTRIBUTE A QUANTITY OF

20  CRACK COCAINE ON THE 17TH OF JUNE 2009 AND ON THE 20TH OF

21  JUNE 2009.  THAT REASONABLE DOUBT IS GOING TO BE IF YOU

22  HAVE, IF YOU HESITATE TO ACT YOU HAVE A REASONABLE DOUBT.

23          IT IS CLEAR COMING HERE BOUGHT A SHIRT, FOR WHAT,

24  OH, LET'S REMEMBER THIS, THERE'S THINGS MISSING, TOO.  WE

25  COULD HAVE CLEARED UP THIS WHOLE IS IT CRACK, IS IT POWDER,

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    236

1    ISSUE WITH WHAT, PICTURES.  THEY TOOK THEM BUT I DON'T

2    KNOW, MAYBE THE TOOTH FAIRY GOT THEM, THEY'RE GONE.

3              HIS HONOR IS GOING TO INSTRUCT YOU THAT YOU CAN

4    MAKE INFERENCE THAT WHEN THE EVIDENCE IS MISSING THAT YOU

5    CAN MAKE AN INFERENCE AGAINST THE STATE BECAUSE IT'S THEIR

6    EVIDENCE AND IT'S MISSING AND YOU HAVE TO LOOK AT IT IN

7    THAT LIGHT.  PICTURES GONE, REALLY, THEY WENT THROUGH, BUT

8    THINK ABOUT IT NOW, THEY MADE IT SEEM AS IF THEY WENT

9    THROUGH SUCH GREAT MEANS WITH THE BEST KIT, WHICH NONE OF

10   THEM KNOW WHAT THAT IS, AND THEY SEALED IT UP AND PUT IT IN

11   THIS SPECIAL MAILBOX AND THEY TOOK IT TO COLUMBIA AND THE

12   GUY AT SLED THEY DO IT, I MEAN THEY'VE GOT THE GLOVES AND

13   THE COATS AND THE LABS BUT THE PICTURES, NAH, WE DON'T NEED

14   THE PICTURES, 99 AND A HALF WILL NOT DO IT, IT WILL NOT.

15             THE MOST POWERFUL PEOPLE IN THIS ROOM ARE YOU 12.

16   YOU 12 ARE THE ONLY PEOPLE THAT CAN SAY THAT HE IS GUILTY

17   ARE YOU 12.  NONE OF OUR SENATOR LINDSEY GRAHAM CAN'T DO

18   IT, THE PRESIDENT CAN'T DO IT, NO ONE ELSE CAN DO IT.

19   SENATOR DEMINT CAN'T DO IT, NO ONE ELSE CAN DO IT.  IT'S UP

20   TO YOU, LADIES AND GENTLEMEN, AND THE ONLY PEOPLE THAT CAN

21   SAY THAT HE IS NOT ARE YOU 12.

22             SO YOU SAW MY CLIENT ON THE STAND, YOU KNOW MS.

23   BAILEY TRIED TO DO THE WHOLE LET ME ASK THE QUESTIONS THREE

24   DIFFERENT WAYS SO I CAN GET THREE DIFFERENT ANSWERS KIND OF

25   STUFF.  HE TOLD HER, LOOK, LADY, I WAS AT WORK AND, YEAH, I

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          237

1  LIVE ON HOLT PLANTATION BUT I WASN'T LIVING THERE THE WHOLE

2  TIME AND HE GAVE HER ANOTHER ADDRESS.  SIMPLE, THIS CASE

3  WAS SIMPLE IF THEY HAD THE PROOF AND THEY DON'T HAVE IT.

4       YOU HEARD THOSE AUDIO, AND LET'S GO TO THE AUDIO

5  TAPES, INTERESTINGLY ENOUGH, DID YOU HEAR ANYTHING ABOUT

6  MONEY ON THE TAPE.  WHOEVER IT WAS ON THE TAPE THAT SAYS I

7  DON'T HAVE NO WEIGHT, I DON'T HAVE ANY GRAMS, DID YOU HEAR

8  A PRICE NEGOTIATED.  DID SOMEONE SAY, HEY, QUENTIN,

9  NOTHING.  WE DON'T KNOW WHO'S ON THE TAPE.  WE DON'T EVEN

10 KNOW IF IT'S JOE.  WE KNOW NOTHING.  THE ONLY THING THEY

11 DID WAS GIVE YOU MORE QUESTIONS RATHER THAN ANSWERS, LADIES

12 AND GENTLEMEN.

13      IT'S NOT GOOD.  THIS ISN'T, IT'S NOT HOW IT'S

14 SUPPOSED TO WORK.  IF THEY WANT A GUILTY VERDICT THIS IS

15 HOWEVER THE WAY IT WORKS IF YOU WANT, IF THEY WANT OR IF

16 YOU'RE REQUIRED TO GIVE A NOT GUILTY VERDICT.  LISTEN MY

17 CLIENT IS NO SAINT AND I WENT INTO GREAT LENGTH ABOUT THAT.

18 HE'S BEEN DOING FOOLISHNESS BUT HE'S DONE FOOLISHNESS

19 BEFORE BUT HE GOES TO WORK AT COASTAL WIRE, HOT COASTAL

20 WIRE EVERY DAY.  HE DOES OVERTIME WHEN HE CAN.  NOW GUESS

21 WHAT, AT SOME POINT IN SOMEONE'S LIFE WHEN THEY DECIDE TO

22 DO RIGHT, YEAH, YOU REMEMBER WHAT THEY'VE DONE BUT YOU'VE

23 GOT TO JUDGE THEM FROM THAT POINT FORWARD AND WHAT DO WE

24 HAVE FROM THIS POINT FORWARD.  YOU DON'T HAVE ANY EVIDENCE

25 COMING FROM THEM THAT MAKES YOU NOT HESITATE TO SAY GUILTY,

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    238

1    YOU DON'T.

2         NO PICTURES, THEY CLAIM THEY HAVE PICTURES, ALL

3    OF A SUDDEN THEY'RE GONE.  YOU, WE DON'T EVEN KNOW HOW IT

4    GOT CRUNCHED UP LIKE THAT, THEY TOOK ALL OF THAT NECESSARY

5    PRECAUTION WHY DOES IT LOOK THAT.

6         VOICES, THAT'S ALL YOU'VE GOT VOICES AND THEN

7    MOST OF THE VOICES ON THERE ARE MUFFLED.  THERE IS A

8    PORTION WHEN THEY'RE TALKING THAT YOU CAN'T EVEN HEAR.

9    THEIR NUMBERS DON'T ADD UP.  ████ IS NOT THE SAME AS

10   █████, THAT'S A DIFFERENT ADDRESS.  EVERYTHING SAYS THAT MY

11   CLIENT LIVES THERE AND BEYOND THAT, LADIES AND GENTLEMEN,

12   ON THE 17TH AND THE 20TH HE WASN'T THERE, SO WHAT ARE WE TO

13   BELIEVE, THAT HE, BECAUSE, GUESS WHAT, THERE'S NO

14   INFORMATION ABOUT THE PHONE CALL SO HOW'S HE GOING TO KNOW

15   TO RUSH HOME, YOU KNOW, THIS IS THE KIND OF THING THAT YOU

16   PUT HOLES IN.  HE JUST RUSHED HOME TO GET THIS SALE, JUST

17   BURN UP AND RUN THROUGH ANDREWS, YOU KNOW, THERE'S HOT OIL,

18   GREASE ON ME CAUSE I GOT THIS SALE, $50, I GOT TO GET.

19        YOU KNOW I LIKE TO THINK WHAT WEBSTER'S

20   DICTIONARY SUMS UP THE ENGLISH LANGUAGE, MERIAM WEBSTER

21   CREATED IT ABOUT 3-400 YEARS AGO AND IN IT CONTAINS WHAT

22   THE WORDS THAT WE USE AND THIS DICTIONARY KIND OF SUMS UP

23   THE STATE'S CASE, IT DOES, BUT I GOT TO TAKE OUT THE THINGS

24   THAT THEY DIDN'T USE LIKE ACCURACY, THE INACCURATE ADDRESS.

25   HOW ABOUT AUDIBILITY, THE ABILITY TO HEAR CLEARLY WHO,

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    239

1   WHAT, AND WHERE, WHAT'S GOING ON ON THE TAPE.  HOW ABOUT

2   CREDIBILITY CAUSE JOE CERTAINLY DOESN'T HAVE ONE CAUSE HE'S

3   AROUND HERE DOING WHATEVER FOR $50 AND SHOPLIFTING IN THE

4   PROCESS SO HE CAN NURSE HIS DRUG HABIT.

5           WELL THEY SAID THEY HAD PICTURES, THOSE ARE GONE,

6   TOO.  WHAT ABOUT HONESTY, DO YOU BELIEVE JOE, I DON'T, SO,

7   NO, LADIES AND GENTLEMEN, THIS IS THEIR CASE.  THEY LEFT

8   YOU WITH SPECULATION, LIES, AND INNUENDO.  THEY LEFT YOU

9   WITH INCOMPLETENESS BY NOT HAVING ANY PICTURES, JUST

10  DOWNRIGHT LAZINESS, BUT THEY LEFT YOU WITH THE TWO MOST

11  IMPORTANT WORDS IN THIS BOOK AND BASED ON THE EVIDENCE YOU

12  HAVE TO SPEAK AND THAT IS NOT GUILTY, THANK YOU.

13          THE COURT:  MS. BAILEY.

14          MS. BAILEY:  MAY IT PLEASE THE COURT?

15          THE COURT:  YES, MA'AM.

16                    **CLOSING ARGUMENT**

17  **BY MS. BAILEY:**

18          IT'S BEEN AN EDUCATIONAL DAY AND A HALF FOR

19  YA'LL.  WHEN I STARTED THIS JOB I DIDN'T KNOW ANYTHING

20  ABOUT CRACK COCAINE.  I DIDN'T KNOW ANYTHING ABOUT DRUG

21  DEALERS AND, AND HOW IT ALL WORKS, AND YA'LL HAVE LEARNED A

22  LOT, AND I THANK YOU FOR YOUR PATIENCE AND YOUR

23  UNDERSTANDING SITTING HERE.  IT'S A VERY IMPORTANT JOB YOU

24  HAVE TO DO.

25          OVERALL HERE'S SOME IMPORTANT THINGS THAT WE'VE

240

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    240

1    ALL LEARNED IN THE LAST DAY AND A HALF.  DRUG DEALERS DEAL

2    DRUGS BEHIND CLOSED DOORS.  DRUG DEALERS DEAL DRUGS TO

3    PEOPLE THAT THEY KNOW, TO FRIENDS, AND TO KNOWN ASSOCIATES.

4    THE OTHER THING THAT JOE LEWIS ADMITTED TO YOU THAT HE HAS

5    HAD A CRACK COCAINE PROBLEM.  HE EDUCATED US A LITTLE BIT

6    ABOUT HOW DRUG DEALS HAPPEN.

7            HE SAID YOU GIVE THE DRUG DEALER MONEY AND HE

8    GIVES YOU WHAT HE'S GOING TO GIVE YOU.  SO, GUESS WHAT, YOU

9    CAN'T REPORT YOUR DRUG DEALER TO THE BETTER BUSINESS

10   BUREAU.  YOU CAN'T REPORT A DRUG DEALER TO THE FEDERAL

11   TRADE COMMISSION.  YOU CAN'T CALL THE POLICE AND SAY MY

12   DRUG DEALER SHORTED ME, I WANT MY MONEY BACK.  YOU GIVE THE

13   DRUG DEALER THE MONEY AND YOU GET WHAT YOU GET.  THAT'S HOW

14   DRUG DEALS HAPPEN.

15           NOW IN THIS CASE QUENTIN J. HOLT, THE DEFENDANT

16   SITTING AT THE TABLE OVER THERE, SOLD DRUGS TO JOE NATHAN

17   LEWIS TWICE, ONCE ON JUNE 17TH AND ONCE ON JUNE 20TH.

18   THOSE TWO THINGS WERE A CRIME; THOSE TWO THINGS ARE WHY HE

19   IS ON TRIAL HERE TODAY, AND THOSE ARE THE TWO THINGS THAT

20   YOU ALL NEED TO PASS JUDGMENT, DECIDE WHETHER HE IS GUILTY

21   OR WHETHER HE IS NOT GUILTY.  I'M ASKING YOU TO COME BACK

22   AND SAY THAT QUENTIN J. HOLT SOLD DRUGS TO JOE NATHAN LEWIS

23   ON JUNE 17TH AND ON JUNE 20TH, THAT HE SOLD CRACK COCAINE.

24           WHAT HAVE I GIVEN TO YOU TO PROVE THAT THAT IS

25   TRUE?  JOE NATHAN LEWIS STOOD UP HERE AND HE TOLD YOU THAT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                 241

1   IT HAPPENED. HE WAS DIRECT. HE ANSWERED THE QUESTIONS

2   WITH A SIMPLE YES OR NO. HE DIDN'T GIVE DIFFERENT ANSWERS

3   TO THE SAME QUESTION. HE GAVE YOU SIMPLE DIRECT ANSWERS.

4            NOW THE MAN'S GOT A RECORD, HE HAD AN ARMED

5   ROBBERY 20 YEARS AGO, GOD KNOWS, HE'S GOT SOME STICKY

6   FINGERS AND HE LIKES TO SHOPLIFT. I'M NOT TRYING TO HIDE

7   THAT, TOLD YOU BEFORE WE STARTED DRUG DEALERS SELL DRUGS TO

8   KNOWN ASSOCIATES, AND GUESS WHAT, WE DON'T HAVE TO RELY ON

9   JUST JOE LEWIS STANDING UP HERE AND SAYING THAT HE BOUGHT

10  DRUGS FROM QUENTIN HOLT. WE CAN VERIFY IT. HOW ARE WE

11  GOING TO VERIFY IT?

12           YOU HEARD DEPUTY GRANT TELL YOU THAT HE SEARCHED

13  JOE LEWIS. HE SEARCHED HIM BEFORE HE LEFT AND HE SEARCHED

14  HIM WHEN HE CAME BACK. BEFORE HE LEFT HE HAD NO DRUGS ON

15  HIM. BEFORE JOE LEWIS LEFT THE PRESENCE OF DEPUTY GRANT

16  ALL HE HAD ON HIM WAS THE $50 THAT DEPUTY GRANT GAVE TO

17  HIM. HE TOLD YOU THEY DON'T LET HIM CARRY EXTRA CASH, THEY

18  DON'T LET HIM CARRY ANYTHING EXTRA. JOE LEWIS LEFT THE

19  PRESENCE ON FOOT, LEFT THE PRESENCE OF AGENT GRANT. HE

20  WALKED, BY EVERYBODY'S ADMISSION, HE WALKED OVER TO COUNTY

21  LINE ROAD TO THIS AREA CALLED HOLT PLANTATION WHERE ALL THE

22  HOLT'S LIVE. EVEN QUENTIN HOLT TOLD YOU THAT, HOLT

23  PLANTATION IS OFF ███████████████        DEPUTY GRANT WATCHED

24  HIM WALK IN THAT DIRECTION.

25           NOW HERE'S ANOTHER THING WE'VE LEARNED, ALTHOUGH

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                  242

1    THIS IS COMMON SENSE, THE DRUG ENFORCEMENT UNIT CANNOT SIT

2    IN THEIR SUV, THEIR COUNTY ISSUED SUV RIGHT OUTSIDE OF A

3    DRUG DEALERS HOUSE AND EXPECT A DRUG DEAL TO GO DOWN.  IT'S

4    NOT GOING TO WORK, SO HE WAS PARKED BESIDE THE ROAD SO HE

5    COULD KEEP AN EYE ON HIS CONFIDENTIAL INFORMANT BUT NOT

6    BLOW HIS COVER.  SO THEY WATCHED HIM WALK DOWN THE ROAD

7    TOWARDS HOLT PLANTATION, A FEW MINUTES LATER JOE LEWIS CAME

8    BACK FROM THE DIRECTION OF HOLT PLANTATION, WENT STRAIGHT

9    TO DEPUTY GRANT.  DEPUTY GRANT SEARCHED HIM AGAIN.  HE

10   DIDN'T HAVE THE $50 ON HIM AND HE HAD THE CRACK COCAINE.

11   THAT IS SOME GOOD VERIFICATION OF WHAT HAPPENED, THAT IS

12   INDEPENDENT VERIFICATION, FOLKS.

13        NOW JOE LEWIS TOLD YOU THAT HE WENT TO QUENTIN

14   HOLT'S HOUSE, THAT HE GAVE HIM SOME MONEY AND IN EXCHANGE

15   HE GOT SOME CRACK COCAINE.  HE TOLD YOU THAT'S WHAT

16   HAPPENED IN THE FEW MINUTES HE WAS GONE.  NOW AGAIN I'VE

17   GOT TO PROVE THAT THAT HAPPENED SO I'VE GOT THE FACT THAT

18   HE WAS, THAT JOE LEWIS WAS SEARCHED BEFORE AND AFTER,

19   THAT'S VERIFICATION NUMBER ONE.  FOR THOSE OF YOU WHO ARE

20   ESPECIALLY SKEPTICAL I'VE GOT VERIFICATION NUMBER TWO.

21   FOLKS, THE CRIME WAS RECORDED.  WE HAVE THE AUDIO RECORDING

22   OF THE CRIME.  MR. MCKNIGHT WOULD HAVE YOU BELIEVE THAT

23   THIS ALL THEORY AND SPECULATION, WE RECORDED THE CRIME.

24   YA'LL HEARD IT, YOU CAN HEAR IT AGAIN.  WHEN YA'LL GO BACK

25   IN THE JURY ROOM IF YOU WANT TO HEAR THOSE RECORDINGS AGAIN

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                243

1   YOU'LL JUST WRITE A NOTE AND ASK THE JUDGE HE'LL LET YOU

2   LISTEN TO IT AGAIN.

3            NOW THIS RECORDINGS, PARTS OF THEM ARE DIFFICULT

4   TO UNDERSTAND.  THERE'S CLEARLY SOME SHORTHAND LANGUAGE

5   GOING IN OF PEOPLE WHO'VE KNOWN EACH OTHER.  JOE LEWIS TOLD

6   YOU THESE FOLKS HAVE KNOWN EACH OTHER FOR TEN YEARS, THAT

7   HE'D BEEN MY DRUG DEALER FOR TEN YEARS, I'VE KNOWN HIM, SO

8   THERE'S NOT THE FORMALITY OF A STRANGER HERE AND SOME OF IT

9   IS DIFFICULT TO UNDERSTAND.

10           LET ME TELL YOU, THOUGH, FROM THOSE RECORDINGS

11  WHAT I WANT YOU TO PAY ATTENTION TO.  ON THE JUNE 17TH

12  RECORDING THE VERY FIRST THING YOU HEAR, (KNOCKING), HEY,

13  BARLEY, THAT'S THE FIRST YOU HEAR.  YOU HEARD JOE LEWIS

14  TELL YOU THAT BARLEY IS QUENTIN HOLT'S NICKNAME SO YOU KNOW

15  WHO IT WAS.

16           THE OTHER THING YOU HEAR FROM THAT JUNE 17TH

17  RECORDING YOU HEAR SOME PROFANITY, AND I APOLOGIZE FOR

18  YA'LL TO HAVE TO SIT THROUGH THAT, AND THEN YOU HEAR

19  QUENTIN HOLT SAY, HEY, YOU NEED A GRAM.  THAT'S THE UNIT

20  THAT THEY SELL CRACK COCAINE IN IS A GRAM.  HEY, YOU NEED A

21  GRAM AND JOE LEWIS SAYS, YEAH.

22           THEN ON THE JUNE 17TH RECORDING THEY PROCEED TO

23  TALK ABOUT THE DRUG TRADE.  THEY TALK ABOUT HOW IT COSTS

24  THIS ONE TIME HE TRIED TO BUY AN 8, THAT'S AN 8 BALL, TRIED

25  TO BUY AN 8 AND IT COST $150 BUT HIS DEALER WANTED TO

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                244

1  CHARGE HIM OUNCE FOR OUNCE.  THEY'RE NOT TALKING ABOUT

2  SUGAR HERE.  WE DON'T MEASURE SUGAR IN GRAMS.  WE DON'T

3  MEASURE SUGAR IN OUNCES.  WE DON'T MEASURE IN 8 BALLS.

4  THAT'S THE FIRST RECORDING.

5          THE SECOND RECORDING ON JUNE 20TH WHEN YOU LISTEN

6  TO THAT THERE'S LOTS THAT YOU CAN'T UNDERSTAND AND THERE'S

7  SOME TALK ABOUT SOME YARD WORK.  THERE'S SOME OTHER THINGS

8  GOING ON, CLEARLY THESE FOLKS KNOW EACH OTHER.  LET ME TELL

9  YOU WHAT ELSE YOU HEAR, YOU HEAR QUENTIN HOLT AT FIRST HE

10 SAYS, MAN, I CAN'T SELL YOU A WHOLE GRAM.  REMEMBER JOE

11 LEWIS TOLD YOU HE DIDN'T WANT TO SELL IT TO HIM THAT WAY

12 CAUSE HE WANTED TO MAKE MORE MONEY BY SPLITTING IT UP IN

13 SMALLER AMOUNTS.  JOE LEWIS EXPLAINED TO YOU WHAT THE WHOLE

14 CONVERSATION WAS ABOUT AND THEN AT THE END OF IT HE JUST

15 GAVE HIM $50 AND HOPED FOR THE BEST CAUSE THAT'S WHAT YOU

16 DO WITH A DRUG DEALER CAUSE YOU CAN'T REPORT YOUR DRUG

17 DEALER TO THE BETTER BUSINESS BUREAU AND WHEN YOU NEED

18 CRACK COCAINE YOU HAND OVER THE MONEY AND YOU GET WHAT YOU

19 GET.

20          YOU KNOW WHAT ELSE IS ON THAT JUNE 20TH TAPE YOU

21 HEAR JOE LEWIS SAY LOOK AT LITTLE QUENTIN, WELL WHO'S

22 LITTLE QUENTIN?  YOU HEARD QUENTIN HOLT SAY HIS YOUNGEST

23 SON'S NAME WAS QUENTIN.  WELL THAT'S SOME INDEPENDENT

24 VERIFICATION AS TO WHO IT WAS.

25          WELL WHY ELSE ARE WE GOING TO BELIEVE JOE LEWIS?

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                245

1  MR. MCKNIGHT QUESTIONED JOE LEWIS VERY AGGRESSIVELY.  HE

2  WANTED TO KNOW WHAT COLOR WERE THOSE WALLS, WHAT COLOR WERE

3  THOSE, HE SAID ANYTHING ELSE YOU CAN TELL US ABOUT THE

4  KITCHEN.  JOE LEWIS THOUGHT FOR A WHILE, NOW KEEP IN MIND

5  DEPUTY GRANT TOLD YOU THAT JOE LEWIS DID 20 TO 30 DIFFERENT

6  UNDERCOVER BUYS, BUT JOE LEWIS THOUGHT ABOUT IT, HE SAID,

7  IN THE KITCHEN THERE'S A STOVE, THERE COUNTERTOP, THERE'S A

8  WINDOW WITH CURTAINS, AND THERE'S BROWN WALLS.

9        FOLKS, I WANT YOU TO TAKE THIS BACK IN THE JURY

10 ROOM AND LOOK AT EXACTLY WHAT JOE LEWIS DESCRIBED, WINDOW,

11 THE CURTAINS, AND A BROWN COLORED WALL.  MR. MCKNIGHT TOLD

12 YOU THIS WAS A PINK WALL.  I'M NOT GOING TO STAND HERE AND

13 ARGUE OVER THAT, YA'LL ALL HAVE EYES AND THAT'S YOUR JOB IS

14 TO EVALUATE THE EVIDENCE.  WHAT I SEE IS BROWNISH COLOR

15 WALL AND SOME CURTAINS JUST LIKE JOE LEWIS SAID THERE WOULD

16 BE THERE.

17        MR. MCKNIGHT WANTS TO SPEND A LOT OF TIME TALKING

18 ABOUT THE ADDRESS, ████  VERSUS ████   JOE LEWIS TOLD YOU

19 I DON'T KNOW THE ADDRESS, I KNOW IT'S ON ████████████

20 AND I KNOW I WENT TO QUENTIN HOLT'S HOUSE.  FOLKS, THAT'S

21 ALL I NEED TO PROVE.  JOE LEWIS WAS UNEQUIVOCABLE ABOUT

22 THAT, I WENT TO QUENTIN HOLT'S HOUSE.

23        NOW IF YOU'RE GOING TO GET HUNG UP ON THE

24 ADDRESS, YOU WANT TO FOCUS ON THE ADDRESS, MY OFFICERS SAY

25 IT HAPPENED AT ████.  QUENTIN HOLT COMES IN TODAY AND SAYS

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          246

1  WELL I DON'T LIVE THERE, I LIVE AT ████ AND I CAN PROVE

2  IT.  WHAT DID HE BRING US TO PROVE IT, DOCUMENTATION FROM

3  THREE DAYS AFTER THE CRIME THAT HE LIVED, THAT HE MOVED

4  INTO ████ FOLKS, THIS DON'T PROVE ANYTHING.

5       ALSO QUENTIN HOLT COULDN'T GIVE YOU A STRAIGHT

6  ANSWER AS TO WHEN HE MOVED INTO THAT PLACE.  HE GAVE US

7  THREE DIFFERENT ANSWERS AND THAT'S BEFORE I STOOD UP.

8  FIRST HE SAID HE HAD BEEN THERE A YEAR LAST SEPTEMBER AND

9  HIS ATTORNEY MR. MCKNIGHT GOES WHOA, WHOA, WHOA, YOU

10 WEREN'T THERE LAST SEPTEMBER WERE YOU, WHEN WERE YOU

11 ACTUALLY THERE, HE SAID, OH, NO, I WAS THERE IN APRIL, AND

12 THEN HE SHOWS YOU DOCUMENTATION THAT SAYS HE MOVED IN IN

13 JUNE, JUNE 23RD, THREE DAYS AFTER THE CRIME.

14      WHAT ELSE IS INTERESTING ON THIS DOCUMENTATION

15 THIS IS A RECEIPT FOR MR. HOLT THREE DAYS AFTER THE CRIME,

16 PAID $100 FOR A MOBILE HOME FEE.  JOE LEWIS PAID HIM $50 ON

17 JUNE 17TH; HE PAID HIM $50 ON JUNE 20TH, AND ON JUNE 23RD

18 QUENTIN J. HOLT PAID $100 FOR THIS MOBILE HOME FEE.

19      NOW YOU HEARD DEPUTY GRANT TELL YOU THAT HE

20 WORKED WITH JOE LEWIS IN 20 TO 30 SEPARATE DRUG BUSTS, THAT

21 EVERY TIME JOE LEWIS WAS RELIABLE.  EVERY TIME HE SAID HE

22 WAS GOING TO DO WHAT HE WAS GOING TO DO.  HE DIDN'T STEAL

23 FROM THEM.  HE SHOWED UP WHEN HE SAID HE WAS GOING TO SHOW

24 UP AND HE WAS A RELIABLE CONFIDENTIAL INFORMANT.  THAT'S

25 THE WAY THESE DRUG OPERATIONS WORK CAUSE YOU USE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                247

1  CONFIDENTIAL INFORMANTS AND YOU HAVE INDEPENDENT

2  VERIFICATIONS.

3        NOW MR. MCKNIGHT WANTS TO MAKE A VERY BIG DEAL

4  OUT OF THESE PICTURES, THE FACT THAT THE PICTURES ARE

5  MISSING.  DON'T NEED PICTURES OF DRUGS, GOT THE DRUGS.  IF

6  THE DRUGS WERE MISSING THAT WOULD BE A PROBLEM THAT I DON'T

7  HAVE PICTURES OF THE DRUGS BUT YOU DON'T NEED TO SEE A

8  PICTURE OF THE DRUGS BECAUSE THESE ARE THE ACTUAL DRUGS

9  THAT WERE SOLD, ONE ON JUNE 17TH, ONE ON JUNE 20TH.  YOU

10 HEARD ALL OF MY WITNESSES TELL YOU ALL OF THE LENGTHS THAT

11 THEY WENT TO TO MAKE SURE THAT THESE DRUGS DO NOT GET MIXED

12 UP WITH ANY OTHER DRUGS, THAT THESE DRUGS DO NOT GET

13 TAMPERED WITH, THAT THESE DRUGS DO NOT GET ALTERED UNTIL

14 THEY WERE TESTED TO VERIFY THAT THEY WERE IN FACT ILLEGAL

15 SUBSTANCES.  I DON'T NEED PICTURES OF THE DRUGS, FOLKS,

16 I'VE GOT THE DRUGS.

17        YOU HEARD MARIBETH BURROUGHS, SHE WAS SO PATIENT

18 WITH US YESTERDAY, A LAB TECH, A SCIENTIST FROM THE STATE

19 LAW ENFORCEMENT DIVISION.  I'M NOT A SCIENTIST, MR.

20 MCKNIGHT IS NOT A SCIENTIST, AND SHE HAD TO EXPLAIN THINGS

21 TO US SEVERAL TIMES, BUT HERE'S WHAT I GOT,  HERE'S WHAT I

22 TOOK OUT OF IT.  SHE PERFORMED TWO TESTS, ONE WAS A

23 PRELIMINARY TEST.  THE PRELIMINARY TEST IS WHERE YOU PUT

24 THE CHEMICAL IN AND IF IT'S CRACK COCAINE IT TURNS A COLOR.

25 THAT TEST WAS POSITIVE.  SHE THEN MOVED ON TO THE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    248

1    CONFIRMATORY TEST WHICH NO ONE CAN PRONOUNCE, THE GAS

2    SPECTROMETRY, SOMETHING LIKE THAT, THAT TEST LOOKED AT THE

3    SPECTRUM OF THE IONS.  SHE PERFORMED THAT TEST AGAINST A

4    KNOWN SAMPLE OF COCAINE THAT SHE BOUGHT, THAT THEY BUY FROM

5    A LAB, A CHEMICAL LAB, AND THIS TESTED POSITIVE FOR CRACK

6    COCAINE.  SHE SAID YOU KNOW IT'S CRACK COCAINE BECAUSE IT

7    DOESN'T DISSOLVE IN WATER.  POWDER COCAINE DISSOLVES IN

8    WATER.  NOW I MAY HAVE MESSED THAT SCIENCE UP A LITTLE BIT

9    BUT I THINK THAT'S THE GIST OF IT.

10            THEY TALKED A LOT ABOUT HER TURNING HER

11   INSTRUMENT YESTERDAY BUT FINALLY WHAT WE GOT OUT OF IT IS

12   IF THE, WE TUNE THE INSTRUMENT WE TEST IT TO MAKE SURE IT

13   WORKS AND THAT THE INSTRUMENT GETS TUNED ONCE A WEEK AND

14   THAT SHE'S NEVER HAD A PROBLEM WITH IT.

15            IT'S CRACK COCAINE, CAME FROM QUENTIN HOLT.  HE

16   SOLD IT TO JOE LEWIS WHO GAVE IT TO AGENT GRANT WHO THEN

17   HAD IT TESTED BY THE STATE LAW ENFORCEMENT DIVISION.  IT'S

18   CRACK COCAINE.

19            NOW TODAY DURING TRIAL MR. HOLT WAS THE ONLY ONE

20   IN THIS ROOM WITH ANY REASON TO LIE, THE ONLY ONE WITH ANY

21   MOTIVATION TO LIE.  ALL OF A SUDDEN AFTER A YEAR OF BEING

22   CHARGED WITH A CRIME HE COMES FORWARD WITH A TIME SHEET,

23   THIS WAS GOING TO BE THE MATLOCK MOMENT, CAME UP WITH A

24   TIME SHEET.  FOLKS, WHEN YOU'RE BACK IN THAT JURY ROOM

25   YOU'LL HAVE THIS WITH YOU.  I WANT YOU TO TAKE A CLOSE LOOK

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                249

1  AT THIS TIME SHEET AND NOTICE SEVERAL THINGS.

2         FIRST OF ALL THE NAME OF MR. HOLT'S COMPANY IS

3  NOT ON THE TIME SHEET.  THE ONLY MARKINGS ON THIS TIME

4  SHEET WERE MADE BY QUENTIN HOLT WHERE HE WROTE HIS NAME AND

5  A STAMP WHERE THERE'S A DATE AND THERE'S A TIME.  THIS IS

6  WHAT WE CALL UNRELIABLE DOCUMENT.  YOU CAN WALK INTO ANY

7  STAPLES, YOU CAN WALK ANY HOME DEPOT YOU CAN PURCHASE A

8  TIME CARD, YOU CAN PURCHASE A TIME CLOCK AND YOU CAN STAMP

9  THEM FOR WHATEVER TIMES YOU WANT.  YOU CAN SET THE CLOCK

10  AND YOU CAN STAMP IT, THIS WAS PRODUCED TODAY, BUT LET'S

11  MOVE ON FROM THAT.

12         TWO DATES IN QUESTION, THERE'S A LOT OF DATES ON

13  HERE, TWO DATES THAT ARE RELEVANT.  JUNE 17TH MR. HOLT WAS

14  ON THAT STAND AND MR. HOLT TOLD YOU THAT ON JUNE 17TH HE

15  WORKED IN THE AFTERNOON.  HE TOLD YOU THAT HE WORKED FROM

16  3:00 IN THE AFTERNOON UNTIL 11:00 P.M. ON JUNE 17TH.  THE

17  TIME SHEET SAYS 3 TO 11 BUT THEY'RE IN THE A.M. SECTION;

18  THEY'RE NOT IN THE P.M. SECTION.  THAT'S NOT AN ALIBI,

19  FOLKS, DOESN'T PROVE THAT HE WAS ANYWHERE, PROVES THAT WITH

20  A SHEET THAT HAS THE NUMBER 3 AND THE NUMBER 11 AND AN A.M.

21  SECTION, THAT'S ALL THAT PROVES, AND BESIDES IF HE GETS OFF

22  ON JUNE 17TH AT 11:00 HE'S HOME IN PLENTY OF TIME TO MAKE

23  THIS DRUG BUY, MAKE THIS SALE.  HOW DO WE KNOW HE MADE THE

24  SELL, WE'VE GOT IT ON TAPE.

25         JUNE 20TH, THAT'S THE SECOND PAGE, IT'S THE LAST

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                250

1    ENTRY ON THIS TIME SHEET.  NOW THIS SAYS THAT ON JUNE THE

2    19TH HE CLOCKED IN AT 11 AND THAT ON JUNE 20TH HE CLOCKED

3    OUT AT 3.  MR. MCKNIGHT WANTS YOU TO THINK THAT I'VE NEVER

4    WORKED A DOUBLE.  THAT'S NOT MY ISSUE, MY ISSUE IS WITH THE

5    TIME SHEET IS THAT IF IT WAS THE NEXT DAY HERE'S THE CLOCK

6    IN DATE HERE'S THE CLOCK OUT DATE, IF IT WAS THE NEXT DAY

7    SHOULD HAVE BEEN HERE ON THIS NEXT LINE.  AND HOW ABOUT

8    THIS, EVERY TIME I'VE EVER TOUCHED A TIME CLOCK YOU CLOCK

9    IN AND OUT FOR BREAKS, FOR LUNCH, 15 MINUTE BREAKS.  YOU

10   REALLY GOING TO WORK FROM 11:00 AT NIGHT UNTIL 3:00 THE

11   NEXT AFTERNOON AND IT'S GOING TO BE RECORDED LIKE THIS MOST

12   BOSSES ARE GOING TO WANT THEIR PERMANENT LABOR TO BE ABLE

13   TO SEE THAT YOU WERE ABLE TO TAKE YOUR HALF HOUR BREAKS AT

14   APPROPRIATE TIMES.  THAT'S NOT WHAT WE HAVE HERE.  WHAT WE

15   HAVE HERE IS ONE CLOCK ON AND ONE CLOCK OUT FROM A TIME

16   CLOCK SOMEWHERE.  WE DON'T KNOW WHERE THE TIME CLOCK WAS;

17   WE DON'T KNOW HOW THIS DOCUMENT GOT CREATED.  WE KNOW THAT

18   THE PERSON WHO BROUGHT THIS TIME SHEET IN TODAY HAS EVERY

19   INCENTIVE IN THE WORLD TO LIE AND HE'S THE ONLY ONE IN THIS

20   COURTROOM THAT DOES.

21           NOW MR. MCKNIGHT WOULD HAVE YOU BELIEVE THAT

22   QUENTIN HOLT IS REFORMED, THAT HE HAD SEEN THE ERROR OF HIS

23   WAYS, THAT HE HAS A GOOD JOB, AND THAT HE'S NO LONGER

24   DEALING DRUGS.  YOU HEARD JOE LEWIS TELL YOU ABOUT THE DRUG

25   DEALS.  YOU HEARD THE DEFENDANT HIMSELF TELL YOU HE'S GOT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          251

1  THREE KIDS TO SUPPORT, KIDS ARE EXPENSIVE, AND SO HE JUST

2  BOUGHT A MOBILE HOME IN THE MIDST OF ALL THIS, AND BESIDES

3  ALL THAT THE DEFENDANT'S TESTIMONY IS UNRELIABLE.  THE

4  DEFENDANT HAS BEEN CONVICTED OF A FELONY IN THE PAST.  THE

5  DEFENDANT HAS BEEN CONVICTED OF FAILURE TO STOP FOR A BLUE

6  LIGHT, OF TWO OTHER DRUG DISTRIBUTION CHARGES, ALL OF THOSE

7  MAKE HIM UNRELIABLE AS A WITNESS, THAT PLUS THE FACT THAT

8  HE HAS EVERY REASON TO LIE.

9         NOW WHAT IS REASONABLE DOUBT?  I HAVE TO PROVE TO

10  YOU THAT THE DEFENDANT SOLD DRUGS TO JOE LEWIS, THAT HE

11  SOLD CRACK COCAINE JUNE 17TH AND JUNE 20TH.  I HAVE TO

12  PROVE THAT TO YOU BEYOND A REASONABLE DOUBT.  WHAT'S

13  REASONABLE DOUBT?  IT'S A DOUBT TO WHICH YOU CAN ASSIGN A

14  REASON.  WHAT'S A REASON?  REASON IS NOT A POSSIBILITY,

15  REASON IS NOT A THEORY; A REASON IS NOT A CONSPIRACY,

16  THEORY THAT SOMEBODY MAKES UP.  A REASON IS A DOUBT TO

17  WHICH, REASONABLE DOUBT IS A DOUBT TO WHICH YOU CAN ASSIGN

18  A REASON, YOU COULD EXPLAIN IT TO SOMEBODY.  YOU CAN SAY

19  THIS RIGHT HERE, THIS CONCRETE THING THAT IS WHY I

20  HESITATED TO ACT.

21         MR. MCKNIGHT TALKS ABOUT THE KID, I LOVE THIS

22  VISUAL THAT HE GAVE YA'LL, I LOVE IT.  YOU FIND YOUR COOKIE

23  JAR EMPTY, YOU FIND THE KID IN THE KITCHEN, AND WITH CRUMBS

24  ALL OVER HIS SHIRT.  HE SAYS, IT WASN'T ME, I BELIEVE

25  THAT'S EXACTLY WHAT WE'VE GOT HERE.  NOW I DON'T HAVE KIDS

252

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          252

1  YET, I'VE GOT A COUPLE OF MORE MONTHS TO GO, I DO HAVE A

2  DOG, THE DOG HAS WHITE PAWS AND AT LEAST ONCE A WEEK I WALK

3  OUT IN THE BACKYARD AND HIS WHITE PAWS ARE PITCH BLACK AND

4  THEY'VE GOT DIRT ALL OVER THEM AND THERE'S A HOLE RIGHT

5  THERE AND THERE'S DIRT RIGHT ON MY DOG'S SNOUT.  THERE'S A

6  HOLE, RIGHT, HE'S STANDING RIGHT OVER THE HOLE AND AS SOON

7  AS I OPEN THAT BACK DOOR AND I LOOK OUT THERE THE DOG

8  FREEZES AND LOOKS UP AS IF TO SAY TO ME I'VE DONE NOTHING

9  WRONG.  SOMETIMES HE LOOKS OVER HIS SHOULDER LIKE IT WASN'T

10  ME, IT WAS THAT SQUIRREL OVER THERE THAT DUG THE HOLE.

11  THAT'S WHAT WE'VE GOT GOING ON HERE, FOLKS.

12          YOU'VE GOT TO RELY ON YOUR COMMON SENSE.  YOU'VE

13  GOT TO RELY ON YOUR GUT JUST LIKE MR. MCKNIGHT SAYS.

14  COMMON SENSE AND YOUR GUT IS GOING TO TELL YOU THAT THE

15  STATE HAS PROVEN THAT QUENTIN J. HOLT SOLD CRACK COCAINE TO

16  JOE LEWIS ON JUNE 17TH AND ON JUNE 20TH.  YOU WANT THE

17  COOKIE CRUMBS AS PROOF?  WE'VE GOT THE TESTIMONY OF JOE

18  LEWIS.  WE'VE GOT THE FACTS THAT HE WAS SEARCHED BEFORE AND

19  AFTER THE BUY.  WE'VE GOT THE VISUAL SURVEILLANCE OF THE

20  OFFICERS AND WE'VE GOT IT ON TAPE.  WE'RE ON THE TAPE ON

21  JUNE 20TH WHERE JOE LEWIS SAYS, HEY, HOW'S LITTLE Minor 3,

22  ON JUNE 17TH WHERE HE KNOCKS ON THE DOOR AND SAYS HEY,

23  BARLEY.  WE'VE GOT DISCUSSION OF THE DRUG TRADE.  FOLKS,

24  THESE ARE ALL CRUMBS.  THEY'RE ALL THE CRUMBS THAT YOU'RE

25  GOING TO USE TO RELY ON YOUR COMMON SENSE AND YOUR

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          253

1  INSTINCTS THAT THIS MAN SOLD DRUGS ON TWO SEPARATE

2  OCCASIONS, THAT HE SOLD CRACK COCAINE, THAT HE SOLD CRACK

3  COCAINE TO JOE NATHAN LEWIS, AND I ASK YOU TO RETURN WITH A

4  VERDICT OF GUILTY ON BOTH COUNTS.

5                          **JURY CHARGE**

6          THE COURT:    ALL RIGHT, LADIES AND GENTLEMEN, ALL

7  OF THE EVIDENCE TO BE PRESENTED IN THIS CASE HAS NOW BEEN

8  PRESENTED TO YOU.  THE ATTORNEYS HAVE MADE THEIR CLOSING

9  ARGUMENTS AND NOW IS THE TIME OF THE TRIAL WHERE I CHARGE

10  YOU WITH THE LAW TO BE APPLIED IN THIS CASE.

11          NOW THE INDICTMENTS IN THIS CASE CHARGE THE

12  DEFENDANT WITH TWO COUNTS OF DISTRIBUTION OF COCAINE BASE.

13  I REMIND YOU THAT THE FACT THAT THE DEFENDANT WAS ARRESTED,

14  CHARGED, AND INDICTED IN THIS CASE IS NOT EVIDENCE IN THIS

15  CASE AND CANNOT BE CONSIDERED BY YOU AS EVIDENCE OF GUILT

16  IN THIS CASE, NOR DO THE INDICTMENTS CREATE ANY PRESUMPTION

17  OR INFERENCE OF GUILT.

18          THESE DOCUMENTS ARE SIMPLY THE FORMAL WRITTEN

19  INSTRUMENTS WHICH CONTAIN THE CHARGES MADE AGAINST THE

20  DEFENDANT.  THEY ARE THE FORMAL DOCUMENTS BY WHICH THIS

21  CASE IS BROUGHT INTO THIS COURT.

22          EACH INDICTMENT CHARGES A SEPARATE AND DISTINCT

23  OFFENSE.  YOU MUST DECIDE EACH INDICTMENT SEPARATELY ON THE

24  EVIDENCE AND THE LAW APPLICABLE TO IT, UNINFLUENCED BY YOUR

25  DECISION AS TO THE OTHER INDICTMENT.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                254

1          THE DEFENDANT MAY BE CONVICTED OR ACQUITTED ON

2   ONE OR BOTH OF THE OFFENSES CHARGED.

3          YOU WILL BE ASKED TO WRITE A SEPARATE VERDICT OF

4   GUILTY OR NOT GUILTY FOR EACH INDICTMENT.

5          THE DEFENDANT HAS PLED NOT GUILTY TO BOTH OF

6   THESE INDICTMENTS.  THAT PLEA PUTS THE BURDEN ON THE STATE

7   TO PROVE THE DEFENDANT GUILTY.

8          A PERSON CHARGED WITH COMMITTING A CRIMINAL

9   OFFENSE IN SOUTH CAROLINA IS NEVER REQUIRED TO PROVE HIS

10  INNOCENCE.

11         I CHARGE YOU THAT THE DEFENDANT IN A CRIMINAL

12  TRIAL NO MATTER WHAT THE SERIOUSNESS OF THE CHARGES MAY BE

13  WILL ALWAYS BE PRESUMED TO BE INNOCENT OF THE CRIMES FOR

14  WHICH THE INDICTMENTS WERE ISSUED UNLESS GUILT HAS BEEN

15  PROVEN BY EVIDENCE SATISFYING YOU OF THAT GUILT BEYOND A

16  REASONABLE DOUBT.

17         THIS PRESUMPTION OF INNOCENCE DOES NOT END WHEN

18  YOU BEGIN YOUR DELIBERATIONS BUT IT ACCOMPANIES THE

19  DEFENDANT THROUGHOUT THE TRIAL UNTIL YOU REACH A VERDICT OF

20  GUILT BASED ON EVIDENCE SATISFYING YOU OF THAT GUILT BEYOND

21  A REASONABLE DOUBT.

22         THE PRESUMPTION OF INNOCENCE IS LIKE A ROBE OF

23  RIGHTEOUSNESS PLACED ABOUT THE SHOULDERS OF THE DEFENDANT

24  WHICH REMAINS WITH THE DEFENDANT UNTIL IT HAS BEEN STRIPPED

25  FROM THE DEFENDANT BY EVIDENCE SATISFYING YOU OF THE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**              255

1  DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.

2          THE PRESUMPTION OF INNOCENCE IS NOT A MERE LEGAL

3  THEORY.  IT'S NOT JUST A LEGAL PHRASE.  IT IS A SUBSTANTIAL

4  RIGHT TO WHICH EVERY DEFENDANT IS ENTITLED UNLESS YOU THE

5  JURY ARE SATISFIED FROM EVIDENCE OF THE DEFENDANT'S GUILT

6  BEYOND A REASONABLE DOUBT.

7          NOW WHAT IS REASONABLE DOUBT IN THE LAW?  A

8  REASONABLE DOUBT IS THE KIND OF DOUBT THAT WOULD CAUSE A

9  REASONABLE PERSON TO HESITATE TO ACT.

10          PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT

11  LEAVES YOU FIRMLY CONVINCED OF THE DEFENDANT'S GUILT.  WE

12  KNOW VERY FEW THINGS IN THIS WORLD WITH ABSOLUTE CERTAINTY

13  AND IN CRIMINAL CASES THE LAW DOES NOT REQUIRE PROOF THAT

14  OVERCOMES EVERY POSSIBLE DOUBT.  IF BASED ON YOUR

15  CONSIDERATION OF THE EVIDENCE YOU ARE FIRMLY CONVINCED THAT

16  THE IS GUILTY OF THE CRIME WITH WHICH HE HAS BEEN CHARGED

17  YOU MUST FIND THE DEFENDANT GUILTY.

18          IF ON THE OTHER HAND YOU THINK THERE IS A REAL

19  POSSIBILITY THAT THE DEFENDANT IS NOT GUILTY YOU MUST GIVE

20  THE DEFENDANT THE BENEFIT OF THAT DOUBT AND FIND HIM NOT

21  GUILTY.

22          I REMIND YOU THAT DURING THIS TRIAL YOU AND I

23  HAVE CERTAIN DUTIES TO PERFORM.  AS THE TRIAL JUDGE MY

24  RESPONSIBILITY IS TO PRESIDE OVER THE TRIAL IN THIS CASE.

25  I ALSO HAVE THE DUTY TO RULE ON THE ADMISSIBILITY OF

256

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                256

1    EVIDENCE OFFERED DURING THIS TRIAL.

2         YOU ARE TO CONSIDER ONLY THE COMPETENT EVIDENCE

3    BEFORE YOU.  IF ANY TESTIMONY IS ORDERED STRICKEN FROM THE

4    RECORD IN THIS CASE DURING THIS TRIAL YOU MUST DISREGARD

5    THAT TESTIMONY.  YOU ARE TO CONSIDER ONLY THE TESTIMONY

6    WHICH HAS BEEN PRESENTED FROM THE WITNESS STAND AND ANY

7    EXHIBITS WHICH HAVE BEEN MADE A PART OF THE RECORD IN THIS

8    CASE.

9         I HAVE THE ADDITIONAL DUTY TO CHARGE YOU THE LAW

10   APPLICABLE TO THIS CASE.  AS THE PRESIDING JUDGE I AM THE

11   SOLE JUDGE OF THE LAW IN THIS CASE AND YOUR DUTY AS JURORS

12   IS TO ACCEPT AND APPLY THE LAW AS I NOW STATE IT TO YOU.

13   IF YOU HAVE ANY IDEAS TO WHAT THE LAW IS OR WHAT THE LAW

14   OUGHT TO BE AND YOUR IDEA DIFFERS FROM WHAT I NOW TELL YOU

15   THE LAW IS YOU MUST ABANDON YOUR IDEA OF WHAT THE LAW IS OR

16   OUGHT TO BE BECAUSE YOU ARE SWORN TO ACCEPT THE LAW AND

17   APPLY THE LAW EXACTLY AS I STATE IT TO YOU.

18         IN EVERY CASE TRIED IN THIS COURT BEFORE A JURY

19   THE JURY IS THE SOLE AND EXCLUSIVE JUDGE OF THE FACTS IN

20   THE CASE.  A TRIAL JUDGE CANNOT INTIMATE, STATE, COMMENT

21   ON, OR MAKE ANY STATEMENT TO A TRIAL JURY ABOUT THE FACTS

22   IN A CASE.  SINCE YOU THE JURY ARE THE SOLE JUDGE OF THE

23   FACTS IN THIS CASE YOU ARE NOT TO INFER FROM WHAT I HAVE

24   SAID DURING THE PROGRESS OF THIS TRIAL IN RULING UPON THE

25   ADMISSIBILITY OF EVIDENCE OR OTHERWISE OR ANYTHING THAT I

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**              257

1  SAY NOW DURING THE COURSE OF THIS INSTRUCTION TO YOU THAT I

2  HAVE ANY OPINION ABOUT THE FACTS IN THIS CASE.  THE LAW

3  DOES NOT ALLOW ME TO HAVE AN OPINION ABOUT THE FACTS IN

4  THIS CASE.  THIS MATTER IS SOLELY FOR YOU THE JURY TO

5  DETERMINE.

6          AS JURORS YOUR DUTY IS TO DETERMINE THE AFFECT,

7  THE VALUE, THE WEIGHT, AND THE TRUTH OF THE EVIDENCE

8  PRESENTED DURING THIS TRIAL.

9          NECESSARILY YOU MUST DETERMINE THE CREDIBILITY OF

10  WITNESSES WHO HAVE TESTIFIED IN THIS CASE.  CREDIBILITY

11  SIMPLY MEANS BELIEVABILITY.  YOUR DUTY AS JURORS IS TO

12  ANALYZE AND TO EVALUATE THE EVIDENCE AND DETERMINE WHICH

13  EVIDENCE CONVINCES YOU OF ITS TRUTH.

14          IN DETERMINING THE BELIEVABILITY OF WITNESSES WHO

15  HAVE TESTIFIED IN THIS CASE YOU MAY BELIEVE ONE WITNESS

16  OVER SEVERAL WITNESSES OR SEVERAL WITNESSES OVER ONE

17  WITNESS.  YOU MAY BELIEVE A PART OF THE TESTIMONY OF A

18  WITNESS AND REJECT THE REMAINING PART OF THE TESTIMONY OF

19  THAT SAME WITNESS.  YOU MAY BELIEVE THE TESTIMONY OF A

20  WITNESS IN ITS ENTIRETY OR REJECT THE TESTIMONY OF A

21  WITNESS IN ITS ENTIRETY.

22          YOU MAY CONSIDER WHETHER ANY WITNESS HAS

23  EXHIBITED TO YOU ANY INTEREST, BIAS, PREJUDICE OR OTHER

24  MOTIVE IN THIS CASE.

25          YOU MAY ALSO CONSIDER THE APPEARANCE AND MANNER

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                258

1   OF THE WITNESS WHILE ON THE WITNESS STAND.

2           THE RULES OF EVIDENCE ORDINARILY DO NOT PERMIT

3   WITNESSES TO TESTIFY AS TO OPINIONS OR CONCLUSIONS.  AN

4   EXCEPTION TO THIS RULE EXISTS FOR WITNESSES WE CALL EXPERT

5   WITNESSES.  A WITNESS WHO BY EDUCATION AND EXPERIENCE HAS

6   BECOME EXPERT IN SOME ART, SCIENCE, PROFESSION, OR CALLING

7   MAY STATE AN OPINION AS TO RELEVANT AND MATERIAL MATTER IN

8   WHICH THE WITNESS CLAIMS TO BE AN EXPERT AND MAY ALSO STATE

9   THE REASONS FOR THE OPINION.

10           YOU SHOULD CONSIDER ANY EXPERT OPINION RECEIVED

11   IN EVIDENCE IN THIS CASE AND LIKE ANY OTHER EVIDENCE GIVE

12   IT THE WEIGHT YOU THINK IT DESERVES.  IF YOU DECIDE THAT

13   THE OPINION OF AN EXPERT WITNESS IS NOT BASED ON SUFFICIENT

14   EDUCATION AND EXPERIENCE OR IF YOU CONCLUDE THAT THE

15   REASONS GIVEN IN SUPPORT OF THE OPINION ARE NOT SOUND OR

16   THAT THE OPINION IS OUTWEIGHED BY OTHER EVIDENCE YOU MAY

17   DISREGARD THE OPINION ENTIRELY.

18           AN EXPERT WITNESSES' TESTIMONY IS TO BE GIVEN NO

19   GREATER WEIGHT THAN THAT OF ANY OTHER WITNESS SIMPLY

20   BECAUSE THE WITNESS IS AN EXPERT.  FURTHER YOU ARE NOT

21   REQUIRED TO ACCEPT AN EXPERTS OPINION EVEN THOUGH IT IS NOT

22   CONTRADICTED.

23           A PERSON WHO HAS A PAST CRIMINAL RECORD IS

24   COMPETENT TO TESTIFY DURING A TRIAL.  A PAST RECORD DOES

25   NOT AFFECT THE ABILITY OF THAT WITNESS TO TESTIFY.  THE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          259

1   PAST RECORD MAY ONLY BE CONSIDERED BY YOU, IF AT ALL, IN

2   DETERMINING THE WITNESSES' BELIEVABILITY.  REMEMBER YOU ARE

3   THE SOLE JUDGE OF THE FACTS IN THIS CASE AND THE SOLE JUDGE

4   OF THE BELIEVABILITY OF THE WITNESSES.

5            YOU HAVE HEARD EVIDENCE THAT THE DEFENDANT WAS

6   CONVICTED OF CRIMES OTHER THAN THE ONES FOR WHICH THE

7   DEFENDANT IS NOW ON TRIAL.  THIS EVIDENCE MAY BE CONSIDERED

8   BY YOU IF YOU CONCLUDE IT IS TRUE ONLY IN DECIDING WHETHER

9   THE DEFENDANT'S TESTIMONY IS BELIEVABLE AND FOR NO OTHER

10  PURPOSE.  YOU MUST NOT CONSIDER THE DEFENDANT'S PRIOR

11  RECORD AS EVIDENCE OF THE DEFENDANT'S GUILT OF THE CHARGES

12  WE ARE TRYING HERE TODAY.

13           IN THIS CASE THERE ARE ALLEGATIONS OF SPOILATION

14  OR DESTRUCTION OF EVIDENCE.  THE STATE NOT ONLY HAS THE

15  BURDEN OF PROOF OF GUILT BUT ALSO IT HAS THE BURDEN OF

16  PRODUCING EVIDENCE WHICH COULD ESTABLISH THE INNOCENCE OF

17  THE DEFENDANT.  WHEN EVIDENCE IS LOST OR DESTROYED BY A

18  PARTY YOU MAY INFER THAT THE EVIDENCE WHICH WAS LOST OR

19  DESTROYED BY THAT PARTY WOULD HAVE BEEN ADVERSE TO THAT

20  PARTY.  IF YOU FIND, FIRST, THAT EVIDENCE WAS SPOILED OR

21  DESTROYED AND IF YOU FURTHER FIND THAT THE EVIDENCE COULD

22  HELP ESTABLISH THE INNOCENCE OF THE DEFENDANT YOU MAY THEN

23  CONSIDER THOSE FACTS IN DECIDING WHETHER OR NOT THE STATE

24  HAS MET ITS BURDEN OF PROOF.

25           THE DEFENDANT IS CHARGED WITH TWO COUNTS OF

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          260

1  DISTRIBUTION OF COCAINE BASE, A CONTROLLED SUBSTANCE

2  COMMONLY REFERRED TO AS CRACK OR CRACK COCAINE.  UNDER

3  STATE LAW THE DISTRIBUTION OF COCAINE BASE IS ILLEGAL.

4          TO PROVE THE DEFENDANT'S GUILT THE STATE MUST

5  PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT

6  DISTRIBUTED COCAINE BASE.  FURTHER THE STATE MUST PROVE

7  EACH CHARGE SEPARATELY BEYOND A REASONABLE DOUBT.

8          DISTRIBUTE MEANS TO DELIVER OR TO ACTUALLY,

9  CONSTRUCTIVELY OR ATTEMPT TO TRANSFER A DRUG OTHER THAN BY

10 ADMINISTERING OR DISPENSING.

11          DELIVER MEANS TO ACTUALLY, CONSTRUCTIVELY, OR

12 ATTEMPT TO TRANSFER A DRUG.

13          A TRANSFER CAN INVOLVE AN EXCHANGE FOR MONEY, A

14 BARTER, OR A GIFT.  THERE DOES NOT HAVE TO BE ANYTHING

15 GIVEN IN EXCHANGE FOR THE DRUGS FOR THE TRANSFER TO

16 CONSTITUTE DISTRIBUTION.

17          NOW THERE ARE TWO POSSIBLE VERDICTS FOR EACH

18 INDICTMENT IN THIS CASE.  NO SIGNIFICANCE WHATSOEVER IS TO

19 BE GIVEN TO THE ORDER IN WHICH I STATE THESE VERDICTS TO

20 YOU.  I SIMPLY MUST STATE ONE POSSIBLE VERDICT FIRST AND

21 ONE POSSIBLE VERDICT SECOND.  THE POSSIBLE VERDICTS IN THIS

22 CASE FOR EACH INDICTMENT ARE, WE THE JURY FIND THE

23 DEFENDANT GUILTY OF DISTRIBUTION OF COCAINE BASE OR WE THE

24 JURY FIND THE DEFENDANT NOT GUILTY.

25          LADIES AND GENTLEMEN, YOUR VERDICT MUST BE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    261

1    UNANIMOUS.  MR. ███████, AS FOREPERSON WHEN THE JURY AGREES

2    ON A VERDICT FOR ONE INDICTMENT YOU WILL WRITE THE VERDICT

3    ON THE BACK OF THAT INDICTMENT AND SIGN YOUR NAME AS

4    FOREPERSON.

5            WHEN THE JURY AGREES ON THE VERDICT FOR THE OTHER

6    INDICTMENT YOU WILL WRITE THE VERDICT ON THE BACK OF THAT

7    INDICTMENT AND SIGN YOUR NAME AS FOREPERSON, THEN I ASK

8    THAT YOU KNOCK ON THE JURY ROOM DOOR AND INFORM THE BAILIFF

9    THAT THE JURY HAS REACHED A VERDICT.  AT THAT TIME WE'LL

10   BRING YOU BACK INTO THE COURTROOM TO DELIVER YOUR VERDICT.

11           NOW I AM GOING TO EXCUSE YOU BACK INTO THE JURY

12   ROOM AT THIS POINT IN TIME BUT, PLEASE, DO NOT BEGIN YOUR

13   DELIBERATIONS AT THIS TIME.  I HAVE TO CHECK WITH THE

14   ATTORNEYS TO SEE IF THEY HAVE ANY CHALLENGES TO THE

15   INSTRUCTIONS THAT I'VE GIVEN YOU THUS FAR.  IF THERE ARE

16   CHALLENGES AND I NEED TO BRING YOU BACK IN TO GIVE YOU

17   ADDITIONAL CHARGES OR CLARIFICATIONS WE'LL DO THAT.  IF NOT

18   THEN WE'LL SEND THE INDICTMENTS WITH THE EXHIBITS AND THE

19   BAILIFF INTO THE JURY ROOM AND YOU'LL BE INSTRUCTED AT THAT

20   TIME TO BEGIN YOUR DELIBERATION, SO I'M GOING TO SEND YOU

21   BACK TO THE JURY ROOM BUT, PLEASE, DO NOT BEGIN YOUR

22   DELIBERATIONS UNTIL THE BAILIFF INDICATES THAT YOU CAN

23   BEGIN YOUR DELIBERATIONS, THANK YOU VERY MUCH.  EVERYBODY

24   ELSE, PLEASE, REMAIN SEATED WHILE THE JURY IS EXCUSED.

25           (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    262

1    12:11 P.M.)

2            THE COURT:    ANY EXCEPTIONS TO THE CHARGE BY THE

3    STATE?

4            MS. BAILEY:    NONE FROM THE STATE, YOUR HONOR.

5            THE COURT:    ANY FROM THE DEFENSE?

6            MR. MCKNIGHT:    NONE FROM THE DEFENSE, YOUR

7    HONOR.

8            THE COURT:    ALL RIGHT, LET'S MAKE SURE THAT

9    WE'VE GOT ALL THE EXHIBITS TOGETHER AND THEN WE CAN SEND

10   THE INDICTMENTS WITH THE EXHIBITS BACK TO THE JURY AND YOU

11   CAN TELL THEM TO BEGIN THEIR DELIBERATIONS.    HERE'S THE

12   INDICTMENTS.

13           MS. BAILEY:    THE STATE HAS NO OBJECTION SINCE

14   THESE ARE ALL SEALED UP LIKE THIS TO SENDING THEM BACK.

15           THE COURT:    WHATEVER YA'LL WANT TO DO, DO YOU

16   WANT TO SEND THEM BACK?    I MEAN THEY'RE IN EVIDENCE?

17           MS. BAILEY:    YES.

18           THE COURT:    OKAY.

19           MS. BAILEY:    AND DID YOU WANT TO KEEP THESE OUT

20   OR SEND THEM BACK?

21           THE COURT:    LET'S JUST GO AHEAD AND PUT THEM IN

22   THERE AND LET THEM SINCE THEY'RE MARKED AS EXHIBITS.

23           ALL RIGHT, AND, MR. LITTLE, WHEN YOU GO IN IF YOU

24   WOULD, PLEASE, BRING THE ALTERNATE ███ █ █████, IF YOU'D

25   BRING HER OUT, PLEASE.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                263

1        (WHEREUPON, THE VERDICT FORMS AND EXHIBITS WERE

2  DELIVERED TO THE JURY ROOM WITH INSTRUCTIONS TO BEGIN

3  DELIBERATIONS BEGAN AT 12:13 P.M.  THE ALTERNATE ENTERS THE

4  COURTROOM WITH THE BAILIFF.)

5        THE COURT:   I ALWAYS HATE THIS PART OF THE

6  TRIAL.  IT'S LIKE YOU GET FANCIED UP FOR THE PARTY AND

7  DON'T GET TO PARTICIPATE.  I APPRECIATE YOUR SERVICE BUT

8  SINCE YOU WERE AN ALTERNATE AND YOUR SERVICE IS NOT NEEDED

9  BECAUSE NO ONE ELSE WAS EXCUSED FROM THE JURY YOU'LL NOT BE

10 ALLOWED TO DELIBERATE IN THIS CASE.  YOU'RE CERTAINLY

11 WELCOME TO STAY WITH US TO SEE WHAT HAPPENS OR IF YOU WANT

12 TO BE EXCUSED --

13        ALTERNATE MS. ███████   I WANT TO HEAR.

14        THE COURT:   OKAY, IF YOU WANT TO STAY AND HEAR

15 YOU'RE CERTAINLY WELCOME TO DO SO.  IF YOU WANT TO SIT OUT

16 HERE YOU CAN OR I CAN HAVE THEM TREAT YOU TO A PRIVATE ROOM

17 IF YOU WANT TO WHICHEVER YOU PREFER.  THAT WILL BE FINE IF

18 YOU WANT TO STEP OUT IN THE HALL OR IF YOU WANT TO HAVE A

19 SEAT RIGHT OVER THERE WHICHEVER YOU PREFER.  ALL RIGHT,

20 THANK YOU VERY MUCH.

21        (WHEREUPON, THE ALTERNATE WAS EXCUSED.)

22        (WHEREUPON, THE JURY KNOCKED WITH A QUESTION AT

23 12:38 P.M.)

24        THE COURT:   I HAD A REQUEST FROM THE JURY THAT

25 WE NEED TO TAKE UP.  THEY SENT BACK A SLIP SAID WHAT WAS

264

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                264

1    THE DATE OF THE ACTUAL ARREST.  I DON'T KNOW THAT THERE WAS

2    ANYTHING PUT INTO EVIDENCE IN THAT REGARD, YA'LL CORRECT ME

3    IF I'M WRONG.

4              MR. MCKNIGHT:   THERE WASN'T.

5              THE COURT:   THERE WASN'T, OKAY.  I'M JUST GOING

6    TO THEN WHEN I BRING THEM OUT I'M JUST GOING TO INSTRUCT

7    THEM THAT THAT'S A FACTUAL DETERMINATION, THAT IT'S UP TO

8    THEM TO DECIDE IF THAT IS A RELEVANT MATTER OR DO YOU WANT

9    ME TO INSTRUCT THEM THAT IT'S NOT A RELEVANT MATTER THE

10   DATE OF ARREST; WHAT DO YA'LL --

11             MR. MCKNIGHT:   I DON'T ---

12             THE COURT:   I HATE ---

13             MR. MCKNIGHT:   --- KNOW THAT I AGREE WITH IT

14   IT'S NOT A RELEVANT MATTER, JUST TO TELL THEM TO DISREGARD

15   THAT ISSUE.  THAT'S JUST GOING TO RAISE MORE QUESTIONS.

16             MS. BAILEY:   YOUR HONOR, I THINK INSTEAD OF

17   MAKING ANY STATEMENT AS TO WHETHER IT'S RELEVANT OR WHETHER

18   TO DISREGARD IT OR NOT DISREGARD IT MAYBE THE SAFEST COURSE

19   WOULD BE TO INSTRUCT THE JURY THAT THEY HAVE ALL THE

20   EVIDENCE THAT THEY'RE GOING TO GET IN THE CASE.

21             THE COURT:   YEAH, I THINK THAT'S IT THAT I'M

22   JUST GOING TO INSTRUCT THEM THAT THEY'VE GOT ALL THE

23   EVIDENCE AND THAT THAT IS A FACTUAL DETERMINATION, THAT

24   NEITHER THE COURT NOR THE ATTORNEYS CAN -- NO, LET ME THINK

25   HOW DO I WANT TO WORD THIS.  IT'S NOT IN EVIDENCE BUT IT IS

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**            265

1  SOMETHING YOU CAN STIPULATE TO IF YA'LL WANT TO.

2            MR. MCKNIGHT:   I DON'T WANT TO STIPULATE TO IT.

3            THE COURT:   BUT I MEAN IT'S NOT, IT'S UP TO THE

4  STATE, YOU DIDN'T PRESENT ANYTHING ON IT?

5            MS. BAILEY:   NO, YOUR HONOR.

6            THE COURT:   YEAH, I'M JUST GOING TO INSTRUCT

7  THEM THAT THEY'VE GOT ALL THE EVIDENCE AND THAT THAT IS A

8  FACTUAL DETERMINATION THAT'S LEFT UP TO THEM.

9            MS. BAILEY:   THANK YOU, YOUR HONOR.

10            THE COURT:   ALL RIGHT, THE NEXT IS THEY WOULD

11  LIKE TO HEAR THE AUDIO AGAIN SO WHEN WE BRING THEM BACK IN

12  I'M GOING TO LET THEM PLAY, WE'LL PLAY THE AUDIOS FOR THEM,

13  OKAY, AND THEN BEFORE I SEND THEM BACK OUT I'M GOING TO

14  TELL THEM THAT WE'VE GOT THEM LUNCH AND THEN LIKE I SAY

15  INSTRUCT THEM THAT THEY CAN EITHER DELIBERATE THROUGH LUNCH

16  OR THEY CAN STOP AND EAT LUNCH AND THEN RESUME BUT THEY ALL

17  HAVE TO DO THE SAME THING, OKAY.

18            ANYTHING FROM THE STATE BEFORE WE BRING THE JURY

19  BACK IN?

20            MS. BAILEY:   NO, YOUR HONOR, OUR EQUIPMENT IS

21  SET UP TO PLAY THOSE, THEY ACTUALLY HAVE THE CD'S BACK

22  THERE.

23            THE COURT:   OKAY, YEAH, WHEN, BAILIFF, WHEN YOU

24  BRING THEM LET'S MAKE SURE WE GET THOSE CD'S WITH THEM.

25            ANYTHING FROM THE DEFENSE BEFORE WE BRING THE

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    266

1    JURY IN?

2                MR. MCKNIGHT:    NOTHING FROM THE DEFENSE, YOUR

3    HONOR.

4                THE COURT:    ALL RIGHT, LET'S BRING THE JURY IN.

5                (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

6    1:15 P.M.)

7                THE COURT:    ALL RIGHT, LADIES AND GENTLEMEN,

8    WELCOME BACK, I APOLOGIZE FOR KEEPING YOU BACK IN THE JURY

9    ROOM FOR SO LONG BUT WE HAD TO SET UP SOME OF THE STUFF AND

10   GET READY FOR THE AUDIO.  WE WILL PLAY THE AUDIO FOR YOU

11   AGAIN.

12               YOUR QUESTION, HOWEVER, WHAT WAS THE DATE OF THE

13   ACTUAL ARREST, THAT IS A FACTUAL DETERMINATION.  THAT IS

14   LEFT UP FOR YOU TO DECIDE AND YOU'VE RECEIVED ALL OF THE

15   EVIDENCE THAT IS TO BE PRESENTED IN THIS CASE AND SO IT IS

16   UP TO YOU IF YOU DEEM THAT ISSUE RELEVANT TO BASE IT UPON

17   THE EVIDENCE THAT HAS BEEN PRESENTED.

18               NOW AS TO THE AUDIO HAVE WE GOT THAT SET AND

19   READY FOR THEM TO PLAY?

20               MS. BAILEY:    YES, YOUR HONOR.

21               THE COURT:    ALL RIGHT.

22               (WHEREUPON, STATE'S EXHIBIT NUMBER 3 PLAYED IN

23   OPEN COURT.)

24               (WHEREUPON, STATE'S EXHIBIT NUMBER 4 PLAYED IN

25   OPEN COURT.)

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**           267

1           THE COURT:    ALL RIGHT, LADIES AND GENTLEMEN,

2    THOSE ARE THE AUDIOS.  I'M GOING TO SEND YOU BACK TO THE

3    JURY ROOM LET YOU RESUME YOUR DELIBERATIONS.  NOW WE'VE

4    ORDERED LUNCH FOR YOU AND LUNCH, I DON'T KNOW IF IT'S HERE

5    YET, IF IT'S NOT IT SHOULD BE HERE MOMENTARILY.  NOW WHEN

6    LUNCH ARRIVES YOU CAN DO ONE OF TWO THINGS.  YOU CAN

7    CONTINUE YOUR DELIBERATIONS WHILE YOU EAT LUNCH IF YOU

8    LIKE.  IF YOU PREFER YOU CAN STOP YOUR DELIBERATIONS, EAT

9    LUNCH, AND THEN RESUME YOUR DELIBERATIONS WHEN YOU FINISH

10   EATING LUNCH.  THE ONLY REQUIREMENT IS THAT EVERYONE MUST

11   DO THE SAME THING.  EITHER ALL OF YOU MUST STOP YOUR

12   DELIBERATIONS EAT LUNCH AND THEN RESUME OR ALL OF YOU MUST

13   CONTINUE YOUR DELIBERATIONS WHILE YOU'RE EATING LUNCH.  YOU

14   CAN'T HAVE SOME DELIBERATE AND OTHERS NOT, OKAY, BUT IT'S

15   ENTIRELY UP TO YOU AS TO HOW YOU WANT TO PROCEED WHEN LUNCH

16   GETS HERE.  ALL RIGHT, I'M GOING TO EXCUSE YOU BACK TO THE

17   JURY ROOM AND LET YOU RESUME YOUR DELIBERATIONS.

18           MR. FOREMAN:  THE QUESTION IS ABOUT TESTIMONY, WE

19   DIDN'T TAKE NOTES.

20           THE COURT:  RIGHT.

21           MR. FOREMAN:   IT SEEMS THAT WE CAN'T REMEMBER

22   BUT WE THINK THAT WE HEARD, CAN WE ASK ABOUT THAT

23   TESTIMONY?

24           THE COURT:  WHAT YOU CAN DO, I CANNOT TELL YOU

25   WHAT WAS OR WAS NOT IN CERTAIN TESTIMONY.  WE HAVE THE

268

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    268

1  TESTIMONY FROM THE COURT REPORTER SO WE CAN PLAY BACK A

2  TESTIMONY IF YOU WISH IT PLAYED BACK BUT WHETHER OR NOT

3  IT'S IN A RECORDED FORM OR SHE WOULD READ IT BACK TO YOU I

4  DON'T KNOW.  IT WILL TAKE US A WHILE TO GET SET UP BUT WHAT

5  I WOULD NEED YOU TO DO IS IF YOU WOULD LIKE TO HEAR SOME

6  OTHER TESTIMONY YOU NEED TO LET US KNOW WHO THE WITNESS IS

7  AND WE WOULD SET IT UP THEN, OKAY, ALL RIGHT.

8          (WHEREUPON, AT 1:26 P.M. THE JURY RETIRED TO THE

9  JURY ROOM AND RESUMED THEIR DELIBERATIONS.)

10         ALL RIGHT, THIS IS THEIR QUESTION, I'M GOING TO

11  MARK THIS AS, THAT WOULD BE COURT'S EXHIBIT 2, ALL RIGHT.

12         (WHEREUPON, COURT'S EXHIBIT NUMBER 2 MARKED FOR

13  IDENTIFICATION.)

14         THE COURT:  ALL RIGHT, ANYTHING FURTHER?

15         MR. MCKNIGHT:  NOTHING FROM THE DEFENSE?

16         MS. BAILEY:  NOTHING FROM THE STATE, YOUR HONOR.

17         THE COURT:  ALL RIGHT, LET'S GO AHEAD AND HAND

18  THOSE DISKS BACK TO THEM JUST SO WE KEEP IT WITH ALL THE

19  OTHER EVIDENCE.  I DON'T KNOW IF THEY'RE GOING TO WANT TO

20  LISTEN SOME OTHER TESTIMONY OR NOT SO LET'S ALL STICK

21  AROUND KIND OF CLOSE IN CASE THEY DO, OKAY.

22         MS. BAILEY:  THANK YOU, YOUR HONOR.

23         THE COURT:  ALL RIGHT, LET'S STAND AT RECESS.

24         (WHEREUPON, THE JURY KNOCKED WITH A QUESTION AT

25  1:36 P.M.)

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          269

1          THE COURT:   THE QUESTION REQUEST THEY SENT IN,

2   WHICH I THINK I CAN RESPOND BY JUST MY WRITTEN ANSWER AND

3   SENDING IT BACK ON THE NOTE, THEY STATE, "WE NEED THE

4   ACTUAL TIMES OF THE DEALS ON THE 17TH AND THE 20TH, CAN YOU

5   GIVE US THIS INFO OR DO WE NEED TO LISTEN TO THE TESTIMONY.

6   WAS THIS SPECIAL AGENT GRANT'S TESTIMONY?"  I'VE JUST

7   WRITTEN THE FOLLOWING RESPONSE, I SAID, "YOU HAVE REQUESTED

8   A FACTUAL DETERMINATION THAT ONLY THE JURY CAN DECIDE.

9   ALSO THE COURT CANNOT COMMENT ON THE TESTIMONY OF ANY

10  WITNESS.  IF YOU WANT TO HEAR TESTIMONY AGAIN LET THE COURT

11  KNOW WHICH WITNESS OR WITNESSES YOU WANT TO HEAR."  DOES

12  THAT SOUND SUFFICIENT?

13          MS. BAILEY:   YES, YOUR HONOR.

14          MR. MCKNIGHT:   YES, SIR.

15          THE COURT:   ALL RIGHT, LET'S MARK THIS AS

16  COURT'S EXHIBIT 3 AND I'LL JUST LET YOU TAKE THAT BACK TO

17  THEM.

18          (WHEREUPON, COURT'S EXHIBIT NUMBER 3 MARKED FOR

19  IDENTIFICATION.)

20          (WHEREUPON, COURT'S RESPONSE DELIVERED TO JURY AT

21  1:51 P.M.)

22          THE COURT:   ALL RIGHT, WE'LL SIT TIGHT UNTIL WE

23  HEAR SOMETHING BACK.  DON'T GO TOO FAR CAUSE THEY MAY WANT

24  TO HEAR SOME TESTIMONY.

25          (WHEREUPON, THE JURY KNOCKED WITH A QUESTION AT

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    270

1  2:27 P.M.)

2          THE COURT:    ALL RIGHT, THE JURY HAS COME BACK

3  WITH ANOTHER REQUEST SAID WE'D LIKE TO HEAR DEPUTY GRANT'S

4  TESTIMONY CONCERNING THE TIMES OF THE BUYS ON THE 17TH AND

5  THE 20TH.  SO ALL I KNOW IS LET'S PLAY THEM BACK THE

6  TESTIMONY OF THAT WITNESS.  HOW LONG IS THAT TESTIMONY OR

7  DO YOU KNOW?

8          MADAM COURT REPORTER:    PROBABLY ABOUT A HALF AN

9  HOUR.

10          THE COURT:    OKAY, I'M THINKING LET'S JUST PLAY

11  BACK THE TESTIMONY OF THE OFFICER, HOW LONG WOULD IT TAKE

12  YOU TO GET THAT SET UP?

13          MADAM COURT REPORTER:    I'VE GOT IT.

14          THE COURT:    OH, YOU'VE ALREADY GOT IT, OKAY,

15  WELL GOOD FOR YOU, GOOD JOB, SO CAN WE GO AHEAD AND BRING

16  THEM IN?

17          MADAM COURT REPORTER:    GO AHEAD.

18          THE COURT:    ALL RIGHT.

19          MS. BAILEY:    WOULD THE COURT MIND ASKING THE

20  JURY IF THEY'VE HEARD ENOUGH THAT THEY COULD SAY SO THEY

21  DON'T HAVE TO SIT THROUGH THE REST OF IT?

22          THE COURT:    LET ME HEAR?

23          MR. MCKNIGHT:    YOUR HONOR, THAT ASSUMES THAT ALL

24  OF THEM WANT TO HEAR THE SAME THING.  THEY MAY BE ASKING

25  FOR THE OFFICER'S TESTIMONY BUT THEY MIGHT BE LISTENING FOR

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    271

1   DIFFERENT.  I JUST THINK WE HAVE TO PLAY THE ENTIRE TAPE.

2            THE COURT:   YEAH, I'M THINKING WE'LL JUST PLAY

3   IT BACK IN ITS FULL, OKAY, LET'S BRING THE JURY IN.

4            (WHEREUPON, THE JURY RETURNS TO THE COURTROOM AT

5   2:34 P.M.)

6            THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN,

7   WELCOME BACK, I UNDERSTAND YOU WANT TO HEAR THE TESTIMONY

8   OF OFFICER GRANT AGAIN; IS THAT CORRECT?

9            ALL RIGHT, WE'VE GOT THAT SET UP AND WE'LL GO

10  AHEAD AND PLAY THAT BACK FOR YOU NOW.  IF YOU HAVE TROUBLE

11  HEARING IT, I THINK WE'VE GOT THE VOLUME SET.  IF YOU CAN'T

12  HEAR IT JUST RAISE YOUR HANDS AND WE'LL TURN UP THE VOLUME,

13  OKAY.

14           (WHEREUPON, TESTIMONY OF DEPUTY REGINALD GRANT IS

15  PLAYED IN OPEN COURT.)

16           THE COURT:   ALL RIGHT, THAT'S THE TESTIMONY OF

17  OFFICER GRANT.  I'LL EXCUSE YOU BACK TO THE JURY ROOM AND

18  YOU CAN CONTINUE YOUR DELIBERATIONS.  THANK YOU VERY MUCH.

19           (WHEREUPON, AT 3:12 P.M. THE JURY RETIRED TO THE

20  JURY ROOM AND RESUMED THEIR DELIBERATIONS.)

21           THE COURT:   ALL RIGHT, THIS IS THEIR REQUEST,

22  THAT WILL BE COURT'S EXHIBIT NUMBER 4, I THINK.  LET'S SEE,

23  I THINK NUMBER 1 WAS THE FOREPERSON'S ELECTION.

24           MADAM COURT REPORTER:   THEY HAVE THE OTHER ONE

25  BACK IN THE JURY ROOM.

272

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**     272

1      THE COURT:  RIGHT, COURT'S EXHIBIT NUMBER 4.

2 ALL RIGHT, DO WE WANT TO GO AHEAD AND DO SOME PLEAS OR WHAT

3 DOES THE SOLICITOR WISH TO DO?

4      (WHEREUPON, COURT'S EXHIBIT NUMBER 4 MARKED FOR

5 IDENTIFICATION.)

6      (WHEREUPON, THE JURY KNOCKED WITH A VERDICT AT

7 3:24 P.M.)

8      THE COURT:  ANYTHING FROM THE STATE BEFORE WE

9 BRING THE JURY IN?

10      MS. BAILEY:  NO, YOUR HONOR.

11      THE COURT:  ANYTHING FROM THE DEFENSE?

12      MR. MCKNIGHT:  NOTHING FROM THE DEFENSE, YOUR

13 HONOR.

14      THE COURT:  ALL RIGHT, LET'S GO AHEAD AND BRING

15 THE JURY IN.

16      (WHEREUPON, THE JURY ENTERED THE COURTROOM AT

17 3:26 P.M. TO DELIVER ITS VERDICT AS TO DEFENDANT QUENTIN J.

18 HOLT.)

19      THE COURT:  ALL RIGHT, MR. ███████ I UNDERSTAND

20 THE JURY HAS REACHED A VERDICT; IS THAT CORRECT?

21      MR. FOREMAN:  YES, SIR.

22      THE COURT:  ALL RIGHT, IF YOU'D PLEASE HAND --

23 HAVE YOU WRITTEN THE VERDICT ON THE BACK OF THE INDICTMENTS

24 AND SIGNED YOUR NAME?

25      MR. FOREMAN:  YES, SIR.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    273

1          THE COURT:   ALL RIGHT, IF YOU'D PLEASE HAND THAT

2     TO THE BAILIFF.  ALL RIGHT, I'LL ASK THE CLERK TO PLEASE

3     PUBLISH THE VERDICTS.  ALL RIGHT, MR. HOLT, IF YOU'D PLEASE

4     STAND?

5          MADAM CLERK:   THE STATE OF SOUTH CAROLINA V.

6     QUENTIN J. HOLT AS TO INDICTMENT 2010-GS-22-179

7     DISTRIBUTION OF COCAINE THE JURY UNANIMOUSLY FIND THE

8     DEFENDANT GUILTY.

9          AS TO INDICTMENT 2010-GS-22-181 DISTRIBUTION OF

10    COCAINE BASE THE JURY UNANIMOUSLY FIND THE DEFENDANT

11    GUILTY.

12         THE COURT:   ALL RIGHT, LET ME SEE THOSE

13    INDICTMENTS FOR A MINUTE BECAUSE I THINK ON BOTH OF THEM, I

14    WANT TO MAKE SURE BOTH OF THEM DEAL WITH DISTRIBUTION OF

15    COCAINE BASE.  I THINK SHE HAD SAID COCAINE ON ONE OF THEM

16    BUT BOTH INDICTMENTS READ COCAINE BASE.

17         ALL RIGHT, MR. ███████ IS THIS THE JURY'S

18    VERDICT?

19         MR. FOREMAN:   YES, SIR.

20         THE COURT:   ALL RIGHT, ANY REQUESTS TO POLL THE

21    JURY?

22         MR. MCKNIGHT:   WELL, CERTAINLY, YOUR HONOR,

23    PLEASE POLL THE JURY.

24         THE COURT:   ALL RIGHT, LADIES AND GENTLEMEN, THE

25    DEFENSE HAS REQUESTED A POLLING OF THE JURY.  WHAT'S GOING

274

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    274

1    TO HAPPEN IS I WILL CALL YOUR NAMES OUT ONE AT A TIME AND

2    WHEN I ASK, WHEN I CALL YOUR NAME IF YOU WOULD PLEASE STAND

3    AND I'M GOING TO ASK YOU TO RESPOND TO TWO QUESTIONS.  THE

4    FIRST QUESTION WILL BE IS THIS YOUR VERDICT.  THE SECOND

5    QUESTION WILL BE IS THIS STILL YOUR VERDICT, OKAY, SO

6    PLEASE STAND AND RESPOND TO THE QUESTIONS WHEN I CALL YOUR

7    NAME.

8              JUROR NUMBER 268, ██████ ██ ██████    MR. ██████

9    IS THIS YOUR VERDICT?

10             JURY PANEL MEMBER:  YES, SIR.

11             THE COURT:  IS IT STILL YOUR VERDICT?

12             JURY PANEL MEMBER:  YES, SIR.

13             THE COURT:  ALL RIGHT, THANK YOU.  JUROR NUMBER

14   7, ██████ ██ ████.  MR. ████ IS THIS YOUR VERDICT?

15

16             JURY PANEL MEMBER:  YES, SIR.

17             THE COURT:  IS IT STILL YOUR VERDICT?

18             JURY PANEL MEMBER:  YES, SIR.

19             THE COURT:  THANK YOU VERY MUCH.  JUROR NUMBER

20   250, ██████ ████████.  MS. ████████ IS THIS YOUR VERDICT?

21             JURY PANEL MEMBER:  YES, SIR.

22             THE COURT:  IS IT STILL YOUR VERDICT?

23             JURY PANEL MEMBER:  YES, SIR.

24             THE COURT:  THANK YOU.  JUROR NUMBER 30, ██████

25   ██ ████████.  MS. ████████ IS THIS YOUR VERDICT?

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    275

1            JURY PANEL MEMBER:   YES, SIR.

2            THE COURT:   IS IT STILL YOUR VERDICT?

3            JURY PANEL MEMBER:   YES, SIR.

4            THE COURT:   THANK YOU.  JUROR NUMBER 50, ██████

5    ██ ██████.  MR. ██████ IS THIS YOUR VERDICT?

6            JURY PANEL MEMBER:   YES, SIR.

7            THE COURT:   IS IT STILL YOUR VERDICT?

8            JURY PANEL MEMBER:   YES, SIR.

9            THE COURT:   THANK YOU.  JUROR NUMBER 206, ██████

10   ██ ██████.  MR. ██████ IS THIS YOUR VERDICT?

11           JURY PANEL MEMBER:   YES, SIR.

12           THE COURT:   IS IT STILL YOUR VERDICT?

13           JURY PANEL MEMBER:   YES, SIR.

14           THE COURT:   THANK YOU.  JUROR NUMBER 11,

15   ██████████ ██ ██████.  MS. ██████ IS THIS YOUR VERDICT?

16           JURY PANEL MEMBER:   YES, SIR.

17

18            THE COURT:   IS IT STILL YOUR VERDICT?

19           JURY PANEL MEMBER:   YES, SIR.

20           THE COURT:   THANK YOU.  JUROR NUMBER 93, ██████

21   ██ ██████.  MS. ██████ IS THIS YOUR VERDICT?

22           JURY PANEL MEMBER:   YES, SIR.

23           THE COURT:   IS IT STILL YOUR VERDICT?

24           JURY PANEL MEMBER:   YES, SIR.

25           THE COURT:   THANK YOU.  JUROR NUMBER 174, ██████

276

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    276

1      ██ ████████.  MR. ██████████ IS THIS YOUR VERDICT?

2           JURY PANEL MEMBER:   YES, SIR.

3           THE COURT:   IS IT STILL YOUR VERDICT?

4           JURY PANEL MEMBER:   YES, SIR.

5           THE COURT:   THANK YOU.  JUROR NUMBER 68, ████████

6      ██ ████████.  MS. ████████ IS THIS YOUR VERDICT?

7           JURY PANEL MEMBER:   YES, SIR.

8           THE COURT:   IS IT STILL YOUR VERDICT?

9           JURY PANEL MEMBER:   YES, SIR.

10          THE COURT:   THANK YOU.  JUROR NUMBER 21, ████████

11     ██ ██████.  MS. ████████ IS THIS YOUR VERDICT?

12          JURY PANEL MEMBER:   YES, SIR.

13          THE COURT:   IS IT STILL YOUR VERDICT?

14          JURY PANEL MEMBER:   YES, SIR.

15          THE COURT:   THANK YOU.  JUROR NUMBER 283,

16     ████████████ ████████.  MS. ██████ IS THIS YOUR VERDICT?

17          JURY PANEL MEMBER:   YES, SIR.

18          THE COURT:   IS IT STILL YOUR VERDICT?

19          JURY PANEL MEMBER:   YES, SIR.

20          THE COURT:   THANK YOU.  ALL RIGHT, LADIES AND

21     GENTLEMEN, THAT WILL CONCLUDE YOUR SERVICES AS JURORS ON

22     THIS PARTICULAR CASE.  IT WILL ALSO CONCLUDE YOUR SERVICE

23     AS JURORS FOR THIS WEEK SO I WANT TO THANK YOU FOR YOUR

24     SERVICE.  I'M GOING TO EXCUSE YOU BACK TO THE JURY ROOM FOR

25     JUST A MINUTE CAUSE I WANT TO COME BACK AND PERSONALLY

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                277

1  THANK YOU FOR YOUR SERVICE IN JUST A MINUTE.  I LIKE TO DO

2  THAT PERSONALLY FOR JURIES AT THE CONCLUSION OF THE TRIAL

3  AND SO IF I CAN GET YOU TO GO BACK TO THE JURY ROOM FOR

4  JUST A MOMENT AND WE'LL BE BACK, I'LL BE BACK THERE IN JUST

5  ONE SECOND, OKAY.

6          (WHEREUPON, THE JURY RETIRED TO THE JURY ROOM AT

7  3:31 P.M.)

8          THE COURT:   ANY MOTIONS AT THIS TIME?

9          MR. MCKNIGHT:   YES, YOUR HONOR, THE DEFENSE

10  RESPECTFULLY MAKE A MOTION THAT YOU SET ASIDE THE VERDICT

11  OF THE JURY.  IT'S QUITE OBVIOUS THERE WERE SOME ISSUES OF

12  MATERIAL FACT THAT THE JURY OVERLOOKED, MISUNDERSTOOD, AND

13  WE WOULD ASK THAT YOU SET ASIDE YOUR VERDICT.

14          THE COURT:   ALL RIGHT, YOUR MOTION IS NOTED;

15  I'M GOING TO DENY THAT MOTION.  ALL RIGHT, ANYTHING ELSE?

16          MR. MCKNIGHT:   NOTHING FROM THE DEFENSE, YOUR

17  HONOR.

18          THE COURT:   ALL RIGHT, ANY REASON AS TO WHY WE

19  CANNOT GO AHEAD AND IMPOSE SENTENCE?

20          MR. MCKNIGHT:   NONE FROM THE DEFENSE SIDE, YOUR

21  HONOR.

22          THE COURT:   ALL RIGHT, ANYTHING FURTHER FROM THE

23  STATE?

24          MS. BAILEY:   NO POST TRIAL MOTIONS FROM THE

25  STATE.  THE STATE WOULD LIKE TO BE HEARD AT THE APPROPRIATE

278

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                      278

1    TIME OF THE SENTENCING AND FOR THE COURT'S INFORMATION THE

2    STATE HAS HAD A TRIAL, GOTTEN CERTIFIED OF THE DEFENDANT'S

3    PREVIOUS CONVICTIONS.  EACH OF THESE IS A DISTRIBUTION

4    THIRD OFFENSE WHICH CARRIES 15 TO 30.  THAT IS A SENTENCING

5    ISSUE AND NOT A TRIAL ISSUE AND I'LL HAND THESE UP AT THE

6    APPROPRIATE TIME AND MAKE THEM COURT'S EXHIBITS.

7            THE COURT:  ALL RIGHT, ALL RIGHT, MR. MCKNIGHT,

8    ANYTHING IN MITIGATION?

9            MR. MCKNIGHT:  YOUR HONOR, I BELIEVE QUITE

10   OBVIOUSLY YOU'VE SAT THROUGH THE ENTIRE TRIAL AND YOU'VE

11   HEARD ABOUT MR. HOLT'S WORK EXPERIENCE AND HIS, AND HIS

12   FAMILY.  HE HAS THREE CHILDREN THAT HE WAS RAISING AND AS I

13   INDICATED BEFORE HE'S A LIFE LONG RESIDENT OF THE ANDREWS

14   AREA OF GEORGETOWN COUNTY.

15           YOUR HONOR, MY, YOU KNOW THE LAW AND YOU KNOW THE

16   SENTENCE THAT HE'S FACING.  IT IS QUITE SIGNIFICANT.  YOUR

17   HONOR, AND MY CLIENT AND MYSELF ARE WELL AWARE THAT YOU ARE

18   STATUTORILY REQUIRED TO ISSUE A MANDATORY MINIMUM, HOWEVER

19   THE COURT IN ITS DISCRETION CAN HAVE, CAN HAND DOWN A

20   SENTENCE THAT'S SIGNIFICANTLY HIGHER THAN THE MANDATORY

21   MINIMUM.  IT'S MY REQUEST UPON THE COURT TO GIVE MY CLIENT

22   OR TO HAND DOWN A SENTENCE THAT IS THE MANDATORY MINIMUM.

23   IT IS AN 85 PERCENT SENTENCE, JUSTICE IS MET.  HE WILL BE

24   GONE FROM, HE'LL BE EXILED FROM SOCIETY FOR A SIGNIFICANT

25   AMOUNT OF TIME SO ON THE MANDATORY MINIMUM SENTENCE SO

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                279

1   ANYTHING ABOVE THE MANDATORY MINIMUM SENTENCE, YOUR HONOR,

2   IS BASICALLY OVERKILL IN MY, IN MY VIEW AND I RESPECTFULLY

3   SUBMIT THAT TO THE COURT.  I'M NOT AT ALL SUGGESTING THAT

4   THE COURT ENDEAVORS IN THINGS EXTRAORDINARY BUT IN THIS

5   INSTANCE, YOUR HONOR, IT'S MY REQUEST THAT YOU SENTENCE HIM

6   TO THE MANDATORY MINIMUM AND NO MORE.

7           THE COURT:  ALL RIGHT, MR. HOLT, ANYTHING YOU'D

8   LIKE TO SAY?

9           DEFENDANT HOLT:  NO, SIR.

10          THE COURT:  ALL RIGHT, ALL RIGHT, MS. BAILEY,

11  I'LL HEAR FROM THE STATE?

12          MS. BAILEY:  THANK YOU, YOUR HONOR, FIRST OF ALL

13  THE STATE WOULD LIKE TO MOVE THESE TWO CERTIFIED

14  CONVICTIONS.  ONE IS FROM 2000 AND ONE IS FROM THE YEAR

15  2007 AND BOTH HAVE BEEN CERTIFIED AND PROVIDED BY THE CLERK

16  OF COURT'S OFFICE.  THE ONE FROM 2000 IS A DISTRIBUTION OF

17  POWDER COCAINE FIRST OFFENSE OR PWID AND DISTRIBUTION

18  COCAINE FIRST OFFENSE.

19          THE ONE FROM 2007 IS A POSSESSION OF POWDER

20  COCAINE SECOND OFFENSE.  BOTH OF THESE AGAIN HAVE BEEN

21  CERTIFIED AS SEPARATE OFFENSES, SEPARATE CONVICTIONS FOR

22  DRUGS AND AT THIS TIME THE STATE WOULD LIKE FOR THEM TO BE

23  MARKED AS COURT'S EXHIBITS AND PLACED IN EVIDENCE,

24          MR. MCKNIGHT:  THE COURT'S INDULGENCE JUST FOR A

25  SECOND.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    280

1          THE COURT:    ALL RIGHT.

2          MR. MCKNIGHT:    YOUR HONOR, WE'VE GOT, THIS

3    INFORMATION SHE'S SUBMITTED IS INCORRECT.    THERE'S A

4    QUENTIN HOLT BORN ON ███████ AND THIS QUENTIN HOLT, MY

5    QUENTIN HOLT IS BORN ███████.

6          THE COURT:    SO IS HE SAYING THAT THESE ARE NOT

7    THIRD OFFENSES?

8          MR. MCKNIGHT:    THIS SHOULD BE HIS SECOND, YOUR

9    HONOR, BUT BASED UPON WHAT'S BEEN SUBMITTED HERE HE ADMITS

10   TO THE SENTENCE IN 2007, THE INDICTMENT NUMBER 2007-22-164,

11   HOWEVER THIS QUENTIN HOLT 2000 --

12         THE COURT:    OKAY, SO HE'S SAYING THAT HE HAS

13   ONLY BEEN CONVICTED OF A DRUG POSSESSION CHARGE ONCE IN HIS

14   LIFE?

15         MR. MCKNIGHT:    HE'S BEEN CONVICTED TWICE, YOUR

16   HONOR, BUT THIS POSSESSION WITH THE INTENT TO DISTRIBUTE IS

17   NOT HIS.

18         THE COURT:    ALL RIGHT, WHAT'S HIS PRIOR RECORD

19   THEN?

20         MR. MCKNIGHT:    YOUR HONOR, BASED UPON THE NCIC

21   REQUEST SUBMITTED TO ME PURSUANT TO MY RULE 5 REQUEST THE

22   FIRST ONE IS IN '99 AND THAT'S FROM 7-24-2000 BUT IT'S

23   LISTED AS -- THIS PERSON HAS A DIFFERENT BIRTHDATE THAN MY

24   CLIENT.

25         THE COURT:    GIVE ME YOUR CLIENT'S PRIOR RECORD.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**          281

1          MR. MCKNIGHT:   OKAY, THIS ONE HERE ON THE PRIOR

2  RECORD HERE THAT INDICATES THAT HE HAS A CONVICTION FOR

3  MANUFACTURING DISTRIBUTION POSSESSION DRUGS FIRST OFFENSE,

4  OKAY, AND THAT WAS, THAT CONVICTION WAS HANDED DOWN ON 7-

5  24-2000.

6          HIS SECOND DRUG CONVICTION COMES ABOUT ON

7  POSSESSION OF COCAINE SECOND AND THAT WAS IN 2008, YOUR

8  HONOR.

9          THE COURT:   OKAY, SO THAT MATCHES WHAT YOU SAID,

10  YOU SAID IT'S A DIFFERENT BIRTHDATE BUT THE CHARGES MATCH

11  AND THE DATES MATCH AND THE CRIMES MATCH.

12          MR. MCKNIGHT:   THEY MATCH BUT THIS INFORMATION

13  HERE IS TOTALLY, IT'S JUST SORT OF DIFFERENT.

14          THE COURT:   BUT THE STATE'S CONTENTION IS THAT

15  YOUR CLIENT HAS A PRIOR DISTRIBUTION AND A PRIOR

16  POSSESSION.

17          MR. MCKNIGHT:   I'M SORRY, JUDGE, I COULD NOT

18  HEAR YOU, SAY THAT AGAIN, PLEASE?

19          THE COURT:   THE STATE'S CONTENTION IS THAT YOUR

20  CLIENT HAS A PRIOR CONVICTION FOR DISTRIBUTION OF COCAINE

21  AND A PRIOR CONVICTION FOR POSSESSION OF COCAINE.

22          MR. MCKNIGHT:   THAT'S THEIR, THAT'S THEIR

23  CONTENTION, YES, SIR.

24          THE COURT:   AND DOES YOUR CLIENT DENY THAT HE

25  HAS A PRIOR CONVICTION FOR DISTRIBUTION OF COCAINE AND DOES

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    282

1    HE DENY THAT HE HAS A PRIOR CONVICTION FOR POSSESSION OF

2    COCAINE?

3              OKAY, THEY'VE GOT CERTIFIED COPIES, I'M GOING TO

4    GO AHEAD AND GO WITH THE STATE'S CONTENTION.

5              MR. MCKNIGHT:   YES, YOUR HONOR, THERE ARE TWO

6    PRIOR CONVICTIONS.

7              (WHEREUPON, COURT'S EXHIBIT NUMBER 5 AND 6 MARKED

8    FOR IDENTIFICATION.)

9              THE COURT:   ALL RIGHT, ALL RIGHT, MR. HOLT,

10   ANYTHING YOU WANT TO SAY?

11             DEFENDANT HOLT:   NO, SIR.

12             THE COURT:   ALL RIGHT, ANYTHING FURTHER FROM THE

13   STATE?

14             MS. BAILEY:   YES, YOUR HONOR, I JUST WANTED TO

15   BRIEFLY STATE ON MR. HOLT'S PREVIOUS OTHER CONVICTIONS

16   OTHER THAN DRUG CONVICTIONS.

17             IN 1996 HE WAS CONVICTED OF CONTRIBUTING TO THE

18   DELINQUENCY OF A MINOR.  AT THAT TIME HE WAS GIVEN THE

19   OPPORTUNITY TO COMPLETE PROBATION.

20             IN 1997 THE NEXT YEAR HE WAS CONVICTED OF FAILURE

21   TO STOP FOR A BLUE LIGHT.  AGAIN HE WAS GIVEN THE

22   OPPORTUNITY TO COMPLETE PROBATION.  WHILE ON PROBATION FOR

23   THAT HE WAS CONVICTED OF THE FIRST DRUG CHARGE WHICH WAS ON

24   A DISTRIBUTION LEVEL AND HE RECEIVED A FOUR-YEAR SENTENCE

25   FOR THAT.

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                283

1    APPARENTLY THAT FOUR-YEAR SENTENCE DID NOT WORK

2  BECAUSE MR. HOLT IN 2007 WAS CONVICTED OF ANOTHER DRUG

3  OFFENSE OF POSSESSION OF POWDER COCAINE SECOND OFFENSE.  HE

4  WAS GIVEN A SECOND CHANCE AND GIVEN PROBATION AT THAT TIME.

5    YOUR HONOR, IT'S THE STATE'S CONTENTION THAT MR.

6  HOLT HAS RUN OUT OF CHANCES.  HE'S BEEN INCARCERATED; HE'S

7  BEEN ON PROBATION SEVERAL TIMES, AND HE CLEARLY HAS NOT

8  LEARNED HIS LESSON THAT IT'S TIME TO STAY AWAY FROM DRUGS.

9    MR. HOLT, THE STATE WOULD ALSO CONTEND THAT SINCE

10  THESE ARE TWO SEPARATE INCIDENTS, TWO SEPARATE VIOLATIONS

11  OF THE DRUG LAW THAT THEY SHOULD BE RUN CONSECUTIVE BECAUSE

12  WE COULD HAVE TRIED THESE SEPARATELY AND HAD TWO SEPARATE

13  SENTENCES ON THESE.

14    GIVEN THAT WE HAVE HAD TO DISCLOSE A CONFIDENTIAL

15  INFORMANT, THAT THAT INFORMANT MAY BE AT GREAT PERIL

16  BECAUSE HIS IDENTITY WAS DISCLOSED AND GIVEN MR. HOLT'S

17  PREVIOUS RECORD THE STATE WOULD REQUEST CONSECUTIVE

18  SENTENCES AND A SUBSTANTIAL DEVIATION UPWARD FROM THE

19  MANDATORY MINIMUM.

20    MR. MCKNIGHT:   YOUR HONOR, IF I MAY BE HEARD

21  VERY BRIEFLY?

22    THE COURT:   I'VE HEARD ENOUGH, THANK YOU.

23    MR. MCKNIGHT:   THANKS.

24    PROBATION OFFICER:   YES, YOUR HONOR, IF I MAY

25  HE'S ALSO ON ACTIVE PROBATION FOR THE POSSESSION OF COCAINE

284

**MR. HOLT - CROSS EXAMINATION BY MS. BAILEY**                    284

1  SECOND OFFENSE.

2          THE COURT:   OKAY.

3          PROBATION OFFICER:   SO WE WOULD NEED TO ADDRESS

4  THAT.

5          THE COURT:   OKAY, ALL RIGHT, WE'LL HOLD HIM FOR

6  A MINUTE CAUSE I NEED TO GO CUT THIS JURY LOOSE BEFORE WE

7  DO THAT.

8          THE COURT:   ALL RIGHT, MR. HOLT, THE SENTENCE OF

9  THE COURT FOR EACH COUNT IS THAT YOU BE CONFINED TO THE

10 STATE DEPARTMENT OF CORRECTIONS FOR 25 YEARS OR PAY A FINE

11 IN THE AMOUNT OF $50,000.  THE SENTENCE IS TO RUN

12 CONCURRENT AND YOU'LL BE GIVEN CREDIT FOR ANY TIME SERVED

13 THUS FAR.

14         MS. BAILEY:   THANK YOU, YOUR HONOR.

15         THE COURT:   ALL RIGHT.

16 END OF REQUESTED TRANSCRIPT- - - -

17

18

19

20

21

22

23

24

25

285

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED BRENDA R. BABB, OFFICIAL COURT
REPORTER THE SOUTH CAROLINA COURT ADMINISTRATION, DO HEREBY
CERTIFY THAT THE FOREGOING IS A TRUE, ACCURATE, AND
COMPLETE TRANSCRIPT OF RECORD OF ALL PROCEEDINGS HAD AND
EVIDENCE INTRODUCED IN THE HEARING OF THE CAPTIONED CASE,
RELATIVE TO APPEAL, IN THE COURT OF GENERAL SESSIONS FOR
GEORGETOWN COUNTY, SOUTH CAROLINA.

I DO FURTHER CERTIFY THAT I AM NEITHER KIN, COUNSEL
NOR INTEREST TO ANY PARTY HERETO.

December 4, 2010

BRENDA R. BABB, CVR
OFFICIAL REPORTER

286

STATE OF SOUTH CAROLINA

IN THE COURT OF APPEALS

———————————

Appeal from Georgetown County

Benjamin H. Culbertson, Circuit Court Judge

———————————

THE STATE,

RESPONDENT,

v.

QUENTIN HOLT,

APPELLANT

———————————

INITIAL BRIEF OF APPELLANT

———————————

TRISTAN M. SHAFFER
Appellate Defender

South Carolina Commission on Indigent Defense
Division of Appellate Defense
PO Box 11589
Columbia, SC 29211-1589
(803) 734-1343

ATTORNEY FOR APPELLANT

## TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................................................1

TABLE OF AUTHORITIES ...............................................................................................2

STATEMENT OF ISSUES ON APPEAL..........................................................................3

STATEMENT OF THE CASE ...........................................................................................4

ARGUMENT ......................................................................................................................5

CONCLUSION....................................................................................................................9

288

## TABLE OF AUTHORITIES

**Cases**

*Jamison v. Morris*, 385 S.C. 215, 684 S.E.2d 168 (2009)........................................................ 7

*People v. Raney*, 324 Ill.App.3d. 703, 756 N.E.2d 338 (Ill. App. Ct. 2001).......................... 7

*State v. Butler*, 615 So.2d 496, 503 (La. Ct. App. 1993)........................................................ 7

*State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999) ............................................................ 6

*State v. Henry*, 329 S.C. 266, 495 S.E.2d 463 (Ct. App. 1997).......................................... 7

*State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979) .......................................................... 7

*State v. Jones*, 343 S.C. 562, 541 S.E.2d 813 (2001)............................................................ 7

*Watson v. Ford Motor Co.*, 389 S.C. 434, 699 S.E.2d 169 (2010) ........................................ 6

**Rules**

*Rule* 703, SCRE.................................................................................................................... 6

## STATEMENT OF ISSUES ON APPEAL

When an "expert" opinion that a substance is crack cocaine was based solely on the results of a gas chromatography mass spectroscopy instrument, should the "expert" have been allowed to give an opinion if she could not testify to the instrument's reliability?

290

## STATEMENT OF THE CASE

Appellant was indicted for two counts of trafficking in crack cocaine third offense by the Georgetown County Grand Jury.  R* (indictments).  On September 20, 2010, Appellant was called to trial before the Honorable Benjamin Culbertson and a jury.  Tr. 1. Appellant was represented by Cezar McKnight and the State was represented by Erin Bailey. Tr.1.

Appellant was found guilty of both counts.  Tr. 273, ll. 5-11.  Appellant was sentenced to twenty-five years for both charges. Tr. 284, ll. 8-13.  Appellant's sentences are to run concurrent.  This appeal follows.

<u>ARGUMENT</u>

<u>When an "expert" opinion that a substance is crack cocaine was based solely on the results of a gas chromatography mass spectroscopy instrument, the "expert" should not have been allowed to give an opinion if she can not testify to the instrument's reliability.</u>

**Relevant Facts**

      The State alleges that an informant purchased crack cocaine from Appellant two times in January of 2009. The substance that allegedly came from Appellant was collected by Deputy Reginald Grant of the Georgetown County Sheriff's Department. Tr. 66, ll. 9-16; Tr. 72, ll. 3-16. Grant determined the combined total weight of the two samples to be 1.5 grams. Tr. 65, ll. 9-16; Tr. 72, ll. 13-16. Grant then sent this substance to SLED for testing. At SLED, the combined total weight of the samples was determined to be .92 grams. Tr. 173, ll. 23-25. Maribeth Burroughs, a forensic chemist with SLED, tested the samples with a gas chromatography mass spectroscopy instrument (GCMS), based on that test she determined the samples to be crack cocaine. Appellant was arrested and charged with two counts of distribution of crack cocaine.

      At trial, Burroughs testified that the GCMS must be tuned. Tr. 177, ll. 10-11; Tr. 179, ll. 2-15. Burroughs claimed that SLED's GCMS is tuned weekly. Tr. 154, l. 5. However, at trial she did not have any records to show that the GCMS was tuned the week that she tested the samples for Appellant's case. Tr. 154, ll. 6-11. Furthermore, she was unable to testify about who tuned the GCMS that week. Burroughs stated that she shared the GCMS with another chemist and "whoever comes in first on Monday" would tune the instrument. Tr. 178, ll. 22-24. Based on the mere fact that the GCMS was not in maintenance when she performed the test, Burroughs assumed that the instrument must have

292

been tuned the week of the test. Tr. 177, l. 25 – Tr. 178, l. 6. However, she did not know when or if her GCMS had been sent to maintenance around the time of her test of the substance. Tr. 179, ll. 16-25. Burroughs tried to say that there were maintenance records on the GCMS, but she did not have them with her when she testified.

Appellant objected to Burroughs ability to give an "expert" opinion concerning whether the substance that was allegedly obtained from Appellant was in fact crack cocaine. Tr. 155, ll. 2-10. The State argued, "The question as to whether or not she can be qualified as an expert is simply this, does she have education and/or experience to assist the trier in (sic) fact beyond what, what a normal person would…" Tr.155, ll. 21-24. After the State's argument, the trial court overruled Appellant's objection. Tr. 156, ll. 7-10. Appellant was convicted of both charges.

**Discussion**

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of the type reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *Rule* 703, SCRE (emphasis added). Before introducing expert testimony "the trial court *must* evaluate the substance of the testimony and determine whether it is reliable." *Watson v. Ford Motor Co.*, 389 S.C. 434, 446, 699 S.E.2d 169, 175 (2010) (*citing State v. Council*, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999)) (emphasis added). If an expert bases their opinion on scientific test, the underlying science should have quality control procedures to ensure reliability. *See*

6

*State v. Jones*, 343 S.C. 562, 573, 541 S.E.2d 813, 819 (2001) (holding the *Jones*[1] factors should be considered when determining the reliability of scientific evidence).

The State failed to present evidence that the GCMS was reliable when the substance was tested. Burroughs' claims that her test was reliable were based solely on the fact that the GCMS was available to do the test. Tr. 177, l. 25 – Tr. 178, l. 6. Furthermore, she was unable to comment on when her GCMS had been serviced. Essentially, Burroughs claimed that the test must have been reliable; otherwise she would not have done the test. Her conclusion that the test must have been reliable lacked solid justification, and this assumption certainly is not the type of information reasonably relied upon by other drug analyst. *See Rule* 703, SCRE. Therefore, the trial court should have found that the State failed to meet *its burden* of producing evidence of reliability. *See State v. Henry*, 329 S.C. 266, 274, 495 S.E.2d 463, 466 (Ct. App. 1997) (noting that the proponent of an expert has the burden of establishing her qualifications).

In this State, trial judges are gatekeepers that must ensure any expert testimony is based upon reliable science. Some states find that calibration records are not required. *See e.g. State v. Butler*, 615 So.2d 496, 503 (La. Ct. App. 1993) (finding calibration records were not needed *when* the witness testified that *he* tuned *his* GCMS daily); *but see People v. Raney*, 324 Ill.App.3d. 703, 710, 756 N.E.2d 338, 344 (Ill. App. Ct. 2001) (finding the drug analyst could not be qualified as an expert when she "failed to explain how the [GCMS] was calibrated or why she knew the results were accurate"). In South Carolina, expert opinions may only be based on scientific evidence when the trial court "*examines the reliability* of the inadmissible evidence and excludes opinions not deserving reliance." *See Jamison v.*

---

[1] *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979).

294

*Morris*, 385 S.C. 215, 228, 684 S.E.2d 168, 175 (2009) (internal citations omitted). Since the State failed to present any factual basis that the GCMS was working properly, the trial court had no basis for determining the reliability of the underlying science. Therefore, Burroughs should not have been allowed to give an "expert" opinion concerning whether or not the substance was crack cocaine.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court grant him a new trial.

Respectfully submitted,

Tristan M. Shaffer
Appellate Defender

ATTORNEY FOR APPELLANT

This 8th day of July, 2011.

296

STATE OF SOUTH CAROLINA

IN THE COURT OF APPEALS

---

Appeal from Georgetown County

Benjamin H. Culbertson, Circuit Court Judge

---

THE STATE,

RESPONDENT,

V.

QUENTIN HOLT,

APPELLANT

---

**DESIGNATION OF MATTER TO BE
INCLUDED IN RECORD ON APPEAL**

---

Appellant proposes the following be included in the Record on Appeal:

(1)     True–billed indictment(s);
(2)     Tr. 1; 59-141; 149-156; 165-185; 194-273; 284-285

I certify that this designation contains no matter which is irrelevant to this appeal.

July 8th, 2011

Tristan M. Shaffer
Appellate Defender

South Carolina Commission on Indigent Defense
Division of Appellate Defense
PO Box 11589
Columbia, SC 29211-1589
(803) 734-1343

STATE OF SOUTH CAROLINA
IN THE COURT OF APPEALS

———————————————

Appeal from Georgetown County
Benjamin H. Culbertson, Circuit Court Judge

———————————————

THE STATE,

RESPONDENT,

V.

QUENTIN HOLT,

APPELLANT

———————————————

CERTIFICATE OF SERVICE

———————————————

The undersigned attorney hereby certifies that a true copy of the Initial Brief of Appellant

and Designation of Matter in the above referenced case has been served upon Salley W. Elliott,

Esquire, at Rembert Dennis Building, 1000 Assembly Street, Room 519, Columbia, SC 29201, this

8th day of July, 2011.

Tristan M. Shaffer
Appellate Defender

ATTORNEY FOR APPELLANT

SUBSCRIBED AND SWORN TO before me
this 8th day of July, 2011.

_____(L.S.)
Notary Public for South Carolina

My Commission Expires:  October 2, 2013  .

298

STATE OF SOUTH CAROLINA

IN THE COURT OF APPEALS

———————

Appeal from Georgetown County
The Honorable Benjamin H. Culbertson, Circuit Court Judge

———————

THE STATE OF SOUTH CAROLINA,

RESPONDENT,

v.

QUENTIN HOLT,

APPELLANT.

———————

## INITIAL BRIEF OF RESPONDENT

———————

ALAN WILSON
Attorney General

JOHN W. McINTOSH
Chief Deputy Attorney General

SALLEY W. ELLIOTT
Assistant Deputy Attorney General

CHRISTINA J. CATOE
Assistant Attorney General
    Post Office Box 11549
    Columbia, SC 29211
    (803) 734-3737

J. GREGORY HEMBREE
Solicitor, Fifteenth Judicial Circuit

    Post Office Box 1276
    Conway, SC 29528
    843-915-5460

**ATTORNEYS FOR RESPONDENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS  ................................................................. 1

TABLE OF AUTHORITIES  ............................................................ 2

STATEMENT OF ISSUE ON APPEAL................................................. 3

STATEMENT OF THE CASE  ..........................................................4

ARGUMENT ...............................................................................5

CONCLUSION ..........................................................….... 8

300

## AUTHORITIES CITED

**Cases:**

State v. Adams, 332 S.C. 139, 504 S.E.2d 124 (Ct. App. 1998) ............................... 6

State v. Caldwell, 378 S.C. 268, 662 S.E.2d 474 (Ct. App. 2008) ........................... 6

State v. Patterson, 324 S.C. 5, 482 S.E.2d 760 (1997) ......................................... 6

State v. White, 382 S.C. 265, 676 S.E.2d 684 (2009) ......................................... 8

**Statutes and Rules:**

Rule 702, SCRE ................................................................................. 7

STATEMENT OF ISSUE ON APPEAL

The trial judge properly allowed the forensic chemist to testify that the substance in question was crack cocaine, where her testimony established that the GCMS machine she used was in proper working order when the substance was tested.

302

## STATEMENT OF THE CASE

Appellant was indicted in Georgetown County in February 2010 for two counts of distribution of crack cocaine, third offense. (2010-GS-22-00179; -00181). On September 20-22, 2010, he proceeded to trial before the Honorable Benjamin H. Culbertson. The jury found him guilty, and Judge Culbertson imposed the mandatory minimum sentence of 25 years on each count, with the sentences to run concurrently. A timely notice of appeal was served and filed.

## ARGUMENT

### Error Preservation

Ms. Burroughs was offered by the State as an expert in forensic laboratory analysis. (R. p. 149-51). She testified that she had been employed as a forensic chemist in the drug analysis department at SLED for two and a half years. (R. p. 149-150). She stated that she held a Bachelor of Science degree and a Master's degree in Secondary Science Education. In her current position at SLED, it was her duty to "analyze non-biological evidence for the presence of controlled substances." (R. p. 150, lines 11-12). She stated that she used a gas chromatography mass spectroscopy instrument ("GCMS") to test for controlled substances. (R. p. 151-52). She stated that the GCMS machine was used to confirm the presence of crack cocaine after a preliminary test of the substance had already been performed. (R. p. 166-67). In his voir dire of the witness, Appellant asked Ms. Burroughs if she calibrated the GCMS machine. (R. p. 153, line 21). Ms. Burroughs responded that the machine was not "calibrated" but was instead "tuned." (R. p. 153, lines 24-25). Counsel asked if she was sure that she had "tuned" the GCMS machine on the day in question. (R. p. 154, lines 3-4). Ms. Burroughs replied that the machine was tuned weekly. (R. p. 154, lines 1-5). When asked if she had "anything to support the fact that you tuned it" during the week in question, she testified that "we would have that in our office and I could provide that for you but I don't have it with me today." (R. p. 154, lines 6-11).

After his voir dire, Appellant objected to Ms. Burroughs' qualification as an expert in the field of forensic testing of illegal substances, arguing that he did not believe the witness was qualified "in that she's going to testify that using a machine with which to get a result from and by her own admission on the stand she has no way of verifying and

304

present (sic) to the court that the machine was calibrated or tuned as she put it." (R. p. 155, lines 2-10). He stated that this "cast some serious doubt" and stated that he did not believe she should be allowed to testify as to whether or not the drugs in question were crack cocaine. (R. p. 155, lines 12-16). The State pointed out that this was an issue for cross-examination rather than an issue going toward the admissibility of the evidence. (R. p. 155, lines 18-20). The State also argued that the witness had education and experience beyond that of a layperson and that she had been trained by SLED and knew how to work the equipment in question. (R. p. 155, line 21 – p. 156, line 3). The trial judge overruled Appellant's objection and found the witness qualified as an expert in forensic chemistry. (R. p. 156, lines 7-10). Thereafter, before the jury, Ms. Burroughs was further questioned by Appellant's counsel regarding the tuning of the GCMS machine; however, no further objections were raised. (R. p. 174-83).

Appellant now argues that Ms. Burroughs should not have been allowed to give her opinion regarding the crack cocaine because she could not testify as to the GCMS machine's reliability. However, the only argument advanced below was, in essence, that because the witness did not bring any *paperwork* to support that the GCMS machine was tuned, she should not be allowed to give her opinion. (See R. p. 153-155). Therefore, since the issue being raised on appeal is different from the issue that was raised below, it is not preserved for review. See State v. Adams, 332 S.C. 139, 144-145, 504 S.E.2d 124, 126-27 (Ct. App. 1998) (argument not preserved for appeal where precise issue not presented to the trial court) (citations omitted); State v. Caldwell, 378 S.C. 268, 283, 662 S.E.2d 474, 482 (Ct. App. 2008) (a party may not argue one ground at trial and another on appeal); State v. Patterson, 324 S.C. 5, 19, 482 S.E.2d 760, 767 (1997) ("Appellant is limited to the grounds raised at trial.").

**The trial judge properly allowed the forensic chemist to testify that the substance in question was crack cocaine, where her testimony established that the GCMS machine she used was in proper working order when the substance was tested.**

Even if the issue on appeal had been properly preserved, the reliability of the GCMS machine used in this case was established by Ms. Burroughs' testimony. Ms. Burroughs testified that the GCMS machine required weekly "tuning," which was a diagnostic test to ensure that the machine was working properly. (R. p. 177, lines 10-11; p. 181, lines 14-18; p. 182, lines 6-13). She testified that "tuning" was necessary to determine whether the machine needed maintenance or not. (R. p. 181, lines 19-23). She testified that if the machine was off-tune, proper maintenance would be performed before the machine was used to test substances. (R. p. 177, line 25 – p. 178, line 6; p. 179, lines 12-15; p. 181, line 19 – p. 182, line 5). She stated that she would not use the GCMS machine to analyze any substances if the tune did not meet the proper specifications. (R. p. 179, lines 12-15; p. 178, lines 17-18; p. 177, line 25 – p. 178, line 1). Ms. Burroughs testified that the GCMS machine in this case was routinely tuned once a week, every week, by either herself or the other chemist working with her in the lab. (R. p. 182, line 18 – p. 183, line 2). She stated that their weekly tuning was in conformance with SLED policy. (R. p. 183, lines 3-5). She stated that these weekly "tunes" were electronically stored in the lab and that she could have them faxed over if requested. (R. p. 177, lines 12-17; p. 178, lines 10-14).

Ms. Burroughs' testimony established that the machine was tuned in accordance with SLED policy and that the machine was working properly when it was used to test the crack cocaine in this case. Accordingly, the trial judge properly exercised his gatekeeping role under Rule 702, SCRE, and did not err in admitting Ms. Burroughs' opinion testimony

306

regarding the results from GCMS machine.  See State v. White, 382 S.C. 265, 275, 676 S.E.2d 684, 689 (2009).

CONCLUSION

For the reasons discussed above, Respondent requests that this Court affirm Appellant's convictions and sentences.


Respectfully submitted,


ALAN WILSON
Attorney General

JOHN W. McINTOSH
Chief Deputy Attorney General

SALLEY W. ELLIOTT
Assistant Deputy Attorney General

CHRISTINA J. CATOE
Assistant Attorney General

J. GREGORY HEMBREE
Solicitor, Fifteenth Judicial Circuit


CHRISTINA J. CATOE
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3737
ATTORNEYS FOR RESPONDENT


September 21, 2011

STATE OF SOUTH CAROLINA

IN THE COURT OF APPEALS

———————

Appeal from Georgetown County
The Honorable Benjamin H. Culbertson, Circuit Court Judge

———————

THE STATE OF SOUTH CAROLINA,

RESPONDENT,

v.

QUENTIN HOLT,

APPELLANT.

———————

**DESIGNATION OF MATTER
TO BE INCLUDED IN THE RECORD ON APPEAL**

———————

The Respondent submits that the following should be included in the Record on Appeal:

(1) Indictment Numbers 2010-GS-22-00179 and -00181;
(2) Trial Transcript, pages 149-156; p. 165-183.

**ALL DOCUMENTS DESIGNATED SHOULD BE REDACTED IN
ACCORDANCE WITH THE SOUTH CAROLINA SUPREME COURT ORDER
ON PERSONAL DATA IDENTIFIERS.**

The undersigned hereby certifies this Designation contains no matter that is irrelevant to this appeal.

CHRISTINA J. CATOE

Office of Attorney General
Post Office Box 11549
Columbia, SC 29211
(803) 734-3737

September 21 , 2011

308

STATE OF SOUTH CAROLINA

IN THE COURT OF APPEALS

———————

Appeal from Georgetown County
The Honorable Benjamin H. Culbertson, Circuit Court Judge

———————

THE STATE OF SOUTH CAROLINA,

RESPONDENT,

v.

QUENTIN HOLT,

APPELLANT.

———————

**AFFIDAVIT OF SERVICE**

———————

The undersigned attorney hereby certifies that the **Initial Brief of Respondent** and **Designation of Matter** in the above-referenced case has been served upon **Tristan M. Shaffer**, Division of Appellate Defense, South Carolina Commission on Indigent Defense, Post Office Box 11589, Columbia, South Carolina 29211-1589, this **21st** day of **September, 2011.**

CHRISTINA J. CATOE
Assistant Attorney General

Office of Attorney General
Post Office Box 11549
Columbia, SC  29211
(803) 734-3737

SWORN to before me this 21st day of September, 2011.

Notary Public for South Carolina.
My Commission Expires: _____7/18/2017_____

**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State,                                    Respondent,

v.

Quentin Holt,                                 Appellant.

―――――――

Appeal from Georgetown County
Benjamin H. Culbertson, Circuit Court Judge

―――――――

Unpublished Opinion No.  2012-UP-253
Submitted April 2, 2012 – Filed April 25, 2012

―――――――

**AFFIRMED**

―――――――

Appellate Defender Tristan M. Shaffer and Deputy Chief Appellate Defender Wanda H. Carter, both of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Christina J. Catoe, all

310

of Columbia; and Solicitor J. Gregory Hembree, of
Conway, for Respondent.

**PER CURIAM:** Quentin Holt appeals his convictions of two counts of
distribution of crack cocaine, arguing the trial court erred in admitting expert
testimony because the instrument used in forming the expert's opinion was
unreliable.    We affirm[1] pursuant to Rule 220(b)(1), SCACR, and the
following authorities: Rule 702, SCRE ("If scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education, may testify thereto in the form of an
opinion or otherwise."); State v. White, 382 S.C. 265, 269, 676 S.E.2d 684,
686 (2009) ("A trial court's decision to admit or exclude expert testimony will
not be reversed absent a prejudicial abuse of discretion."); id. at 270, 676
S.E.2d at 686 ("All expert testimony must satisfy the Rule 702 criteria, and
that includes the trial court's gatekeeping function in ensuring the proposed
expert testimony meets a reliability threshold for the jury's ultimate
consideration."); State v. Jones, 343 S.C. 562, 572, 541 S.E.2d 813, 818
(2001) (holding scientific evidence is admissible under Rule 702, SCRE, if
the trial court determines the underlying science is reliable after applying the
factors set forth in State v. Jones, 273 S.C. 723, 259 S.E.2d 120 (1979));
Jones, 343 S.C. at 573, 541 S.E.2d at 819 (holding one of the Jones reliability
factors taken into consideration is the quality control procedures used to
ensure reliability).

**AFFIRMED.**

**PIEPER, KONDUROS, and GEATHERS, JJ., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.

FORM 5

STATE OF SOUTH CAROLINA        )        2012 CP 22 00 735
                                )        IN THE COURT OF COMMON PLEAS
COUNTY OF GeorGetown            )
                                )
Quentin J. Hour 268198         )
Full name and prison number (if any) of Applicant.  )
                                )
              v.                )        APPLICATION FOR
                                )
State of South Carolina        )        POST-CONVICTION RELIEF
                                )

## INSTRUCTIONS - READ CAREFULLY

In order for this application to receive consideration by the Court, it shall be in writing (legibly handwritten or typewritten), signed by the applicant and verified (notarized), and it shall set forth in concise form the answers to each applicable question. If necessary, applicant may furnish his answer to a particular question on the reverse side of the page or on an additional page. Applicant shall make clear to which question any such continued answer refers.

Since every application must be sworn under oath, any false statement of a material fact therein may serve as the basis of prosecution and conviction for perjury. Applicants should, therefore, excise care to assure that all answers are true and correct.

If the application is taken in forma pauperis it shall include an affidavit (attached at the back of the form) setting forth information which establishes that applicant will be unable to pay the fees and costs of the proceedings. When the application is completed the original shall be mailed to the Clerk of Court for the County in which the applicant was convicted.

1.    Place of detention  McCormick C. I

2.    Name and location of Court which imposed sentence  GeorGetown County

3.    Name(s) of co-defendant(s) (if any)  NONE

4.    The indictment number or numbers (if known) upon which and the offenses for which sentence was imposed:

      (a)  2010-GS-22-00179

      (b)  2010-GS-22-00181

      (c)  _____

5.    The date upon which sentence was imposed and the terms of the sentence:

      (a)  Sept. 22, 2010    25 Years

      (b)  _____

Revised 3/2003

1

(e) _____

6. Check whether a finding of guilty was made:

(a) after a plea of guilty _____

(b) after a plea of not guilty _____

(c) after a plea of nolo contendere _____

7. Did you appeal from the judgment of conviction or the imposition of sentence?
_____ YES _____

8. If you answered "yes" to (7), list:

(a) the name of each Court to which you appealed:

i. THE SOUTH CAROLINA COURT OF APPEALS

ii. _____

iii. _____

(b) the result in each such Court to which you appealed:

i. AFFIRMED

ii. _____

iii. _____

(c) the date of each such result:

i. APRIL 30, 2012

ii. _____

iii. _____

(d) if known, citations of any written opinion or orders entered pursuant to such results:

i. NONE

ii. _____

iii. _____

9. If you answered "no" to (7), state your reasons for not so appealing:

(a) _____

(b) _____

(c) _____

10. State concisely the grounds on which you base your allegation that you are being held in custody unlawfully: SEE ATTACHED AMENDED PCR

Revised 3/2003

(a) _____

(b) _____

(c) _____

11. State concisely and in the same order the facts which support each of the grounds set out in (10):

(a) *See Attachment Amended To Post Conviction*

(b) *Relief Application* _____

(c) _____

12. Prior to this application have you filed with respect to this conviction:

(a) any petition in a State Court under South Carolina Law? *NO*

(b) any petition in State or Federal Courts for habeas corpus or post-convictions relief? *NO*

(c) any petition in the United States Supreme Court for certiorari other than petitions, if any, already specified in (8)? *NO*

(d) any other petitions, motions or applications in this or any other Court? _____

13. If you answered "yes" to any part of (12), list with respect to each petition, motion or application: *NO*

(a) the specific nature thereof:

i. _____

ii. _____

iii. _____ *NONE* _____

iv. _____

(b) the name and location of the Court in which each was filed:

i. _____

ii. _____

iii. _____ *NONE* _____

iv. _____

(c) the disposition thereof:

i. _____

ii. _____ *NONE* _____

iii. _____

Revised 3/2003

314

iv. _____

(d)    the date of each such disposition:

i.    _____ *NONE* _____

ii.   _____

iii.  _____

iv.   _____

(e)    if known, citations of any written opinions or orders entered pursuant to each such disposition:

i.    _____

ii.   _____

iii.  _____ *NONE* _____

iv.   _____

14.    Has any ground set forth in (10) been previously presented to this or any other Court, State or Federal, in any petition, motion or application which you have filed?

_____ *NO* _____

15.    If you answered "yes" to (14) identify:

(a)    which grounds have been presented:

i.    _____

ii.   _____ *NONE* _____

iii.  _____

(b)    the proceedings in which each ground was raised:

i.    _____

ii.   _____ *NONE* _____

iii.  _____

16.    If any ground set forth in (10) has not previously been presented to any Court, State or Federal, set forth the ground and state concisely the reasons why such ground has not previously been presented:

(a)    _____ *NONE* _____

(b)    _____

(c)    _____

17.    Were you represented by an attorney at any time during the course of:

Revised 3/2003

4

315

(a) your arraignment and plea? ~~YES~~ - NO

(b) your trial, if any? YES

(c) your sentencing? YES

(d) your appeal, if any, from the judgment of conviction or the imposition of sentence? YES

(e) preparation, presentation or consideration of any petitions, motions or applications with respect to this conviction, which you filed? YES

18. If you answered "yes" to one or more parts of (17), list:

(a) the name and address of each attorney who represented you:

i. COZAR EDWARD McKNIGHT P.O. BOX 688, LAKE CITY, SC 29560

ii. TRISTAN M. SHAFFER P.O. BOX 11589, Columbia, SC 29211-1589

iii. WANDA H. CARTER P.O. BOX 11589, Columbia, SC 29211-1589

(b) the proceedings at which each such attorney represented you:

i. CRIMINAL TRIAL

ii. DIRECT APPEAL

iii. DIRECT APPEAL

19. State clearly the relief you seek in filing this application:

SEE AMENDMENT TO PCR APPLICATION

20. Are you now under sentence from any other court that you have not challenged?

NO

Revised 3/2003

5

316

STATE OF SOUTH CAROLINA    )        *2012 CP 22 00 735*
                           )        VERIFICATION
County of                  )

I,    , being duly sworn upon my oath, depose and say that I have subscribed to the foregoing application; that I know the contents thereof; that it includes every ground known to me for vacating, setting aside or correcting the conviction and sentence attacked in this application; and that the matters and allegations therein set forth are true.

*Quentin Holt*

SWORN to and subscribed before me this _2_
day of __July__, 2_0_12

_Joyce L Young_ (L.S.)
*Notary Public*

My Commission Expires: _10-11 2021_

FILED
GEORGETOWN COUNTY
2012 JUL 11 PM 4:02
ALMA L WHITE
CLERK OF COURT

Revised 3/2003

6

317

### APPLICATION TO PROCEED WITHOUT PAYMENT
### OF COSTS AND AFFIDAVIT
### IN SUPPORT THEREOF

*2012 CP 2200 735*

I,     , hereby apply for leave to proceed in this action without prepayment of fees or costs or security therefor.  In support of my application I declare under penalty of perjury that the following facts are true:

(1)     I am the applicant in this action and I believe I am entitled to redress.

(2)     Because of my poverty I am unable to pay the costs of said proceeding or give security thereof.

_____
*Applicant*

SWORN or affirmed to and subscribed before me this
___ day of _____, 2012

_____
*Notary Public*

My Commission Expires: ___10  11  2021___

FILED
GEORGETOWN COURT
2012 JUL 11  PM 4:02
ALMA Y. WHITE
CLERK OF COURT

Revised 3/2003

7

318

2012CP2200735

## CERTIFICATE OF SERVICE

I, _QUENTIN HOLT____, deposes and states that I have served the foregoing documents which were mailed postage pre-paid within the United States Mail addressed as follows:

> ATTN; Brenda Babb, Clerk of Court
> Alma Y. White, Clerk of Court
> Georgetown County Courthouse
> Post Office Box 479
> Georgetown, South Carolina 29442

S/ _Quentin Holt_____
Quentin J. Holt, Applicant

Sworn and Subscribed to before me this 2 day of July____, 2012.

_Joyce L. Young____
Notary Public For South Carolina

My Commission Expires: _60 11 2021_

FILED
GEORGETOWN COUNTY
2012 JUL 11  PM 4:02
ALMA Y. WHITE
CLERK OF COURT

STATE OF SOUTH CAROLINA    )
                           )    IN THE COURT OF COMMON PLEAS
COUNTY OF _GEORGETOWN_      )

                                CASE NO. ;  _10-GS-2200-179_
                                           _10-GS-2200-181_

Quentin Holt, #268198,     )
                           )
        Applicant,         )
                           )
    Vs.                    )        **APPLICANT'S MEMORANDUM OF LAW**
                           )         **IN SUPPORT OF ALL ISSUE(S)**
State of South Carolina,   )
                           )
        Defendants.        )
_____   )


    **NOW COMES**, the above Applicant upon this Court to institute his support of all allegations within his Post-Conviction Relief Application, Amendment to Post-Conviction Relief Application.

    Applicant's warrant states that the Warrant/Indictment were not valid to confer Jurisdiction, by either Court, pursuant to State v. Brewer, 129S.E. 2d 262; State v. McBane, 170 S.E. 2d 913. Applicant have shown that the warrants that were signed for probable cause (See Exhibits/Warrants).

    Applicant's Indictments were **constructivly amended to state a whole new charge, from the probable cause on the warrants.** "A valid warrant or indictment is an essential of jurisdiction, **State v. Morgan**, 38 S.E. 2d 266; **State v. Thornton**, 111 S.E. 2d 901, where the warrant(s) and indictment(s) must **charge** all the elements of the alleged criminal offense. Also the essential elements of the offense must be charged, **State v. Gibbs**, 66 S.E. 2d 883; **State v. Strickland**, 89 S.E. 2d 781, (See Exhibits/Indictment).

320

Applicant contends that neither Warrants/Indictment substantially follows the language of the statute thereby does not charge the essentials of the **offense(s)**, "in a plain, intelligable and explicit manner" **State v. Eason**, 86 S.E. 2d 774. Whereby no words were supplemented by other allegations which explicitly set fourth every essential element of the offense as to leave no doubt in the mind of the accused, and the Court as to the offense intended to be charged." **State v. Cox**, 92 S.E. 2d 413.

Applicant contends that the Prosecution Chain of Custody was not proven. Wherein Agent Grant's Incident Report states the C.I. was given money with Serial Numbers: $20-GJ89326836A, $20-EF20086764C, and $10-GL37642449A, CI-178 was given a transmitter.

Pursuant to the Georgetown County Sheriff's Office Policy and Procedure Manual Section 6-4, Property And Evidence Control, Section III., Procedure Property Management Responsibility Section 4; It is the responsibility of the submitting Deputy Sheriff to properly tag, mark, package, photograph, or request photographing of evidence or property submitted to (ECO) Evidence Custodian Officer. All evidence must be bagged, tagged, or labeled in Georgetown Sheriff's Office Policy and Procedure Manual, cont. . . . . .

Accordance with agency procedures and South Carolina Law Enforcement Division (SLED) requirements and secure in either evidence locker or the evidence compound at Headquarters prior to the end of the Deputy Sheriff's Tour of Duty.

Georgetown County Sheriff's Office Policy and Procedure Manual, Section 8; The Duputy Sheriff submitting the property to (ECO) must also submit an Incident Report, complete with Case Number, specifically describing each item of property obtained and detailing the circumstances by which the property came into the Agency's possession. If the item(s) have serial numbers, an Article Supplement Report must also be completed.

2. The Incident Report will contain the following information:
   (a) Date/Time of arrival at the scene,
   (b) Location of the crime,
   (c) Name of the victim(s), if known,
   (d) Name of the suspect(s), if known,
   (e) Narrative of the Investigator's actions at the scence, and
   (f) Case Number

Applicant contends that Defendants deliberately violated Agency's Policy; by instituting procedures which are against the law. See Norton vs. Opening Break of Aiken, Inc., 443 S.E. 2d 406, 313 S.C. 508 (S.C. APP. 1994) **regulations** have the force of law. Applicant contends that Agent Reginald Grant's Chain of Custody from the C.I. was broken by the standard of the Georgetown County Sheriff's Office Policy and Procedure Manual. The Georgetown County Sheriff's Office is an Administrative Agency, is bound to follow procedures required by it's own regulations, even if these regulations were not statutorily or constitutionally mandated; Bergamo, 192 F. 3d 78 (2nd Cir. 1999)(Same); Doe v. Tenel, 329 F. 3d 1135 (9th Cir. 2003).

Whereby looking at the warrants/indictments along with the procedures of the Georgetown County Sheriff's Office, protocol was not followed in convicting the Applicant. The procedural laws which

are rights, responsibilities that are exercised and enforced within the courts.

Procedural due process which guarantee procedural fairness thereby Applicant's claim that his Fifth and Fourteenth Amendment Rights to the Due Process Clause have been violated by the balancing analysis based on the specific factual context.

Applicant now seeks immediate release from a conviction which is based upon motive of discrimnation, racial profiling, retaliation by the Georgetown County Sheriff's Office, The Georgetown County Solicitor's Office, Honorable Issaac Pyatt, and Honorable Benjamin Culbertson.

## DUE PROCESS OF LAW

Applicant contends that he was denied due process of law which requires the State to establish each element of each offense by proof beyound a reasonable doubt. Inre v. Winship, 397 U.S. 358 (1970), Article I, 553 of the South Carolina Constitution, the Fourteenth Amendment of the United States Constitution, Brady v. Maryland, 373 U.S. 583, 5. CF 1194 (1963). Where critical evidence that was witheld from Applicant would have shown violations.

## DID THE COURT HAVE JURISDICTION TO TRY APPLICANT OF CRIME CHARGED?

Applicant contends that the Trial Court lacked jurisdiction to convict him because of the warrant(s) which probable cause was granted for arrest, 44-53-375 (B) (1), is different from the indict-ment which was constructive amended by the Solicitor Scott R. Hixson, Erin Bailey, of the Georgetown Solicitor's Office.

Applicant now submit this Memorandum of Law in Support of all issues raised within his Post-Conviction Relief Application, and the First Amendment to his Post-Conviction Relief Application.

Applicant requests upon this Court for immediate remedy to all issues thereof.

S/ _Quentin Holt_____
Quentin J. Holt, Applicant

## CERTIFICATE OF SERVICE

I, _QUENTIN HOLT_____, deposes and states that I have served the foregoing document upon the listed below agencies by mailing the said documents by United States Mail postage pre-paid addressed as follows:

Assistant Solicitor, Erin Bailey
Georgetown Solicitor's Office
Post Office Box 1688
Georgetown, South Carolina 29442

ATTN: Brenda Babb
Alma Y. White
Georgetown County Clerk of Court
Georgetown County Court of Common Pleas
Post Office Box 479
Georgetown, South Carolina 29442

S/ _Quentin Holt_____
Quentin J. Holt, Applicant

Sworn and Subscribed to
before me this 2 day of July__, 2012.

_Joyce E. Young_____
Notary Public For South Carolina

My Commission Expires: _10 11 2021_

324



TATE OF SOUTH CAROLINA        )
                             )    IN THE COURT OF COMMON PLEAS
COUNTY OF GEORGETOWN          )
                             )
                             )        2012-CP-22-735
                             )
Holt Quentin J.,  268198     )
                             )
                Applicant,   )
                             )
                      v.     )        **RETURN**
                             )
State of South Carolina,     )
                             )
                Respondent.  )
                             )

Respondent, making its Return to the Application for post conviction relief (PCR) filed July 11, 2012, would respectfully show this Court:

I.

Applicant is presently confined in the South Carolina Department of Corrections pursuant to orders of commitment of the Georgetown County Clerk of Court. Applicant was indicted by the Georgetown County Grand Jury for two counts of distribution of cocaine base, (2010-GS-22-179 and 181). Cozar McKnight, Esquire, represented Applicant.

On September 22, 2010, the Applicant pled guilty as indicted. The Honorable Benjamin Culbertson sentenced Applicant to twenty five years on each charge, with both running concurrent. Applicant appealed his conviction but on April 30, 2012 the South Carolina Court of Appeals affirmed his conviction and sentence.

Page 1 of 4

Attached herewith and incorporated herein are the records of the Georgetown County Clerk of Court regarding the subject conviction, and the guilty plea transcript. Respondent reserves the right to amend this Return upon receipt of any relevant materials.

II.

Applicant alleges that he is being held in custody unlawfully for the following reasons:

    1.    "See attached Amended PCR"

Respondent did not receive an attachment from Applicant, nevertheless Respondent interprets Applicants allegations as ineffective assistance of counsel.

III.

In a post-conviction relief action, the Applicant bears the burden of proving the allegations in their application. Butler v. State, 286 S.C. 441, 334 S.E.2d 813 (1985). Where the application alleges ineffective assistance of counsel as a ground for relief, the Applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692 (1984); Butler, 334 S.E.2d 813.

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. The courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Strickland, 80 L.Ed.2d 674. The Applicant must overcome this presumption in order to receive relief. Cherry v. State, 300 S.C. 115, 386 S.E.2d 624 (1989).

326



The reviewing court applies a two-pronged test in evaluating allegations of ineffective assistance of counsel. First, the applicant must prove that counsel's performance was deficient. Under this prong, the court measures an attorney's performance by its "reasonableness under professional norms." <u>Cherry</u>, 300 S.C. at 117, 386 S.E.2d at 625, <u>citing</u> <u>Strickland</u>. Second, counsel's deficient performance must have prejudiced the Applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Cherry</u>, 300 S.C. at 117-18, 386 S.E.2d at 625.

Respondent submits that Applicant cannot satisfy either requirement of the <u>Strickland</u> test. However, the allegation of ineffective assistance of counsel probably raises questions of fact that the record does not conclusively refute. Accordingly, Respondent requests an evidentiary hearing to fully resolve this issue. <u>See</u> <u>Sharper v. State</u>, 279 S.C. 264, 305 S.E.2d 247 (1983).

### IV.

The State therefore requests that this Court convene an evidentiary hearing solely on the issue of ineffective assistance of counsel. As to all other allegations, the State moves for summary dismissal pursuant to S.C. Code Ann. § 17-27-70 on the basis that there is no genuine issue of material fact which would necessitate an evidentiary hearing and that those allegations should be dismissed as a matter of law.

### V.

Each and every allegation contained within the application not hereinbefore either expressly admitted, qualified or explained is hereby denied.

### VI.

Page 3 of 4




WHEREFORE, having made its Return, the State requests that the Application be denied and the matter dismissed with prejudice.

Respectfully submitted,

ALAN WILSON
Attorney General

JOHN W. McINTOSH
Chief Deputy Attorney General

SALLEY W. ELLIOTT
Senior Assistant Deputy Attorney General

TYSON ANDREW JOHNSON, SR.
Assistant Attorney General

By:_____
ATTORNEYS FOR RESPONDENT

Office of the Attorney General
P.O. Box 11549
Columbia, SC  29211
Telephone: (803) 734-3737

10 / 4 _____, 2012.

328

## Rule 2 Preliminary Hearing

1. According to S.C. Rule Criminal Procedure Sec(6) gives me the right to a Preliminary Hearing which I was afforded a Preliminary Hearing without Counsel of Record (Richard Colvin) of the Georgetown Public Defender Office. Judge Issac Pyatt violated my Sixth Amendment right in holding this hearing without Counsel present.

2. My Attorney of Record never communicated to me that a deadline for a plea deal was on the table, if I wanted to accept the deal (Rule 1.4 Communication)

3. On July 6, 2010, I retained Cezar McKnight, he said they had problems with the warrant(s) because they got the warrant(s) before the crime happen.

4. A Bench Warrant was issued for my arrest on July 17, 2010.

5. My retained Counsel of Record (Cezar McKnight) only visited me once in detention center stating he will get the bench warrant lifted. My retain counsel was unable to be at the court house, I received a letter on 8.17.2010, that a hearing will be held on 8/30 1:00 p.m.. The bench warrant was lifted on 8/30/2010, Roll call was 9/17/10 and the solicitor plea offer was 10 yrs. Non-violent.

6. My Attorney of Record never communicated to me what kind of time, I was facing Rule 1.3 Diligence. A lawyer shall act with reasonable diligence and promptness in representing a client. I was told we can win one, and loose one.

7. ON 9.22.10, I RECEIVED 25 yrs. AFTER MY TRIAL ENDED. LOOKING AT MY WARRANTS / INDICTMENTS THE STATE NEVER PROVED EACH & EVERY ELEMENT ALLEGED.

8. MY ATTORNEY NEVER COMMUNICATED TO ME MY PRIOR CONVICTION(S), AND WHAT THE STATES POSITION WHEN I TAKE THE WITNESS STAND IN MY OWN DEFENSE.

9. Juror 93, WAS A FRIEND OF SHERIFF, Juror 250 KNEW ME AND MY FAMILY. THEREFORE HOW COULD I HAVE RECEIVED A FAIR TRIAL WITH JURY TAMPERING IN THIS CASE.

10. MY ATTORNEY OF RECORD REPRESENTED ME AS WELL AS (3) THREE OTHER GUYS IN WHICH THE SAME C.I. WASS INVOLVED WITH THESE CHARGES. RULE 1.7 CONFLICT OF INTEREST.

11. MY ATTORNEY OF RECORD NEVER SEEN / VIEW THE INDICTMENT(S) OF WHICH THE GEORGETOWN COUNTY GRAND JURORS UPON THEIR OATH INDICTED ME. ( SEE Tr. P. 39, 6-12) RULE 1.1 COMPETENCI A LAWYER SHALL PROVIDE COMPETENT REPRESENTATION TO A CLIENT. COMPETENT REPRESENTATION REQUIRES THE LEGAL KNOWLEDGE, SKILL, THOROUGHNESS AND PREPARATION REASONABLY NECESSARY FOR THE REPRESENTATION.

12. MY ATTORNEY OF RECORD FAILED TO INVESTIGATE MY CASE, FOR IF HE HAD DONE A THROUGH INVESTIGATION OF THE CASE HE WOULD HAVE KNOWN THE WARRANT(S) STATED (2) TWO DIFFRENT CHARGES. THE INDICTMENT(S) STATED SOMETHING TOTALLY DIFFERENT

330

FROM THE WARRANT(S) 44-53-375 (B)(3), 44-53-375 (B)(1) SCHEDULE II CONTROLLED SUBSTANCE. THE BONDING OUT PAPERWORK STATES P.W.I.D. 2-COUNTS, MY QUESTION NOW IS DOES DISTRIBUTION 44-53-375, POSSESSION WITH INTENT TO DISTRIBUTE COCAINE BASE FALL UNDER THE SAME STATUTE?

13. THE GEORGETOWN COUNTY SHERIFF'S DEPARTMENT ALONG WITH THE GEORGETOWN COUNTY SOLICITOR'S OFFICE INTRODUCE IMPROPER EVIDENCE i.e. VIDEO/MONEY WHICH MY ATTORNEY OF RECORD SHOULD HAVE MOTION THE COURT TO SURPRESS THIS EVIDENCE BEFORE THE JURY WAS SWORN IN RULE 3.1 MERITORIOUS CLAIMS AND CONTENTIONS. ALSO RULE 3.8, SPECIAL RESPONSIBILITIES OF A PROSECUTOR SEC. (d), REFRAIN FROM PROSECUTING A CHARGE THAT THE PROSECUTOR KNOWS IS NOT SUPPORTED BY PROBABLE CAUSE. WHICH NO PROBABLE CAUSE TO HAVE THE CHARGES WHICH I'M INCARCERATED FOR ALLEGED WITHIN AN INDICTMENT TO HAVE ME ARRESTED.

I AM INNOCENT OF ALL THESE CHARGES BECAUSE I FILED A COMPLAINT AGAINST A. BLAKE #544 DEPUTY AND THE GEORGETOWN SHERIFF'S OFFICE, DEPARTMENT FOR HARRASSMENT AND I FILE A FEDERAL COMPLAINT WITH THE DEPARTMENT OF JUSTICE WHICH LED TO THESE OFFICERS FALSE WARRANTS/INDICTMENTS.

S/ Quentin Holt
QUENTIN HOLT

STATE OF SOUTH CAROLINA )

COUNTY OF McCORMICK } VERIFICATION

I, QUENTIN HOLT_____, BEING DULY SWORN UPON MY OATH,
DEPOSES AND SAYS THAT I HAVE SUBSCRIBED TO THE FOREGOING
BY PLACING THE SAME WITHIN THE UNITED STATES MAIL ADDRESSED
TO THE FOLLOWING ADDRESS:

PAUL ARCHER
ATTORNEY AT LAW
233 MUIRFIELD DRIVE
PAWLEYS, ISLAND, S.C. 29585

SWORN AND SUBSCRIBED TO BEFORE ME
THIS 7th DAY OF November 2012
Stephanie Marshall
NOTARY PUBLIC
MY COMMISSION EXPIRES May 14 2021

S/ Quentin Holt
QUENTIN HOLT

302

STATE OF SOUTH CAROLINA    )
                           )
COUNTY OF  GEORGETOWN      )

Quentin J. Holt, #268198, )
                           )
        Applicant,         )
                           )
   Vs.                     )
                           )
State of South Carolina,   )
                           )
        Respondent.        )

IN THE COURT OF COMMON PLEAS

CASE NO.;  10-GS-2200-179
           10-GS-2200-181

APPLICANT'S FIRST AMENDMENT
    TO POST-CONVICTION
    RELIEF APPLICATION

NOW COMES, the Applicant in the above captioned matter being first duly sworn deposes and state that the following is true and correct to the best of my knowledge.

That the Applicant comes respectfully to move this Honorable Court on Amendment(s) to his Post-Conviction Relief Application filed on July 11, 2012            .

The Applicant makes the following Amendments in addition to issues raised in original application:

(1). Applicant contends that his conviction for Drugs/Manufacture, Distribution, etc., of Methamphetamine or Cocaine Base, 1st 3014 Two Counts. Were Constructive Amended.

(2). That the Chain of Custody Link have been broken.

(3). Applicant contends that the Trial Court was without any jurisdiction to entertain indictment(s) of an greater sentence/offense.

(4). Applicant was denied effective assistance of Trial Counsel.

(5). Applicant contends that there were no chain of custody in the following; from (C.I.) to Deputy Grant.

(6). Applicant was denied of discovery of Grand Jury Impanelment Documents.

(7). Prosecutorial Misconduct, where Trial Counsel was ineffective for failing to object to the Solicitor's Closing Arguments.

(8). Denial of Sixth Amendment to the United States Constitution.


## QUESTIONS PRESENTED

(1). Whether or not Trial Court lacked jurisdiction of the Distribution of Cocaine Base Third, Two Counts?

(2). Whether or not Applicant's convictions and sentence violated double jeopardy?

(3). Whether the State proved beyond a reasonable doubt with each and every element of the crime(s) charged?

(4). Whether or not the Applicant's due process of law/equal protection of the law was violated?

(5). Whether the State produced chain of custody?

(6). Was Applicant denied discovery of grand jury impanelment documents?

(7). Whether Erin Bailey constructivally amended Applicant indictments?

(8). Whether the Court denied Applicant his Sixth Amendment right

334

(8). to Counsel at his revocation hearing?

## STATEMENT OF FACTS
### IN REFERENCE TO ISSUE NO. 1 ABOVE:

Probable caused to issue an arrest warrant for Two Counts of Drugs/Manufacture, Distribution, etc. of Methamphetamine or Cocaine Base first in violation of S.C. Code Section 44.53.375 (B)(1), by Warrant # J-513626, J-513630. These charges were up graded to Distribution Third Offense. However, prior to trial the State amended the indictments constructively First to Third, where there are many different charge's. (See Warrants/Indictments Exhibit 1)

### IN REFERENCE TO ISSUE NO. 2 ABOVE:

After Applicant's charges were upgraded from Section 44.53.375 (B)(1), to Section 44.53.375 (B)(3), on September 20/21, 2010. The State prepared an indictment for Distribution of Cocaine Base Third Offense, which is in violation of 17-19-100 S.C. Code of Laws.

### IN REFERENCE TO ISSUE NO. 3 ABOVE:

Applicant contends that the State never proved beyond a reasonable doubt each element of the crime charged. The Solicitor never produced the following:

    (a). Applicant's Trial Counsel failed to object to this constructive amended indictment when the chain of custody was not challenge.

    (b). Applicant's Trial Counsel failed to properly informed his client that he could not be convicted and punished for the greater and lesser of Distribution and P.W.I.D.

which is a lesser included offense of Distribution of
Cocaine.

(c). Trial Counsel failed to investigate and inform his client
of the circumstances surrounding his arrest.

(d). Trial Counsel failed to properly and fully inform Applicant
of the nature and cause of the accusation against him and
necessary requirement of proof of each and every element
being charged in the indictment.

(e). Trial Counsel failed to properly and fully inform his client
as to the merits of his case and the likelihood of success
if going to trial was imminent in that there was a great
difference "variance" between indictment and the proof
which the State intended to prove.

### IN REFERENCE TO ISSUE NO. 4 ABOVE:

In light of all the facts in Issues 1 thru 3 above, the Trial
Court failed to protect the Applicant's due process to know what
the State have called issued indictments which he is called upon
to answer. The Trial Court failed to protect the Applicant's Equal
Protection of the Law. Where Prosecutor Erin Bailey had not proven
each and every element of the crimes charged.

### ARGUMENT
### IN REFERENCE TO ISSUE NO. 1 ABOVE:

It was error for Trial Court to allow the State to construct-
ively amend the Indictment from 44.53.375(B)(1), to 44.53.375(B)
(3), when there was probable cause submitted for 44.53.375(B)(1),

336

and the dates of June 14, and 15, 2009.

The probable cause to have Applicant arrested was on the warrant for Drugs/Manufacture, Distribution, etc. of Methamphetamine or Cocaine Base, First. But upon Applicant going to trial an indictment was entered for 44.53.375 (B)(3), which now have changed the elements as well as the punishment from fifteen (15) years, to twenty-five (25) years, the Applicant's indictment read as follows:

STATE OF SOUTH CAROLINA    )
                           )          INDICTMENT FOR
COUNTY OF  GEORGETOWN       )      DISTRIBUTION OF COCAINE BASE
                           )        CDR; 3039 44-53-0375 (BX3)

At a Court of General Sessions convened on February 2010 Term, the Grand Jurors of Georgetown County upon their oath:

That Quentin J. Holt, did in Georgetown County, on or about June 17, 2009, Distribute, Dispense or Deliver or Did Aid, Abet, Attempt or Conspire To Distribute, Dispense or Deliver A Quantity of Cocaine Base, a Controlled Substance Under Provisions of Section 44.53.110, et seq. Code of Laws of South Carolina, 1976, as amended, such distribution not having been authorized by law, and being in violation of Section 44.53.375(B), S.C. Code of Laws, 1976, as amended.

Applicant
~~imprisonment~~ alleges that he is being held unlawfully against the laws under the Constitution of the United States and the Constitution of the Laws of the State of South Carolina.

That this Court was without jurisdiction to impose sentence;

That there exists evidence of material facts not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice.

That his sentenced have expired, his probation, parole or the conditional release unlawfully revoked or he is otherwise unlawfully held in custody or other restraint; or

That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under any common law, statutory or other writ, motion petition, proceeding or remedy, may institute, without paying a filing fee.

```
STATE OF SOUTH CAROLINA  )
                         )
COUNTY OF  MCCORMICK     )          VERIFICATION
```

I, __Quentin J. Holt__ , deposes and states that upon my oath that said Amendment To Post-Conviction Application is true and correct to the best of my knowledge.

S/ _Quentin Holt_
Quentin J. Holt

Sworn and Subscribed to
before me this 2 day of _July_ , 2012.

_Young_
Notary Public for South Carolina

My Commission Expires: _10 | 1 2021_

6 of 10

338



## INEFFECTED ASSISTANCE OF COUNSEL

1. Counsel was ineffective for failing to conduct an adequate pre-trial investigation as the Supreme Court also recognized in <u>Strickland</u> Counsel bears a duty to make a "reasonable" investigation of the law and facts in the Client's Case. South Carolina Rules of Professional Conduct Rule 407, Rule 1.1, requires a lawyer to provide completent service to a Client competent representation is defined as the legal knowledge, skill thoroughness and prepartion reasonably for the representation.

2. It is the duty of the lawyer to conduct a prompt investigation of the <u>circumstances</u> of the case. And to <u>explore</u> all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . Cezar stated you can win one and loose one!!! The investigation should always include efforts to secure information in the possession of the Prosecution and Law Enforcement. <u>Discovery Material(s)</u> _ _____ <u>Received It From Cezar on February 14, 2011.</u> The duty to investigate exists regardless of the accused admissions or statements to the lawyer of facts constituting guilt or the accused's states desire to plea guilty. When a lawyer fails to conduct a substantial investigation into any of his client's possible lines of defense, the lawyer have failed to render effective assistance of counsel, <u>Cobb v. State,</u> 3605 S.C. 299, 408 S.E. 2d 223 (1991). Failure to investigate the charge against Applicant, research all motion(s) which were filed. Applicant may have made an informed decision, South Carolina Rules of Professional Conduct Rule 1.4 Communication.

.(a). A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b). A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make an informed decisions regarding the representation. Offer made by the Solicitor's Office.

Counsel's performance fell below an objective standard by not investigating the procedure of the Georgetown Sheriff Department if Counsel had put forth the standard of a competent lawyer. The results of his performance would have been unmeasureable in seeking the truth.

Counsel's failure to conduct an independant investigation does not in itself constitute ineffective assistance of counsel when the allegation is supported only by mere speculation as to the results. Davis v. State, 326 S.C. 283, 486 S.E. 2d 747 (1997). Applicant states his Counsel's performance to put forth caselaw to support i.e., arguments, objections, motions which were before the Court establish Counsel was inadequately prepared for trial. Applicant must present evidence of what Counsel could have discovered or provided other defenses which could have been pursued, had Counsel been fully prepared. See Jackson v. State, 329 S.C. 345, 495 S.E. 2d 768 (1988), Moorehead v. State, 329 S.C. 496 S.E. 2d 415 (1988).

**340**

The standard of which claims of ineffective assistance of counsel claim pursuant to the United States Supreme Court in <u>Strickland v. Washington</u>, that Counsel's duty was to provide effective assistance which is required under the Sixth Amendment of the Constitution.

1).Trial Counsel was ineffective for failing to object to the Court submittting Text of 44-53-375 (B)(3) to the Jury.

At the start of the Jury deliberations the Judge announced to the Jury Foreperson that he has prepared for your use in the Jury Room a Verdict Form. On this Verdict Form, I am going to go over it with you at this time. There are three (3) possible verdicts which appear on the Verdict Form.

The first possible verdict which appears on the Verdict Form reads as follows; We, The Jury, Find The Defendant Guilty of in the Amount of _____ Grams.

The second possible verdict which should have appeared on the Verdict Form should have read as follows: We, The Jury, Find The Defendant Guilty of the lesser included offense of

The third possible verdict which should have appeared on the Verdict Form should have read as follows: We, The Jury, Find The Defendant Not Guilty. By the Judge submitting the Text of the Trafficking Statute to the Jury in written form was highly pre-judicial to the Applicant.

This is a novel question of law in South Carolina; However,
historically, as a common practice, Trial Judges in South Carolina
have not given the actual text of a statute in written form to a
Jury. The Court of Appeals of New York have ruled that the "Consent
of Defense Counsel is an absolute precondition to furnishing the
Jury with the Text of a Statute because questions may arise concerning
which sections of pertinent statutory material should be given to
the Jury." People v. Sanders, 70 N.Y. 2d 837, 838 (N.Y. 1987)
(Citations Omitted). Therefore, we find that the Judge's submission
of the actual text of the statute was in error because covert's
Counsel did not consent to it being given to the Jury. See State v.
Covert, OP. No: 4071 (S.C. APP. 2006).

    "The general rule of issue preservation states that if an
issue was not raised and ruled upon below, it would not be con-
sidered for the first time on appeal."
State v. Passmore, 611 S.E. 2d 273 (S.C. 2003); State v. Lee, 564
S.E. 2d 372 (S.C. APP. 2002). Our Courts have "consistently refused to
apply the plain error rule." Jackson v. Speed, 486 S.E. 2d 750
(S.C. 1997)(Citations Omitted). Instead, we have held: "It is the
responsibility of Counsel to preserve issues for Appellate Review" Id.

    Our Supreme Court, In I'on, LLC. v. Town of Mt. Pleasant, 526
S.E. 2d 716 (S.C. 2000).

    Imposing this preservation requirement on the Appellant is
meant to enable the Lower Court to rule properly after it have
considered all relevant facts, laws, and arguments. The requirements
also serves as a keen incentive for a party to prepare a case
thoroughly. It prevents a party from keeping an ace card up their

342

sleeve — intentionally or by chance — in hope that an Appellate
Court will accept that ace card and, via a reversal, give him an-
other opportunity to prove his case.

Id. at 422, 526, S.E. 2d at 724 (Citations Omitted); See also,
Ellie Inc. v. Micchichi, 594, S.E. 2d 485 (CT. APP. 2004) ("Without
an initial ruling by the Trial Court, a Reviewing Court simply
would not be able to evaluate whether the Trial Court committed
error).

1. The Applicant was denied due process of a fair trial and is
   entitled to a new trial on the grounds of lack of proof and
   insufficient evidence.

      In the instant case, the Applicant was convicted on insuff-
icient hearsay evidence introduced by a State Witness whose
credibility was in question. There is no direct evidence linking
the Applicant to the State's Star Witness, Joe Nathan Lewis, but
there are credible evidence that Joe Lewis, had pending charges,
i.e., Shoplifting And Breach of Trust, and expecting some type of
deal, as a matter of fact, Joe Nathan Lewis. While this case was
being heard he was under arrested for specified crimes, yet, time
and time again, it was the testimony of        Erin E.Bailey,
that no deal had been made for his testimony in return for leniency
from prosecution. Then, you use a three minute phone call to say
that's him! Realistically you use this kind of evidence to trap
someone. There'e no evidence of conspiracy. There is no eye-witness
evidence as the State contend that a video tape of the alleged drug
transaction when in fact the Solicitor never produced this video
tape or the drug money which was used in this transaction. The



343

Applicant never conspired to dispense or commit any of the
allegations that he's accused of and he's entitled to a new trial.

"The power to grant new trials in cases tried by the Circuit Courts
was one of their inherenr powers." <u>State v. David</u>, 14 S.C. 428
(S.C. 1881). Defendant asserts this inherent power to grant a new
trial, has not, and can not be circumvented through any other rule
of law, or case law. (1). In fact, "Circuit Courts have the power to
grant new trials not only under specific provisions rules or
restrictive case law can interfere with a Court's power and
jurisdiction to correct injustices. In this case at bar, accused
has raised a lack of proof <u>Aliunde of Corpus Delect</u>, Lack of Evidence
Beyond a Reasonable Doubt. Not only is the Indictment for
<u>Distribution of Cocaine Base</u>, overly broad and vague. This Indict-
ment is insufficient for conviction. "Trial Court has a duty to
Direct Verdict when there is absence of evidence of a <u>material</u>
<u>element</u> of the offense." <u>State v. Gore</u>, 456 S.E. 2d 419 (S.C. APP.
1995). Where evidence is insufficient to support a conviction on
the lesser offense, and Appellate Court on Appeal may direct the
entry of judgement on the lesser offense. See <u>State v. Muldrow</u>,
559 S.E. 2d 847 (S.C. 2002). "A conviction without evidence to it is
contrary to law and requires a new trial. See <u>State v. Hampton</u>, 60
S.E. 669 (S.C. 1908). If there is no evidence of <u>Corpus Delecti</u>, the
Defendant is entitled to a Direct Verdict. See <u>State v. Epps</u>, 39
S.E. 2d 769 (S.C. 1946); <u>State v. Teal</u>, 82 S.E. 2d 787 (S.C. 1954)
(Defining Corpus Delect). Applicant was convicted upon insufficient
evidence by a manifested denial of fundamental fairness shocking to
the universal sense of Justice, <u>Butler v. State</u>, 397 S.E. 2d 87

344

(S.C. 1990); See Dissent in Johnson v. Catoe, 548 S.E. 2d 589 (S.C. 2001) (Arguing a grant of a new trial under Butler). In this case, the State did not, has not, and indeed can not present credible evidence establishing each and every element of the crime charged as required by, State v. Smith, 266 S.E. 2d 422 (S.C. 1980).

### Denial of Discovery of The Grand Jury Impanelment Documents

In the instant case, Applicant was denied discovery of the Grand Jury that allegedly indicted him, denying him fundamental fairness, due process, and equal protection of the law.

See indictment for Distribution of Cocaine Base, it is alleged that the Georgetown County Grand Jury convened on February 10, 2010, and presented upon their oath, and true billed the indictment. This indictment is not legal and is defective because on the face of this indictment it is shown that the Grand Jury True Billed the indictment on February 10, 2010, which supports the Grand Jury Pre-True Bill the indictment before the Grand Jury convened on February 10, 2010, in which the Court of General Sessions was without jurisdiction to entertain the matters, so therefore proof is needed in support of the Grand Jury Process.

In Evans v. State, 611 S.E. 2d 510 (S.C. 2005); a Defendant's right to obtain recorded proceedings and testimony before the State Grand Jury in preparing his defense, which right is subject to the limitations imposed by statute and rule, necessary arises past-indictment; although maintaining secrecy is essential while a matter is under deliberations by the Grand Jury, such concerns diminish

following inssuance of a True Bill of Indictment, and thus, a
Defendant is allowed to obtain and use the impanelment documents in
preparing a defense and ensuring protection of his due process
rights U.S.C.A. Const. Amend. 14, Code 1976, 14-7-1700, 14-7-1720(B).
Also see Rules Criminal Procedures Rule 5; Criminal Law Key 627.9(1).
Grand Jury Key 41.50(3).

### Grand Jury Impanelment Documents May Be Released To A Defendant Prior To Trial Upon Timely Request Or To An Applicant In A P.C.R. Proceeding

See Criminal Law Key 1032(2); also challenges to legality and
sufficiency of the process of a <u>County Grand Jury</u> must be made before
the Jury renders a verdict in order to preserve the error for Direct
Appellate Review. The Applicant in this matter was denied due process
and equal protection of the law.

### PROSECUTORIAL MISCONDUCT

In the instant case, the Applicant's due process rights were
violated when the Prosecution engaged in misconduct during Closing
Arguments, a violation to which Defense Counsel failed to raise an
proper objection. The Prosecutor's repeatedly vouching the credibility
of the State's main witnesses prejudiced the Applicant and rendered
the trial fundamentally unfair. The rule is well established that
the Government may prosecute with earnest and vigor. <u>Berger v. United
States</u>, 295 U.S. 78 (1935). But, the Supreme Court have held that. . .
"While the Prosecutor may strike hard blows, he is not at liberty to
strike foul ones." <u>Id</u>. It is as much the Prosecutor's duty to refrain
from improper methods calculated to produce a wrongful conviction as
it is to use every legitimate means to bring about a just one." <u>Id</u>.

346

See Darden v. Wainwright, 477 U.S. 168 (1986); Gialic v. United States, 405 U.S. 150 (1992). Likewise, it is necessary to review the entire proceedings and place the Prosecutor's remarks in context. Greer v. Miller, 483 U.S. 756 (1982). However, if a Trial Court issues a curative instruction it is assumed that the Jury will follow the instruction and disregard any improper statements by the Prosecutor. In the instant case, the Court issued no curative instruction regarding the improper statements." A Solicitor's Closing Argument must not appeal to the personal bases of the Jurors. In addition, the argument may not be calculated to arouse the Juror's Passions or Prejudices, and it's content's should stay within the record and reasonable inferences to it." State v. Copeland, 468 S.E. 2d 620 (S.C. 1996); Vaugh v. State, Op. No. 25914 (S.C. 2004); Gradsky v. Unite States, 373 F. 2d 706 (1967).

### Denial Of Sixth Amendment To U.S. Constitution Amend. VI

Appellant contends that his right to Counsel to his Probation Revocation Proceedings held in Georgetown County on September 22, 2010, was not attached Salley v. State, 306 S.C. 213, 215, 410 S.E. 2d 921, 922 (1991).

To establish a valid waiver of Counsel, the accused must be advised of the right to counsel and adequately warned of the dangers of self representation. Faretta v. California, 422 U.S. 866, 835, 95 S.Ct. 2525, 2451, 45 L.Ed. 2d 562, 581-82 (1975).

347

Appellant contends that his Trial Attorney Cezar McKnight, by correspondence stated to Appellant his services were only for the **pending charges**, not for the probation violation. Therefore, Honorable Judge, **Benjamin Culbertson**, should have appointed a Public Defender to up hold Appellant's Sixth Amendment Right to Counsel.

Appellant submitted a timely Motion To Appeal his Probation Revocation Hearing on July 11, 2011, to the South Carolina Department of Parole, Probation, Pardons Services. (See Exhibits)

Therefore, Honorable Judge, Benjamin Culbertson, should have postponed this Revocation Hearing to make sure Appellant's Probation Revocation Proceedings attached with his Sixth Amendment to the U.S. Constitution.

Appellant states the Court was without jurisdiction to hear the Probation Revocation Proceedings, because there was not a valid waiver of Counsel. Appellant was not advised of the right to have Counsel at his Probation Revocation Proceedings, <u>Salley v. State,</u> 306 S.C. 213, 215, 410 S.E. 2d 921 (1991).

The current sentence of four (4) years should not be allowed to stand, Appellant requests upon this Court for the four (4) years which was imposed at his Trial be void without force. The Sixth Amendment guarantees a right to counsel in Probation Revocation Proceedings.

348.

## PROSECUTORIAL MISCONDUCT

The Prosecutor committed misconduct by presenting an indictment to the Grand Jury of Georgetown County that was not filed with the Clerk of Court in violation of Rule 3(b), and 3(c), of the SCRCRIM.P. Once the Prosecutor received the warrant from the Clerk of Court of General Sessions Court, he/she had ninety (90) days to take action by preparing an indictment. The Prosecutor must return the indictment to the Clerk's Office to be "filed" receiving the authoritative clock-stamp.

In the present case on the indictment which has been assigned a case number, "True Billed" signed by the Grand Jury Foreman. However, on the indictment it have the word witnesses, (SEE State v. Dawkins, 377 S.E. 2d 298 S.C. 1989). Which the Court once again discouraged the practice of using a Solicitor or other State Officer as Sole Witness, and the Signature of the Grand Jury Foreman is not dated and yet not filed with the Clerk of Court. Further the indictment does not show what date the Grand Jury convened upon their oath) and the True Bill appears to be written, not stamped. Counsel for the Respondent should be held accountable. Counsel for the Respondent also prepared an indictment that did not bare the Statute 44-53-375 B(1), a further defect of the indictment. Therefore, the Grand Jury of Georgetown County could not have return a proper indictment.

SEE Browning v. State, 320 S.C. 360,386; 465 S.E. 2d 358, 359 (1995); Brown v. State, 343 S.C. 343,347; S.E. 2d 846, 849 (2001); State v. Primus, 349 S.C. 576, 579; 564 S.E. 2d 103, 105 (2002); State v. Beam, 336 S.C. 45, 518 S.E. 2d 297 (Ct.App. 1999).

An indictment is sufficient to convey jurisdiction if it appraise the Defendant of the necessary elements of the offense intended to be charged and informs the Defendant of the circumstances he must be able to defend. SEE State v. Parker, 344 S.C. 250 S.E. 2d 255 (Ct.App. 2001).

An indictment poses legal muster if it charges the crime substantially in the language of the . . . statute prohibiting the crime or so plainly that the nature of the offense charged may be easily understood. SEE State v. Nelson, Id.

Here in this case the indictment shows not statutorily jurisdictional code on the face whatsoever. In State v. Quattlebaum, 577, 441 S.E. 2d 105 (S.C. 2000). The S.C. Supreme Court held that a Prosecutor has special responsibilities to do justice and is held to the highest standard of professional ethics. . . And that the deliberate, Prosecutorial Misconduct which threatens rights fundamental to liberty and justices will not be tolerated. Accordingly, the standard for reviewing a claim of Prosecutorial Misconduct is whether the Prosecutor's actions are of such a nature as render the trial fundamentally unfair. SEE Donnelly v. Dechirtophard, 64 U.S. 637, 94 S.Ct. 1868 (1947).

The Solicitor's duty is to see that no conviction takes place except in strict conformity with the law, that the accused is not deprived of any constitutional rights and that nothing is done to prevent the accused from obtaining a fair trial under the law. SEE State v. King, 71 S.E. 2d 793 (S.C. 1952).

350.

Due Process of Law requires the State to establish each element of each offense by proof beyond a reasonable doubt. SEE Inre v. Winship, 397 U.S. 358 (1970).

I was not provided with a Drug Analysis Report from the Georgetown County Organized Crime Bureau or the Georgetown County Sheriff's Department Chain of Custody Report from the Solicitor. The Trial Counsel should have pointed these issues out to the Court by raising a Brady violation and Filed a Jackson v. Deno Motion to Suppress The Evidence. SEE Rules 5 and 6, of the S.C.R.Crim.P.) State v. Joseph, 491 S.E. 2d 275, at 280, S.C.App. 019972-280-285. Id.

Article I, 553 of the S.C. Constitution, Fourteenth Amendment of the U.S. Constitution, Brady v. Maryland, 323 U.S. 583, 5, CF 1194 (1963). Due Process witholding evidence that if would been presented would have shown all violations.

## SUBJECT MATTER JURISDICTION

The Court lacked Subject Matter Jurisdiction to convict because the indictment was not dated or clock-stamped by the Clerk of Court which is in violation of Rule 3(b) and 3(c), of the S.C.R.Crim.P. The Court of General Sessions for Georgetown County did error in accepting "unfiled" documentation in the form of my indictment. The Court had to be aware that the indictment did not carry the necessary Statute for Distribution of Cocaine Base, 44-53-375(B)(1), as did the Arrest Warrant(s).

In Gentry v. State, the Supreme Court held that in order for an Applicant to challenge the sufficiency of an indictment in a P.C.R., it must be challenged before a Jury was sworn. I respectfully agree,



and admit, had I been knowledgable of the Law concerning this issue at the time of my arrest and trial. I would have questioned the Solicitor, and Counsel to perform his duty to make the challenge on my behalf. The Court held the indictment(s) within his hands which clearly shows a statute different from the Arrest Warrant(s), and my Counsel was "Ineffective" in assisting me in this matter. The indict-ment witness(es) is the Georgetown Sheriff's Department which is a entity as a sole witness it should be two (2) witness(es), and not a State Officer/Entity as a sole witness. SEE State v. Dawkins, 377 S.E. 2d 298 (S.C. 1989). The Court once again discouraged the practice of using a Solicitor or other State Officer as Sole Witness(es).

The indictment has True Billed stamped on it's face and signed by the Grand Jury Foreman. However, the signature is not dated and there is no indication that the indictment was received and filed by the Clerk of Court. The State's failure to ensure compliance with S.C. Code 14-17-530 (2), deprive the Trial Court of Subject Matter Jurisdiction.

I further argue that on September 22, 2010, I was unlawfully convicted and sentenced based on the many errors of my case and the indictment/warrant(s).

352

STATE OF SOUTH CAROLINA          )          IN THE COURT OF COMMON PLEAS
                                 )
COUNTY OF GEORGETOWN             )
                                 )
Quentin Holt,#268198            )          C/A NO: 2012-CP-22_735
                                 )
            Applicant,           )
                                 )
vs,                              )          AMENDMENT TO POST CONVICTION
                                 )
STATE OF SOUTH CAROLINA          )          APPLICATION
                                 )
            Defendant.           )
_____ )

    Now comes Quentin Holt,# 268198 through his undersigned
attorney moves this Court pursuant to rule 15 of the South
Carolina Rules of Civil Procedure for an Order to amend the Post
Conviction Application.   These claims are amended to the Claim:

1.   Counsel was ineffective by his failure to do reasonable
investigation and move to suppress communications that was
unlawfully intercepted in violation of §17-30-10 et. seq. and
especially 17-30-65 (Admissibility of Contents or Evidence
derived from, Intercepted Communication) and the Fourth Amendment
of the United States Constitution and parallel to the South
Carolina Constitution Art. 1, § 10.

2.   Appellate counsel was ineffective by failing to raise
amending the indictments  before the South Carolina Appellate
Court.

1.

STATE OF SOUTH CAROLINA   )    IN THE COURT OF COMMON PLEAS

COUNTY OF GEORGETOWN     )

Quentin Holt, #268198       )    C/A NO: 2012-CP-22-735

        Applicant,     )

vs,                  )    MEMORANDUM OF LAW IN SUPPORT

STATE OF SOUTH CAROLINA   )    OF AMENDMENT TO PCR

        Respondent.   )

———————————————————————)

1.  Counsel was ineffective by his failure to do reasonable investigation and move to suppress communication that was unlawfully intercepted in violation §17-30-10 et. seq. and especially §17-30-65 (Admissibility of Contents or Evidence derive from. Intercepted Communication) and the Fourth Amendment of the United States Constitution and parallel to the South Carolina Constitution Art. 1, § 10 against Unreasonable Search and Seizure.


   In order to prove that counsel was ineffective, the PCR Applicant must show that: (1) counsel's performance was deficient, and (2) there is a reasonable probably that, but for counsel's errors, the result of the trial would have been different. Strickland v Washington 466 U.S. 668 (1984); Rhodes v State, 349 S.C., 561 S.E.2d 608 (2002). A reasonable probability is a probability sufficient to undermine confidence in the

354

outcome of the trial. Id. Furthermore, when a defendant's conviction is challenged, "the question is whether the defendant was prejudiced by that error, and there is a reasonable probability that, absent the error, the fact finder would have has a reasonable doubt respecting guilt." Strickland at 695. Moreover, a criminal defense attorney has a duty to investigate, but this duty is limited to reasonable investigation. Ard v Catoe, 372 S.C. 318, 642 S.E.2d 590 (200). quoting Thompson v Wainwright 737 F.2d 1447, 1450 (11 Cir. 1986) See also Strickland v Washington, 466 U.S. at 691. When evaluating the reasonableness of counsel's conduct, "the Court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing work in the particular case. Strickland 466 at 690. Moreover, while the scope of a reasonable investigation depends upon a number of issues, "at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." Troedel v Wainwright 667 F.Supp. 1456, 1461 (S.D.Fla 1986).

Here in this case, there is no mention of a warrant or authorizing the Interception of wire, Electronic, or Oral communication that Reginld Grant, got before he and Mr. Lewis met. Tr. p. 64, lines 2-4, lines 9-25, p. 65, lines 1-16, p. 67, lines 5-7, p. 71, lines 11-20, p. 72, lines 17-24.

The communication was unlawfully intercepted and introduced to the jury in violation of this section, and therefore the Applicant must have a new trial.

2.    Appellate counsel was ineffective by failing to raise amending the indictment before the South Carolina Appellate Court.

A defendant is constitutionally entitled to effective assistance of appellate counsel. Evitts v Lucey, 469 U.S. 387 (1985). Appellate counsel has a professional duty to choose among potential issues according to their merit. Jones v Barnes 463 U.S. 745 (1983). The Applicant must show that appellate counsel's performance was deficient and that he was prejudiced by the deficiency. Thrift v State, 397 S.E.2d at 537; Gilchrist v State, 364 S.C. 173, 612 S.E.2d 702 (2005). When a claim of ineffective assistance of counsel is based upon failure to raise viable issues, the court must examine the record to determine, "whether appellate counsel failed to present significant and obvious issues on appeal." Gray v Greer, 800 F.2d 644, 646 (7th Cir 1986). Generally, the presumption of effective assistance of counsel will be overcome only when the alleged ignored issues are clearly stronger than those actually raised on appeal. Id. where result of appeal would have been different had counsel not been deficient, the appropriate remedy is to grant a new trial. Ezell v State, 345 S.C. 312, 548 S.E.2d 852 (2001).

3.

356

STATE OF SOUTH CAROLINA          )          IN THE COURT OF COMMON PLEAS

COUNTY OF GEORGETOWN             )

Quentin Holt,#268198            )          C/A NO: 2012-CP-22-735

       Applicant,              )

vs,                             )          AFFIDAVIT OF MAIL SERVICE

STATE OF SOUTH CAROLINA          )

      Respondent              )
_____

I _Quentin HolT_ being first duly sworn and under the penalty of perjury depose and states;

1.  That I am the applicant in the above numbered case.

2.  The mail service is a proper means of communication in the State of South Carolina and mail service is proper in this matter.

3.  That I have on this _19_ day of March 2013 mail a copy of the Amendment of this Post Conviction Application to Paul Archer, Esquire, 233 Muirfield Drive, Pawleys Island, SC 29565 for filing in Georgetown Common Please Court.


Sworn to and Subscribed before Me

This _19_ day of March 2013

_Olga L. Young_

Notary Public of S.C.

My Commission expires __10-11-2021__

_Quentin Holt_
Quentin Holt

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF GEORGETOWN ) FOR THE FIFTEENTH JUDICIAL CIRCUIT

)
Quentin J. Holt, #268198, ) C.A. No. 2012-CP-22-00735
)
    Applicant, )
)
v. ) AMENDED RETURN
)
State of South Carolina, )
)
    Respondent. )
_____ )

    The Respondent, making its Amended Return to the Application for Post-Conviction Relief

(PCR) filed July 11, 2012, would respectfully show this Court:

## I.

    Applicant is presently confined in the South Carolina Department of Corrections pursuant to

orders of commitment of the Georgetown County Clerk of Court. The Georgetown County Grand

Jury indicted Applicant in February 2010 for two counts of distribution of cocaine base, third offense

(2010-GS-22-179 and 2010-GS-22-181). Cezar E. McKnight, Esquire, represented applicant on the

charge. On September 20-22, 2010, Applicant stood trial before the Honorable Benjamin H.

Culbertson and a jury. The jury found Applicant guilty as indicted. Judge Culbertson sentenced

Applicant to confinement for a period of twenty-five (25) years on each charge, to run concurrently.

    Applicant filed a timely notice of appeal and Tristan M. Shaffer of the South Carolina Office

of Appellate Defense perfected the appeal. The South Carolina Court of Appeals affirmed the

conviction in an unpublished opinion on April 25, 2012. See State v. Holt, Op No. 2012-UP-253

358

(S.C. Ct. App. filed April 25, 2012). The remittitur was returned to the circuit court on May 15, 2012.

Attached to the State's initial Return and incorporated therein were the records of the Georgetown County Clerk of Court regarding the subject convictions, Applicant's records from the South Carolina Department of Corrections, and the trial transcript. Attached to this Amended Return and incorporated herein is the opinion from Applicant's direct appeal. Any records not attached will be forwarded upon receipt. The State reserves the right to further amend this Amended Return upon receipt of any relevant materials.

## II.

In his first amendment to his current application, Applicant alleges that he is being held in custody unlawfully for the following reasons:

1. "[H]is convictions …Were Constructive Amended."
2. "[T]he Chain of Custody Link have been broken."
3. "[T]he Trial Court was without any jurisdiction to entertain indictment9s0 of an greater sentence/offense."
4. "Applicant was denied effective assistance of Trial Counsel."
5. "[T]here was no chain of custody … from (C.I.) to Deputy Grant."
6. "Applicant was denied discovery of Grand Jury Impanelment Documents."
7. "Prosecutorial Misconduct, where Trial Counsel was ineffective for failing to object to the Solicitor's Closing Arguments."
8. "Denial of sixth Amendment to the United States Constitution."

In a second amendment, Applicant further alleges:

1. "Counsel was ineffective by his failure to do reasonable investigation and move to suppress communications that was unlawfully intercepted…"
2. "Appellate counsel was ineffective by failing to raise amending the indictments before the South Carolina Appellate Court."

Any claims not specifically enumerated in the Application or amendments thereto will be opposed by the State at the evidentiary hearing. All amendments should be made well in advance of hearing and should be filed in compliance with Rule 11, SCRCP.

### III.

In a post-conviction relief action, the applicant bears the burden of proving the allegations in their application. Butler v. State, 286 S.C. 441, 442, 334 S.E.2d 813, 814 (1985) (citing Griffin v. Martin, 278 S.C. 620, 300 S.E.2d 482 (1983)). Where the application alleges ineffective assistance of counsel as a ground for relief, the applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Id. (citing Strickland v. Washington, 466 U.S. 668, 686 (1984)).

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Id. (citing Strickland, 466 U.S.at 687; Turner v. Bass, 753 F.2d 342 (4th Cir. 1985); Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977)). The court strongly presumes that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id. (citing Strickland, 466 U.S. at 690). The applicant must overcome this presumption in order to receive relief. Cherry v. State, 300 S.C. 115, 118, 386 S.E.2d 624, 625 (1989).

The reviewing court applies a two-pronged test in evaluating allegations of ineffective assistance of plea counsel. Id. at 117, 386 S.E.2d at 625. First, the Applicant must prove that counsel's performance was deficient. Id. Under this prong, the court measures an attorney's performance by its "reasonableness under prevailing professional norms." Id. (citing Strickland, 466

360

U.S. at 688). Second, counsel's deficient performance must have prejudiced the Applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 117-18, 386 S.E.2d at 625.

The State submits that Applicant cannot satisfy either requirement of the Strickland test. However, the allegation of ineffective assistance of counsel probably raises questions of fact that the record does not conclusively refute. Accordingly, the State requests an evidentiary hearing to fully resolve this issue. See Sharper v. State, 279 S.C. 264, 305 S.E.2d 247 (1983).

## IV.

The State submits that Applicant's allegations regarding the chain of custody or the indictment should be dismissed. Post-conviction relief "is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction." S.C. Code Ann. § 17-27-20(b); see also Simmons v. State, 264 S.C. 417, 423, 215 S.E.2d 883, 885 (1975) ("It is uniformly held that an application for post-conviction relief is not a substitute for an appeal."). Applicant's allegations regarding the chain of custody are an inappropriate challenge to the sufficiency of the evidence. See Ashley v. State, 260 S.C. 436, 438, 196 S.E.2d 501, 502 (1973). The allegations relating to the indictment must be raised before the jury is sworn. See State v. Gentry, 363 S.C. 93, 101, 610 S.E.2d 494, 499 (2005). Applicant could have raised these issues at trial or on appeal. His failure to do so has waived these allegations as grounds for relief. Therefore, the State requests these allegations be dismissed.

## V.

Each and every allegation contained within the Application not hereinbefore either expressly admitted, qualified, or explained is hereby denied.

Page **4** of **5**

**VI.**

WHEREFORE, having made its Amended Return, the State requests that an evidentiary

hearing be held on the allegations so requiring one, and that all other allegations be dismissed.


Respectfully submitted,

ALAN WILSON
Attorney General

JOHN W. McINTOSH
Chief Deputy Attorney General

SALLEY W. ELLIOTT
Senior Assistant Deputy Attorney General

JOSHUA L. THOMAS
Assistant Attorney General
S.C. Bar No. 100777

By: _____
ATTORNEYS FOR RESPONDENT

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Telephone: (803) 734-3737


August 20, 2013

Page **5** of **5**

362

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
                        )
COUNTY OF GEORGETOWN    )
                        )
                        )   2012-CP-22-735
                        )
QUENTIN J. HOLT #268198 )
                        )
              Applicant, )
                        )
        vs              )   AFFIDAVIT OF SERVICE BY MAIL
                        )
STATE OF SOUTH CAROLINA, )
                        )
            Respondent.  )
_____)

1.      I am an employee of the Respondent in the above-captioned action.

2.      Regular communication by mail exists throughout the State of South Carolina and that this is a proper circumstance of service by mail.

3.      I have this day served a copy of the **Amended Return** in the above-captioned matter on the following person by depositing same in the United States mail, postage prepaid:

**Charles T. Brooks, III, Esquire**
**309 Broad Street**
**Sumter, SC 29150**

DATED this 20TH day of August , 2013.


Norma Bigbee, Legal Assistant
For Respondent

```
STATE OF SOUTH CAROLINA)        COURT OF COMMON PLEAS
                       )
COUNTY OF GEORGETOWN   )

QUENTIN J. HOLT        )
268198

         PETITIONER,)       TRANSCRIPT OF RECORD
         v.           )         12-CP-22-735

STATE OF SOUTH CAROLINA,)

         RESPONDENT.)
```

August 29, 2013
Georgetown, South Carolina


**B E F O R E :**

    THE HONORABLE J. CORDELL MADDOX, JR., JUDGE


**A P P E A R A N C E S:**

        CHARLES T. BROOKS, II, ESQ.
        Attorney for the Petitioner


        JOSHUA L. THOMAS, ESQ.
        Attorney for Respondent



        FRANCES BAKIS-RAY, RPR
        Circuit Court Reporter

364

2

# I N D E X

Page

Quentin Holt:
    Direct examination by Mr. Brooks      5
    Cross-examination by Mr. Thomas      14

Cezar McKnight:
    Direct examination by Mr. Thomas      18
    Cross-examination by Mr. Brooks      26

(There were no exhibits submitted.)

3

365

1    MR. THOMAS:  The next case is Quentin Holt

2  versus the State of South Carolina.

3    THE COURT:  Okay, Mr. Holt.

4    THE DEFENDANT:  Yes, sir.

5    MR. THOMAS:  May it please the Court.

6    THE COURT:  All right.

7    MR. THOMAS:  This is case number

8  2012-CP-22-735.  Mr. Holt was indicted in July

9  of two thousand — I'm sorry, in February of 2010

10  for distribution of crack cocaine two counts.  He

11  went to trial September 20th through 22nd of 2010.

12  He was convicted as indicted.  The Honorable

13  Benjamin H. Culbertson sentenced him to 25 years on

14  one distribution charge and a concurrent 25 years on

15  the second distribution charge.  Tristan M.

16  Schaeffer of the Office of Appellate Defense filed

17  an appeal for him.  That appeal was — the

18  conviction was affirmed in unpublished opinion.  PCR

19  was filed July 11th, 2012.  Mr. Holt is present in

20  court with his attorney Mr. Brooks and the State is

21  ready to proceed.

22    THE COURT:  Okay.  Yes, sir.

23    MR. BROOKS:  Judge.

24    THE COURT:  Call your first witness or

25  I'll be happy to hear from you.

366

1        MR. BROOKS:  Before I get ready to call

2   our witness, Judge, one other issue that I want to

3   raise was my client subsequently had a probation

4   matter that was revoked without having a hearing and

5   he had four years added on to his sentence, but I

6   think it probably was done with the intent of being

7   done concurrently.

8        THE COURT:  Yeah, I would think so.

9        MR. BROOKS:  So I wanted to — he wanted

10   me to at least raise that issue to the Court.  I

11   don't know if that's something that needed to be

12   raised through Al Shabazz petition.

13        THE COURT:  Probably.  I mean, I don't

14   think I can deal with it.  I would assume that — in

15   fact, I'm sure I can't deal with it today but quite

16   frankly I would guarantee that the judge meant to do

17   it concurrent.

18        MR. BROOKS:  So that would mean the m an

19   could come make for the probation revocation

20   hearing.

21        THE COURT:  Yeah, I, you know, I've done

22   those.  Quite frankly, I've talked to probation

23   agent or I've had lawyers talk to probation agent

24   and done a consent order.  You might try that.  I

25   mean, it just depends on the agent.

1      MR. BROOKS:  And you know, I don't know

2  how folks are, you know, probation as far as down

3  here. but it might be something he has to do in an

4  Al Shabazz petition.  I just want to bring it to

5  y'all's attention.

6      THE COURT:  Okay.

7      MR. BROOKS:  Be that as it may we call

8  Quentin Holt to the stand.

9      THE COURT:  All right.

10      THE CLERK OF COURT:  Place your left hand

11  on the Bible and raise your right hand please.

12  WHEREUPON,

13              **QUENTIN HOLT,**

14  having been duly sworn by the Clerk of Court,

15  testified as follows:

16      THE CLERK OF COURT:  Please be seated.

17  State and spell your name for the record.

18      THE WITNESS:  Quentin Holt.

19        **D I R E C T  E X A M I N A T I O N**

20  BY MR. BROOKS:

21  Q  Mr. Holt, you understand that conversation I had

22  with the Court about that extra four years from the

23  probation revocation what you may have to do?

24  A  Yes, sir.

25  Q  You familiar with doing an Al Shabazz petition on

368

```
 1   your own through SCDC?
 2   A  No, sir.
 3   Q  Okay.  But you understand that you have to
 4   address that through Al Shabazz petition?
 5   A  Yes, sir.
 6   Q  Okay, all right.  Now obviously you filed a PCR
 7   for ineffective assistance against Mr. McKnight.
 8   He's the one that represented you; is that correct?
 9   A  Yes, sir.
10   Q  Okay.  You went to trial on this case; is that
11   right?
12   A  Yes, sir.
13   Q  All right.  Now one of the things that you
14   expressed is that you didn't know exactly how much
15   time you're exposed to; is that right?
16   A  Yes, sir.
17   Q  Now was there ever an offer in your case?
18   A  Yes, sir.
19   Q  What was the offer?
20   A  Ten years.
21   Q  But you didn't take that?
22   A  No, sir.
23   Q  Can you tell the Court why you didn't take that?
24   A  Because Cezar advised me that we can win one or
25   lose one, that we didn't have a case.
```

1  Q  Okay, and why did you — why did you think that

2  meant that you didn't have a case?  Can you explain

3  that?

4  A  He told me something about the warrants.  It was

5  a problem with the warrants.  I think the date was

6  at issue.

7  Q  Okay.  Now obviously if you had to do it all over

8  again 10 is better than 25; is that right?

9  A  Yes, sir.

10  Q  And how old are you, Quentin?

11  A  35.

12  Q  All right.  Do you remember how long you had

13  Mr. McKnight on your case?

14  A  About 75 days.

15  Q  Okay.  And you retained him; is that correct?  He

16  wasn't court appointed?

17  A  Yes, sir.

18  Q  Okay.  Now you also said he didn't investigate

19  this case properly; is that right?

20  A  Yes, sir.

21  Q  Can you tell the Court what you mean by that.

22  A  Counsel failed to do a reasonable investigation

23  of the facts and circumstances of my case.  Had he

24  done a reasonable investigation he would have

25  discovered that there was no warrants authorization

1  for the witness to intercept the communication.

2  Q  Okay.  So you're talking about the audio that was

3  played; is that right?

4  A  Yes, sir.

5  Q  Okay.  You saying that Mr. McKnight didn't do a

6  good job of trying to keep that suppressed; is that

7  right?

8  A  Yes, sir.

9  Q  And you basically hinging that on his failure to

10  properly investigate the case?

11  A  Yes, sir.

12  Q  And you feel that that had a prejudicial outcome

13  on your case?

14  A  Yes, sir.

15  Q  Now this phone call, who was that phone call

16  with?  Can you tell the Court about that.

17  A  It wasn't a photo call.  It was -- they put a

18  recording on the CI.

19  Q  Okay, this was an audio recording of the CI

20  allegedly making a buy from you?

21  A  Yeah, alleged buy.

22  Q  Okay.  And you're saying that that should not

23  have come in?

24  A  Yes, sir.

25  Q  And your lawyer should have done a better job

```
 1   raising the issue, try to keep that suppressed away
 2   from the jury; is that right?
 3   A  Yes, sir.
 4   Q  Okay.  Now, and he would have done a better job
 5   had he done an investigation that you claim, right?
 6   A  Yes, sir, and he suppressed the audio recording.
 7   Q  All right.  Now one of the issues you talked
 8   about was you took the stand in your trial; is that
 9   right?
10   A  Yes, sir.
11   Q  And you had a prior drug conviction that
12   obviously came in; is that right?
13   A  Yes, sir.
14   Q  The jury heard that?
15   A  Yes, sir.
16   Q  You -- one of the things you said is your lawyer
17   didn't really explain to you that if you took the
18   stand that was going to come in?
19   A  Yes, sir.
20   Q  You didn't know that?
21   A  No, sir.
22   Q  Okay.  What did you think was gonna happen when
23   you took the stand from your conversations with your
24   lawyer?
25   A  Me telling, you know, that I didn't do the crime,
```

372

10

1  and I never knew that if I took the stand that they

2  could have used the priors against me to enhance the

3  sentence.

4  Q  Okay.  We're not talking about enhancement.  I'm

5  talking about the jury hearing that you had a prior

6  drug conviction.

7  A  Yea.

8  Q  You think that that hurt your case, right?

9  A  Yes, sir.

10  Q  Okay.  You didn't understand that that the jury

11  was going to find that out once you took the stand?

12  A  Yes, sir.

13  Q  Okay.  If you had known that would you have taken

14  the stand?

15  A  No, sir.

16  Q  One of the other issues you talked about was the

17  indictment in your case; that you got an indictment

18  alleging an incident on this day, an incident on

19  this day.  Can you explain that to the Court in why

20  you feel that that hurt you and why you should be

21  given a new trial as a result of that?

22  A  Because at the -- when they amend the indictment

23  they allege that the crime happened on two separate

24  days.  So when they -- the Court allowed them to

25  amend the indictment the alleged crimes crossed up.

1   Q  One indictment had an earlier date?

2   A  Yes, sir.

3   Q  And another indictment had a later date?

4   A  Yes, sir.

5   Q  And then they changed it where the one that had a

6   later date was now the earlier date, and the one

7   that was the earlier date became the later date?

8   A  Yes, sir.

9   Q  You felt that that's something that your lawyer

10  should have addressed?

11  A  Yes, sir.

12  Q  And should have addressed in a manner to keep you

13  from going to trial; is that right?

14  A  Yes, sir.

15  Q  The entire indictment should have been quashed?

16  A  Yes, sir.

17  Q  That's one of your allegations?

18  A  Yes, sir.

19  Q  And one of the other things you said your

20  appellate counsel did not raise that on appeal?

21  A  Yes, sir.

22  Q  You think that had an impact on your appeal ———

23  A  Yes, sir.

24  Q  ——the fact that that wasn't raised?

25  A  Yes, sir.

**374**

```
1   Q  Okay.  Now your appeal was dismissed?
2   A  Yes, sir.
3   Q  Okay, all right.  Or better yet it was denied.
4   It wasn't necessarily dismissed, I'm sorry.
5   A  Denied.
6   Q  Do you think if it had been raised it would have
7   had a different outcome on your appeal?
8   A  Definitely.
9   Q  That would have helped you; is that right?
10  A  Yes, sir.
11  Q  And one of the things you talked about was you
12  felt that you had an illegal sentence?
13  A  Yes, sir.
14  Q  You got sentenced to 25 years or 50,000-dollar
15  fine?
16  A  Yes, sir.
17  Q  Now you take that to mean if you, you or somebody
18  in your behalf walked in and paid 50-000-dollars to
19  the Clerk of Court you could go home?
20  A  According to the sentence.
21  Q  According to the sentence and according to your
22  understanding of the statute?
23  A  No, sir, the statute told, I mean, says something
24  totally different than what the judge sentenced me
25  to.
```

1    Q  What –– what do you know the statute to say?

2    A  The statute says that you can be, I mean, be

3    sentenced to 25 years or pay a 50,000-dollar fine or

4    both.  It don't say you be sentenced to 25 years or

5    pay a 50,000-dollar fine.

6    Q  But according to your sentencing sheet by Judge

7    Culbertson it says 25 years or?

8    A  Or pay a 50,000-dollar fine.

9    Q  Okay.  Have you tried to go pay that

10   50,000-dollars or have somebody pay that

11   50,000-dollars on your behalf?

12   A  No, sir.

13   Q  But obviously you feel that that was an illegal

14   sentencing sheet?

15   A  Yes, sir.

16   Q  And that's one of the allegations you feel like

17   you should be granted a post-conviction relief and

18   get a new trial; is that right?

19   A  Yes, sir.

20   Q  All right.  Now Mr. Holt, I think we've covered a

21   great deal of issues here.  Is there anything else

22   you want to tell Judge Maddox that we haven't said

23   as to why you should be granted a new trial?

24   A  No, sir, but I got one question.

25   Q  Well, I mean, you have anything that we haven't

376

1    covered that you want to raise?

2    A  No, sir.

3    Q  This is your one bite at the apple.

4    A  No, sir.

5    Q  We're trying to get you a new trial?

6    A  Yes, sir.

7    Q  All right.  And you understand that the only

8    remedy you can get is a new trial?

9    A  Yes, sir.

10   Q  And you want to get that new trial?

11   A  Yes, sir.

12   Q  Is there anything that we've overlooked?

13   A  No, sir.

14   Q  Are you sure?

15   A  Yes, sir.

16   Q  All right.  Answer any questions of the attorney

17   general.

18                **C R O S S - E X A M I N A T I O N**

19   BY MR. THOMAS:

20   Q  Good morning, Mr. Holt.

21   A  Good morning.

22   Q  You said you retained Mr. McKnight?

23   A  Yes, sir.

24   Q  How many times did you meet with him before

25   trial?

```
 1   A  Before trial?
 2   Q  Yes, sir.
 3   A  I want to say two times, when I first hired him
 4   and roll call on Friday.
 5   Q  And do you recall during those meetings you guys
 6   reviewed the discovery; didn't you?
 7   A  No, sir.
 8   Q  What did you discuss at those meetings?
 9   A  The actual charge.
10   Q  Did you discuss any possible defenses?
11   A  No, sir.
12   Q  Did you give him any investigatory leads,
13   anything to go talk to, anything for him to go look
14   into at that time?
15   A  Nothing but a time card, work card.
16   Q  The solicitor's office offered you a plea,
17   correct?
18   A  Yes, sir.
19   Q  And what were the terms of that plea?
20   A  Ten years.
21   Q  It was your decision to turn that plea down;
22   wasn't it?
23   A  Yes, sir.
24   Q  And one of your allegations is that you were not
25   aware that when you testified your prior record
```

378

1  would come out; is that correct?

2  A  Yes, sir.

3  Q  But isn't it true that the judge before you

4  testified, he told you twice that if you took the

5  stand you would be impeached by your prior record?

6  A  Yes, sir.

7  Q  He told you once on the afternoon first day of

8  trial when the State rested their case before you

9  went home, he told you that your record would come

10  out; didn't he?

11  A  Yes, sir.

12  Q  And then again the next morning when you got

13  there he went over that again with you; didn't he?

14  A  Not use against me.  He never explained to me

15  that it can be used against me.  He just said that

16  it can be brought up, but not used against me.  And

17  if I knew that you can use it against me why would I

18  take the stand.

19          MR. THOMAS:  Beg the Court's indulgence.

20          THE COURT:  All right.

21          MR. THOMAS:

22          MR. THOMAS:  No further questions.  Thank

23  you.

24          THE COURT:  Anything in redirect?

25          MR. BROOKS:  Nothing further, Judge.

```
 1            THE COURT:  Anything you want to -- you
 2   said you had a question.  Did you have a question
 3   for me?
 4            THE DEFENDANT:  So if my family, mother
 5   and father, paid the 50,000-dollars I can be
 6   released?
 7            THE COURT:  I don't think so.  I mean,
 8   I've got your file here.  I don't think that's what
 9   the statute says.
10            THE DEFENDANT:  Yes, sir.
11            THE COURT:  What happens is, when I come
12   today they hand me a file like that with everything
13   in there, and since yours was a trial I've got the
14   transcript.  I'm going to go back and read it.  I'll
15   take the case under advisement and look at the
16   sentencing sheet, but I don't think that's what the
17   statute -- as a matter of fact, I'm sure that's not
18   what the statute says.  But I'm not going to rule
19   today because I want to read everything in your
20   file.
21            THE DEFENDANT:  Yes, sir.
22            THE COURT:  I take this one seriously.
23            THE DEFENDANT:  Yes, sir, thank you.
24            MR. BROOKS:  Judge, that's it from our
25   side.
```

380

18

```
 1          THE COURT:  Okay.  Thank you, sir.  You
 2   can step down.
 3          All right, yes, sir.
 4          MR. THOMAS:  At this time the State would
 5   call Mr. McKnight.
 6          THE CLERK OF COURT:  Place your left hand
 7   on the Bible, raise your right hand.
 8   WHEREUPON,
 9                    CEZAR MCKNIGHT,
10   having been duly sworn by the Clerk of Court,
11   testified as follows:
12          THE CLERK OF COURT:  Please be seated and
13   spell your name for the record.
14          THE WITNESS:  Cezar McKnight, C-E-Z-A-R
15   M-C-K-N-I-G-H-T.
16   BY MR. THOMAS:
17   Q  Good morning, Mr. McKnight.
18   A  Good morn-- good afternoon.
19   Q  Is it afternoon?
20   A  It is.
21   Q  How long have you been practicing law?
22   A  October will make it 11 years.
23   Q  And do you recall being retained on Mr. Holt's
24   case?
25   A  I do.
```

1    Q  Can you briefly summarize the State's evidence

2    against Mr. Holt?

3    A  From what I can recollect they had some narcotics

4    agents from the Georgetown County Sheriff's Office

5    that had confidential informants who were wired with

6    audio equipment who would go in and make purchases

7    from individuals.  In this specific instance they

8    had an individual named Joe Lewis who went in

9    wearing a wire and audio device that -- and the

10   Sheriff's Office claimed that they checked him for

11   drugs beforehand, gave him some money.  He went in,

12   engaged with Mr. Holt, purchased some narcotics, and

13   then returned to the agents where they took the

14   narcotics into their possession.

15   Q  And did you, when you first got the case did you

16   file the standard Rule 5 and Brady motions?

17   A  I did.

18   Q  And so what kind of evidence did they, did the

19   State give you in response to that?

20   A  Well, first they provided indictments.  There was

21   one two, three, four.  They gave me copies of the

22   warrants which were four, an incident report.  They

23   gave me a property report, a drug report, an arrest

24   report, a SLED drug analysis with a chain of

25   custody, his three year driving record, another

382                                                        20

1    incident report, booking report, photograph of him,
2    another drug analysis, an NCIC warning which is
3    something they do in this circuit that basically
4    says you can't use the information NCIC for any
5    other purpose other than this, and the, and Mr.
6    Holt's NCIC report.
7    Q  And did you have an opportunity to review, sort
8    this evidence with Mr. Holt?
9    A  I'm sorry, I also have — they also gave me
10   copies of the audio from the transactions that they
11   did with Mr. Holt.  Yes, I did review the
12   information with Mr. Holt.
13   Q  And how many times did you get a chance to meet
14   with him before trial?
15   A  I want to say that we met maybe three or four
16   times; but we talked on the telephone extensively
17   because there was an issue as to, of some pictures
18   that I got that were put into evidence that I had to
19   get from him that we did of his residence and the
20   like so we met probably for trial at least three or
21   four times.  I'm not exactly certain.
22   Q  When you met with him did you discuss his version
23   of the facts of the case?
24   A  Yes.
25   Q  And what was his version of things?  What was

21    **383**

1    your — let me rephrase that.  What was your defense

2    theory for this case?

3    A  Well, the defense theory of this case is number

4    one, the CI wasn't reliable.  This is a person that

5    I had knowledge of that had been an extensive user

6    of crack cocaine for years who had been involved in

7    multiple, who'd been arrested and convicted multiple

8    times.  This was just his effort to avoid going to

9    the penitentiary for an extended amount of time.

10    Also, there was an issue that we saw with the

11    indictments and arrest warrants where they didn't

12    have specific days indicated that Mr. Holt, that the

13    purchases were actually there.  So Mr. Holt

14    maintained to me that he at no time sold any

15    narcotics to Mr. Lewis.  And so based upon him

16    stating that he was innocent, not guilty of the

17    offenses, and the obvious inconsistencies with the

18    affidavits and the lack of credibility of the CI,

19    that was basically our theory of the case; that one,

20    the CI wasn't reliable.  He was only in it to save

21    himself.  And also, Mr. Holt's statement that he

22    didn't at all sell narcotics or some of the bases,

23    theory of the case.

24    Q  And did he give you any potential evidence to

25    interviews or leads for investigation?

384

22

```
 1   A  Yes.  Like I said before, there were pictures
 2   because one of the things we were going to do on the
 3   stand was, or one of the things we did from the
 4   stand with the confidential informant was to get him
 5   to testify about the location as to where this
 6   transaction took place.  And there were several
 7   inconsistencies in his statement or in his testimony
 8   about where it took place, and we tried to
 9   illustrate or make hey with those inconsistencies
10   with the pictures that were provided by Mr. Holt.
11   Q  So did you do anything else in terms of
12   investigating the case?
13   A  Yes.  Well, first of all, we had to figure out
14   who the confidential informant was.  I was able to
15   find out who that was beforehand, then necessarily
16   get them to -- I knew who it was before so I --
17   there was a way for me then to figure out, you know,
18   not figure out but I know this guy has been busted
19   several times before.  He's done some stealing and,
20   you know, possession of drugs so then I could
21   prepare for my potential cross-examination of him.
22   And also, I went by the location where this
23   allegedly took place 'cause it happened in Andrews
24   where it took place.  It's a -- it's like, it's not
25   a neighborhood but there's several houses in a
```

```
 1    particular location, several mobile homes, so I had
 2    to look at the layout to make sense of what it is
 3    they were saying.  When I say "they" I mean the
 4    State, what the State was saying took place.
 5  Q  And sort of after you reviewed all this did you
 6    enter into plea negotiations with the State?
 7  A  Yes, I did.
 8  Q  And what kind of offers did they make?
 9  A  They offered, they made us an offer I believe of
10    a sentence of about ten years for Mr. Holt.
11  Q  And did you communicate that offer to him?
12  A  Most certainly I did.
13  Q  And what was his decision in regards to that
14    offer?
15  A  I told him prior to trial, getting ready for
16    trial because that was our sentence, that was our
17    offer.  I said to him, Quentin, that is the offer
18    that they have, I believe it's a good one, I know
19    you don't want to go jail ten years.  And he says,
20    you know, I'm not, I can't go back to SCDC.  So he
21    told me you need to get ready for trial, which is
22    what I started doing.
23  Q  And did you advise him of the, I guess, the
24    benefits of taking the plea versus the risks of
25    going to trial?
```

386

24

```
 1   A  Yes, I did.
 2   Q  And so ultimately whose decision was it to plead
 3   guilty -- or go to trial?
 4   A  It was Mr. Holt's decision against my advice.
 5   Q  Do you feel like you had ample time to prepare
 6   for trial?
 7   A  Yes.
 8   Q  In regards specifically to the indictments, what
 9   was your trial strategy in regards to those?
10   A  Well, the key to the strategy is with the dates
11   on the indictments being so vague it didn't provide
12   to us, and this is -- and I made that motion at
13   trial.  It didn't provide us for grounds for us to
14   solidify our defense.  If they're giving us random
15   days, how then are we able to prepare for trial by
16   possible alibi witness or alibi defenses.  So it was
17   at that time at beginning of trial before we even
18   took any testimony that I asked the Court to
19   consider that, and Judge Culbertson decided that the
20   indictment was specific enough and denied my motion,
21   ordered us on to trial.
22   Q  And then on the day of trial did the State make
23   any motions in regard to the indictment?
24   A  Yes, they did.  They made some motions to amend
25   the indictment.
```

1   Q  And what was your reaction to that?

2   A  That's when I made –– I'm sorry.  That's when I

3   made –– that's when I raised objection to that

4   because it didn't provide us with the specificity

5   that we needed.

6   Q  So there was no pretrial discussion or pretrial

7   motion?

8   A  Well, when you say pretrial do you mean –––

9   Q  I mean prior to date of trial?

10  A  No.

11  Q  Okay.  That's what I was confused about, I

12  apologize.

13  A  No.

14  Q  In regards to the tape of the buy, what was your

15  trial strategy in regards to that?

16  A  The –– there wasn't any clear identification of

17  Mr. Holt.  He doesn't –– on the tape you clearly

18  hear Mr. Lewis refer to somebody as Volley (ph).  He

19  never says Quentin or Holt so our strategy was who's

20  Volley.  We don't know who that is, we have no idea

21  who that is.  And unless you've got some concrete

22  proof as to whom Volley is, you don't have Mr. Holt.

23  Q  Did you challenge the introduction of the tape at

24  trial?

25  A  I did.

388

1  Q  What was the outcome of that?

2  A  The judge overruled my objection.

3  Q  Do you remember what your grounds of your

4  objection were?

5  A  Can you give me just a second.

6          THE COURT:  Okay, take your time.

7          THE WITNESS:  I believe my objection was

8  based upon the lack of identification as to who the

9  person was, that it shouldn't come into evidence

10  because it's prejudicial in nature, outweighs its

11  probative value.

12  BY MR. THOMAS:

13  Q  And what was Judge Culbertson's ruling on that

14  motion?

15  A  He overruled my objection and let it in over my

16  objection.

17          MR. THOMAS:  Beg the Court's indulgence

18  one second.

19          Thank you, Mr. McKnight, I'm gonna let you

20  answer any questions Mr. Brooks has.

21              **C R O S S - E X A M I N A T I O N**

22  BY MR. BROOKS:

23  Q  Mr. McKnight, do you recall ever putting that

24  offer on the record during the trial or prior to the

25  trial commencing?

```
 1    A  If you mean put on the record as in open court,
 2    no, sir, we didn't put on — I don't believe I put
 3    it on the record.  No, sir, I did not.
 4    Q  Okay, all right.  And it's your position that you
 5    did explain the potential likelihood of conviction
 6    to Mr. Holt?
 7    A  Yes.  When I communicate with my clients it's a
 8    rather casual nature.  A lot of my clients I know,
 9    and so I have to — I explain to them that some
10    venues there's some things which I like to call
11    there's some magic I can work and some magic that I
12    cannot work.  When I come over to, when we're in the
13    venue of Georgetown County where I'm not as familiar
14    with the people who are gonna compose the jury and a
15    lot of them come from very conservative backgrounds,
16    particularly if they're on the other side of Winyah
17    Bay, they tend to be retired law enforcement,
18    whatever.  And so they have — the credibility
19    issues of a person like Mr. Holt — and I'm not
20    suggesting anything negative about him, I think he's
21    a good person.  But it's a lot eas— it's harder to
22    convince them that law enforcement is just, you
23    know, grabbing crack heads off the street and using
24    them and twisting them to grab anybody they can.
25    And that coupled with the fact that he had the
```

390

1   record that he has, it makes it harder.  A juror

2   here who lots of them never come in contact with

3   anybody that's ever been arrested so when they hear

4   that a particular person has a prior conviction for

5   something, particularly that offense that we're

6   there, a lot of them tend to just close out anything

7   else, you know, assuming, well, he's done it once

8   before.  And I drive that point home to them and let

9   them know.  And the phrase that I always use when

10  I'm telling clients about trial, if we go to trial,

11  if we win we win big; but if we lose, we lose big.

12  And at the end of the day I'm gonna go home and

13  you're not, so we need to really think about what

14  we're doing.  And I, I say that -- vary rare all day

15  that I talk to someone who is charged with a crime

16  that they're going to trial.

17  Q  It's your testimony that you relayed that to

18  Mr. Holt?

19  A  In that same way.

20  Q  Did you explain to him that if he took the stand

21  that his record was going to come in?

22  A  Yes, sir, I told him that because if he -- and

23  again, because you just do it so much it becomes

24  routine.  I sat down and I also told him.  I said,

25  look, your record is going to come in and I even

```
 1   went over the NCIC report with him like, this is
 2   gonna come in, that's gonna come in.  And a lot of
 3   times — and you can tell by the testimony — I try
 4   to steal their thunder meaning that I try to bring
 5   it out before the prosecution brings it out so it
 6   wouldn't have such a big sting because I knew -- and
 7   I communicated that fact to him -- that it was going
 8   to be a major blow to our case.
 9   Q  Did you ask for any type of reconsideration of
10   the sentence at the conclusion of the case?
11   A  Yes, I asked the judge to set aside the verdict.
12   Q  No, no, I mean, reconsider once he was sentenced?
13   A  Oh.
14   Q  Twenty-five years?
15   A  I do not believe that I did.  I don't believe I
16   did.
17   Q  Okay.
18   A  No, sir.
19   Q  And you did make a motion in regards to the
20   changing of the dates ——
21   A  Yes.
22   Q  ——of the indictment?
23   A  Yes, I did.
24          MR. BROOKS:  Beg the Court's indulgence,
25   Your Honor.
```

**392**

```
1              THE COURT:  Yes, sir.
2              MR. BROOKS:  No other questions.
3              THE COURT:  Okay.  Thank you, sir.  You
4  can step down.
5              THE WITNESS:  Yes, sir.
6              THE COURT:  Can he be released from the
7  subpoena?
8              MR. THOMAS:  Absolutely, Your Honor.
9              THE COURT:  Okay, you're released.  Thanks
10 for waiting.
11             THE WITNESS:  Yes, sir.
12             MR. THOMAS:  That's the State's case, Your
13 Honor.
14             THE COURT:  Okay.  I haven't looked at
15 this sentencing sheet and this is, this would, the
16 judge -- the way they got these, it does say "or";
17 the statute obviously doesn't.  The interesting
18 thing is he filled it in, fine may be paid in full.
19             MR. BROOKS:  It look like if he paid the
20 fifty grand he'd go home, right, Judge.
21             THE COURT:  It does to me.  I know that
22 we'd all go to jail if he did.
23             MR. MCKNIGHT:  Your Honor, if I may, we
24 did have a conversation about that, about the
25 sentencing sheet and about the penalty that was
```

1    imposed.  And from my understanding 'cause it was
2    unusual to me, Judge Culbertson made it seem as if
3    he could pay the 50,000-dollars and get out 'cause
4    we talked about that.
5              THE COURT:  Really?
6              MR. MCKNIGHT:  Yes, sir, that did happen.
7    That did.
8              MR. BROOKS:  Judge, that's the way the
9    sentencing sheet looks; doesn't it?
10              THE COURT:  That's the way it looks.  I --
11    unless any of y'all object I may talk to Judge
12    Culbertson about that.  I don't know, I mean, these
13    sentencing sheets -- and I don't know, when was this
14    case?
15              MR. MCKNIGHT:  2010.
16              THE COURT:  So he's been around for a
17    while.  When I first started twelve years ago, you
18    know, my sentencing sheets looked like my children's
19    fingerpaint 'cause I was writing all over them.  But
20    yea, it does look like that.  And you're saying that
21    he said, he said that that was his intention?
22              MR. MCKNIGHT:  Yes, sir, Your Honor,
23    that's what he led me to believe.
24              THE COURT:  Okay.
25              MR. THOMAS:  And Your Honor, that's what

32

**394**

```
 1   the record appears -- the Court appears to say 25
 2   years or pay a fine but.
 3           THE COURT:  That's what the statute says,
 4   or pay a fine?
 5           MR. THOMAS:  I believe the statute says
 6   and.
 7           THE COURT:  I thought ---
 8           MR. THOMAS:  It's a mandatory ---
 9           THE COURT:  Yeah, I think it's "and" in
10   the statute and ---
11           MR. BROOKS:  Judge, he puts in the
12   transcript 25 or pay a fine in the amount of 50,000
13   basically what Mr. McKnight says.
14           THE COURT:  Yea, I just, I'm just
15   wondering if -- I mean, the statue says "and" I feel
16   certain.  I haven't read it in a while but.
17           MR. BROOKS:  And Judge, just for putting
18   on the record our position would be that the
19   sentencing sheet is the law in this case as opposed
20   to the statute.
21           MR. MCKNIGHT:  And Your Honor, from
22   talking with learned counsel it's my understanding
23   that that's his sentence; they can't amend it now.
24           MR. THOMAS:  And, Your Honor, I would just
25   say this is a moot point because the fine has not
```

```
 1   been paid.  If he pays his fine and SCDC still
 2   refuses to release him we'll be happy to address
 3   that matter.
 4         MR. BROOKS:  I'll tell my client once he
 5   and his family pays the fifty grand and whatever the
 6   fine is —— 'cause I know with the Clerk of Court,
 7   they add all these charges and stuff.  So if he pays
 8   the fine, whatever the fine is, and he tells me he's
 9   paid it ——
10         THE COURT:  Well, don't quote me on that.
11   I'm just saying that reading this if — I mean,
12   look, the fine would end up being a hundred thousand
13   by the time you add everything to it, or more.
14         MR. BROOKS:  And if he pays it, Judge?
15         THE COURT:  I just, you know, this is,
16   quite frankly, as much as interesting as that is and
17   y'all just give me a little time to check on it.  It
18   is most likely a scrivener's error; but if they talk
19   about it back, I mean, you know.  I've seen judges
20   order people to be castrated before or go to jail.
21   I was there when that happened in Anderson 22 years
22   ago so that didn't go too well.
23         All right, let me look through the record
24   and I'll take it under advisement.  I mean, I've
25   done that with all of them, and I do that 'cause I
```

396

34

```
 1   do take these seriously and I want to read it.  This

 2   one is going to take me a little longer.

 3           MR. BROOKS:  That's fine.  Thank you,

 4   Judge.

 5           THE COURT:  Thank y'all.

 6

 7

 8

 9

10     * * * END OF REQUESTED TRANSCRIPT OF RECORD * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

35

397

# CERTIFICATE OF REPORTER

STATE OF SOUTH CAROLINA)
                        )
COUNTY OF FLORENCE      )

       I, FRANCES BAKIS-RAY, Registered Professional Reporter (RPR), court reporter for the State of South Carolina, Twelfth Judicial Circuit, do hereby certify that the foregoing proceeding is a stenographic report and was transcribed through computer-aided transcription; that the foregoing transcript contains a true record of the proceedings.

       I further certify that I am neither counsel for, nor related to nor employed by any of the parties connected to the action, nor am I financially interested in the action.

       Witness my hand at Florence, South Carolina, this 20th day of June, 2014.


_____

FRANCES BAKIS-RAY, RPR

398

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
COUNTY OF GEORGETOWN ) FOR THE FIFTEENTH JUDICIAL CIRCUIT

Quintin J. Holt, #268198, ) Case No. 2012-CP-22-735
)
Applicant, )
)
v. ) **ORDER OF DISMISSAL**
)
State of South Carolina, )
)
Respondent. )
_____ )

FILED
GEORGETOWN COUNTY, S.C.
2014 FEB 21 AM 11: 21
ALMA Y. WHITE
CLERK OF COURT

      This matter comes before the Court by way of an Application for Post-Conviction Relief (PCR) filed July 11, 2012.  Respondent made its Return on or about October 8, 2012, and its amended return on or about August 20, 2013.  The Court convened an evidentiary hearing into the matter on August 29, 2013, at the Georgetown County Courthouse.  Applicant was present at the hearing and represented by Charles T. Brooks, III, Esquire.  Joshua L. Thomas, Esquire, of the South Carolina Attorney General's Office, represented Respondent.

      Applicant testified on his own behalf at the PCR hearing.  Applicant's trial counsel, Cezar E. McKnight, Esquire, also testified.  The Court had before it a copy of the trial transcript, the records of the Georgetown County Clerk of Court, Applicant's records from the South Carolina Department of Corrections, the application for post-conviction relief, and the amended return.  The Court finds as follows:

## I. PROCEDURAL HISTORY

      Applicant is presently confined in the South Carolina Department of Corrections pursuant to orders of commitment of the Georgetown County Clerk of Court.  The Georgetown County Grand Jury indicted Applicant in February 2010 for two counts of distribution of cocaine base,

third offense (2010-GS-22-179 and 2010-GS-22-181). Cezar E. McKnight, Esquire ("trial counsel"), represented Applicant on the charges. On September 20-22, 2010, Applicant stood trial before the Honorable Benjamin H. Culbertson and a jury. The jury found Applicant guilty as indicted. On each charge, Judge Culbertson sentenced Applicant to concurrent terms of confinement for a period of twenty-five (25) years or a fine or $50,000.

Applicant filed a timely notice of appeal and Tristan M. Shaffer of the South Carolina Office of Appellate Defense perfected the appeal. The South Carolina Court of Appeals affirmed the conviction in an unpublished opinion on April 25, 2012. State v. Holt, Op No. 2012-UP-253 (S.C. Ct. App. filed April 25, 2012). The remittitur was returned to the circuit court on May 15, 2012.

## II. ALLEGATIONS

In his application, Applicant alleges he is being held in custody unlawfully for the following reasons:

1. "See attached Amended PCR"

In a subsequently filed amendment, Applicant alleges that he is being held in custody unlawfully for the following reasons:

1. "[H]is convictions …Were Constructive Amended."
2. "[T]he Chain of Custody Link have been broken."
3. "[T]he Trial Court was without any jurisdiction to entertain indictment(s) of an greater sentence/offense."
4. "Applicant was denied effective assistance of Trial Counsel."
5. "[T]here was no chain of custody … from (C.I.) to Deputy Grant."
6. "Applicant was denied discovery of Grand Jury Impanelment Documents."
7. "Prosecutorial Misconduct, where Trial Counsel was ineffective for failing to object to the Solicitor's Closing Arguments."
8. "Denial of sixth Amendment to the United States Constitution."

Page 2 of 8

400

In a second amendment, Applicant further alleges:

1. "Counsel was ineffective by his failure to do reasonable investigation and move to suppress communications that was unlawfully intercepted…"
2. "Appellate counsel was ineffective by failing to raise amending the indictments before the South Carolina Appellate Court."

At the PCR hearing, the Applicant proceeded on only the allegations of ineffective assistance of trial counsel for failure to challenge the indictments, failure to challenge the introduction of a recording, failure to advise, and failure to investigate. Applicant also alleged he received an illegal sentence because Judge Culbertson sentenced him to imprisonment *OR* a fine, whereas the statute requires imprisonment *AND* a fine.

## III. SUMMARY OF TESTIMONY

Applicant testified he was not aware of how much time he could potentially serve if convicted. He testified he rejected the State's ten (10) year offer because trial counsel advised Applicant the State did not have a strong case. He further testified trial counsel should have investigated whether the police had a warrant to intercept the audio from the confidential informant who purchased drugs from Applicant. Applicant testified he was not aware his prior drug crimes would be placed before the jury if he testified. He further testified he would not have taken the stand had he been advised the jury would hear of his prior record. Applicant also testified the indictments in his case stated the incorrect dates on which he sold drugs to the confidential informant. Finally, Applicant testified he received an illegal sentence because the trial judge sentenced him to twenty-five (25) years *OR* a fine of $50,000 dollars.

Trial counsel testified he met with Applicant three (3) or four (4) times after being retained. He further testified he filed discovery motions and discussed the State's responses to

those motions with Applicant.  The State's evidence consisted of police reports, chemical analyses, and an audio recording of a drug buy.  Trial counsel testified the only defenses he had to the charge were challenges to the sufficiency of the indictment and to the confidential informant's credibility.  Trial counsel's investigation involved reviewing the informant's case file and visiting the location where the drug buy was alleged to have happened.  Trial counsel testified he advised Applicant of the potential sentences.  Trial counsel further testified he negotiated a ten (10) year deal with the State, but Applicant rejected the offer.  Trial counsel testified he discussed with Applicant the risks of trial versus the benefits of accepting the plea. He further testified he explained to Applicant that his prior record would come into play if he testified at trial.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has reviewed the record in its entirety and has heard the testimony and arguments presented at the PCR hearing.  This Court has further had the opportunity to observe each witness who testified at the hearing, and to closely pass upon their credibility.  This Court has weighed the testimony accordingly.  Set forth below are the relevant findings of fact and conclusions of law as required by S.C. Code Ann. § 17-27-80 (2003).

### A. Ineffective Assistance of Trial Counsel

In a post-conviction relief action, the applicant bears the burden of proving the allegations in his application.  Butler v. State, 286 S.C. 441, 442, 334 S.E.2d 813, 814 (1985) (citing Griffin v. Martin, 278 S.C. 620, 300 S.E.2d 482 (1983)).  Where the application alleges ineffective assistance of counsel as a ground for relief, the applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be

402

relied upon as having produced a just result." Id. at 442, 334 S.E.2d at 814 (citing Strickland v. Washington, 466 U.S. 668 (1984)).

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Id. (citing Strickland, 466 U.S. at 687; Turner v. Bass, 753 F.2d 342 (4th Cir. 1985); Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977)). Courts presume counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id. (citing Strickland, 466 U.S. at 690). The applicant must overcome this presumption in order to receive relief. Cherry v. State, 300 S.C. 115, 118, 386 S.E.2d 624, 625 (1989).

Courts use a two-pronged test in evaluating allegations of ineffective assistance of counsel. Id. at 117, 386 S.E.2d at 625. First, the applicant must prove that counsel's performance was deficient. Id. Under this prong, courts measure an attorney's performance by its "reasonableness under prevailing professional norms." Id. (citing Strickland, 466 U.S. at 688). Second, any deficient performance must have prejudiced the applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 117-18, 386 S.E.2d at 625.

The Court finds Applicant failed to meet his burden of proof regarding his allegation of ineffective assistance of trial counsel. The Court finds Applicant's testimony regarding trial counsel's ineffectiveness to be not credible; accordingly, the Court finds trial counsel's testimony very credible. The Court further finds trial counsel adequately conferred with Applicant, conducted a proper investigation, and was thoroughly competent in his representation.

Page 5 of 8

Specifically, the Court finds trial counsel advised Applicant of the nature of the charges, the maximum penalty, and any available defenses.

Applicant's allegation trial counsel failed to investigate the case is without merit. Failure to conduct an independent investigation is not *per se* ineffective assistance of counsel, especially where an investigation would not have uncovered any helpful information. See Moorehead v. State, 329 S.C. 329, 334, 496 S.E.2d 415, 417 (1998). Here, Applicant has not presented any evidence of what a further investigation would have uncovered. Further, trial counsel's investigation was proper in light of his defense strategy of attempting to discredit the confidential informant. See Stokes v. State, 308 S.C. 546, 548, 419 S.E.2d 778, 779 (1992) ("Where, as here, counsel articulates a valid reason for employing certain strategy, such conduct will not be deemed ineffective assistance of counsel." (citing Whitehead v. State, 308 S.C. 119, 417 S.E.2d 529 (1992))).

Applicant's allegations trial counsel failed to challenge the indictment and failed to challenge the introduction of the recording of the crime is wholly unsupported by the record. Trial counsel challenged the State's attempt to amend the indictment. (Trial Tr. 36:1). Inherent in his argument is a challenge to the sufficiency of the indictments for failing to include the correct dates on which the crime occurred. Likewise, trial counsel objected to the introduction of the recording. (Trial Tr. 103:24).

Furthermore, Applicant's allegation he would not have testified had he been informed his prior record would be presented to the jury is unsupported by the record. Applicant was twice informed he would be subject to cross examination regarding his prior record. (Trial Tr. 186:32, 191:6). The Court finds credible trial counsel's testimony he advised Applicant of the risks of

404

testifying.  Regardless, the colloquy with the trial judge regarding Applicant's right to remain silent should have driven this point home to him.  See Wolfe v. State, 326 S.C. 158, 164, 485 S.E.2d 367, 370 (1997).

### B. Illegal Sentence

Finally, the Court finds Applicant is not serving an illegal sentence.  A sentence is not illegal as long as it is "within the limits of the punishment prescribed by statute and conformable to the gravity of the offense."  Willis v. Leeke, 255 S.C. 230, 236, 178 S.E.2d 251, 254 (1970). Applicant was convicted of distribution of cocaine base, third offense, which is punishable by a fine or imprisonment, or both.  S.C. Code Ann. § 44-53-375(B)(3) ("[F]or a third or subsequent offense … the offender must be imprisoned for not less than ten years nor more than thirty years, or fined not more than fifty thousand dollars, or both.").  Therefore, Judge Culbertson's sentence was well within the limits prescribed by law.  Furthermore, Applicant testified he has made no attempt to pay the $50,000 fine.  Therefore, he cannot complain he is being held in violation of the court's sentence.

### C. All Other Allegations

As to any and all allegations that were raised in the application or at the hearing in this matter and not specifically addressed in this Order, the Court finds Applicant failed to present sufficient evidence regarding such allegations.  Accordingly, the Court finds Applicant has abandoned any such allegations.

## V. CONCLUSION

Based on the foregoing, the Court finds and concludes that Applicant has not established any constitutional violations or deprivations that would require this Court to grant his

application.  Therefore, this application for post-conviction relief must be denied and dismissed with prejudice.

The Court notes that Applicant must file and serve a notice of appeal within thirty (30) days from the receipt by counsel of written notice of entry of judgment to secure the appropriate appellate review.  See Rule 203, SCACR.  Pursuant to Austin v. State, 305 S.C. 453 (1991), an applicant has a right to an appellate counsel's assistance in seeking review of the denial of post-conviction relief.  Rule 71.1(g), SCRCP, provides that if the applicant wishes to seek appellate review, post-conviction relief counsel must serve and file a notice of appeal on the applicant's behalf.  Applicant is directed to South Carolina Appellate Court Rule 243 for appropriate procedures for appeal.

**IT IS THEREFORE ORDERED THAT:**

1.  The Application for Post-Conviction Relief is denied and dismissed with prejudice; and

2.  The Applicant must be remanded to the custody of the Respondent.


**AND IT IS SO ORDERED** this ___30___ day of ___January___, 20_14_.



_____
THE HONORABLE J. CORDELL MADDOX, JR.
Presiding Judge


___Anderson___, South Carolina

Page **8** of **8**

406

DOCKET NO. _____ 2010GS2200179x

# The State of South Carolina

## County of Georgetown

09G01040

## COURT OF GENERAL SESSIONS

## FEBRUARY, 2010 TERM

### WITNESSES

Georgetown County Sheriff's Office

Scott R. Hibson

## THE STATE

### vs.

**QUENTIN J HOLT**
Andrews, SC 29510
DOB:
SSN:
B/M



ATTORNEY: Colvin, Richard F.

Indictment for

## DISTRIBUTION OF COCAINE BASE

J. Gregory Hembree, Solicitor

—ARREST WARRANT NUMBER
J513626
CDR: 3039   §44-53-0375 (B) (3)
DOI: June 14, 2009

### ACTION OF GRAND JURY

—reperson of Grand Jury
Date: 2·10·10

TRUE BILL

### VERDICT

Guilty

Foreperson of Petit Jury
Date:

{

STATE OF SOUTH CAROLINA    )
                           )         INDICTMENT
COUNTY OF GEORGETOWN       )

At a Court of General Sessions, convened on February 10, 2010, the Grand Jurors of Georgetown County present upon their oath:

### DISTRIBUTION OF COCAINE BASE

CDR: 3039 44-53-0375(B)(3)

That Quentin J Holt did in Georgetown County, on or about June 20 (PWC), 2009, distribute, dispense or deliver, or did aid, abet, attempt or conspire to distribute, dispense or deliver a quantity of Cocaine Base, a controlled substance under provisions of Section 44-53-110, et. seq., Code of Laws of South Carolina, 1976, as amended, such distribution not having been authorized by law, and being in violation of Section 44-53-375(B), S. C. Code of Laws, 1976, as amended.

Against the peace and dignity of the State, and contrary to the statute in such case made and provided.

J. GREGORY HEMBREE
FIFTEENTH CIRCUIT SOLICITOR

408

**WITNESSES**

Georgetown County Sheriff's Office

Scott R. Husson

---

DOCKET NO. _____ 2010GS2200181_

# The State of South Carolina

## County of Georgetown

**COURT OF GENERAL SESSIONS**

**FEBRUARY, 2010 TERM**

09G01040

---

~~REST WARRANT NUMBER

J513630
CDR: 3039   §44-53-0375 (B) (3)
DOI: June 15, 2009

**ACTION OF GRAND JURY**



~~erson of Grand Jury
Date: 2-10-10

**VERDICT**
*Guilty*

*Foreperson of Petit Jury*
*Date:*

---

THE STATE

vs.

**QUENTIN J HOLT**
Andrews, SC 29510
DOB:
SSN:
B/M

ATTORNEY: Colvin, Richard F.

Indictment for

## DISTRIBUTION OF COCAINE BASE

J. Gregory Hembree, Solicitor

STATE OF SOUTH CAROLINA    )
                          )         INDICTMENT
COUNTY OF GEORGETOWN       )

At a Court of General Sessions, convened on February 10, 2010, the Grand Jurors of Georgetown County present upon their oath:

### DISTRIBUTION OF COCAINE BASE

CDR:   3039 44-53-0375(B)(3)

That Quentin J Holt did in Georgetown County, on or about June 18, 2009, distribute, dispense or deliver, or did aid, abet, attempt or conspire to distribute, dispense or deliver a quantity of Cocaine Base, a controlled substance under provisions of Section 44-53-110, et. seq., Code of Laws of South Carolina, 1976, as amended, such distribution not having been authorized by law, and being in violation of Section 44-53-375(B), S. C. Code of Laws, 1976, as amended.

Against the peace and dignity of the State, and contrary to the statute in such case made and provided.

J. GREGORY HEMBREE
FIFTEENTH CIRCUIT SOLICITOR